1  RUSSELL J. FRACKMAN (State Bar No. 49087)
   PATRICIA H. BENSON (State Bar No. 60656)
2  STEVEN B. FABRIZIO (*pro hac vice*)
   MITCHELL SILBERBERG & KNUPP LLP
3  11377 West Olympic Boulevard
   Los Angeles, CA  90064-1683
4  Telephone:  (310) 312-2000
   Facsimile:  (310) 312-3100
5
   Attorneys for Defendants and Counterclaimants
6

7

8                       UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                         SAN FRANCISCO DIVISION

11

12
   321 STUDIOS, also known as 321 Studio,    Case No.: C-02-1955 SI
13 LLC,

14              Plaintiff,                    **NOTICE OF MOTION AND MOTION
                                             OF DEFENDANTS AND
15      v.                                   COUNTERCLAIMANTS FOR PARTIAL
                                             SUMMARY JUDGMENT**
16 METRO-GOLDWYN-MAYER STUDIOS
   INC.; TRISTAR PICTURES, INC.;
17 COLUMBIA PICTURES INDUSTRIES,             Date: Friday, February 28, 2003
   INC.; SONY PICTURES                       Time: 9:00 a.m.
18 ENTERTAINMENT, INC.; TIME                 Courtroom: 10, 19th Floor
   WARNER ENTERTAINMENT CO. L.P.;
19 DISNEY ENTERPRISES, INC.;                 Judge: The Honorable Susan Illston
   UNIVERSAL CITY STUDIOS, INC.; and
20 THE SAUL ZAENTZ COMPANY,

21              Defendants.

22
   METRO-GOLDWYN-MAYER STUDIOS
23 INC.; TRISTAR PICTURES, INC.;
   COLUMBIA PICTURES INDUSTRIES,
24 INC.;TIME WARNER ENTERTAINMENT
   COMPANY, L.P.; DISNEY ENTERPRISES,
25 INC.; THE SAUL ZAENTZ COMPANY;
   and UNIVERSAL CITY STUDIOS LLLP,
26 formerly known as UNIVERSAL CITY
   STUDIOS, INC.
27
                Counterclaimants,
28

                                            1

1    v.

2    321 STUDIOS, also known as 321 Studio,
LLC,; ROBERT MOORE, an individual;

3    ROBERT SEMAAN, an individual; and
VICTOR MATTISON, an individual,

4

              Counterclaim Defendants.

5

6

7    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

8

9       **PLEASE TAKE NOTICE** that on February 28, 2003 at 9:00 a.m., or as soon thereafter

10   as the matter may be heard before the Honorable Susan Illston, United States District Judge, in

11   Courtroom 10 on the 19th Floor, 450 Golden Gate Avenue, San Francisco, California.

12   Defendants and Counterclaimants Metro Goldwyn-Mayer Studios Inc., TriStar Pictures, Inc.,

13   Columbia Pictures Industries, Inc., Sony Pictures Entertainment Inc., Time Warner

14   Entertainment Co. L.P., Disney Enterprises, Inc., Universal City Studios LLLP, formerly known

15   as Universal City Studios, Inc., and The Saul Zaentz Company ("the Studios") will and hereby

16   do move for summary adjudication in favor of the Studios and against Plaintiff/Counterclaim

17   Defendant 321 Studios ("321") on 321's First Claim (Declaratory Relief under the DMCA, 17

18   U.S.C. Section 1201 *et seq.*), for summary adjudication that 321 is liable on the Studio's

19   Counterclaim (violation of the DMCA, 17 U.S.C. § 1201), and for an order dismissing as moot

20   321's Second Claim (Declaratory Relief, Direct, Vicarious or Contributory Infringement, [1]7

21   U.S.C. Section 101 *et seq.*).

22

23       The Studios seek an order adjudicating (1) that 321 is not entitled to a declaratory

24   judgment that its products DVD Copy Plus and DVD-X Copy are legal under 17 U.S.C. § 1201

25   and is not entitled to a declaratory judgment that the DMCA is invalid or unconstitutional, (2)

26   that 321 is liable for violation of Section 17 U.S.C., and (3) dismissing 321's Second Claim for

27   Relief as moot.

28

Mitchell Silberberg &
Knupp LLP

0487574.DOC

1       This Motion is based on this Notice of Motion and Motion, the Memorandum of Points

2   and Authorities and Declarations of Robert W. Schumann and Marc E. Mayer served and filed

3   concurrently herewith, on the pleadings and records on file in this action, and on such other

4   argument and evidence as may be presented to this Court at or before the hearing on this

5   Motion.

6

7   DATED: January 10, 2003

8                                           RUSSELL J. FRACKMAN
                                        PATRICIA H. BENSON

9                                           STEVEN B. FABRIZIO
                                        MITCHELL SILBERBERG & KNUPP LLP

10

11                              By:     _____

12                                      Russell J. Frackman
                                   Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell Silberberg &
Knupp LLP

0487574.DOC

MOTION FOR PARTIAL SUMMARY JUDGMENT;  C-02-1955 SI

1

## **TABLE OF CONTENTS**

2

**Page**

3   I.    STATEMENT OF THE ISSUES .................................................................................. 2

4   II.   STATEMENT OF UNDISPUTED BACKGROUND FACTS .......................................... 2

5         A.    The Studios and DVD Technology .............................................................. 2

6         B.    "CSS" And DVD Anti-Piracy Technology .................................................. 3

7         C.    The DMCA Anti-Circumvention Provisions .............................................. 5

8         D.    "DeCSS" and the *Corley* Litigation ......................................................... 6

9         E.    321 and The DVD Circumvention Software .............................................. 7

10        F.    321's Admissions That Its Software Circumvents CSS Technology .......... 8

11        G.    The Current Litigation ................................................................................ 9

12        H.    The Elcom Litigation ................................................................................ 10

13  III.  THE LEGAL STANDARD ...................................................................................... 10

14  IV.   321 IS LIABLE UNDER THE ANTI-CIRCUMVENTION PROVISIONS OF THE

15        DMCA .................................................................................................................. 11

16  V.    THE ANTI-CIRCUMVENTION PROVISIONS OF THE DMCA ARE NOT INVALID

17        OR UNCONSTITUTIONAL .................................................................................... 15

18        A.    Congress Did Not Exceed Its Constitutional Power in Enacting the DMCA ....... 16

19        B.    The DMCA Does Not Conflict With Or Otherwise Eliminate Fair Use ............. 18

20        C.    Section 1201 Does Not Violate the First Amendment .......................................... 20

21              1.    The DMCA Is Content-Neutral ................................................................ 20

22              2.    The DMCA Promotes Substantial Governmental Interests And Is Tailored

23                    To Further Those Interests ........................................................................ 22

24        D.    Section 1201 Is Not Unconstitutionally Vague ..................................................... 23

25  VI.   321 SHOULD BE ENJOINED FROM MANUFACTURING, DISTRIBUTING, OR

26        OTHERWISE TRAFFICKING IN THE DVD CIRCUMVENTION SOFTWARE ....... 24

27  CONCLUSION ................................................................................................................ 25

28

i

Mitchell Silberberg &
Knupp LLP

0487574.DOC

# TABLE OF AUTHORITIES

**Page**

## CASES

Celotex Corp. v. Catrett,
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).....................................................10

Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.,
    896 F.2d 1542 (9th Cir. 1990) ..................................................................................................2

Posters 'N' Things, Ltd. v. United States,
    511 U.S. 513 (1994)...................................................................................................................24

Preiser v. Newkirk,
    422 U.S. 395 (1975)....................................................................................................................2

RealNetworks, Inc. v. Streambox, Inc.,
    Case No. 2:99-CV-02070, 2000 WL 127311 (W.D. Wash., Jan. 18, 2000)...............13, 14

Richmond Boro Gun Club, Inc. v. City of New York,
    97 F.3d 681 (2d Cir. 1996)........................................................................................................24

Sable Communications of California, Inc. v. FCC,
    492 U.S. 115 (1989)...................................................................................................................20

Sony Computer Entertainment America Inc. v. GameMasters,
    87 F. Supp. 2d 976 (N.D. Cal. 1999) .......................................................................................14

Turner Broad. System, Inc., v. FCC,
    520 U.S. 180 (1997)...................................................................................................................18

Turner Broadcasting System, Inc. v. FCC,
    512 U.S. 622 (1994)............................................................................................................20, 22

U.S. v. Lopez,
    514 U.S. 549 (1995)............................................................................................................17, 18

United States v. Elcom, Ltd.,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002).............2, 10, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24

United States v. Moghadam,
    175 F.3d 1269 (11th Cir. 1999) .........................................................................................17, 18

Universal City Studios, Inc. v. Corley,
    273 F.3d 429 (2d Cir. 2001)...........................................1, 5, 6, 7, 8, 16, 19, 20, 21, 22, 23

Universal City Studios, Inc. v. Reimerdes,
    82 F. Supp. 2d 211 (S.D.N.Y. 2000).......................1, 3, 4, 6, 7, 8, 12, 13, 14, 15, 21, 24, 25

ii

Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,
     455 U.S. 489 (1982)..............................................................................................24

Woods v. Cloyd W. Miller Co.,
     333 U.S. 138 (1948)..............................................................................................18

## STATUTES

17 U.S.C. §106.............................................................................................................13

17 U.S.C. §107 ............................................................................................................15

17 U.S.C. § 1201 et seq...............................1, 5, 6, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 23, 24

18 U.S.C. § 2319A.......................................................................................................17

37 CFR Part 201, 65 Fed. Reg. 64556-01, at 64561 ..................................15, 19, 20, 25

47 U.S.C. § 553(a)(2)..................................................................................................16

## MISCELLANEOUS

H.R. Rep. No. 105-551(I), at 17 (1998) .......................................................................11

S. Rep. No. 105-190, at 10 (1998) ................................................5, 6, 12, 16, 18, 23

I. Ballon, E-Commerce and Internet Law (2001) ........................................................15

M. & D. Nimmer, Nimmer On Copyright (2001)....................................................5, 11

Mitchell Silberberg &
Knupp LLP

0487574.DOC

1

**Introductory Statement**

2    The action filed by Plaintiff/Counterclaim Defendant 321 Studios, LLC. ("321") is the

3  most recent in a series of unsuccessful challenges to the anti-circumvention provisions of the

4  Digital Millennium Copyright Act ("DMCA").  The DMCA expressly and unambiguously

5  prohibits trafficking in "any technology, or product…or part thereof," that primarily is designed

6  to circumvent any access-control or other technological measures implemented by a copyright

7  holder to protect its rights in its copyrighted works, including the exclusive right to copy.  17

8  U.S.C. §§1201(a) and 1201(b).  In violation of the DMCA, 321 is trafficking in software

9  designed *expressly* to circumvent the access-control and copy-prevention system incorporated

10  into the DVDs containing copyrighted motion pictures that are commercially released by

11  Defendants/Counterclaimants (the "Studios").

12    In its claim for declaratory relief, 321 concedes that the software it distributes is designed

13  to permit the copying of the Studios' encrypted copyrighted motion pictures on DVDs.  FAC ¶¶

14  1, 23, 26, 28, 29.  By that concession, 321 necessarily admits that its software is designed to

15  circumvent the encryption protection embedded in those DVDs. Thus, *the* material fact

16  necessary to decide both 321's challenge to section 1201 and the Studios' counterclaim for

17  violation of section 1201 is undisputed.  No discovery on this dispositive issue is necessary.

18  Therefore, in the interests of economy and efficiency, the Studios move for summary

19  adjudication of 321's First Claim for Declaratory Relief Under the DMCA and of the Studios'

20  Counterclaim for violation of section 1201.

21    The legal issues involved – the validity and applicability of the DMCA – previously have

22  been analyzed and decided in two cases.  321, which is based in Missouri, filed this declaratory

23  relief action after the Second Circuit, affirming the District Court's judgment in a lawsuit brought

24  by most of the same motion picture studios that are Defendants and Counterclaimants in this

25  case, had flatly rejected, in a highly-publicized opinion, the precise arguments 321 advances

26  here.  Universal City Studios, Inc. v. Corley, 273 F.3d 429 (2d Cir. 2001), aff'g, Universal City

27  Studios, Inc. v. Reimerdes, 111 F. Supp.2d 294 (S.D.N.Y. 2000).  Forum shopping in no way has

28  improved 321's arguments, however.  After this case was filed, a third court, in this district, also

1

1    rejected the same Constitutional challenges that 321 raises here.  United States v. Elcom, Ltd.,

2    203 F. Supp.2d 1111 (N.D. Cal. 2002) (Whyte, J.)

3    If the Court determines that 321's products violate the anti-circumvention provisions of

4    the DMCA, then 321 must stop distributing those products (and will be liable for damages).

5    Therefore, there will not be any current, judiciable controversy as to whether, by selling its

6    circumvention products, 321 also is liable for copyright infringement – which is the issue raised

7    in 321's Second Claim for Declaratory Relief – and that claim will be moot.  Hal Roach Studios,

8    Inc. v. Richard Feiner and Co., Inc., 896 F.2d 1542, 1555-56 (9th Cir. 1990) (request for

9    declaration of non-infringement presents an actual case or controversy "if the plaintiff has a real

10    and reasonable apprehension that he will be subject to liability [for infringement] if he continues

11    to manufacture his product"); Preiser v. Newkirk, 422 U.S. 395, 401 (1975) ('[A]n actual

12    controversy must be extant at all stages of review, not merely at the time the complaint is filed").

13    Accordingly, 321's Second Claim would be dismissed as moot.  ATMI, Inc. v. Innovative

14    Engineering Solutions, Inc., 2002 WL 826794 at *1 (N.D. Cal. 2002) (Illston, J.) (granting

15    plaintiff partial summary judgment on its  claim for declaratory judgment that defendant did not

16    own certain patents, and dismissing as moot plaintiff's claim for declaratory judgment that it did

17    not infringe those patents).

18    I.    **STATEMENT OF THE ISSUES**

19    1.    Does the manufacture and trafficking in software that circumvents copying and
      access control measures violate the "anti-circumvention" provisions of the DMCA?

20

21    2.    Are the DMCA's anti-circumvention provisions unconstitutional?

22

23    II.    **STATEMENT OF UNDISPUTED BACKGROUND FACTS[1]**

24    A.    The Studios and DVD Technology

25    The Studios, directly or through affiliates, are engaged in the business of producing and

26    distributing motion pictures and other copyrighted works.  FAC ¶5; AC ¶ 5.  The Studios

27    _____

28    [1]    The facts derived from 321's First Amended Complaint ("FAC") and Answer to
      Counterclaim ("AC") are assumed to be true for purposes of this Motion only.

2

1   distribute motion pictures theatrically, by television transmission, and on portable media, such as

2   videocassette tapes and DVDs (an acronym for "Digital Versatile Discs").  FAC ¶ 5, 19;

3   Reimerdes, 111 F. Supp. 2d 294, 308 (S.D.N.Y. 2000).

4        A DVD is a digital storage medium, similar in shape and size to the "compact disc"

5   ("CD") medium that is used for the storage of audio files.  FAC ¶ 19; Declaration of Robert W.

6   Schumann ("Schumann Decl."), ¶ 7.  Because a DVD is capable of storing several times the

7   amount of data that can be stored on a CD, DVDs are used to store the digital video and audio

8   information that comprises a full-length motion picture (or other audiovisual work).  FAC 19;

9   Schumann Decl., ¶¶ 8-9; Reimerdes, 111 F. Supp. 2d at 307.  DVDs can be viewed either on a

10  television equipped with a stand-alone DVD player or on a computer with a DVD-Rom and

11  specialized playback software ("DVD Player" software).  FAC ¶ 20; Schumann Decl., ¶ 9.

12  DVDs are the latest technology for private home viewing of recorded motion pictures, and

13  provide a significant improvement on audio and visual quality as compared to video cassette

14  tapes.  FAC ¶ 20; Reimerdes, 111 F. Supp. 2d at 307; Schumann Decl. ¶ 10.

15        B.    "CSS" And DVD Anti-Piracy Technology

16        DVDs distributed by the Studios are protected by a technology known as "Content

17  Scramble System," or "CSS."  The development of CSS was explained in Reimerdes:

18              "Motion pictures first were, and still are, distributed to the home
                market in the form of video cassette tapes.  In the early 1990's,
19              however, the major movie studios began to explore distribution to
                the home market in digital format, which offered substantially
20              higher audio and visual quality and greater longevity than video
                cassette tapes.  This technology, which in 1995 became what is
21              known as DVD, brought with it a new problem – increased risk of
                piracy by virtue of the fact that digital files, unlike the material on
22              video cassettes, can be copied without degradation from
                generation to generation. . . .  Discussions among the studios with
23              the goal of organizing a unified response to the piracy threat
                began in earnest in late 1995 or early 1996. . . . In 1996,
24              Matsushita Electric Industrial Co. and Toshiba Corp. presented –
                and the studios adopted – CSS."  Reimerdes, 111 F. Supp. 2d at
25              309.

26

27

28  See also Schumann Decl., ¶ 11-12.

1    CSS is an integrated system of access "locks," encryption technology and licensing

2    provisions that protect the contents of a DVD from unauthorized access and copying.

3    Reimerdes, 111 F. Supp. 2d at 309-10; Schumann Decl., ¶ 14.  321 accurately summarizes the

4    encryption elements of CSS:

5            "Most DVDs manufactured, distributed or sold by the [Studios] are
             recorded onto the DVD in a scrambled format in which the data is
6            encrypted in order to prevent unauthorized access to the data
             contained on the DVD. . . . [The Studios] have adopted CSS as a
7            standard encryption technique to prevent access to DVD data.  CSS
             works by scrambling the digital data that makes up each frame of
8            video images.  The CSS standard, as well as the licensing of the
             electronic encryption 'keys' necessary to play back the DVDs, is
9            administered by an organization known as the Copyright Control
             Authority (CCA).  The CSS 'keys' are licensed to the makers of
10           DVD players and DVD software.  A CSS-protected DVD can only
             be played or viewed by DVD players or computer software
11           which contain the 'keys' licensed by the CCA, either directly or
             through subcontracts.  When the CSS-encrypted DVD is placed in
12           a licensed DVD player, the DVD player uses software and
             electronic decryption 'keys' in order to unscramble the data and
13           display the frames that make up the video images."  FAC ¶23.

14

15   CSS also has a "locking" mechanism so that the computer's DVD drive will not allow

16   access to a DVD's content until it confirms that the DVD player software seeking access is an

17   authentic, CCA-licensed player.  Schumann Decl. ¶ 15.  The CSS locking mechanism and

18   encryption are independent and complementary protections.  Id., ¶ 14, 16.  Only players and

19   drives equipped with both the proper authentication credentials and the necessary "keys" are able

20   to access and decrypt CSS-encrypted DVD files and thereby play the motion pictures stored on

21   DVDs.  Id., ¶¶ 16-20.  In order to ensure that CSS decryption technology (1) would not become

22   generally available, and (2) would only be used to play – and not to copy – DVDs, CCA licenses

23   CSS subject to strict requirements, including that authorized DVD players not permit copying.

24   Id., ¶ 14; Reimerdes, 111 F.Supp. 2d at 310.  As a result of CSS and the CCA licensing

25   procedures, DVDs encrypted with CSS cannot be accessed (played) on noncompliant players and

26   cannot be digitally copied (including on a personal computer) unless CSS protection is

27   circumvented.  Id. ¶ 21.

28

C.   The DMCA Anti-Circumvention Provisions

Congress enacted the DMCA in 1998.  (It is codified in the Copyright Act at 17 U.S.C. §§1201 et seq.).  A key element of the digital protection enacted as part of the DMCA was to "provide 'legal protection and effective legal remedies' against circumventing technological measures, e.g., encryption and password protection, that are used by copyright owners to protect their works from piracy . . . ."  S. Rep. No. 105-190, at 10 (1998); see also Corley, 273 F.3d at 440.  Congress considered this protection to be critical so that copyrighted works could be offered to the public in digital formats without the substantial risk of wholesale, high-tech infringement:

> "When copyrighted material is adequately protected in the digital environment, a plethora of works will be distributed and performed....  In order to protect the owner, copyrighted works will most likely be encrypted and made available to consumers once payment is made for access to a copy of the work.  There will be those who will try to profit from the works of others by decoding the encrypted codes protecting copyrighted works, or engaging in the business of providing devices or services to enable others to do so."  H. Rep. No. 105-511(I), p. 10 (1998).

See also 3 M. & D. Nimmer, Nimmer On Copyright § 12A.03 at 12A-14 (2001) (hereafter "Nimmer") (section 1201 is "first not only in order and length [of the DMCA sections], but in importance as well.")

The approach Congress adopted was to "import[] into the online environment the same sensitivities that Congress previously brought to bear 'in the areas of cable television and satellite transmissions to prevent unauthorized interception and descrambling of signals.'" 3 Nimmer, § 12A.03, at 12A-14, quoting H. Rep. No. 105-511(I), at 10.

> "The Copyright Act in section 1002(c) already protects sound recordings and musical works by prohibiting devices which circumvent any program or circuit that implements a serial copy management system or similar system included in digital audio recording devices and digital audio interface devices.  The Communications Act in section 605(e)(4) prohibits devices that are 'primarily of assistance in the unauthorized decryption of satellite cable programming.'"  S. Rep. No. 105-190 at 11.

Two key provisions of the DMCA prohibit trafficking in technology that circumvents copyright protection systems such as CSS.  Corley, 273 F.3d at 440.  First, 17 U.S.C.

5

1   §1201(a)(2) prohibits the "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or

2   otherwise traffic[king]" in technology or products designed to circumvent a technological

3   measure that controls *access* to a copyrighted work.  Second, 17 U.S.C. 1201(b) prohibits

4   trafficking in technology or products designed to circumvent "a technological measure that

5   effectively protects a right of a copyright owner under this title in a work or a portion thereof" –

6   e.g., *the reproduction right*.  S. Rep. No. 105-190 at 12 ("Section 1201(b) is designed to protect

7   the traditional copyright rights of the copyright owner").  As the Second Circuit explained:

8           "[A]lthough both subsections prohibit trafficking in a
            circumvention technology, the focus of subsection 1201(a)(2) is
9           circumvention of technologies designed to *prevent access* to a
            work, and the focus of subsection 1201(b)(1) is circumvention of
10          technologies designed to *permit access* to a work but *prevent
            copying* of the work or some other act that infringes a copyright."
11          Corley, 273 F.3d at 441 (emphasis in original) (citing S. Rep. No.
            105-190, at 11-12).
12

13          D.      "DeCSS" and the *Corley* Litigation

14          Around 1999, a software utility known as "DeCSS" appeared on the Internet.

15   (Presumably, the first syllable refers to the program's ability to "de-scramble" or "de-crypt"

16   CSS).  Schumann Decl., ¶ 22.  "If a user runs the DeCSS program . . . with a DVD in the

17   computer's disk drive, DeCSS will decrypt the DVD's CSS protection, allowing the user to copy

18   the DVD's files and place the copy on the user's hard drive.  The result is a very large computer

19   file that can be played on a non-CSS-compliant player and copied, manipulated, and transferred

20   just like any other computer file."  Corley, 273 F.3d at 437-38; Schumann Decl., ¶¶ 23-24.  See

21   also FAC ¶25 (DeCSS is a "piece of software which descrambles DVD data encrypted by CSS,

22   permitting the access and playback of legitimately owned DVD videos on computers not

23   equipped with the CSS encryption keys").  The quality of the resulting decrypted movie is

24   "virtually identical" to that of the encrypted movie on the original DVD.  Corley, 273 F.3d at

25   438; Schumann Decl. ¶ 23.

26          In January 2000, eight plaintiffs, including some of the Studios, sued a distributor of

27   DeCSS.  Universal City Studios, Inc. v. Reimerdes, 82 F. Supp. 2d 211 (S.D.N.Y. 2000).  The

28   District Court issued a preliminary injunction, enjoining the distribution of DeCSS.  Id.  In a later

1   opinion, the District Court held that by distributing DeCSS, the Defendants violated the

2   DMCA's anti-circumvention provisions, noting that "[t]here is no serious question that

3   defendants' posting of DeCSS violates the DMCA." <u>Reimerdes</u>, 111 F. Supp. 2d 294, 304

4   (S.D.N.Y. 2000).  The Court determined that "DeCSS is a free, effective and fast means of

5   decrypting plaintiffs' DVDs," and that "the availability of DeCSS on the Internet effectively has

6   compromised plaintiffs' system of copyright protection for DVDs." 111 F. Supp. 2d at 315.  The

7   Second Circuit Court of Appeals affirmed, holding that "DeCSS is computer code that can

8   decrypt CSS.  In its basic function, it is like a skeleton key that can open a locked door, a

9   combination that can open a safe, or a device that can neutralize the security device attached to a

10  store's products." <u>Corley</u>, 273 F.3d at 452-53.

11      E.      <u>321 and The DVD Circumvention Software</u>

12          Beginning around August 2001 – after the well-publicized injunction had been issued in

13  <u>Reimerdes</u> prohibiting the distribution of DeCSS – 321 not only ignored the clear ruling that

14  distributing a CSS circumvention utility was illegal, but took the concept of DeCSS one step

15  further by marketing and selling DVD Copy Plus, a software application that bundles a program

16  that operates in a manner largely identical to DeCSS with other software that then copies the "de-

17  scrambled" DVD content onto a CD.  FAC ¶¶ 26, 29; Schumann Decl. ¶¶ 26-30.  In November

18  2002, 321 began selling a second software product called DVD-X-Copy, which copies the "de-

19  scrambled" DVD content onto a DVD, rather than a CD.  FAC ¶ 28; Schumann Decl. ¶ 31.

20  ("DVD Copy Plus" and "DVD-X-Copy" collectively are referred to as the "DVD Circumvention

21  Software").

22          The processes by which 321's DVD circumvention software operates are described in

23  detail in the Schumann Declaration.  Schumann Decl. ¶¶ 25-37.  In its basic function, the DVD

24  Circumvention Software "rips" (copies) a DVD's CSS-protected content onto a computer hard

25  drive in a de-scrambled form, and then copies (or "burns") that de-scrambled DVD content onto

26  computer disc.  FAC ¶¶ 26, 28.  DVD Copy Plus "compresses" the de-scrambled DVD content

27  on the computer hard drive to a smaller size, and then copies the de-scrambled, compressed

28

Mitchell Silberberg &
Knupp LLP

0487574.DOC

1  content onto a recordable CD.  FAC ¶ 26.  DVD-X-Copy copies the de-scrambled DVD content

2  from the hard drive to a recordable DVD, without first compressing the file.  FAC ¶ 28.

3       DVD Copy Plus and DVD-X-Copy achieve precisely the same end result as DeCSS, and

4  in order to do so necessarily circumvent CSS.  Schumann Decl. ¶¶ 6, 25-36.  Both products

5  bypass CSS protection by improperly gaining access to the DVD content, causing its decryption,

6  and depositing a de-scrambled, unprotected copy of the DVD content on the hard drive of the

7  user's computer.  Id.  That post-circumvention copy is forever stripped of its CSS protection, and

8  can be freely viewed (accessed) through unlicensed players, copied (as many times as a user

9  wishes) or Internet distributed in its unprotected form.  Id.

10       The DVD Circumvention Software currently is being marketed, distributed and sold by

11  321 at retail stores and by mail-order through 321's Internet websites.  FAC ¶ 26.  Both DVD

12  Copy Plus and DVD-X-Copy are sold by 321 with instructions and tutorials which explain, step-

13  by-step, how to use the products to circumvent CSS protection.  321 also provides both live and

14  Internet technical support for these products, through which purchasers may obtain assistance in

15  installing and running the DVD Circumvention Software.  The instructions for DVD Copy Plus

16  specifically teach the user how to use the software to "*decode*, store, and rerecord video content

17  that has been placed on a DVD."  FAC ¶ 29.  321 Studio's DVD Circumvention Software is

18  marketed as a fast, easy way to copy CSS-protected DVDs.  Declaration of Marc E. Mayer

19  ("Mayer Decl."), Exs. A, B.  Advertising on 321's website promises that DVD-X-Copy will

20  make "PERFECT COPIES OF YOUR DVDS!...IN ABOUT AN HOUR."  Id, Ex. C.

21       F.    321's Admissions That Its Software Circumvents CSS Technology

22       321 admits that the DVD Copy Plus is designed to circumvent CSS, and that it is either

23  based on, derived from, or has the same effect as the DeCSS technology that the Corley and

24  Reimerdes Courts found to have "compromised [the Studios'] system of copyright protection for

25  DVDs."  Its First Amended Complaint alleges that DVD Copy Plus contains "four freely-

26  available software components" (including a next generation DeCSS program, Schumann Decl.

27  ¶ 28), and that its value "lies primarily in the instructions which permit the use of the software"

28  to "*decode*, store, and rerecord video content that has been placed on a DVD."  FAC ¶ 29.  321

8

1  confirmed this in a press release: "DVD Copy Plus combines three freeware utilities for

2  ***decoding***, storing and burning the DVD contents with interactive tutorial software developed by

3  321Studios.com to simplify those highly technical applications for use by anyone with a general

4  knowledge of Windows."  Mayer Decl., Ex. C (emphasis added).

5     321 likewise admits that DVD-X-Copy operates to the same result as DeCSS by

6  decoding and descrambling the DVD's CSS-protected contents.  As one of the programmers of

7  DVD-X-Copy explained:

8         "The dispute between whether or not DVD XCopy uses deCSS is
          more an issue of semantics than substance.  When Robert [Moore,
9         the President of 321] says we don't use DeCSS he is referring to the
          source code for DeCSS, about which there was such a flap a year
10        or so ago.  Bottom line is, yes, the software has to descramble the
          contents of the DVD in order to do anything useful with it."  Mayer
11        Decl., Ex. E.

12    321's chief executive, Robert Semaan, recently acknowledged that the software is no

13  different from preexisting CSS-decoding utilities: "People are already making DVD copies,

14  we're just making it simpler with a click of a button… It's not so earth-shattering from the

15  technology environment because that stuff already exists.  What we're doing is bringing it to the

16  mass market."  Mayer Decl., Ex. D.

17     G.     The Current Litigation

18    321's Complaint "asks the Court to confirm its right to distribute and sell DVD Copy Plus

19  and DVD-X COPY, [and] seek[s] a declaratory judgment that 321 Studios is not violating the

20  provisions of the Digital Millennium Copyright Act ("DMCA"), that it is not contributorily

21  infringing any copyright in video works stored in the DVD format, and that its activities are

22  protected by the First Amendment."  FAC ¶ 2.  On November 5, 2002, 321 filed a First Amended

23  Complaint, again asserting two claims for relief:  First, without explaining the specifics of its

24  position, it seeks a declaratory judgment that 321's "activities in distributing DVD Copy Plus and

25  DVD-X-COPY do not violate the provisions of the DMCA or, in the alternative, that these

26  provisions are invalid in light of other copyright law provisions, these provisions are invalid

27  because Congress exceeded its enumerated powers under Article 1, Section 8, of the United

28  States Constitution, these provisions are unconstitutionally vague, and/or these provisions violate

9

1  the First Amendment of the Constitution." FAC ¶ 44.  Second, it seeks a declaratory judgment

2  that, by virtue of its sale and distribution of DVD Circumvention Software, it is not liable for

3  copyright infringement.  FAC ¶ 49.  On December 19, 2002, the Studios filed an Answer to the

4  First Amended Complaint and a Counterclaim against 321, asserting violations of section 1201

5  of the DMCA.

6          H.      The Elcom Litigation

7          Less than a month after 321 filed this action, another court in this district addressed many

8  of the assertions 321 makes here.  In United States v. Elcom, Ltd., 203 F. Supp. 2d 1111 (N.D.

9  Cal. 2002) (Whyte, J.), the United States brought a criminal indictment, under section 1201,

10  against the manufacturer, distributor, and creator of a software program ("AEBPR") that allowed

11  a user to remove use restrictions from encoded electronic books ("eBooks") formatted for use

12  only on a particular software application, the Adobe eBook Reader.  Use of AEBPR, precisely

13  like the DVD Circumvention Software, causes "the restrictions imposed by the publisher [to be]

14  stripped away, leaving the eBook in a 'naked PDF' format that is readily copyable, printable, and

15  easily distributed electronically."  203 F. Supp. at 1118.  Like 321 in this case, Defendant Elcom

16  argued that the DMCA anti-circumvention provisions are unconstitutionally vague, exceed

17  Congress' enumerated powers, and violate its First Amendment rights.  The Court considered

18  and rejected each of these assertions.  Id.[2]

19

20  **III.    THE LEGAL STANDARD**

21          A party seeking summary judgment has the initial burden of "informing the district court

22  of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers

23  to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

24  demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S.

25  _____

26          [2]  In December 2002, the jury acquitted Elcom of criminal violation of section 1201.  The
    jury found that although Elcom's product was unlawful, it did not intend to violate the law.  That
27  verdict has no bearing here, because criminal intent is not an element of civil liability under the
    DMCA; even completely innocent violations (which is not the case here) are subject to civil
28  liability.  17 U.S.C. § 1203(c)(5).

                                                              10

1    317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  There are no disputed issues of material fact

2    relevant to DMCA liability.  The undisputed facts establish, as a matter, of law that 321 is liable

3    under the DMCA.

4

5    **IV.    321 IS LIABLE UNDER THE ANTI-CIRCUMVENTION PROVISIONS OF THE DMCA**

6

7            Section 1201(a)(2) of the DMCA provides:

8            "[n]o person shall manufacture, import, offer to the public, provide,
             or otherwise traffic in any technology, product, service, device,
9            component, or part thereof, that:

10           (A) is primarily designed or produced for the purpose of
             circumventing a technological measure that effectively controls
11           access to a work protected under this title;

12
             (B) has only limited commercially significant purpose or use other
13           than to circumvent a technological measure that effectively
             controls access to a work protected under this title; or
14
             (C) is marketed by that person or another acting in concert with
15           that person with that person's knowledge for use in circumventing a
             technological measure that effectively controls access to a work
16           protected under this title.  17 U.S.C. § 1201(a)(2)

17

18   These "access protection" anti-circumvention provisions prohibit the electronic "equivalent [of]

19   breaking into a castle." 3 Nimmer, § 12A.03[D][1], at 12A-33; H.R. Rep. No. 105-551(I), at 17

20   (1998) ("The act of circumventing a technological protection measure put in place by a copyright

21   owner to control access to a copyrighted work is the electronic equivalent of breaking into a

22   locked room in order to obtain a copy of a book").

23           Section 1201(b)(1) provides:

24           "[n]o person shall manufacture, import, offer to the public, provide,
             or otherwise traffic in any technology, product, service, device,
25           component, or part thereof, that:

26           (A) is primarily designed or produced for the purpose of
27           circumventing protection afforded by a technological measure that
             effectively protects a right of a copyright owner under this title in a
28           work or a portion thereof;

                                            11

1
2
3

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or portion thereof; or

4
5
6

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or portion thereof." 17 U.S.C. §1201(b)(1).

7

8  Only one of the three enumerated conditions ("primarily designed or produced for the purpose of

9  circumventing", "limited commercially significant purpose or use other than to circumvent," or

10  "marketed ...for use in circumventing") in sections 1201(a)(2) or 1201(b)(1) need be satisfied in

11  order to find a violation. See S. Rep. No. 105-190, at 29 ("For a technology, product, service,

12  device, component, or part thereof to be prohibited under this subsection, *one of three* conditions

13  must be met.") (emphasis added).

14      A.    <u>321 Is Engaged In Conduct Prohibited By Sections 1201(a)(2) and 1201(b)</u>

15      The manufacture and distribution of the DVD Circumvention Software violates both

16  sections 1201(a)(2) and 1201(b)(1) of the DMCA.

17      ***First***, the DVD Circumvention Software plainly is "technology" within the meaning of

18  section 1201. See <u>Reimerdes</u>, 111 F. Supp.2d at 317 ("[A] computer program...unquestionably

19  is 'technology' within the meaning of the statute.").

20      ***Second***, CSS is a "technological measure" that both (1) "effectively controls access to a

21  work protected under this title" and (2) "effectively protects a right of a copyright owner under

22  this Title." "[A] technological measure 'effectively controls access to a work' if the measure, in

23  the ordinary course of its operation, requires the application of information, or a process or

24  treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C.

25  §1201(a)(3)(B). Congress made clear that technological measures based on encryption or

26  scrambling "effectively control" access to copyrighted works. <u>Reimerdes</u>, 111 F. Supp. 2d at

27  318, <u>citing</u> H.R. Rep. No. 105-551(II) at 39 (1998). CSS prevents access to (i.e., use of) DVDs

28  without the application of the proper CSS keys, so that a DVD cannot be played by any software

12

1  or hardware other than a licensed DVD player. Reimerdes, 111 F. Supp. 2d at 317-18 ("One

2  cannot gain access to a CSS-protected work on a DVD without application of the three keys that

3  are required by the software. One cannot lawfully gain access to the keys except by entering into

4  a license with the DVD CCA under authority granted by the copyright owners or by purchasing a

5  DVD player or drive containing the keys pursuant to such a license."). See RealNetworks, Inc.

6  v. Streambox, Inc., Case No. 2:99-CV-02070, 2000 WL 127311, *7 (W.D. Wash., Jan. 18, 2000)

7  (software technology that limited access to and playback of digital media files in proprietary

8  "RealMedia" format to plaintiff's own media players was a technological measure that

9  "effectively controls access").

10  CSS also "effectively protects a right of a copyright owner under this title" because it "in

11  the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right

12  of a copyright owner under this title." 17 U.S.C. § 1201(b)(2)(B). CSS prevents, among other

13  things, the unauthorized *copying* of a DVD – a right reserved to the copyright owner. 17 U.S.C.

14  §106(1); see RealNetworks, at *7 (software technology that prevented plaintiff's media player

15  from allowing users to copy digital media files designated as copy-protected effectively protects

16  the right of a copyright owner to control the unauthorized copying of its work because it "may

17  restrict others from exercising a copyright holder's exclusive right to copy its work.").

18  *Third*, the DVD Circumvention Software – and particularly the "part thereof" that

19  accesses the DVD content and decrypts CSS while "ripping" the DVD – is (1) "primarily

20  designed or produced for the purpose of circumventing" CSS, (2) "has only limited

21  commercially significant purpose or use other than to circumvent" CSS, and (3) is marketed by

22  321 for use in circumventing CSS. Sections 1201(a)(3) and 1201(b)(2) define "circumvention"

23  as "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological

24  measure." The *only* purpose of the DVD Circumvention Software is to "avoid, bypass, remove,

25  or deactivate" CSS protection and thereby to permit access to and copying of CSS-protected

26  DVDs. See Reimerdes, 111 F. Supp. 2d at 319 (DeCSS software violated both 1201(a)(2) and

27  1201(b)); RealNetworks, at *7-8 ("StreamBox VCR" software that improperly accessed

28  restricted "RealMedia" files by emulating plaintiff's media player and then allowed such files to

13

1  be copied "bypassed" the access control technology and "circumvented" the copy protection

2  technology); Sony Computer Entertainment America Inc. v. GameMasters, 87 F. Supp.2d 976,

3  987 (N.D. Cal. 1999) ("GameEnhancer" circumvented access control technology that permitted

4  video game consoles to play only video games "when encrypted data is read from an authorized

5  CD-Rom."). Further, because DVDs *cannot be digitally copied without circumventing CSS*, the

6  DVD Circumvention Software would not have any commercially significant purpose without its

7  circumvention components. See RealNetworks, at *8 (no commercial purpose other than

8  circumvention). Finally, the DVD Circumvention Software is marketed as a tool to copy CSS-

9  protected DVDs. That the DVD Circumvention Software may contain elements or applications

10  that perform functions other than circumvention (such as compressing or burning the protection-

11  circumvented works) is not relevant, because 321's distribution of the circumvention elements

12  alone subjects it to liability. See 17 U.S.C. §§ 1201(a)(2) and 1201(b) ("[n]o person shall

13  manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product,

14  service, device, component, *or part thereof*..."). See also RealNetworks, at *7 *("[A]t least a*

15  *part* of the Streambox VCR. . . . circumvents the Copy Switch, enabling a user to make a copy

16  of a file that the copyright owner has sought to protect").

17       B.    None of the Exemptions Of Section 1201 is Applicable Here.

18       Section 1201 contains limited, specified exemptions for what otherwise would constitute

19  unlawful trafficking in circumvention technology. None of these is applicable here. See 17

20  U.S.C. §§ 1201(e) (law enforcement, intelligence and other governmental activities), 1201(f)(3)

21  (information acquired through reverse engineering "solely for the purpose" of achieving

22  interoperability of computer programs as defined in the statue)[3], 1201(g)(4) (providing

23  technological means of circumvention to another with whom one is working collaboratively in

24  good faith encryption research), and 1201(j)(4) (certain acts of security testing).

25

26

27

28       [3]   Section 1201(f)(3) "does not apply to public dissemination of the means of
circumvention, as the legislative history confirms."   Reimerdes, 111 F. Supp. 2d at 320.

14

C.   "Downstream" Uses of Unlawfully-Circumvented DVD Content Are Irrelevant to Section 1201 Liability

With no defense to its liability under the DMCA, 321 attempts to cloud the issue with arguments that "post-circumvention" uses made of the decrypted DVDs allegedly are lawful. See, e.g., FAC ¶¶ 32-34. 321 is wrong that such uses are lawful. However, these arguments are irrelevant to 321's liability. Section 1201 prohibits the very acts of *circumventing access controls and trafficking in circumvention technology*, both of which necessarily occur before the end user burns, distributes, or otherwise undertakes any action with respect to the unprotected DVD. For that reason, any argument by 321 that copying of CSS-protected DVDs by end users of its DVD Circumvention Software is "fair use," is a red herring. Fair use, 17 U.S.C. §107, is a defense *only* to actions for *copyright infringement*, and not to liability under *section 1201*. See Elcom, 203 F.Supp.2d at 1124 ("Nothing within the express language would permit trafficking in devices designed to bypass use restrictions in order to enable a fair use, as opposed to an infringing use. The statute does not distinguish between devices based on the uses to which the device will be put. Instead, all tools that enable circumvention of use restrictions are banned, not merely those use restrictions that prohibit infringement."); Reimerdes, 111 F.Supp.2d. at 322 ("If Congress had meant the fair use defense to apply to such actions, it would have said so. Indeed, as the legislative history demonstrates, the decision not to make fair use a defense to a claim under Section 1201(a) was quite deliberate."); Copyright Office, Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies; Final Rule (hereinafter, the "DMCA Rulemaking"), 37 CFR Part 201, 65 Fed. Reg. 64556-01, at 64561 ("fair use …is not a defense to the cause of action created by the anticircumvention prohibition of section 1201");  2 I. Ballon, E-Commerce and Internet Law §22.02[4][D][ii], at 22-16 ("Section 1201…is not limited by the fair use doctrine…").

V.   **THE ANTI-CIRCUMVENTION PROVISIONS OF THE DMCA ARE NOT INVALID OR UNCONSTITUTIONAL**

Each constitutional argument raised in the FAC is without merit and previously has been rejected. This result is not surprising. "Legislation prohibiting circumvention devices is not

15

1   unprecedented." S. Rep. 105-190, at 11-12 (noting that §1002(c) of the Copyright Act,

2   §605(e)(4) of the Communications Act, and article 1707(b) of the NAFTA all involve

3   prohibitions on circumvention devices).  "Similar laws have been enacted in related contexts."

4   Id. at 28 (noting the 47 U.S.C. § 553(a)(2) prohibition on the manufacture or distribution of

5   equipment intended for the unauthorized reception of cable television service).  Section 1201

6   protects against trafficking in what essentially amounts to high-tech lock-picks.  Id. at 11

7   (describing the anti-circumvention provisions as "roughly analogous to making it illegal to break

8   into a house using a tool, the primary purpose of which is to break into houses."); Corley, 273

9   F.3d at 452 ("[W]e must recognize that the essential purpose of encryption code is to prevent

10  unauthorized access.  Owners of all property rights are entitled to prohibit access to their

11  property by unauthorized persons.  Homeowners can install locks on the doors of their houses.

12  Custodians of valuables can place them in safes.  Stores can attach to products security devices

13  that will activate alarms if the products are taken away without purchase.").

14       A.    Congress Did Not Exceed Its Constitutional Power in Enacting the DMCA

15            321 suggests that the DMCA is invalid because Congress "exceeded its enumerated

16  powers under Article I, Section 8, of the United States Constitution."  FAC ¶44.  This suggestion

17  is without merit:  The Commerce Clause, Article I, Section 8, Clause 3, "grants Congress the

18  power to regulate commerce with foreign nations, among the several States and with the Indian

19  tribes," (H. Rep. No. 105-551 (II), at 35 (1998)), and "Congress plainly has the power to enact

20  the DMCA under the Commerce Clause."  Elcom, 203 F.Supp.2d at 1138.[4]  The Commerce

21  Clause power, "like all others vested in Congress, is complete in itself, may be exercised to its

22

---

23       [4]  In Elcom, the Court also rejected the argument that Congress exceeded its authority
     under the Intellectual Property Clause, Art. 1, § 8, Cl. 8, when it enacted the DMCA.  The Court
24   reasoned that, if a statute is within Congress' Commerce power and is "not fundamentally
     inconsistent with" the Intellectual Property Clause, it is not an unconstitutional exercise of
25   congressional power.  203 F. Supp. 2d at 1139-41.  The Court concluded that the DMCA's anti-
     circumvention provisions were *not* "fundamentally inconsistent" with the Intellectual Property
26   Clause, and that "preventing trafficking in tools that would enable widespread piracy and
     unlawful infringement is *consistent* with the Intellectual Property Clause's grant to Congress of
27   the power to 'promote the useful arts and sciences' by granting exclusive rights to authors in their
     writings." Id. at 1140 (emphasis added).

28

16

1  utmost extent, and acknowledges no limitations, other than are prescribed in the constitution."

2  U.S. v. Lopez, 514 U.S. 549, 553 (1995) (quoting Gibbons v. Ogden, 9 Wheat 1, 196, 6 L. Ed. 23

3  (1824)).  Under the Commerce Clause, Congress can, inter alia, regulate intrastate activities that

4  substantially affect interstate commerce.  Id., at 558-59.  The applicable test is "'whether a

5  rational basis existed for concluding that a regulated activity sufficiently affected interstate

6  commerce.'"  Id. at 557.  Such a basis clearly exists here.

7          In United States v. Moghadam, 175 F.3d 1269, 1280 (11th Cir. 1999), a defendant

8  charged with violating the "anti-bootlegging" statute (18 U.S.C. § 2319A), which, among other

9  things, criminalizes the unauthorized recording of live musical performances, challenged

10  Congress' power to enact the legislation.  Id. at 1271.  The Court examined whether the

11  Commerce Clause provided Congressional power for the enactment, and concluded that the

12  required nexus with commerce easily was established:

13                  "The link between bootleg compact discs and interstate commerce
                    and commerce with foreign nations is self-evident. . . . Bootleggers
14                  depress the legitimate markets because demand is satisfied through
                    unauthorized channels.  Generally speaking, performing artists
15                  who attract bootleggers are those who are sufficiently popular that
                    their appeal crosses state or national lines. The very reason
16                  Congress prohibited this conduct is because of the deleterious
                    economic effect on the recording industry. The specific context in
17                  which [the anti-bootlegging statute] was enacted involved a treaty
                    with foreign nations, called for by the World Trade Organization,
18                  whose purpose was to ensure uniform recognition and treatment of
                    intellectual property in international commerce. The context
19                  reveals that the focus of Congress was on interstate and
                    international commerce. . . . Moreover, the type of conduct that
20                  Congress intended to regulate by passing the anti-bootlegging
21                  statute is by its very nature economic activity."  Id. at 1276-77.

22
23          The conduct regulated by the DMCA has a near-identical nexus with commerce, and one

24  that is more than sufficient to validate Congressional power for the enactment.  The Court in

25  Elcom specifically considered this issue:

26                  "The DMCA prohibits conduct that has a substantial effect on
                    commerce between the states and commerce with foreign nations.
27                  Trafficking in or the marketing of circumvention devices 'for gain,'
                    as proscribed by [Section 1201] has a direct effect on interstate
28                  commerce.  To the extent that circumvention devices enable
                    wrongdoers to engage in on-line piracy by unlawfully copying and

                                                    17

distributing copyrighted works of authorship, the sale of such devices has a direct effect on suppressing the market for legitimate copies of the works.  Accordingly, there is a rational basis for concluding that the regulated activity sufficiently affects interstate commerce to establish that Congress had authority under the Commerce Clause to enact the legislation." Elcom, 203 F.Supp.2d at 1138.

The DMCA legislative history reflects that it was developed out of "a wide-ranging review of all issues" relating to electronic commerce (which Congress felt was "having a profound impact on the nation's economy"), and a concern about products with the potential to harm the developing market for digital content.  H. Rep. No. 105-551 (II), at 22.  Although "the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise," Woods v. Cloyd W. Miller Co., 333 U.S. 138, 144 (1948), legislative findings "are normally helpful to a court in finding an interstate commerce nexus." Moghadam, 175 F.3d at 1275 (citing Cheffer v. Reno, 55 F.3d 1517, 1520 (11th Cir. 1995)).  Such findings are entitled to "substantial deference." Turner Broad. Sys., Inc., v. FCC, 520 U.S. 180, 195 (1997); Moghadam, 175 F.3d at 1275 (citing United States v. Viscome, 144 F.3d 1365, 1371 (11th Cir. 1998)).  Faced with the ease by which widespread Internet access could facilitate the unlawful copying and distribution of digital media in orders of magnitude previously unseen, Congress chose to regulate this aspect of electronic commerce by enacting the DMCA and, specifically, section 1201.  See S. Rep. No. 105-190, at 8 ("Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy.").  Because a "rational basis" exists "for concluding that a regulated activity sufficiently affected interstate commerce," Lopez, 514 U.S. at 557, Congress properly exercised its power under the Commerce Clause.  Moghadam, 175 F.3d at 1275.

    B.    The DMCA Does Not Conflict With Or Otherwise Eliminate Fair Use

Like other defendants who unsuccessfully have challenged the DMCA, 321 likely will argue that "fair use" is a constitutional mandate that the DMCA unconstitutionally "eliminates."  Both prongs of this argument are wrong.  Fair use is not constitutionally-based.

18

1
2
3
4

> "Asserting that fair use 'is rooted in and required by both the Copyright Clause and the First Amendment…the Appellants contend that the DMCA, as applied by the District Court, unconstitutionally eliminates 'fair use' of copyrighted materials. We reject this extravagant claim….[T]he Supreme Court has never held that fair use is constitutionally required." <u>Corley</u>, 273 F.3d at 458.

5   Nor does the DMCA "eliminate" fair use; to the contrary, Section 1201(c)(1) expressly provides

6   that "[n]othing in this section shall affect . . . defenses to copyright infringement, including fair

7   use."  While the fair use doctrine may insulate certain limited uses of a copyrighted work from

8   liability for copyright infringement, it never has been held to guarantee either access to a

9   copyrighted work or copying of that work by the user's "preferred technique."

10
11
12
13
14
15

> "We know of no authority for the proposition that fair use, as protected by the Copyright Act, much less the Constitution, guarantees copying by the optimum method or in the identical format of the original. . . .  Fair use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original. The fact that the resulting copy will not be as perfect or as manipulable as a digital copy obtained by having direct access to the DVD movie in its digital form, provides no basis for a claim of unconstitutional limitation of fair use." <u>Corley</u>, 273 F.3d at 459.

16   <u>See also</u> <u>Elcom</u>, 203 F.Supp.2d at 1125. ("Congress' expressed intent to preserve the right of fair

17   use is not inconsistent with a ban on trafficking in circumvention technologies, even those that

18   could be used for fair use purposes rather than infringement. Fair use of a copyrighted work

19   continues to be permitted . . . even though engaging in certain fair uses of digital works may be

20   made more difficult if tools to circumvent use restrictions cannot be readily obtained."); DMCA

21   Rulemaking at 64569 ("there is no unqualified right to access works on any particular machine

22   or device of the user's choosing.").

23          Congress even enacted an additional "fail-safe" mechanism to assure that the DMCA

24   would be flexible enough to adapt to and account for any unreasonable restraints on fair use that

25   might arise in practical application.  Thus, the DMCA requires a triennial rulemaking review by

26   the Copyright Office to consider the need for additional exemptions.  17 U.S.C. § 1201(a)(1).

27   On October 27, 2002, the Copyright Office concluded its first review during which it specifically

28   considered – **and rejected** – the suggestion that CSS encryption technology had an adverse

19

1   impact on the ability of users to make lawful uses of DVD motion pictures.[5] DMCA

2   Rulemaking, at 64567-70. It found the contrary to be true: "it appears clear from the evidence

3   that the *circumvention* of technological measures would be likely to have an adverse effect on

4   the availability of digital works on DVDs to the public." Id., at 64570.

5       C.    Section 1201 Does Not Violate the First Amendment

6       Although it is perhaps questionable whether true "speech" is implicated by 321's conduct

7   in trafficking in the DVD Circumvention Software, courts have held that "[c]omputer software is

8   expression that is protected by the copyright laws and is therefore 'speech' at some level, speech

9   that is protected at some level by the First Amendment." Elcom, 203 F.Supp.2d 1126. See also

10  Corley, 273 F.3d at 454. Accepting, arguendo, that the DVD Circumvention Software is

11  protectable speech, it is clear that the DMCA is content-neutral, furthers important governmental

12  interests, and is sufficiently tailored to further those interests.

13      **1.**    **The DMCA Is Content-Neutral**

14      "[T]he scope of protection for speech generally depends on whether the restriction is

15  imposed because of the content of the speech." Corley, 273 F.3d at 450. "Content-based

16  restrictions are permissible only if they serve compelling state interests and do so by the least

17  restrictive means available." Id. (citing Sable Communications of California, Inc. v. FCC, 492

18  U.S. 115, 126 (1989)). "A content-neutral restriction is permissible if it serves a substantial

19  governmental interest, the interest is unrelated to the suppression of free expression, and the

20  regulation is narrowly tailored." Id. A law is narrowly-tailored when "the means chosen do not

21  'burden substantially more speech than is necessary to further the government's legitimate

22  interests.'" Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 662 (1994) (quoting Ward v.

23  Rock Against Racism, 491 U.S. 781, 799 (1989)); Corley, 273 F.3d at 450.

24      Circumvention software is not pure speech. In its key respects, it is functional, thereby

25  necessitating an analysis that severs the software's expressive aspects from these functional

26  _____

27      [5]  The Copyright Office noted that "[m]ore comments and testimony were submitted on
the subject of motion pictures on digital versatile discs (DVDs) and the technological measures

28  employed on DVDs, primarily Content Scramble System ("CSS"), than on any other subject in
this rulemaking." DMCA Rulemaking at 64567.

1   elements.  "When speech and non-speech elements are combined in a single course of conduct, a

2   sufficiently important government interest in regulating the non-speech element can justify

3   incidental intrusions on First Amendment freedoms." Elcom, 203 F. Supp. 2d at 1127-28 (citing

4   United States v. O'Brien, 391 U.S. 367 (1968)); Junger v. Daley, 209 F.3d 481, 485 (6ᵗʰ Cir.

5   2000)).  Because "computer code can instantly cause a computer to accomplish tasks and

6   instantly render the results those tasks available throughout the world via the Internet," and

7   "[t]he only human action required to achieve these results can be as limited and instantaneous as

8   a single click of a mouse," the "realities of what code is and what its normal functions are require

9   a First Amendment analysis that treats code as combining nonspeech and speech elements, *i.e.*,

10  functional and expressive elements." Corley, 273 F.3d at 451.  Accordingly, "the capacity of a

11  decryption program like DeCSS to accomplish unauthorized – indeed, unlawful – access to

12  materials in which the Plaintiffs have intellectual property rights must inform and limit the scope

13  of its First Amendment protection." Id. at 453.

14          Section 1201 prohibitions are aimed at the functional conduct of circumvention devices

15  without regard to the viewpoint of the expression -- the "content" is irrelevant.  "The principal

16  inquiry in determining whether a statute is content-neutral is whether the government has

17  adopted a regulation of speech because of agreement or disagreement with the message it

18  conveys." Elcom, 203 F. Supp. 2d at 1128 (citing Ward, 491 U.S. at 791).  It is clear from the

19  plain text of Section 1201, as well as from its legislative history, that Congress had no intention

20  to regulate expressive content, but rather sought to protect copyrighted works in digital form

21  from rapid and viral copying and distribution.  17 U.S.C. § 1201; see Reimerdes, 111 F.Supp.2d

22  at 329 ("The reason that Congress enacted the anti-trafficking provision of the DMCA had

23  nothing to do with suppressing particular ideas of computer programmers and everything to do

24  with functionality."); Corley, 273 F.3d at 454.[6]  As Congress did not enact the DMCA because of

25  any agreement or disagreement with any particular message, the DMCA is content-neutral.

26

27          [6]  Because the DMCA does not, by its terms, regulate spoken words or expressive
    content, 321 cannot argue that the DMCA is facially overbroad.  Elcom, 203 F.Supp at 1133
28  (rejecting challenge that DMCA was facially overbroad because it infringed alleged First

21

1

"Here, the parties have pointed to no portion of the legislative
history that demonstrates a congressional intent to target speech

2

because of its expressive content. Rather, Congress sought ways to
further electronic commerce and protect intellectual property

3

rights, while at the same time protecting fair use. In order to
balance these priorities, Congress sought to ban trafficking in any

4

technology or device that could be used to circumvent
technological restrictions that served to protect the rights of

5

copyright owners." Elcom, 203 F.Supp.2d at 1128.

6

   **2.    The DMCA Promotes Substantial Governmental Interests And Is
           Tailored To Further Those Interests**

7

8

   Because the provisions of the DMCA are content-neutral, "intermediate" scrutiny applies

9

to any First Amendment challenge. Elcom, 203 F.Supp.2d at 1129 ("the court concludes that

10

intermediate scrutiny, rather than strict scrutiny, is the appropriate standard to apply."); Corley,

11

273 F.3d at 454 ("[Section 1201] is. . . .content-neutral, just as would be a restriction on

12

trafficking in skeleton keys, identified because of their capacity to unlock jail cells"). Under

13

"intermediate" scrutiny, a regulation:

14

"will be sustained if it furthers an important or substantial
governmental interest; if the governmental interest is unrelated to

15

the suppression of free expression; and if the incidental restriction
on alleged First Amendment freedoms is no greater than is

16

essential to the furtherance of that interest. To satisfy this standard,
a regulation need not be the least speech-restrictive means of

17

advancing the Government's interests. Rather, the requirement of
narrow tailoring is satisfied so long as the regulation promotes a

18

substantial governmental interest that would be achieved less

19

effectively absent the regulation." Turner, 512 U.S. at 680
(quoting O'Brien, 391 U.S. at 377; Ward, 491 U.S. at 799, internal

20

quotations omitted).

21

22

   "The Government's interest in preventing unauthorized access to encrypted copyrighted

23

material is unquestionably substantial, and the regulation of DeCSS . . . plainly serves that

24

interest." Corley, 273 F.3d at 454. Congress had at least two important governmental interests

25

in enacting the DMCA: (1) preventing the unauthorized access, copying, and distribution of

26

_____

27

Amendment rights of third parties: "facial attacks on overbreadth grounds are limited to

28

situations in which the statute or regulation by its terms regulates spoken words or expressive
conduct.")

22

1  copyrighted works, and (2) promoting the development of electronic commerce.  See H. Rep.

2  No. 105-551 (II) , at 23 (1998) ("The debate on this legislation highlighted two important

3  priorities: promoting the continued growth and development of electronic commerce; and

4  protecting intellectual property rights"); S. Rep. No. 105-190, at 8 (1998) ("Due to the ease with

5  which digital works can be copied and distributed worldwide virtually instantaneously, copyright

6  owners will hesitate to make their works readily available on the Internet without reasonable

7  assurance that they will be protected against massive piracy").  "These governmental interests

8  are both legitimate and substantial."  Elcom, 203 F.Supp.2d at 1130.

9         Section 1201 is tailored to achieve these important governmental interests:  "Without the

10  ban on trafficking in circumvention tools, the government's interest in promoting electronic

11  commerce, preserving the rights of copyright holders, and preventing piracy would be

12  undermined.  The absence of effective technological restrictions to prevent copyright

13  infringement would inevitably result in even more rampant piracy, with a corresponding likely

14  decrease in the willingness of authors and owners of copyrighted works to produce them in

15  digital form or make the works available on-line."  Id.  "[T]he DMCA does not burden

16  substantially more speech than is necessary to achieve the government's asserted goals of

17  promoting electronic commerce, protecting copyrights, and preventing electronic piracy."  Id. at

18  1132 (citing O'Brien, 391 U.S. at 367); Corley, 273 F.3d at 454-55 (prohibition on dissemination

19  of DeCSS does not burden more speech than necessary).

20         D.    Section 1201 Is Not Unconstitutionally Vague

21         The mandate of section 1201 could not be clearer: trafficking in technology primarily

22  designed to circumvent access or copying protection is unlawful.  Liability under section 1201

23  does not require knowledge of the uses an alleged trafficker's customers might make of the

24  technology, and liability does not turn on whether those customers intend or actually do make

25  "fair" or socially acceptable uses.  Section 1201 expressly prohibits *all* trafficking in anti-

26  circumvention devices.  Elcom, 203 F.Supp. 2d at 1124.

27         The specific language of section 1201 also is clear.  In Elcom, the Court considered and

28  upheld the "primarily designed" and "marketed for use" phrases in section 1201, 203 F.Supp.2d

23

Mitchell Silberberg &
Knupp LLP

0487574.DOC

1  at 1137 ("'the primarily designed for' and 'marketed for use' language is not unconstitutionally

2  vague"), and courts repeatedly have upheld this language in other statutes. See Village of

3  Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 500-03 (1982) ("designed

4  for" and "marketed primarily for use" drug law was not unconstitutionally vague); Posters 'N'

5  Things, Ltd. v. United States, 511 U.S. 513 (1994) ("primarily intended ... for use" drug law was

6  not unconstitutionally vague); Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681,

7  685-86 (2d Cir. 1996) ("designed for" gun law was not unconstitutionally vague).

8       In fact, all of the operative language of Section 1201 is specifically defined.  17 U.S.C.

9  §§ 1201 (a)(3) (defining "circumvent a technological measure," and "effectively controls access

10  to a work"); 1201 (b)(2) (defining "circumvent protection afforded by a technological measure,"

11  and "effectively protects a right of a copyright owner under this title").  Taken together, these

12  definitions ensure that "the DMCA's prohibition on trafficking in technologies that circumvent

13  use and copy restrictions is sufficiently clear to withstand a vagueness attack." Elcom, 203

14  F.Supp.2d at 1137 (referring to the Section 106 and 107 definitions as well as those contained in

15  Section 1201 in rejecting a void-for-vagueness argument).

16

17  **VI.  321 SHOULD BE ENJOINED FROM MANUFACTURING, DISTRIBUTING, OR OTHERWISE TRAFFICKING IN THE DVD CIRCUMVENTION SOFTWARE**

18       Section 1203(b) provides: "In an action brought under [the DMCA], the court. . . may

19  grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or

20  restrain a violation."  In Reimerdes, the Court held that "injunctive relief is appropriate if there is

21  a reasonable likelihood of future violations absent such relief," and the plaintiffs lack an

22  adequate remedy at law.  111 F.Supp.2d at 343.  Both elements are present here.  321 continues

23  to traffic in the DVD Circumvention Software, notwithstanding (1) the plain language of the

24  statute prohibits the circumvention of technological protection measures; (2) 321's knowledge

25  that the Second Circuit already has found liability for circumventing CSS protection; and (3)

26  every court that has considered 321's constitutional challenges has rejected them.  321's attitude

27  was voiced by its president: "[w]hether we knew or didn't know we were breaking the law was

28  irrelevant."  Mayer Decl., Ex. D.  And, an injunction is necessary because the Studios have no

24

1   adequate remedy at law.  The further dissemination of the DVD Circumvention Software would

2   have far-reaching, serious consequences for the ongoing viability of the DVD medium.

> "Copyright and, more broadly, intellectual property piracy are
> endemic, as Congress repeatedly has found.  The interest served by
> prohibiting means that facilitate such piracy – the protection of the
> monopoly granted to copyright owners by the Copyright Act – is of
> constitutional dimension.  There is little room for doubting that
> broad dissemination of DeCSS would seriously injure or destroy
> plaintiffs' ability to distribute their copyrighted products on DVDs
> and, for that matter, undermine their ability to sell their products to
> the 'home video' market in other forms.  The potential damages
> probably are incalculable...."  Reimerdes, 82 F. Supp. 2d at 225-
> 26.

9   See also, DMCA Rulemaking at 64570 ("it appears clear from the evidence that the

10  circumvention of technological protection measures would be likely to have an adverse effect on

11  the availability of digital works on DVDs to the public.").

12

13                                  **CONCLUSION**

14          Each of the three courts that has ruled on the DMCA's anti-circumvention provisions has

15  considered the very issues that 321 asserts here.  Each time, the court upheld the constitutionality

16  of the DMCA, in thoughtful opinions, whose reasoning, we submit, is equally persuasive here.

17  321's admitted conduct (and the results of its conduct) are no different from that of the other

18  traffickers whose challenges to the DMCA were rejected.  Because there are no material issues

19  of fact, the Studios respectfully request that the Court grant the motion for partial summary

20  judgment and issue the requested injunction, and dismiss as moot 321's Second Claim for

21  Declaratory Relief.

22  DATED:  January 10, 2003            RUSSELL J. FRACKMAN
23                                       PATRICIA H. BENSON
                                         STEVEN B. FABRIZIO
24                                       MITCHELL SILBERBERG & KNUPP LLP

25
                                        By:  _____
26                                            Russell J. Frackman
                                              Attorneys for Plaintiffs
27

28