KEKER & VAN NEST, LLP
MICHAEL H. PAGE - #154913
DARALYN J. DURIE - #169825
LLOYD A. FARNHAM - #202231
710 Sansome Street
San Francisco, CA  94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Plaintiff and Counter Defendants
321 STUDIOS, ROBERT MOORE,
ROBERT SEMAAN and VICTOR MATTISON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| 321 STUDIOS,<br><br>                     Plaintiff,<br><br>    v.<br><br>METRO-GOLDWYN-MAYER STUDIOS INC., et al.,<br><br>                Defendants, | **Case No. C 02-1955 SI**<br>**[E-Filing]**<br><br>**321 STUDIOS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Date:**     **April 25, 2003**<br>**Time:**     **9:00 A.M.**<br>**Dept:**     **Courtroom 10, 19th Floor**<br>**Judge:**     **The Honorable Susan Illston** |
| METRO-GOLDWYN-MAYER STUDIOS INC., et al.,<br><br>             Counterclaimants,<br><br>    v.<br><br>321 STUDIOS, ROBERT MOORE, ROBERT SEMAAN, and VICTOR MATTISON,<br><br>         Counterclaim Defendants. | |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     SUMMARY OF RELEVANT FACTS ................................................................1

    A.      DVDs Are The Movie Industry's Leading Format For The Distribution
        Of Films .......................................................................................................1

    B.      DVDs Are Susceptible To Damage, Scratching And Deterioration ....................2

    C.      CSS Is Used To Encode The Data On Certain DVDs Distributed By
        The Studios ...................................................................................................2

    D.      CSS Does Not Necessarily Correspond With Copyright Protection Of
        The DVD Contents .......................................................................................3

    E.      DVD Copy Plus Consists Of Publicly Available Software And An
        Instruction Guide That Permits Legitimate Owners Of DVDs To
        Create Backup Copies ...................................................................................3

    F.      DVD X Copy Can Make An Archival Backup Copy Of A DVD Or To
        Restore Data That Cannot Otherwise Be Retrieved From Damaged
        DVDs ...........................................................................................................4

    G.      DVD Copy Code Is Not An Instrument Of Piracy ............................................4

III.    LEGAL ANALYSIS ...........................................................................................7

    A.      DVD Copy Code Is Not Prohibited Under The DMCA ....................................7

        1.      DVD Copy Code Does Not "Circumvent" Encryption .............................8

            a.      321 Does Not Violate Section 1201(a)(2) ......................................8

        2.      321 Does Not Violate Section 1201(b) ...................................................9

            a.      Section 117 Of The Copyright Act Allows Users To
                Make Archival Copies ...................................................................10

            b.      Making An Archival Backup Copy Is A Fair Use Under
                Section 107 ...................................................................................11

            c.      Because The Primary And Intended Use Of 321's
                Software Is Legal, 321 Does Not Violate
                Section 1201(B) ............................................................................13

                (i)      Fair Use Is A Common Law Defense To The
                      DMCA ..............................................................................13

(ii)   Section 1201(B) Explicitly Preserves Fair Use As A Limitation ......................................13

(iii)  DVD Copy Code Does Not Interfere With A Right Of A Copyright Holder ...........................14

(iv)   DVD Copy Code Does Not "Circumvent" Encryption ....................................................16

3.   321 Does Not Violate Any Of The Three Statutory Prongs Of Either Section ........................18

a.   DVD Copy Code Is Not Primarily Designed Or Produced To Circumvent ........................18

b.   DVD Copy Code Does Not Have Only Limited Commercially Significant Purposes Other Than To Circumvent ...............................................18

c.   A Prohibition On Truthful Marketing Violates The First Amendment ..............................19

B.   As Construed By The Studios, The DMCA Violates The First Amendment ...........................................19

1.   A Ban on DVD Copy Code Impermissibly Burdens The First Amendment Rights of Users ...................20

(i)   Users Have A First Amendment Right To Make Fair Use Of Copyrighted Works .........................20

(ii)   The DMCA Unduly Burdens The Exercise Of First Amendment Rights .............................21

(iii)  The DMCA Impairs The First Amendment Right To Access Non-Copyrighted Works .......................22

(iv)   A Prohibition On DVD Copy Code Is Not Necessary To Advance Any Significant Government Interest .....................................23

2.   The DMCA Unconstitutionally Restricts 321's Speech ...........................25

(i)   The DMCA Regulates Speech On The Basis Of Its Content .........................................26

(ii)   Computer Code Is Speech Protected By The First Amendment .....................................27

(iii)  The DMCA Regulates Both Function And Expression ............................................28

307369.02

(a)    Computer Code Can Be Either Functional Or Expressive ...................................28

(b)    DVD Copy Code Cannot Be Regulated On The Basis Of Its Potential Consequences .......................................29

(iv)    A Ban on DVD Copy Code Cannot Survive Strict Scrutiny .................................................32

3.    The DMCA Is Substantially Overbroad .........................33

C.    The DMCA Exceeds The Scope Of Congressional Powers ...............................34

1.    The DMCA Cannot Be Sustained Under The Intellectual Property Clause .......................................34

2.    The DMCA Cannot Be Sustained Under The Necessary And Proper Clause ..........................................35

3.    The DMCA Cannot Be Sustained Under The Commerce Clause ..............................................36

D.    The Studios' Claims Under The DMCA Are Barred By Misuse .........................37

E.    The Studios Cannot Established A Claim Under The DMCA Because They Have Not Demonstrated Any Injury .............................................39

F.    The Studios Are Not Entitled to Injunctive Relief ...................................40

IV.    CONCLUSION .........................................................................40

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

*44 Liquormart v. Rhode Island,*
   517 U.S. 484 (1996)....................................................................................19

*A&M Records, Inc. v. Abdallah,*
   948 F. Supp. 1449 (C.D. Cal. 1996) ........................................................24

*A&M Records v. Napster, Inc.,*
   114 F. Supp. 2d 896 (N.D. Cal. 2000) .....................................................13

*Alcatel USA Inc. v. DGI Tech., Inc.,*
   166 F.3d 772 (5th Cir. 1999) .....................................................................38

*American Booksellers Associate v. Hudnut,*
   771 F.2d 323 (7th Cir. 1985) .....................................................................30

*Amoco Product Co. v. Gambell,*
   480 U.S. 531 (1987)....................................................................................40

*Arkansas Writers' Project, Inc. v. Ragland,*
   481 U.S. 221 (1987).............................................................................22, 26

*Ashcroft v. Free Speech Coalition,*
   535 U.S. 234 (2002)....................................................................................20

*Baker v. Selden,*
   101 U.S. 99 (1879).....................................................................................35

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963).....................................................................................21

*Bartnicki v. Vopper,*
   532 U.S. 514 (2001).........................................................................24, 25, 30

*Bernstein v. United States Department of State,*
   922 F. Supp. 1426 (N.D. Cal. 1996) ..................................................28, 29

*Broadrick v. Oklahoma,*
   413 U.S. 601 (1973)....................................................................................34

*Brulotte v. Thys Co.,*
   379 U.S. 29 (1964).....................................................................................37

*Burrey v. Pacific Gas & Electric Co.,*
   159 F.3d 388 (9th Cir. 1998) .....................................................................15

307369.02

*Bursey v. United States*,
    466 F.2d 1059 (9th Cir. 1972) ..............................................20

*Carey v. Brown*,
    447 U.S. 455 (1984)..............................................................27

*City of Boerne v. Flores*,
    521 U.S. 507 (1997).............................................................35

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994)..............................................................32

*Clark v. Community for Creative Non-Violence*,
    468 U.S. 288 (1984).............................................................23

*Clayton v. Stone*,
    5 F. Cas. 999 (C.C.S.D.N.Y. 1829) ....................................35

*Craig v. Boren*,
    429 U.S. 190 (1976).............................................................20

*Denver Area Education Telcoms. v. FCC*,
    518 U.S. 727 (1996)...............................................21, 25, 29

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
    92 F.3d 1486 (9th Cir. 1996) ...............................................40

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972).............................................................20

*Eldred v. Ashcroft*,
    123 S. Ct. 769 (2003)....................................................20, 21

*Feist Publications v. Rural Telegraph Service Co.*,
    499 U.S. 340 (1991).......................................................34, 35

*First National Bank v. Bellotti*,
    435 U.S. 765 (1978).............................................................22

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) .................................................24

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992).......................................................21, 30

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)................................................................34

-v-

307369.02

*Harper & Row Publishers, Inc. v. Nation Enterprise,*
    471 U.S. 539 (1985)......................................................................................13, 21

*Houston v. Hill,*
    482 U.S. 451 (1987).............................................................................................30

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group,*
    15 U.S. 557 (1995)..............................................................................................26

*Hustler Magazine v. Falwell,*
    485 U.S. 46 (1988)..............................................................................................26

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952)............................................................................................29

*Junger v. Daley,*
    28 Media L. Rep. (BNA) 1609 (6th Cir. 2000) .................................................27

*Karn v. U.S. Department of State,*
    925 F. Supp. 1 (D.D.C. 1996).............................................................................27

*Lasercomb America, Inc. v. Reynolds,*
    911 F.2d 970 (9th Cir. 1990) ..............................................................................37

*MAI Systems Corp. v. Peak Computer Inc.,*
    991 F.2d 511 (9th Cir. 1993) ..............................................................................17

*Martin v. Struthers,*
    319 U.S. 141 (1943)............................................................................................24

*McCulloch v. Maryland,*
    17 U.S. 316 (4 Wheat)........................................................................................35

*Members of City Council v. Taxpayers for Vincent,*
    466 U.S. 789 (1984)......................................................................................23, 33

*Metromedia, Inc. v. San Diego,*
    453 U.S. 490 (1981)............................................................................................27

*Morton Salt Co. v. G. S. Suppiger Co.,*
    314 U.S. 488 (1942)............................................................................................39

*Mutual Film Corp. v. Industrial Com. of Ohio,*
    236 U.S. 230 (1915)............................................................................................29

*NAACP v. Button,*
    371 U.S. 415 (1963)............................................................................................32

*NAACP v. Claiborne Hardware, Co.,*
    458 U.S. 886 (1982)............................................................................................31

307369.02

1

2

*National Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998)...................................................................33

3

4

*New Kids on the Block v. New American Publishing*,
   971 F.2d 302 (9th Cir. 1992) ....................................................14

5

6

*Police Department of Chi. v. Mosley*,
   408 U.S. 92 (1972).....................................................................26

7

*Practice Mgmt. Information Corp. v. AMA*,
   121 F.3d 516 (9th Cir. 1997) ....................................................37

8

9

*RCA Records v. All-Fast System, Inc.*,
   594 F. Supp. 335 (S.D.N.Y. 1984)............................................24

10

11

*RIAA v. Diamond Multimedia System, Inc.*,
   180 F.3d 1072 (9th Cir. 1999) ..................................................12

12

*Railway Labor Executives' Association v.  Gibbons*,
   455 U.S. 457 (1982)..............................................................36, 37

13

14

*Red Lion Broadcasting Co. v. FCC*,
   395 U.S. 367 (1969) ..................................................................31

15

*Regan v. Time*,
   468 U.S. 641 (1984)...................................................................27

16

17

*Reno v. ACLU*,
   521 U.S. 844 (1997)..............................................................22, 31

18

19

*Rice v. The Palladin Enter's.*,
   128 F.3d 233 (4th Cir. 1997) ....................................................31

20

*Riley v. National Federation of the Blind, Inc.*,
   487 U.S. 781 (1988)..............................................................32, 33

21

22

*Roulette v. City of Seattle*,
   97 F.3d 300 (9th Cir. 1996) ......................................................33

23

24

*Rubin v. Coors Brewing Co.*,
   514 U.S. 476 (1995)...................................................................19

25

*Russello v. United States*,
   464 U.S. 16 (1983).....................................................................16

26

27

*Schaumburg v. Citizens For Better Environment*,
   444 U.S. 620 (1980)..............................................................23, 32

28

307369.02

*Schneider v. State*,
    308 U.S. 147 (1939)...............................................................................23

*Secretary of Maryland v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984)...............................................................................33

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    1993 U.S. App. LEXIS 78 (9th Cir. 1993) .........................................17

*Sega Enterprises v. MAPHIA*,
    948 F. Supp. 923 (N.D. Cal. 1996).....................................................24

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Board*,
    502 U.S. 105 (1991).................................................................22, 23, 26

*Sony Computer Ent't, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ...................................................... *passim*

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)..................................................................... *passim*

*Texas v. Johnson*,
    491 U.S. 397 (1989).................................................................................26

*Thomas v. Chi. Park District*,
    534 U.S. 316 (2002).................................................................................20

*Trade-Mark Cases*, 100 U.S. 82 (1879)......................................................34

*Turner Broad. System v. FCC*,
    512 U.S. 622 (1994)..................................................................... *passim*

*Union Carbide Corp. v. Ever-Ready, Inc.*,
    531 F.2d 366 (7th Cir. 1976) ................................................................38

*United Sates v. O'Brien*,
    391 U.S. 367 (1968)................................................................................26

*United States v. Elcom*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002) ...................................... *passim*

*United States v. Lopez*,
    514 U.S. 549 (1995)................................................................................35

*United States v. Moghadam*,
    175 F.3d 1269 (11th Cir. 2000) ............................................................37

*United States v. Poocha*,
    259 F.3d 1077 (9th Cir. 2001) ..............................................................30

-viii-

*Universal Studios, Inc. v. Corley*,
  273 F.3d 429 (2d Cir. 2001) ............................................................................... *passim*

*Universal Studios v. Reimerdes*,
  111 F. Supp. 2d 294 (S.D.N.Y. 2002) ................................................................ *passim*

*Vault Corp v. Quaid Software Ltd.*,
  847 F.2d 255 (5th Cir. 1988) ..................................................................................12

*Virginia v. America Booksellers Association*,
  484 U.S. 383 (1988) ................................................................................................20

*Waller v. Osborne*,
  763 F. Supp. 1144 (M.D. Ga. 1991) .......................................................................30

*Walters v. Reno*,
  145 F.3d 1032 (9th Cir. 1998) ................................................................................40

*Wheaton v. Peters*,
  33 U.S. (8 Pet.) 591 (1834) ....................................................................................34

*Winter v. G.P. Putnam & Sons*,
  938 F.2d 1033 (9th Cir. 1991) ................................................................................29

### STATE CASES

*McCollum v. CBS, Inc.*,
  202 Cal. App. 3d 989 (1988) ............................................................................30, 31

### DOCKETED CASES

*Lexmark International Inc. v. Static Control Components*,
  Case No. 02-571-KSF (E.D. Ky 2002) ....................................................................38

*Tattered Cover, Inc. v. City of Thornton*,
  44 P. 3d 1044, 1061 (S. Ct. Colo. 2002) .................................................................25

### FEDERAL STATUTES

  17 U.S.C. §101 ........................................................................................................10
  17 U.S.C. §102 ........................................................................................................36
  17 U.S.C. §107 ..................................................................................................11, 14
  17 U.S.C. §107(3) ....................................................................................................11

  17 U.S.C. §117(a) ....................................................................................................10

  17 U.S.C. §1201(a) ....................................................................................................9
  17 U.S.C. §1201(a)(2) .......................................................................................*passim*
  17 U.S.C. §1201(a)(3) ................................................................................................9

-ix-

17 U.S.C. §1201(a)(3)(A) ...............................................................8
17 U.S.C. §1201(b)(1) ...............................................................*passim*
17 U.S.C. §1201(b)(2) ...............................................................16
17 U.S.C. §1201(b)(2), (b)(1) .....................................................13
17 U.S.C. §1201(c)((1) ...............................................................25

## **LEGISLATIVE MATERIAL**

H.R. Rep. No. 94-1476 (1976) ....................................................14
H.R. Rep. No. 105-551 (1998) ....................................................35
H.R. Rep. No. 2441 ....................................................................14

S. Rep. No. 105-190 (1998) .........................................................8
S. Rep. No. 1284 ........................................................................14

U.S. Const. Art. I, § 8, cl. 8 .........................................................34
U.S. Const. Art. I, §8, cl. 18 ........................................................35

**321 Studios' MPAs In Opposition To Defendants' Motion For Summary Judgment**
**Case No. C 02-1955 SI**

307369.02

# I.    INTRODUCTION

In 1982, Jack Valenti, President of the Motion Picture Association of America ("MPAA"), predicted: "I say to you that the VCR is to the American film producer and the American public as the Boston strangler is to the woman at home alone. . . .  We are going to bleed and bleed and hemorrhage, unless this Congress at least protects one industry . . . whose total future depends on its protection from the savagery and the ravages of this machine."  Despite these dire predictions, in *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417 (1984), the Supreme Court upheld the legality of the VCR, concluding that most people used it for "time shifting"—taping a show to watch later—which the Court ruled, after an exhaustive review of the detailed factual record, was a fair use.  Today, the rental of videotapes accounts for approximately one quarter of the gross revenues of the motion picture industry.

Here, as in *Sony*, the Studios have invoked colorful imagery, but have failed to proffer any evidence to support their conclusory allegations of harm.  Although captioned a motion for summary judgment, the Studios' motion is more in the nature of a motion to dismiss, filed before any discovery and devoid of virtually any supporting facts.  But whether 321 Studios' products are legal under the DMCA and, if not, whether the DMCA comports with the Constitution, are fact-dependent questions that cannot be resolved on summary judgment or adjudication.

# II.    SUMMARY OF RELEVANT FACTS

## A.    DVDs Are The Movie Industry's Leading Format For The Distribution Of Films

A DVD—a "digital versatile disc"—is a five-inch-wide plastic disk that stores the digital information constituting films and videos.  Moore Decl., ¶2 n.1; Schumann Decl., ¶7.  Thousands of video works, including feature-length motion pictures, television shows, documentaries, and historical footage have been released in the DVD format.  DVDs currently make up 39% of the sales of video and film works.  Schwerin Decl., ¶3.

Many movies are sold only in the DVD format, and VHS is being phased out altogether.  Moore Decl*.,* ¶25;  Schwerin Decl., ¶4.  Moreover, the DVD format allows features such as alternate soundtracks, subtitles, alternate viewing configurations and other menu-driven options.  Moore Decl*.,* ¶¶26-30; Schwerin Decl., ¶7; Touretzky Decl., ¶9; Schumann Decl., ¶18.  For

-1-

1    example, many DVDs contain a number of different audio tracks in different languages, or tracks

2    with running commentary from the film's director or actors.  Moore Decl., ¶¶26-30.  Many

3    DVDs also include video segments in addition to the main feature, such as scenes cut from a

4    movie, alternate endings that were not used in a film's theatrical release, interviews with the

5    film's cast and other so-called "bonus tracks."  Some of these bonus tracks are interactive (such

6    as allowing the viewer to freeze the action and view it from different camera angles); other bonus

7    tracks may include video games that can be "played" on a DVD player.  Moore Decl., ¶26;

8    Schwerin Decl., ¶7.  Many bonus tracks are not available to consumers in any other format,

9    including the VHS version of the film.  Moore Decl., ¶26-30; Schwerin Decl., ¶7.

**B.    DVDs Are Susceptible To Damage, Scratching And Deterioration**

11         DVDs are fragile and are easily damaged.  The DVD is comprised of one or two layers of

12    reflective material that holds the digital information, encased in clear plastic.  Moore Decl., ¶2

13    n.1; ¶7.  The plastic disk is very sensitive to scratches and cracks on the playing surface, and

14    because of the high density of the data stored on the DVD even a slight scratch or imperfection

15    in the plastic surface can lead to problems playing the DVD.  Moore Decl., ¶7**;** Schwerin Decl.,

16    ¶6.  Similarly, exposing the disk to heat or light can damage the reflective surface or the plastic

17    coating, leading to problems ranging from lost video frames, to skipping, to the complete

18    inability to play the DVD.  *Id.*  DVDs are also susceptible to "DVD rot" and delamination, the

19    deterioration over time of a DVD in which the plastic and one or more of the reflective coatings

20    begin to separate, rendering the DVD unplayable.  Schwerin Decl., ¶6.

**C.    CSS Is Used To Encode The Data On Certain DVDs Distributed By The Studios**

22         Many DVDs distributed by the Studios store the digital data that makes up the film in a

23    format called the "Contents Scramble System" or "CSS."  The Copyright Control Authority

24    ("CCA") administers the CSS encoding scheme and the licensing of the electronic "keys" used

25    by DVD players to play back DVDs. Moore Decl., ¶10-11; Schumann Decl., ¶¶12-14.  All 31

26    CSS keys and the algorithm that can be used to decode a DVD are well known and publicly

27    available on the Internet.  Touretzky Decl., ¶¶7,11, 14, 22, 24; Schumann Decl., ¶22.

28         CSS is an access control system, not a copy control system.  Touretzky Decl., ¶17.

1    Broadly speaking, a licensed DVD player contains a CSS key that opens a "lock" on the DVD,

2    which is contained on a "CSS lock" track, enabling the contents to be decrypted and viewed.

3    CSS does not prevent the copyrighted contents of a CSS-protected DVD from being copied.

4    Touretzky Decl., ¶¶10-17; Moore Decl., ¶¶10-13.  However, the CCA does not permit licensed

5    manufacturers of DVD players to sell a DVD write drive that will write to the "CSS lock track."

6    Likewise, under the CCA's license requirements, the makers of blank DVD media are required

7    to block the CSS track and make blank DVDs unrecordable in that section.  As a result, although

8    it is possible to make a copy of a CSS-encrypted DVD, such a copy is missing the CSS "lock."

9    Because the copy is missing the lock, it cannot be opened by the CSS key, and cannot be

10   accessed or viewed.  *Id.*  So although CSS allows for copying, that copying is not particularly

11   useful.

12          The CCA's licensing scheme can also prohibit a user from skipping or fast-forwarding

13   through certain portions of a DVD, such as advertisements or previews for other movies

14   produced by the studio selling the DVD.  Moore Decl., ¶10.  Taken together, the licensing

15   scheme is thus analogous to a lock on a copy of a book that you have purchased: You can sit next

16   to your bookshelf and read the book cover to cover, but you cannot skip the introduction, quote

17   your favorite passage, or repair a damaged spine.

18   **D.      CSS Does Not Necessarily Correspond With Copyright Protection Of The DVD Contents**

19          CSS is used to encrypt video content that is in the public domain, including video works

20   that are not protected by copyright.  These include works for which the copyrights have expired

21   and works created by the Government.  Moore Decl., ¶¶33-34; Schwerin Decl., ¶ 9.  In addition,

22   a number of CSS-encrypted DVDs contain portions that are in the public domain.

23   **E.      DVD Copy Plus Consists Of Publicly Available Software And An Instruction Guide That
         Permits Legitimate Owners Of DVDs To Create Backup Copies**

24          DVD Copy Plus consists of an electronic guide explaining how to create backup copies

25   of DVDs, bundled with two pieces of free, publicly available software which can be downloaded

26   without charge from Internet websites and are included with DVD Copy Plus as a convenience,

27   and a licensed CD burning application.  Moore Decl., ¶¶2-4.  The instruction manual explains

28

-3-

how to download the video and sound content of a DVD onto a CD, which can be played on a computer and many DVD players. *Id.* DVD Copy Plus does not create a copy of the DVD itself, but copies the video and sound contents of the DVD into a different storage medium. *Id.* DVD Copy Plus cannot make a backup of the entire contents of the DVD; instead, DVD Copy Plus makes a backup copy of the film only without the bonus tracks (or of a bonus track without the film) which will not have the menu-driven playback options of the original DVD. *Id.* The quality of the video CDs created by DVD Copy Plus is lower than the original DVD. *Id.* As explained on 321s' website and in other marketing materials, DVD Copy Plus is intended to permit legitimate DVD owners to create archival backup copies of the DVDs they already own (whether encoded with CSS or not), as well as to engage in other fair uses. *Id.*

**F.    DVD X Copy Can Make An Archival Backup Copy Of A DVD Or To Restore Data That Cannot Otherwise Be Retrieved From Damaged DVDs**

DVD X Copy is software that allows a DVD owner to make an archival backup copy of an original DVD, including original menus and special features. Moore Decl., ¶5. DVD X Copy reads the data on the DVD drive, decodes it as necessary, and then uses the data to create a backup copy of the DVD. *Id.*, ¶6. DVD X Copy can be used to create backup copies of DVDs encoded with or without CSS, including home movies. *Id.* In order to read CSS-encoded data, DVD X Copy uses a well known and publicly available CSS key. Moore Decl., ¶¶8-9. DVD X Copy then uses the well-known CSS algorithm to decode the data, and in this respect, DVD X Copy works just like any licensed DVD player. *Id.*

In addition to being able to create backup copies of DVDs, DVD X Copy also has the ability to recover the data from DVDs that have been scratched or damaged. Moore Decl., ¶7. DVD X Copy uses the error correction data placed on DVDs to recover data that has been lost due to damage. *Id.* If DVD X Copy is able to create a backup from a DVD, the backup copy will be able to play, even if the damaged original DVD is unplayable. *Id.*

**G.    DVD Copy Code Is Not An Instrument Of Piracy**

321's customers use DVD Copy Plus and DVD X Copy (collectively "DVD Copy Code") for diverse purposes: A medical physicist inserts clips from popular movies into training

-4-

1   tapes for radioactive patients and nursing staff (Still), a dentist makes excerpts from instructional

2   videos to use in lectures (Levitt), an IT administrator allows children at a school to view DVDs

3   over the school's network (Millhouse), an electronics engineer learns about MPEG video

4   (Pfeninger), a computer administrator backs up data at a hospital (Koop), a producer of wedding

5   videos makes multiple copies of clients' wedding DVDs (Yaciw), a retiree copies his home

6   movies (Stier), a student makes copies of class teaching aides (Omojola), a father edits out

7   material he deems inappropriate for his children (Jones), a student expresses himself by

8   incorporating clips from films in his own artistic works (Goscha), a computer aided drafter

9   makes copies of animations to which he owns the copyrights (Piell), a doctor makes copies of his

10  patients' radiographs (Bevans), a woodworker copies instructional videos so that they will play

11  on his computer DVD drive (Gage), a retiree transfers his VHS tapes into DVD format

12  (Hummel), and a small business owner recovers his scratched DVDs (Lang).  The list goes on

13  and on.  Farnham Decl., Exh. A.

14       It is unlikely that anyone would use DVD Copy Code to copy DVDs for sale or

15  distribution in a manner prohibited by the Copyright Act.  Burke Decl., ¶19; Moore Decl., ¶¶4,

16  14-21.  It is impractical to use DVD Copy Plus as a method of mass-producing bootleg copies of

17  DVDs because the process of copying a DVD video takes between four to six hours, and the

18  resulting copy's image quality is inferior to the original.  *Id.*  It is likewise impractical to make

19  bootlegged or pirated copies of DVDs using DVD X Copy, which has several built-in anti-piracy

20  measures.  First, the program makes a copy of a DVD onto another DVD, and erases the data

21  from the computer's hard drive to prevent any distribution of an unencrypted copy over the

22  Internet.  Moore Decl., ¶15; Burke Decl., ¶¶14-15.  Second, an indelible visible disclaimer is

23  placed onto each backup copy of a DVD made by the user of the DVD X Copy software.  Moore

24  Decl., ¶16; Burke Decl., ¶16.  The disclaimer states:

25       DVD BACKUP.  You are viewing an archival backup copy of a DVD, created
         solely for the private and personal use of the owner of the DVD from which it was
26       made.  Federal copyright laws prohibit the unauthorized reproduction, distribution,
         or exhibition of copyrighted materials, if any, contained in this archival backup
27       copy.  The resale, reproduction, distribution, or commercial exploitation of this
         archival backup copy is strictly forbidden.  We ask you to respect the rights of
28       copyright holders.

307369.02

1   This disclaimer, which appears on the screen for approximately eight seconds, cannot be skipped

2   and is displayed each time the DVD is played in a DVD player.  Moore Decl., ¶16.  Third, DVD

3   X Copy places a digital semaphore in each and every copy of a DVD it creates.  *Id., ¶17.*  That

4   digital semaphore prevents DVD X Copy from making further copies of the backup copy of the

5   DVD.  Thus, a user of DVD X Copy must have an original DVD in order to make a copy and

6   cannot use DVD X Copy to make serial copies of a DVD.  *Id.*  Finally, the data on a copy of a

7   DVD created using DVD X Copy is digitally watermarked so that 321 can trace any particular

8   copy back to the computer that was used to create it, based on the license that is required to

9   activate the software.  *Id., ¶18.*  If 321 determines that a particular copy of its software is being

10  misused, 321 can remotely disable that copy of the software.  *Id.*, ¶19.

11      321 markets its products for uses that include making archival backup copies of DVDs,

12  and explains to potential customers that the products are useful for copying all kinds of DVD

13  video content, including home movies and other materials not covered by any copyright or the

14  CSS scheme.  Moore Decl., ¶21.  The Internet websites operated by 321, as well as the materials

15  and instructions included with DVD Copy Plus and DVD X Copy, explain to users that the

16  instructions and software must be used only to create legitimate copies of the contents of DVDs

17  in a manner consistent with the copyright laws.  *Id.*, ¶¶22-24.  DVD Copy Plus and DVD X

18  Copy include the following warning on the its packaging and in the instruction materials:

19          RESPECT THE RIGHTS OF ARTISTS.  DVD Copy Plus allows you to make
            backup copies of movies you own or movies you have created.  It is against the law to
20          make or distribute reproductions of copyrighted material for most purposes other than
            your own use.  This software is designed for you to make a backup copy for personal
21          use only.  We respect the rights of artists and ask you to do the same.  *Id.*, ¶21.

22      321 actively discourages anyone from using these products to create pirated copies of

23  copyrighted DVDs.  Moore Decl., ¶22-24.  321 has offered to assist the Studios and the MPAA

24  in tracking down anyone who has used 321 products to create pirated copies of DVDs.  *Id.*  321

25  also has publicly announced that it will assist in the apprehension of people that may attempt to

26  use 321's products to illegally copy DVDs, and announced a $10,000 reward for information

27  leading to the arrest and conviction of any person who uses 321's products to copy DVDs

28  illegally.  *Id.*  To date, the Studios have come forward with no evidence that *anyone* has ever

-6-

307369.02

1  used DVD Copy Code for an illegal purpose.

2  ## III.   LEGAL ANALYSIS

3  **A.   DVD Copy Code Is Not Prohibited Under The DMCA**

4        A good analogy can be a powerful tool, fostering the understanding of otherwise difficult

5  technology and law.  Indeed, the process of applying copyright law has been described as

6  "deciding whether a horse is more like an apple or an orange."  But analogies are only as helpful

7  as they are accurate.  The Studios are fond of analogizing 321 Studio's software, describing it at

8  various points as "like a skeleton key that can open a locked door"  (Motion at 7), "the electronic

9  equivalent of breaking into a castle" (*Id.* at 11), "the electronic equivalent of breaking into a

10  locked room in order to obtain a copy of a book" (*Id.*), "break[ing] into a house" (*Id* at 16.), and

11  removing "security devices that will activate alarms if the products are taken away without

12  purchase" (*Id.*)

13        These are powerful images, but they are quite wrong.  Each of the Studios' analogies is

14  misleading because each ignores the central fact that makes 321's DVD Copy Code legal: The

15  end user isn't gaining access to anyone's "castle" but her own.  DVD Copy Code works on

16  *original* DVDs the user has already purchased, and thus unquestionably has the right to access.

17  321 has put in place technological measures that effectively preclude the use of 321's software

18  for illicit, "serial copying" purposes.  Thus—to align the Studios' colorful imagery with the facts

19  in *this* case—321's software is the electronic equivalent of calling a locksmith to obtain a

20  duplicate key that will allow one to unlock the front door to one's own home.  This crucial

21  distinction is what makes this case completely different from *Universal Studios, Inc. v. Corley*,

22  273 F.3d 429 (2d Cir. 2001) and *United States v. Elcom*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002),

23  both of which involved computer programs that arguably facilitated the instant redistribution of

24  copyrighted content over the internet.[1]

25

26  _____

[1] DVD Copy Code is very different from the computer programs at issue in *Corley* and *Elcom*, both of which were found to have the primary purpose of allowing access to those who had not paid for it.  *Elcom*
27  involved Advanced eBook Processor ("AEBPR").  Like most other forms of digital content, digital eBooks are distributed for free download, but because they are encrypted, the user must purchase his or
28  her own key to access the contents.  ARBPR allows a user to access an eBook for free, without buying the key, and to redistribute the unlocked version widely over the Internet.  *Elcom* at 1118-19.  *Corley*

307369.02

1.     **DVD Copy Code Does Not "Circumvent" Encryption**

The Studios accuse 321 of violating two separate sections of the DMCA: §1201(a)(2), which regulates devices providing unauthorized *access* to works, and §1201(b), which regulates devices enabling *violation of a copyright holder's rights* (such as illegal copying).  Only §1201(a)(2) applies to DVD Copy Code, because CSS controls access to DVDs, not the copying of DVDs.  CSS prevents unauthorized access to a DVD by requiring a key in order to view the data contained on the DVD.  Touretzky Decl., ¶10-14.  CSS does not prevent the copying of the encrypted data on the DVD.  *Id.*, ¶17; Schumann Decl., ¶19.  Thus, any circumvention of CSS raises issues under §1201(a), which governs unauthorized access, but does not raise issues under §1201(b), which governs technological measures that protect against copying.  Indeed, Congress recognized that "the two sections are not interchangeable, and many devices will be subject to challenge under one of the subsections."  S. Rep. 105-190 at 12 (1998).

a.     **321 Does Not Violate Section 1201(a)(2)**

Section 1201(a)(2) prohibits trafficking in tools that "circumvent a technological measure" in order to gain access to a work.[2]  "Circumvent a technological measure" is defined in §1201(a)(3)(A): to "'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, **without the authority of the copyright owner**."  (Emphasis added.)

Remarkably, the Studios' brief misquotes this definition, removing (without ellipses) the key phrase "without the authority of the copyright holder."  Motion at 13.  This omission is

involved DeCSS, which allows the user to distribute an unencrypted copy of a CSS-protected movie over the Internet, at the touch of a button, to users who would then be able to watch the unencrypted movie without having paid for it.  Notwithstanding *Corley*'s entry of a permanent injunction, DeCSS remains widely available for free download on the Internet.  Moore Decl., ¶20; Burke Decl., ¶16; Touretzky Decl., ¶36-40; Schumann Decl., ¶22.

[2] Section 1201(a)(2) provides that: "No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected

-8-

307369.02

1    critical.  Because "circumvention" is by express definition limited to *unauthorized access*, DVD

2    Copy Code does not violate §1201(a)(2) for an obvious reason: It works *only* on original DVDs.

3    By definition, *any* purchaser of a DVD has the right to *access* its content; otherwise, he has

4    purchased nothing but an expensive coaster.  Indeed, if providing the means to decrypt

5    scrambled content to the rightful owner of the original disk constituted "circumvention" under

6    §1201(a)(2), then *every* manufacturer of DVD players would violate that section because all

7    DVD players must descramble a scrambled work and decrypt an encrypted work in order to play

8    a DVD.  DVD players do not violate the DMCA because—just like DVD Copy Code—they are

9    a tool for use by the persons who have the right to access the contents of the DVDs.[3]

10        The Studios nonetheless urge this Court to hold that providing the tools for users to

11   access content they are authorized to access violates §1201(a)(2).  This absurd result can only be

12   achieved by doing what the Studios literally do in their brief: removing the words "**without the**

13   **authority of the copyright owner**" from the text of the statute.[4]  §1201(a)(3) (emphasis added).

14        **2.        321 Does Not Violate Section 1201(b)**

15        The Studios also assert that 321's software violates §1201(b), which prohibits devices

16   that circumvent technological measures protecting "a right of a copyright holder."[5]  Section (b)

17   _____

18   under this title."

     [3] The Studios make much of the "strict requirements" of "CCA licensing procedures."  Motion at 4.
19   Those provisions are irrelevant here, as neither 321 nor its users are parties to those contracts.  DVDs are
     sold outright, not licensed, and the Studios thus have no right to impose any use restrictions on their
20   purchasers other than those provided by copyright law.  They can no more dictate to users which
     decryption software to use than a book author can tell a buyer he must not skip the introduction.

21   [4] Because 321's software can only be used on original DVDs, the Studios' reliance on *Elcom* and *Corley*
     is misplaced.  *Elcom* did not address the "without the authority of the copyright holder" language in
22   §1201(a)(2) at all.  Although *Corley* did briefly address the "without the authority of the copyright
     holder" language of §1201(a)(3)(A), it did so in a different context, because the court concluded that
23   DeCSS allows persons without authority (*i.e.,* those who have not purchased a DVD) to view a DVD.
     Unlike DeCSS, DVD Copy Code creates physical backups of DVDs, not electronic files that can be
24   shared on the Internet, and thus is intended to preclude any such unauthorized viewing.

     [5] That section provides: "(1) No person shall manufacture, import, offer to the public, provide, or
25   otherwise traffic in any technology, product, service, device, component, or part thereof, that—

26   (A) is primarily designed or produced for the purpose of circumventing protection afforded by a
     technological measure that effectively protects a right of a copyright holder under this title in a work or
27   portion thereof;

     (B) has only limited commercially significant purpose or use other than to circumvent protection afforded
28   by a technological measure that effectively protects a right of a copyright holder under this title in a work
     or portion thereof; or

was designed to combat the copyright infringement of digital works (*i.e.*, the violation of "a right of a copyright holder").  As discussed above, any circumvention of CSS falls under §1201(a), not §1201(b).[6]  Even if §1201(b) did apply, however, DVD Copy Code would not violate that section because its primary and intended use does not violate any right of a copyright holder.  Many uses of DVD Copy Code either do not implicate the DMCA at all (*e.g.,* making copies of DVDs not encoded with CSS), or do not implicate copyright infringement (*e.g.,* making copies of DVDs, or excerpts from DVDs, in the public domain).[7]  Others unquestionably constitute the fair use of copyrighted materials (*e.g.*, making clips from DVDs for purposes of commentary, scholarship or discussion, or making a playable copy of a scratched DVD).  The other main use of DVD Copy Code—making a single, archival backup copy of a movie that the user has already purchased—is also authorized under the copyright law.

> **a.**    **Section 117 Of The Copyright Act Allows Users To Make Archival Copies**

Section 117 of the Copyright Act provides that "it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided: . . . (2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful."  17 U.S.C. §117(a).  The Act defines "computer programs" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  17 U.S.C. §101.

DVDs—whether they contain digital video, digital audio, or programs to control the selection and display of other content on the disk (or, in virtually all cases, a combination of the three)—are computer programs under §117.  Touretzky Decl., ¶41.  The contents of a DVD

---

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright holder under this title in a work or portion thereof."  §1201(b)(1).

[6] There is also a disputed question of fact at this point whether CSS "effectively" controls anything, particularly since all the player keys are in the public domain, and DeCSS is widely available on the Internet. Moore Decl., ¶20; Burke Decl., ¶16; Touretzky Decl., ¶36-40; Schumann Decl., ¶22.

[7] Unauthorized extraction of unprotectable content from a copyrighted work has consistently been held not to violate a copyright.  *See, e.g., Sony Computer Ent't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602-08 (9th Cir. 2000).

consist entirely of a series of millions of zeroes and ones, which must be converted into what we call a "movie." *Id*., ¶3. In some instances, those functions are performed on a standalone DVD player, which contains computer circuitry to read the program on the disk, perform millions of computations based on that digital information, and create a display and accompanying sound on a television. In other instances, the same functions are performed by a "general purpose" computer. In either case, the machine must perform millions of calculations on the digital information from the DVD, first applying keys contained on the disk to decrypt the data, then dividing and packaging that data into electronic commands to draw pictures on a screen and make sounds through speakers. Whether "played" on a computer or a DVD player, the DVD is a set of instructions that are used by a computer to bring about a certain result.[8] Therefore, making personal backup copies of DVDs is expressly authorized under the copyright laws.

> **b.**     **Making An Archival Backup Copy Is A Fair Use Under Section 107**

Section 107 of the Copyright Act sets forth a non-exclusive list of four factors to be considered in assessing whether an act is fair use: "(1) the purpose or character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. §107.

In *Sony*, the court found that the practice of recording commercial television broadcasts was fair use, notwithstanding that users typically taped the entire program. The Court explained that where the use is non-commercial, "the fact that the entire work is reproduced, see §107(3), does not have its ordinary effect of militating against a finding of fair use." *Sony*, 464 U.S. at 449-50. *Sony* concluded that recordings that allow a user to view the same content at different

---

[8] The Studios will likely argue that DVDs are not properly viewed as computer programs, because some (though not all) of the digital information contained therein is properly labeled "data" rather than "programs." To begin with, this is an artificial distinction, as any computer "program" or "data" consists of an unbroken string of ones and zeroes to be sequentially read into a computer, which will then perform functions based on the content of that string of data. Moreover, the same argument can be made concerning virtually any modern "computer program": The vast majority of the information in video games, educational software, and electronic books ("eBooks"), for example, consists of what can be called "data" (such as graphics, text, and sounds) rather than "programs." Finally, increasing amounts of

307369.02

1    times are clearly non-commercial, even though the user is making an additional, permanent and

2    complete copy of the copyrighted work, for two reasons.  *Id.*  First, a user who records television

3    programs is authorized to view them.  *Id.*  Second, the harmful effects of the use upon the

4    potential market for the work could not simply be presumed: "[a] challenge to a non-commercial

5    use of a copyrighted work requires proof either that the particular use is harmful, or that if it

6    should become widespread, it would adversely affect the potential market for the copyrighted

7    work."  *Id.* at 451.  In order to establish that non-commercial copying was not a fair use, "[w]hat

8    is necessary is a showing by a preponderance of the evidence that <u>some</u> meaningful likelihood of

9    future harm exists."  *Id.*  (Emphasis in original)

10        *Sony* compels the conclusion that making archival backup copies of DVDs is a fair use.

     Indeed, the *Elcom* court reached the same conclusion with respect to eBooks:

12        Courts have been receptive to the making of an archival copy of electronic media
          in order to safeguard against mechanical or electronic failure.  *See Vault Corp v.*
13        *Quaid Software Ltd.*, 847 F.2d 255, 267 (5th Cir. 1988).  *Making a back-up copy*
          *of an ebook, for personal noncommercial use would likely be upheld as a non-*
14        *infringing fair use.*

15   *Elcom*, 203 F. Supp. 2d at 1135 (emphasis added).  Similarly, in *RIAA v. Diamond Multimedia*

16   *Sys., Inc*., 180 F.3d 1072, 1079 (9th Cir. 1999), the Ninth Circuit held, again after reviewing a

17   detailed factual record, that most people used the MP3 player to "space shift," which was a fair

18   use, noting that "such copying is paradigmatic non-commercial personal use entirely consistent

19   with the purposes of the Act."  *Id.* at 1079.

20        To the extent that there is any doubt on this point, the likelihood of future harm and the

21   impact on the market for DVDs is a factual question that cannot be resolved on summary

22   judgment.  The Studios have not shown that the use of DVD Copy Code has *any* present or

23   future impact on the market for their products, and indeed have made no effort to do so.  The

24   Studios will no doubt argue, on Reply, that there are other possible uses (and misuses) of 321's

25   software: One could use it to make a copy of a DVD borrowed from a friend, or a DVD rented

26   from a video store, or give the copy to someone else.  Perhaps.  But exactly the same possibilities

27   existed in *Sony*: A VCR can be used to copy a television broadcast for sale, or to make a copy of

28   _____

     content on DVDs is interactive, such as video games that must be played on a computer's DVD drive.

307369.02

a rented tape.  *Sony* held that mere speculation about such unfair uses cannot defeat the right to fair use.  Proof of harm is required.  And such speculation certainly cannot justify summary judgment: The Studios have introduced no evidence (disputed or otherwise) that *any* unfair use has *ever* been made, or is threatened to be made, of DVD Copy Code.[9]

           **c.**    **Because The Primary And Intended Use Of 321's Software Is Legal, 321 Does Not Violate Section 1201(B)**

In a single paragraph, the Studios dismiss entirely any consideration of the legality of the use of 321's software, arguing that "these arguments are irrelevant to 321's liability."  Motion at 15.  The Studios are wrong: They both misunderstand 321's argument and misstate the law.

        **(i)**    **Fair Use Is A Common Law Defense To The DMCA**

The fair use doctrine arose under the common law as a "general equitable defense" to copyright infringement, well before any such defense was expressly incorporated into the copyright statute.  *See Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539 (1985).  When the fair use doctrine ultimately was codified at §107, Congress simply imported the relevant standards from the applicable case law.  The Studios have articulated no reason why the courts should create fair use as a judge-made defense to copyright infringement but not create the same defense to circumvention liability under the DMCA, and there is none.  Thus, even to the extent not explicitly provided by the statute, the fair use doctrine is a common law defense to liability under the DMCA.

        **(ii)**    **Section 1201(B) Explicitly Preserves Fair Use As A Limitation**

In fact, however, the DMCA explicitly incorporates fair use as a limitation to liability.  In drafting §1201(b), Congress made clear that "[n]othing in this section shall affect rights, remedies, *limitations*, or defenses to copyright infringement, including fair use, under this title."  17 U.S.C. §1201(c)(1) (emphasis added).  The fair use doctrine is a limitation that applies to all rights under Title 17, including those rights that do not technically sound in copyright.  For

---

[9] This case is thus quite different from *A&M Records v. Napster, Inc.*, 114 F. Supp. 2d 896 (N.D. Cal. 2000), in which the court concluded, after a detailed evidentiary presentation, that "any potential non-infringing use of the Napster service is minimal or connected to the infringing activity, or both."  *Id.* at 912 (finding Napster liable for contributory infringement because it was able to, but did not, filter out copyrighted works from its service).

307369.02

1  example, §1101 sets forth the right to fix performances of musical works and does not contain an

2  explicit fair use provision, but such a right surely could be asserted by a professor who played a

3  bootleg recording of Maria Callas in an opera appreciation course.  Jane C. Ginsburg, *Copyright*

4  *Use and Excuse On The Internet*, Columbia-VLA journal of Law & Arts, Fall 2000, p.9, n.28.[10]

5  As noted by the Registrar of Copyrights, (H.R. Rep. No.  2441 and S. Rep. No. 1284):

6           This legislation clarifies existing law and expands specific exemptions for
         laudable purposes.  These specific exemptions are supplemented by the broad
7        doctrine of fair use.  Although not addressed in this bill, fair use is both a
         fundamental principle of the U.S. copyright law and an important part of the
8        necessary balance on the digital highway.  *Therefore, the application of fair use in*
         *the digital environment should be strongly reaffirmed.*

9

10  (Emphasis added.)  The DMCA is thus in accord with the common law, and explicitly preserves

11  fair use as a general limitation on the rights set forth in Title 17, including §§1201(a)(2) and (b).

12         **(iii)   DVD Copy Code Does Not Interfere With A Right Of A**
                    **Copyright Holder**

13         In codifying the copyright fair use doctrine at 17 U.S.C. §107, Congress disavowed any

14  intent to "freeze" the doctrine, "especially during a period of rapid technological change."  *See*

15  H.R. Rep. No. 94-1476 at 66 (1976).  Indeed, the fair use doctrine has always been interpreted to

16  change as technology changes: For example, the "time shifting" allowed under *Sony* did not exist

17  until VCRs were introduced.  The Studios suggest that §1201, rather than changing with new

18  technologies, simply relegates fair use to the analog past.  They argue that, in enacting the

19  DMCA, Congress pretended that the DMCA did nothing to affect the right of fair use while

20  actually prohibiting all the tools necessary to engage in it.  Congress was not so underhanded.

21         Because Congress did not, and as discussed *infra*, could not constitutionally eliminate fair

22  use in the digital realm, §1201(b) does not bar *all* tools that can defeat technological measures.

23  Rather, it only bars only a tool that "is primarily designed or produced for the purpose of"

24  (§1201(b)(1)(A)), "has only limited commercially significant purpose other than"

25  (§1201(b)(1)(B)), or "is marketed . . . for use in" (§1201(b)(1)(C)) circumventing the protection

26  "of a right of a copyright holder."  Without proof of one of these three elements, which were

27

28  [10] *Cf. New Kids on the Block v. New American Publishing*, 971 F.2d 302 (9th Cir. 1992) (fair use of
    trademarks).

307369.02

1    adapted from the test for fair use set forth in *Sony*, there is no liability.  And the Studios have not

2    proven, and cannot prove, any of these elements, because as set forth above the primary and

3    intended use of 321's software does not violate a "right of a copyright holder" at all.[11]

4         The Studios may argue in Reply that §1201(b) should be read differently.  Section

5    1201(b), they may say, should be parsed to ban not just products whose primary purpose is to

6    infringe the rights of copyright holders, but any products whose primary purpose is to copy

7    encrypted content, even if such copying is perfectly legal.  This construction cannot withstand

8    even the most casual scrutiny.  If Congress had intended to ban all tools whose primary purpose

9    is to enable the copying of encrypted content, regardless of the use to which those products are

10   put, it could have made §1201(b) a lot shorter: Because *any* copy protection measure *can* (in

11   theory) serve to protect both copyrighted and uncopyrighted material, §1201(b)(1)(A) could

12   simply read "is primarily designed or produced for the purpose of circumventing copy protection

13   afforded by a technological measure."  The additional language in each of §1201(b)'s three

14   subsections—"that effectively protects a right of a copyright holder under this title in a work or a

15   portion thereof"—is under the Studios' construction mere surplusage.  Of course, statutes must

16   be read, if possible, to give meaning to each word or phrase.  *See e.g.*, *Burrey v. Pacific Gas &

17   Elec. Co.*, 159 F.3d 388, 394 (9th Cir. 1998).

18        Moreover, if the requirement of infringing purpose is read out of the statute, as the

19   Studios suggest, the result is nonsensical: absent that requirement, *any* DVD player, *any* cable

20   television descrambler, and *any* Digital Rights Management software violates §1201(b)(1),

21   because they all decrypt encrypted content.  Under the Studios' reading, it makes no difference

22   that the copyright holder or the law has authorized that circumvention, because the definition of

23   "circumvention" in §1201(b), unlike that in §1201(a), does not contain the limiting language

24

---

25   [11] *Corley* rejected the notion that the rights under §1201(b) are limited by fair use as inconsistent with
     §1201(c), which allows the Library of Congress to engage in triennial rulemakings to exempt certain

26   categories of works from the prohibition contained in §1201(a)(1).  But §1201(a)(1) is the "anti-
     circumvention" provision of the DMCA: it prohibits the *use* of technology in order to circumvent a

27   technological measure that controls access to a work; it does not address the distribution of devices under
     §1201(b).  And § 1201(a), unlike §1201(b), does not contain any limitation that the circumvention be of a

28   technology protecting a right of a copyright holder.  Thus, it does not expressly incorporate the same fair
     use limitation as §1201(b).

-15-

307369.02

1   "without the authority of the copyright holder."[12]  Thus the only reason an authorized decryption

2   tool does not violate the DMCA is that its primary purpose is not to infringe copyright.  If one

3   reads the infringing purpose limitation out of §1201(b), the baby goes out with the bath water,

4   and every decryption tool is illegal.  The statute makes sense only by inclusion of the infringing

5   purpose limitation, and that limitation makes the DVD Copy Code legal.

6                    **(iv)    DVD Copy Code Does Not "Circumvent" Encryption**

7           DVD Copy Code does not violate §1201(b)(2) for the additional reason that it does not

8   "circumvent" encryption.  Section 1201(b) defines to "circumvent protection afforded by a

9   technological measure" as "avoiding, bypassing, removing, deactivating or otherwise impairing a

10  technological measure."  17 U.S.C. §1201(b)(2).  Even under the Studios' reading of §1201(b),

11  DVD Copy Code does none of these things.  First, it does not "avoid" or "bypass" the encryption

12  of a DVD.  Instead, it simply uses the authorized key to unlock the encryption.  In this respect,

13  DVD Copy Code is no different from any commercially-available DVD player.  Moore Decl.,

14  ¶8.

15          Second, DVD Copy Code does not "remove, deactivate or otherwise impair" the

16  encryption on a DVD, because the original DVD is completely unchanged, and its encryption

17  remains intact.  Touretzky Decl., ¶¶4, 6. This is not mere semantics: Because DVD Copy Code

18  does not strip the encryption from the original DVD, it does not allow it to be copied *seriatim*.

19  The Studios may argue that DVD Copy Code circumvents encryption because the *copy* of the

20  DVD made with DVD Copy Code is not encrypted.  But the Studios cannot credibly argue that

21  §1201(b) prohibits the making of any unencrypted *copy* of a DVD, regardless of whether doing

22  so constitutes copyright infringement.  It is literally impossible to use a DVD at all without

23  making such a copy of its content.  Touretzky Decl., ¶29; Schumann Decl., ¶19.  First, in order to

24

25  [12] The omission of "without the authority of the copyright holder" cannot be ignored, because Congress
    included it in the parallel definition in §1201(a).  Under the doctrine of *expressio unius est exclusio*
26  *alterius*, when a legislature explicitly includes a word or phrase in one section of a statute, but omits that
    same word or phrase from another section, courts presume that the omission was intentional and that the
27  legislature intended to impose a different rule.  *See Russello v. United States*, 464 U.S. 16, 23 (1983)
    ("[W]here Congress includes particular language in one section of a statute but omits it in another section
28  of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate
    inclusion or exclusion.").

307369.02

1   decrypt the encrypted content, that content must be copied into memory before the mathematical

2   computations of the decryption process can be executed.  Then, the decrypted results of that

3   process must also be stored in memory.  Thereafter, depending on whether the DVD is being

4   played on a standalone DVD player or a computer, and depending on whether the monitor is

5   analog or digital, additional copies of the data are created in digital to analog converters, in video

6   driver boards or buffers, and the like.  Touretzky Decl., ¶29-30; Schumann Decl., ¶¶19-21.

7          These copies, although typically transitory, are nonetheless copies.  *MAI Systems Corp. v.*

8   *Peak Computer Inc.*, 991 F.2d 511, 518 (9th Cir. 1993).  Inescapably, at least some copying of

9   DVDs is permitted, notwithstanding both copyright law and the DMCA.  The Studios, of course,

10  will retort that this is not the sort of copying that concerns them; it is simply the sort of copying

11  that is the natural byproduct of lawful use of DVDs.  After all, such copying does not supplant

12  the market for their films, as the user must first purchase a DVD in order to create those copies.

13  They are copies made for non-commercial purposes, with no effect on the potential market for

14  the copyrighted work.  But that is precisely the point; the transitory copies created by any DVD

15  player do not violate any right of the copyright holder because they are a fair use of the work in

16  question, just like the archival copies made by 321's software.

17         The Studios' arguments also fail, as a factual matter, as to DVD X Copy, because that

18  software does not remove, deactivate or impair copy protection, even on the copied DVD.  The

19  Studios' own expert admits as much: A copy made using DVD-X-Copy includes copy

20  protections to ensure that no serial copying will take place.  That copy protection is not identical

21  to CSS, because the Studios have structured the CSS licensing scheme to preclude its inclusion

22  on a copy made by DVD Copy Code.  Moore Decl., ¶¶10-13.  But the Studios' design choice

23  cannot circumvent the safeguards of the DMCA.  *Sega Enterprises Ltd. v. Accolade, Inc.*, 1993

24  U.S. App. LEXIS 78, 3 (9th Cir. 1993) (rejecting trademark infringement claim because Sega

25  bore primary responsibility for designing system in order to create trademark infringement by

26  would-be fair users).  To the extent the Studios argue that the copy protections contained in DVD

27  X Copy are inadequate, that is a factual question that cannot be resolved on summary judgment.

28

307369.02

### 3.   321 Does Not Violate Any Of The Three Statutory Prongs Of Either Section

Finally, even accepting the Studios' interpretation of the DMCA as eliminating fair use altogether, there are still disputed issues of fact under each statutory subsection that preclude summary judgment.

### a.   DVD Copy Code Is Not Primarily Designed Or Produced To Circumvent

DVD Copy Code was not primarily designed and produced to circumvent a technological measure; it was primarily designed and produced to allow users to make copies of all or part of a DVD.  Moore Decl., ¶¶21-24.  DVD Copy Code includes within it much more than the DVD player key that unlocks the encryption.  For example, DVD Copy Code works on DVDs that have no CSS encryption, and customers purchase and use it in order to make copies of such DVDs.  *Id.*  The ability to unlock CSS is just one feature of DVD Copy Code.

The Studios appear to acknowledge the force of this argument, but contend that, even if DVD Copy Code as a whole is not primarily designed to circumvent, one utility within it satisfies that requirement.  The Studios further argue that §1201(b) prohibits the sale of any "technology, product, . . . or *part* thereof" that is primarily designed to circumvent, and that if any part of DVD Copy Code is primarily designed to circumvent, the whole product is prohibited under the DMCA.  That argument ignores the plain language of the statute: 321 does not sell individual components or "parts"; it sells DVD Copy Code.  Under the Studios' interpretation of the statute, the words "primarily designed" would be surplusage, because it would always be possible to isolate the offending portion of any software that had the circumvention feature and thus pronounce the entire product illegal.  That is not what the DMCA provides.

### b.   DVD Copy Code Does Not Have Only Limited Commercially Significant Purposes Other Than To Circumvent

DVD Copy Code has a number of commercially significant purposes, of which unlocking CSS encryption is only one.  DVD Copy Code is used, for example, to make copies of home movies to send to relatives and to make copies of instructional videos.  Moreover, even when used to make backup copies of CSS-protected works, or to make a copy of a damaged DVD, the unlocking of the encryption is only incidental to the legal copying of the content.  The Studios

-18-

307369.02

1    have proffered no evidence regarding the substantiality of those uses, which is a factual question

2    that cannot be resolved on summary judgment.

3                    **c.    A Prohibition On Truthful Marketing Violates The First Amendment**

4            Unlike subsections (A) and (B), subsection (C) concerns not the sale of a device, but

5    rather what is said about that device: It prohibits marketing a product for use in circumventing

6    protection.  Thus, according to the Studios' interpretation, a product might be perfectly legal

7    under every other section of the DMCA, but nonetheless the seller could be prohibited from

8    telling potential customers about certain uses of the product—even if those uses are themselves

9    perfectly legal.  321 markets DVD Copy Code for a variety of legal purposes, including making

10   backup copies of lawfully purchased DVDs.  A prohibition on the dissemination of such truthful

11   information about the product's legal attributes cannot be reconciled with the First Amendment.

12   *See Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) (First Amendment right to list alcohol

13   content of beer on label); *44 Liquormart v. Rhode Island*, 517 U.S. 484 (1996) (striking down

14   prohibition on alcohol price advertisements).

15   **B.    As Construed By The Studios, The DMCA Violates The First Amendment**

16           The Studios ask this Court to construe the DMCA in a manner that effectively does away

17   with fair use in the digital realm.  Such an interpretation is incompatible with the First

18   Amendment's free speech guarantees.  Moreover, the Studios ask the Court to rule that this

19   evisceration of fair use survives First Amendment scrutiny—which requires the Court to make

20   determinations regarding the challenged statute's impact on speech, and the extent to which there

21   are other, less intrusive ways to address the government's legitimate interests—on a record bereft

22   of any facts, without even affording 321 the opportunity to take discovery necessary to develop

23   the relevant evidence.  The procedural posture of this case is thus unlike *Corley*, in which the

24   court conducted a six-day trial before rendering a final decision, and *Elcom*, in which the court

25   ruled on a motion to dismiss a criminal indictment which, because of the lack of discovery

26   afforded criminal defendants, was of necessity only a broad-brush facial challenge to the statute.

27           321 will show that the DMCA is unconstitutional as applied to the sale of DVD Copy

28   Code in two ways.  First, prohibiting the sale of DVD Copy Code tramples on the First

                                              -19-

1   Amendment rights of third parties who want to engage in protected expression using that

2   software.  Second, prohibiting the dissemination of DVD Copy Code violates 321's First

3   Amendment rights, because DVD Copy Code is itself speech.  Finally, even if a ban on the sale

4   of DVD Copy Code could be reconciled with the First Amendment, a ban on all technology that

5   could be used to circumvent encryption is so overbroad as to be unconstitutional on its face.

6       **1. A Ban on DVD Copy Code Impermissibly Burdens The First Amendment Rights of Users**

7           Would-be purchasers of DVD Copy Code have a First Amendment right to use that code

8   in order to engage in expressive activities, including the fair use of movies.[13]  *See Ashcroft v.*

9   *Free Speech Coalition*, 535 U.S. 234 (2002) (First Amendment applies to watching movies).

10  The origins of the First Amendment lie in the compulsory licensing of printing presses which

11  effectively eliminated the tools necessary to engage in activities protected by the First

12  Amendment.  *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 320 (2002).  For movies, DVD Copy

13  Code is the printing press of the digital age.

14              **(i)      Users Have A First Amendment Right To Make Fair Use Of**
                           **Copyrighted Works**

15

16          The purchasers of DVDs need access to DVD Copy Code (or software like it) in order to

    make fair use of their contents.[14]  The Studios, citing *Corley* and *Elcom*, argue that prohibiting
17

18  such fair use does not raise First Amendment concerns because "fair use is not constitutionally

    based."  Motion at 18.  But the Supreme Court has since rejected that view in *Eldred v. Ashcroft*,
19

20  123 S. Ct. 769 (2003), instead explaining that First Amendment principles are built directly into

21  copyright law through the doctrine of fair use: "[C]opyright law contains built-in First

22  Amendment accommodations. . . .  [T]he 'fair use' defense allows the public to use not only

23  _____

    [13] The purveyors of products have standing to assert the constitutional speech rights of those who would
24  purchase them.  *See Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972) (distributor of contraceptives can
    challenge law banning their distribution to unmarried individuals); *Craig v. Boren*, 429 U.S. 190, 195
25  (1976) (vendor may challenge statute forbidding sale of 3.2% beer to men—but not women—between the
    ages of 18 and 21); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *Bursey v. United*
26  *States*, 466 F.2d 1059, 1083 (9th Cir. 1972) ("The First Amendment interests in this case are not confined
    to the personal rights of Bursey and Presley.  Although their rights do not rest lightly in the balance, far
27  weightier than they are the public interests in First Amendment freedoms that stand or fall with the rights
    that these witnesses advance for themselves").

28  [14] *Universal Studios v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2002) and *Corley* did not consider this
    issue because the defendants had not developed an adequate factual record.  Here, by contrast, 321 is

-20-

307369.02

1   facts and ideas contained in a copyrighted work, but also expression itself in certain

2   circumstances." *Id.* at 788-89 (citations omitted).  Thus, the fair use doctrine is the savings

3   clause that renders the copyright laws consistent with the First Amendment.  Without the fair use

4   doctrine as a safety valve to prevent "abuse of the copyright owner's monopoly as an instrument

5   to suppress" facts, ideas, and critical commentary, the copyright laws impermissibly would

6   abridge the freedom of speech.  *Harper & Row*, 471 U.S. at 559.  To the extent that it restricts

7   fair use in the digital realm, a ban on the sale of DVD Copy Code breaches the constitutional

8   wall between copyright and freedom of expression.

9           **(ii)     The DMCA Unduly Burdens The Exercise Of First
                    Amendment Rights**

10         The many fair uses of DVD Copy Code that involve copying CSS-protected DVDs

11  include excerpting clips for scholarship or critical reviews, creating instructional videos,

12  incorporating movie clips into new video works, making backup copies of DVDs, and repairing

13  scratched DVDs.  Although the Studios have argued vociferously that fair use is no defense

14  under the DMCA, the Studios doubtless will also argue in response to this argument that the

15  DMCA does not eliminate these fair uses after all.  They cannot have it both ways.  To the extent

16  that the DMCA bans the tools necessary to engage in fair use, it has eliminated fair use itself.

17  The courts have long rejected such "back door" regulations of speech.  *See Denver Area Educ.*

18  *Telcoms. v. FCC*, 518 U.S. 727, 809-810 (1996) ("few of our First Amendment cases involve

19  outright bans on speech); *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130-137

20  (1992) (broad discretion of county administrator to award parade permits and to adjust permit fee

21  according to content of speech violates First Amendment); *Bantam Books, Inc. v. Sullivan,* 372

22  U.S. 58, 67-68 (1963) (informal threats to recommend criminal prosecutions and other pressure

23  tactics by state morality commission against book publishers violate the First Amendment).

24         Nor is there any practical way to make a copy of a DVD without using DVD Copy Code

25  (or other software like it).[15]  The Supreme Court recently cautioned that "one is not to have the

26

27  _____

entitled to take discovery in order to make such a showing.

28  [15] The Studios may contend that fair use is not implicated because all content on DVDs is available in
another form, but they have proffered no evidence in support of that contention, and it is false.  While

307369.02

1   exercise of his liberty of expression in appropriate places abridged on the plea that it may be

2   exercised in some other place."  *Reno v. ACLU*, 521 U.S. 844 (1997) (availability of indecent

3   speech on paper did not justify banning it on the internet).  Nonetheless, the Studios may argue

4   that it is theoretically possible to purchase (for hundreds of dollars) a video camera, point it at the

5   screen, and videotape the DVD playing on the television (though there is no evidence in the

6   record on this point).  But such a financial burden on the exercise of First Amendment rights is

7   equally impermissible.  *See Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 227-28

8   (1987) (invalidating tax on magazines); *Simon & Schuster, Inc. v. Members of N.Y. State Crime*

9   *Victims Bd*., 502 U.S. 105, 116 (1991) (invalidating New York's "Son of Sam" law which made

10  available to victims a criminal's income from works describing his crime).  Moreover, the copy

11  will not be of remotely comparable quality, and will not allow use of the many interactive

12  features of modern DVDs, like the video game included with the *Monsters, Inc.* DVD.

13              **(iii)    The DMCA Impairs The First Amendment Right To Access**
                 **Non-Copyrighted Works**

14          The Studios' effort to preclude any copying of CSS-encrypted content runs afoul of the

15  First Amendment because it places almost unlimited power in the hands of copyright holders to

16  control information, including information that is not even protected by copyright.  Some DVDs

17  encrypted with CSS contain material that is in the public domain, either in whole or in part.

18  Moore Decl., ¶32-33.  The purchaser of a DVD has an unqualified right under the First

19  Amendment to make use of this public domain information.  *See First Nat'l Bank v. Bellotti,* 435

20  U.S. 765, 783 (1978).  However, under the Studios' reading of the DMCA, because the

21  technological measure *can* be used to protect a copyrighted work, it is illegal to market a product

22  that could circumvent it *even if the product is applied to non-copyrighted works*.  There is no

23  governmental interest whatsoever in allowing a distributor to prohibit such copying, and no

24  justification under the First Amendment for doing so.

25

26  such an assumption may have been warranted as to eBooks based upon the record presented on the
     motion to dismiss in *Elcom*, the record here is replete with evidence that some content is available only in
27  CSS encrypted DVDs.  Thus, a scholar wanting to comment upon alternative endings to Alfred
     Hitchcock's *Vertigo*, and wanting to show the examples in question, has no ability to do so under the
28  Studios' reading of the DMCA.  Moore Decl., ¶32.

### (iv)     A Prohibition On DVD Copy Code Is Not Necessary To Advance Any Significant Government Interest

A ban on the sale of DVD Copy Code is not "narrowly tailored to serve a significant governmental interest" and does not "leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Nor does it "eliminate the exact source of the evil it sought to remedy." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984). Such a ban "is not 'narrowly tailored'—even under the more lenient tailoring standards applied in *Ward* and *Renton*—where, as here, 'a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals.'" (Citations omitted). *Simon & Shuster*, 502 U.S. at 122.[16]

In order to determine whether DVD Copy Code can be prohibited consistent with the First Amendment, the Court must evaluate an empirical record and draw "reasonable inferences based on substantial evidence." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 666 (1994). In *Turner*, the Supreme Court subjected the must-carry rules of the Cable Act to an exhaustive review, explaining that factual findings concerning the actual effects of the regulations on protected speech were "critical" because "unless we know the extent to which the . . . provisions in fact interfere with protected speech, we cannot say whether they suppress 'substantially more speech than . . . necessary.'" *Id.* at 668; s*ee also Reimerdes*, 111 F. Supp. 2d at 333-34 (granting injunction only because no other practical means of preventing infringement through the use of DeCSS).

Here, however, the Studios have put forward no evidence that a ban on DVD Copy Code will advance *any* governmental interest, let alone that such a ban is narrowly tailored. DVD Copy Code is not a tool for pirates. There is no evidence that DVD Copy Code has ever been used for copyright infringement. DVD Copy Code does not allow for the redistribution of movies over the Internet; it burns a physical backup copy of a DVD, and erases the electronic

---

[16] If the government wants to avoid fraudulent political fundraising, it may bar the fraud, but it may not prohibit legitimate fundraising. *See Schaumburg v. Citizens For Better Env't*, 444 U.S. 620 (1980). If the government wants to avoid littering, it may ban littering, but it may not ban all leafleting. *Schneider v. State*, 308 U.S. 147 (1939). If the government wants to protect homeowners from unwanted solicitation, it may enforce householders' "no soliciting" signs, but it may not cut off access to homes whose residents

-23-

1    copy from the computer in the process of doing so.  Moreover, DeCSS, which lacks the serial

2    copy protections of DVD X Copy, is still widely available on the Internet.

3              Not only is there no evidence that a ban on DVD Copy Code will advance any

4    governmental interest, but it also does not leave open "ample alternative channels" for the fair

5    use of encrypted, copyrighted DVDs and the copying of non-copyrighted content.  Moreover,

6    there are clear alternatives.  The DMCA could incorporate—as we believe it does—principles of

7    fair use, thus permitting products designed to allow consumers to exercise their First Amendment

8    rights.  Such a regulation would advance the legitimate interests of copyright holders while

9    minimizing the burden on protected speech.  Alternatively, Congress could have elected to make

10   the penalties for copyright infringement more stringent or to criminalize the use of the Internet to

11   distribute infringing copies.  *See Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) ("[t]he normal

12   method of deterring unlawful conduct is to impose an appropriate punishment on the person who

13   engages in it.")  As the Court recently explained, in striking down portions of a wiretap statute,

14   "[I]f the sanctions that presently attach to a violation of [the law] do not provide sufficient

15   deterrence, perhaps those sanctions should be made more severe."  *Id.*  Indeed, the DMCA itself

16   adopts this approach in §1201(a)(1) by banning the *use* of circumvention tools to obtain

17   unauthorized access to a work.[17]

18             Moreover, the Court can and should "take Congress' different, and significantly less

19   restrictive, treatment of a highly similar problem as at least as some indication that more

20   _____

     are willing to hear what the solicitors have to say.  *Martin v. Struthers*, 319 U.S. 141 (1943).

21   [17] The Studios began releasing DVDs well before the enactment of the DMCA, presumably relying on the
     doctrine of contributory infringement, which affords strong protection for copyright owners.  Courts have

22   uniformly extended contributory infringement liability to those who use dual-purpose devices actively to
     participate in acts of infringement, as well as to those who knowingly provide facilities to infringers.  *See,*

23   *e.g., Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) (flea market operator); *Sega
     Enters. v. MAPHIA*, 948 F. Supp. 923 (N.D. Cal. 1996) (internet bulletin board operator); *A&M Records,*

24   *Inc. v. Abdallah*, 948 F. Supp. 1449 (C.D. Cal. 1996) (provider of blank "time-loaded" audiocassettes);
     *RCA Records v. All-Fast Sys., Inc.*, 594 F. Supp. 335 (S.D.N.Y. 1984) (commercial operator of

25   audiocassette copying machine).  The doctrine of contributory infringement is robust, and well advances
     the government's interest in copyright enforcement.  Indeed, contrary to the Studio's assertions, the

26   DMCA's anti-trafficking provisions were not enacted to comply with the WIPO Copyright Treaty
     because the Treaty requires only that the signatory states provide "adequate legal protection and effective

27   legal remedies" against the circumvention of technological controls, and such protection was already
     provided by the contributory copyright infringement doctrine.  Notably, 321 has sought declaratory relief

28   that it is not engaged in contributory copyright infringement, but the Studios have responded that 321's

1   restrictive means are not essential (or will not prove very helpful)." *Denver Telcoms.*, 518 at

2   757.  These less restrictive alternatives include (i)  the "burglars' tools" statutes, which restrict

3   circumvention liability to those who intentionally aid and abet copyright infringement, (ii) the

4   Audio Home Recording Act, 17 U.S.C. §1008, which expressly allows purchasers of digital

5   musical content—including content that is protected by technological measures—to make copies

6   of the original recording, but not serial copies,[18] and (iii) 17 U.S.C. §1309(b), enacted in

7   conjunction with the DMCA, which makes a disseminator of information liable only if he or she

8   "induced or acted in collusion with" one who actually gains unauthorized access to a work.[19]

9          The Studios have come forward with no evidence that any of these approaches are not

10  adequate to meet the legitimate objective of stemming copyright infringement.  Instead, the

11  Studios have come forward with at best conclusory assertions of harm.  But the justification for a

12  burden on expression must be "far stronger that mere speculation about serious harms,"

13  *Bartnicki*, 532 U.S. at 532, particularly as applied to a prohibition on the sale of software

14  intended to facilitate legal copying.  The Studios must come forward with *evidence*, and they

15  have not, let alone the undisputed evidence required to obtain summary judgment.  At a

16  minimum, there is a question of fact regarding the extent to which the DMCA impairs the ability

17  of users of DVD Copy Code to engage in protected speech, and the extent to which there are

18  other less restrictive means could meet the Government's legitimate goals.  *Cf. Tattered Cover,*

19  *Inc. v. City of Thornton*, 44 P. 3d 1044, 1061 (S. Ct. Colo. 2002) (requiring hearing in order for

20  court to balance government interest in law enforcement with harms associated with enforcing

21  search warrant for bookstore's records).

22          **2.       The DMCA Unconstitutionally Restricts 321's Speech**

23          As interpreted by the Studios, the DMCA also unconstitutionally restricts 321's First

24  Amendment right to tell others how to make fair use of copyrighted works.

25

26  _____

    request for declaratory relief is moot.

27  [18] *Corley* dismissed the significance of the AHRA because there was no evidence in the record that the
    same scheme could be applied to DVDs.  But DVD Copy Code is just a program.

28  [19] *Corley* refused to consider these arguments because they had not been presented to the trial court.

### (i)       The DMCA Regulates Speech On The Basis Of Its Content

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972).  "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Turner,* 512 at 642-43.[20]  A regulation is content-based when the only way to determine whether the regulation prohibits speech is to examine the content of the speech.  *See Arkansas Writers' Project*, 481 U.S. at 227-230 ("In order to determine whether a magazine is subject to sales tax, . . . 'enforcement authorities must necessarily examine the content of the message that is conveyed. . . .'  Such official scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press").  (Citation omitted).[21]

---

[20] The *Elcom* court determined that the DMCA is content neutral and thus subject to intermediate scrutiny under *United Sates v. O'Brien*, 391 U.S. 367 (1968) (upholding statute prohibiting destruction of draft cards).  The Studios wisely do not advance this argument.  In *O'Brien*, the Court rejected the plaintiff's claim that his burning of his draft card was protected under the First Amendment because he had intended to convey an anti-war message.  The Court explained that the statute condemned only the "independent non-communicative" aspect of O'Brien's conduct, and that this aspect of his conduct frustrated a legitimate governmental objective.  *Id.* at 382.  (The governmental purpose would be frustrated equally if O'Brien burned his draft card to make a point or to light a cigarette).  The Court thus concluded that "[t]he case at bar is therefore unlike one where the alleged governmental interest in regulating conduct arises on some measure because the communication allegedly integral to the conduct is itself thought to be harmful."  *Id.*  *O'Brien* is inapposite for three reasons.  First, *O'Brien* applies only where speech and non-speech elements are combined in a single course of conduct; it does not apply to regulations of pure speech.  All the parties here agree that the DMCA applies to software ("technology") as well as hardware, and that software is speech.  Because the DMCA directly regulates speech, not merely conduct, *O'Brien* does not apply.  *See id.* at 376.  Second, to the extent that the DMCA bans the sale of DVD Copy Code, it does so because the communication of those programs "is itself thought to be harmful": because the content of the code (circumvention) frustrates a governmental purpose.  *See id.* at 382.  Third, in *O'Brien*, the court did not need to examine the nature of the expression being conveyed by O'Brien's conduct in order to determine that the conduct was prohibited.  *See id; Compare Texas v. Johnson*, 491 U.S. 397, 404-05 (1989) (striking down statute prohibiting flag burning because prohibition on flag-burning depended upon message being communicated).  Under the DMCA, however, the Court must examine the content of code in order to determine whether it is prohibited.  For each of these reasons, the DMCA cannot be subjected to intermediate scrutiny under *O'Brien*.  Instead, the better analogy is to *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988), in which Falwell brought a claim under the "generally applicable" tort of intentional infliction of emotional distress.  The Court held that where the alleged tort was speech, no liability could attach without a showing that the publication contained a false statement of fact made with actual malice.  *See also Hurley v. Irish-American Gay, Lesbian & Bisexual Group*, 515 U.S. 557, 577-78 (1995) (general anti-discrimination laws require strict scrutiny when applied to a parade).

[21] A content-based regulation cannot be saved by invoking a supposedly content-neutral purpose.  The

-26-

1   According to the Studios, the DMCA suppresses speech that indicates how to circumvent

2   a technological measure protecting a copyright.  That regulation cannot even be articulated

3   without reference to the content of the speech that is banned.  If DVD Copy Code helped bolster

4   encryption technology, the DMCA would not apply.  It is only by referring to the content of the

5   speech that it is possible to tell whether that speech is licit or illicit under the DMCA.  Because

6   the DMCA discriminates against certain speech based upon its content, the DMCA is a content-

7   based restriction.

8                    **(ii)     Computer Code Is Speech Protected By The First Amendment**

9        The DMCA targets both speech in the English language, and speech in the form of

10  computer code.  For example, DVD Copy Plus is essentially an instruction manual that explains

11  how to use certain programs that are freely available on the Internet, while DVD X Copy is a

12  computer program, but the Studios treat them the same way, conceding, as they must, that

13  computer code is speech that is fully protected by the First Amendment.  *See Corley*, 273 F.3d at

14  447; *Karn v. U.S. Dep't of State,* 925 F. Supp. 1, 9-11 (D.D.C. 1996); *Elcom*, 203 F. Supp. 2d at

15  1126-27*; Junger v. Daley*, 28 Media L. Rep. (BNA) 1609 (6th Cir. 2000).[22]  As the *Reimerdes*

16  court concluded:

17             It cannot seriously be argued that any form of computer code may be regulated
              without reference to First Amendment doctrine.  The path from idea to human
18             language to source code to object code is a continuum.  As one moves from one to
              the other, the levels of precision and, arguably, abstraction increase, as does the

19

20  Supreme Court has long recognized that even regulations aimed at proper governmental concerns can
    restrict unduly the exercise of rights protected by the First Amendment.  *See Turner*, 512 U.S. at 642-43.
21  Thus "while a content-based purpose may be sufficient in certain circumstances to show that a regulation
    is content-based, it is not necessary to such a showing in all cases. . . .  Nor will the mere assertion of a
    content-neutral purpose be enough to save a law which, on its face, discriminates based on content."  *Id.*;
22  *see also*, *Simon & Schuster*, 502 U.S. at 117 ("illicit legislative intent is not the *sine qua non* of a
    violation of the First Amendment"); *Regan v. Time*, 468 U.S. 641, 648-59 (1984) (exceptions in a general
23  anti-counterfeiting statute), *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 514-15 (1981) (general urban
    beautification ordinance), *Carey v. Brown*, 447 U.S. 455, 466-68 (1984) (ordinance aimed at preserving
24  residential privacy).  A statute barring the advocacy of communism may have the content-neutral goal of
    preventing the overthrow of the government, but that does not render the statute content-neutral.
25  [22] Source code and object code are the languages used by humans to express ideas in forms
    understandable to and usable by computers.  Touretzky Decl., ¶¶31-35.  Most programmers write in
26  source code languages, which involve a series of letters and symbols, with specific vocabulary, syntax
    and expository conventions.  *Id.*  Object code has a simpler structure: a sequence of instructions, each of
27  which is a sequence of fields, each of which has a fixed size.  *Id.*  Both source code and object code can
    be read and understood by programmers (albeit with varying degrees of difficulty) and both are
28  expressive languages.  *Id.*

307369.02

1
2
3
4

> level of training necessary to discern the idea from the expression.  Not everyone
> can understand each of these forms.  Only English speakers will understand
> English formulations.  Principally those familiar with the particular programming
> language will understand the source code expression.  And only a relatively small
> number of skilled programmers and computer scientists will understand the
> machine readable object code.  But each form expresses the same idea, albeit in
> different ways.

5  111 F. Supp. 2d at 326.  Moreover, as Judge Patel explained, "[w]hether source code and object

6  code are functional is immaterial to the analysis at this stage.  Contrary to defendants' suggestion,

7  *the functionality of a language does not make it any less like speech.*"  *Bernstein v. United States*

8  *Department of State,* 922 F. Supp. 1426, 1435 (N.D. Cal. 1996) (emphasis added) (export

9  regulations prohibiting the dissemination of encryption software violated the First Amendment).

10  Thus, "even if source code, which is easily compiled into object code for the computer to read

11  and easily used for encryption, is essentially functional that does not remove it from the realm of

12  speech."  *Id.*

13           **(iii)     The DMCA Regulates Both Function And Expression**

14          The Studios argue that the DMCA is content-neutral because the DMCA targets the

15  "functional" aspect of DVD Copy Code, citing *Corley* and *Elcom*, both of which correctly

16  concluded that object code is speech and thus subject to First Amendment scrutiny.  However,

17  *Corley* also concluded that the DMCA prohibited DeCSS "on the basis of the functional

18  capability of DeCSS to instruct a computer to decrypt CSS, *i.e.*, 'without reference to the content

19  of the regulated speech.'"  *Corley*, 273 F.3d at 454.  The *Elcom* court similarly concluded that

20  "to the extent that the DMCA targets computer code, Congress sought to ban the code not

21  because of what the code says, but rather because of what the code does."  203 F. Supp. 2d at

22  1128.

23           **(a)     Computer Code Can Be Either Functional Or Expressive**

24          Words in any language—English or object code—*can* be functional.  One would not

25  defend an action for breach of oral contract by invoking the First Amendment.  The same is true

26  of words that constitute sexual harassment, unlawful termination, or fraud.  Nor could a hacker

27  defend an action for unauthorized access to a secure website on the ground that he was engaged

28  in protected speech because he was merely typing letters and numbers on a keyboard.

1    The fact that words *can* be functional, however, does not mean that they are always so.

2    Two persons exchanging marriage vows could be changing their legal status, acting in a play, or

3    engaging in political protest (if they are of the same sex and not in Vermont).  As with words

4    spoken in the English language, whether computer code is functional can only be determined in

5    context.  In the case of code, the inquiry turns substantially on to whom (or to what) the code is

6    transmitted.  When one person transmits computer code to another person, there is nothing

7    inherently functional about that transmission, any more than there is anything inherently

8    functional in transmitting a recipe or an instruction manual over the Internet.  See *Bernstein,* 922

9    F. Supp. at 1435 ("Instructions, do-it-yourself manuals, [and] recipes" are all "speech"); *Winter*

10   *v. G.P. Putnam & Sons*, 938 F.2d 1033 (9th Cir. 1991) (instructional guide on the collection and

11   cooking of mushrooms protected under the First Amendment).  Once either DVD Copy Plus or

12   DVD X Copy is transmitted, it simply resides on the recipient's computer.  Nothing happens

13   from the mere fact of transmission.  The recipient may study it, delete it, use it, or do nothing

14   with it at all.

15       Computer code does not perform any function until a person transmits that code to a

16   computer, just like an instruction manual does nothing until a user follows its instructions.[23]

17   Only at that point does code "do" anything, and thus only at that point does it become

18   "functional."[24]  Thus, a prohibition on the *use* of computer code is not a direct regulation of

19   speech, even though it involves the transmission of 0s and 1s.  But the regulation of the

20   transmission of that code from one person to another, independent of its use, is a regulation of

21   speech, not function.

22       **(b)     DVD Copy Code Cannot Be Regulated On The Basis Of Its Potential
                  Consequences**

23

24   [23] This is why computer viruses can be regulated, although they are written in code: once sent to their
     victim, they require no human intervention in order to work.

25   [24] At a minimum, the extent to which object code is functional or expressive or both cannot be resolved
     adversely to 321 on summary judgment, particularly when the Studios have put forward no evidence on

26   the issue.  In this dynamic an area, where technology changes rapidly, drawing legal lines in the sand is,
     at best, a risky venture.  *See Denver Telcoms.,* 518 U.S. at 768 (Stevens, J., concurring) ("[I]t would be

27   unwise to take a categorical approach to the resolution of novel First Amendment questions arising in an
     industry as dynamic as this").  *Compare Mutual Film Corp. v. Industrial Com. of Ohio*, 236 U.S. 230,

28   243-45 (1915) (movies are not entitled to First Amendment protection) *with Joseph Burstyn, Inc. v.
     Wilson*, 343 U.S. 495, 501 (1952) (movies are entitled to First Amendment protection).

307369.02

1   The gist of *Corley* and *Elcom*'s analysis is that Congress can regulate DVD Copy Code

2   because the government's real target is the potential consequences of DVD Copy Code.  There

3   are two problems with that reasoning.  First, DVD Copy Code does not lead inexorably to

4   copyright infringement.  To the contrary, its principal and intended uses—and the only uses of

5   which there is any evidence in the record—are perfectly legal.  Second, the Supreme Court has

6   held that, other than in very narrow circumstances, the consequences that *potentially* flow from

7   speech cannot be used to justify a lower level of scrutiny.  *Forsyth County v. Nationalist*

8   *Movement*, 505 U.S. 123, 134 (1992) (listeners "reaction to speech is not a content-neutral basis

9   for regulation").  As the Supreme Court explained in *Bartnicki*, "it would be quite remarkable to

10  hold that speech by a law-abiding possessor of information can be suppressed in order to deter

11  conduct by a non-law-abiding third party."  *Bartnicki*, 532 U.S. at 529-30 (invalidating as

12  unconstitutional under the First Amendment a law that prohibited the dissemination of

13  intercepted private conversations).  Indeed, as explained in *American Booksellers Assoc. v.*

14  *Hudnut*, 771 F.2d 323, 333 (7th Cir. 1985):

15       Much speech is dangerous.  Chemists whose work might help someone build a
         bomb, political theorists whose papers might start political movements that lead to
16       riots, speakers whose ideas attract violent protesters, all these and more leave loss
         in their wake.  Unless the remedy is very closely confined, it could be more
17       dangerous to speech than all the libel judgments in history.

18  Where a regulation is justified based upon the likely of a listener in response to the speech, the

19  prohibited speech must be so inflammatory that it renders the listeners unable to control

20  themselves.  *See, e.g., United States v. Poocha*, 259 F.3d 1077 (9th Cir. 2001); *Houston v. Hill*,

21  482 U.S. 451, 462 (1987).  *Cf. Waller v. Osbourne*, 763 F. Supp. 1144, 1151 (M.D. Ga. 1991)

22  (sustaining demurrer to complaint alleging Ozzie Osbourne's songs cause plaintiff's son to shoot

23  himself); *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (1988) (same).

24       Neither *Corley* nor *Elcom* cited or discussed these cases, or the principles they embody,

25  instead concluding that the human intervention required to turn a computer program into

26  "function" is so slight that it should be disregarded.  *Corley* tried to justify this slippage on the

27  ground that "the causal link between the dissemination of circumvention computer programs and

28  their improper use is more than sufficiently close to warrant selection of a level of constitutional

-30-

1    scrutiny based on the programs' functionality." *Id.* at 452.  In other words, *Corley* was

2    concerned that the Internet makes it too easy to push a button and transform speech into conduct.

3    But there is no "internet exception" for the application of the First Amendment, and *Corley*

4    provided no authority for that conclusion other than *Red Lion Broadcasting Co. v. FCC*, 395

5    U.S. 367, 386 (1969), which it cited for the proposition that "the characteristics of new media

6    justify differences in the First Amendment standards applied to them." *Id.*  The Supreme Court

7    rejected precisely this analogy in *Reno*, 521 U.S. at 868-69, distinguishing *Red Lion* and other

8    cases pertaining to the FCC's regulation of radio and television, and concluding that "our cases

9    provide no basis for qualifying the level of First Amendment scrutiny that should be applied to

10   [the internet]." *Id.* at 870.[25]

11         Under the relevant cases, what matters is not the ease with which the listener could take

12   action but rather whether the listener could reasonably be expected to exercise restraint in light

13   of the nature of the speech.  *See, e.g., NAACP v. Claiborne Hardware, Co.*, 458 U.S. 886

14   (1982).[26]  In other words, if a mob is so aroused that it could be considered a gun, a speaker can

15   be held liable for pulling the trigger.  Here, there is no mob, and there is no trigger.  Any

16   potential user can sit at home and contemplate his actions at his leisure.  There is at a minimum a

17   disputed issue of fact as to whether the availability of a program such as DVD-X-Copy will

18   overbear the will of the citizenry and turn them into a lawless mob.  Under the First Amendment,

19   that is a question that this Court must decide based on facts, not merely assumptions, and thus

20   cannot resolve on summary judgment.

21

---

22   [25] The *Elcom* court cited only one case (other than *Corley*) in support of the proposition that it is possible
     to divorce the function of computer code from its message: *Connectix*, 203 F.3d at 602-03.  *Connectix* has
23   no relevance here: it holds that, because copyright protects only the form in which ideas are expressed,
     not the ideas that are being expressed, copyrighted software contains both copyrighted elements and non-
24   copyrighted elements.  But the First Amendment, unlike the Copyright Act, is not concerned only with
     form over substance; it is as concerned with the free dissemination of the ideas themselves as it is with the
25   words or symbols in which those ideas are expressed.

26   [26] Some cases recognize an exception for speech that amounts to aiding and abetting a crime.  *See Rice v.
     The Palladin Enter's.*, 128 F.3d 233, 247 (4th Cir. 1997) (liability for publishing book on how to be a hit
27   man with knowledge and intent that the book would be used to facilitate criminal activity).  But here, 321
     neither advocates nor encourages lawless action, and indeed has taken steps to ensure that its products are
28   not used for illegal ends, nor have the Studios proffered any evidence that anyone has used DVD Copy
     Code for an illegal purpose.

---

-31-

307369.02

**(iv)      A Ban on DVD Copy Code Cannot Survive Strict Scrutiny**

"Content-based speech restrictions are generally unconstitutional unless they are narrowly tailored to a compelling state interest.  This is an exacting test.  It is not enough that the goals of the law be legitimate, or reasonable, or even praiseworthy.  There must be some pressing public necessity, some essential value that has to be preserved; and even then the law must restrict as little speech as possible to serve the goal."  *Turner*, 512 U.S. at 680.  "Broad prophylactic rules in the area of free expression are suspect.  Precision of regulation must be the touchstone. . . ."  *NAACP v. Button*, 371 U.S. 415, 438 (1963) (citations omitted).  Although the Government may have a legitimate interest in preventing widespread digital piracy, "[t]he First Amendment as we understand it today rests on the premise that it is government power, rather than private power, that is the main threat to free expression, and, as a consequence, the Amendment imposes substantial limitations on the Government even when it is trying to serve concededly praiseworthy goals."  *Turner*, 512 U.S. at 685.[27]

Moreover, even to the extent that DVD Code is deemed functional, not expressive, the Supreme Court has applied a stringent standard.  For example, in *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), the Supreme Court invalidated a sign ban even though signs posted on houses or front lawns involved the "functional" creation of "visual blight and clutter," because the functional aspect of the regulation was inseparable from the expression of ideas.  *Id.* at 47.  In the context of charitable solicitation, which involves the "functional" exchange of money as well as support for ideas, the Supreme Court has consistently "refused to separate the component parts of charitable solicitations from the fully protected whole."  *Riley v. National Fed'n of the Blind, Inc.,* 487 U.S. 781, 796 (1988); *see also Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980) (solicitation is "characteristically intertwined with informative and perhaps persuasive speech . . . [and] without solicitation the flow of such information and advocacy

---

[27] The Court must evaluate not only the importance of the asserted interest but also the realistic scope of the threat: although Jack Valenti still cries that "we are in the midst of the possibility of Armageddon," and cites as evidence that millions attempted to download copies of the movies *Spiderman* and *Star Wars: Episode II* before they were released, thus undercutting box office sales, those two movies were the fastest ever to reach $100 million in box office receipts, and combined for a whopping $715 million in box office sales in 2002.  *Washington Times*, Jan. 24, 2003, p. A22.

307369.02

1  would likely cease"). And "where . . . the component parts of a single speech are inextricably

2  intertwined," the Court has held, "we cannot parcel out the speech, applying one test to one

3  phrase and another test to another phrase. Such an endeavor would be both artificial and

4  impractical." *Riley*, 487 U.S. at 796.[28]

5      A ban on the sale of DVD Copy Code does not advance any compelling government

6  interest, and certainly is not the least restrictive means of doing so. The Studios have come

7  forward with no evidence that DVD Copy Code has *ever* been used to engage in piracy. Indeed,

8  it has built-in protections to guard against such piracy; even the Studios concede that DVD-X-

9  copy cannot be used to make multiple serial copies of a DVD. To the extent that the DMCA

10  restricts the sale of DVD Copy Code, the DMCA does not "restrict as little speech as possible to

11  serve the [government's legitimate] goal."

12      **3.       The DMCA Is Substantially Overbroad**

13      Even if a prohibition on the sale of DVD Copy Code could survive First Amendment

14  scrutiny, the DMCA cannot survive a broader challenge to its many other applications. "Where

15  the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute

16  will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack."

17  *Taxpayers for Vincent*, 466 U.S. at 801 n. l9. The overbreadth doctrine applies where the

18  movant's own speech is not implicated (or the movant's speech can permissibly be regulated),

19  but the movant can "demonstrate a substantial risk that application of the provision will lead to

20  the suppression of speech" on the part of others. *National Endowment for the Arts v. Finley*, 524

21  U.S. 569, 580 (1998).[29]

22      A litigant can bring a facial challenge on behalf of third parties if the statute is

23  "substantially overbroad." *See Secretary of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947,

24

25  [28] For all the reasons set forth herein a ban on DVD Copy Code also cannot withstand even intermediate scrutiny.

26  [29] A party may make a facial challenge to a statute if the statute seeks to regulate either speech or "patently 'expressive or communicative conduct.'" *Roulette v. City of Seattle*, 97 F.3d 300, 303 (9th Cir.

27  1996). The DMCA is susceptible to a facial challenge because it regulates software, which the Studios have conceded is speech. Moreover, the effect of the DMCA is overwhelmingly on speech. The name of the statute is the "*Digital*" Millennium Copyright Act and, as even *Elcom* recognized "in the digital age,

28  more and more conduct occurs through the use of computers and over the internet." *Elcom*, 203 F. Supp.

-33-

959 (1984)  "Litigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  *Broadrick v. Oklahoma,* 413 U.S. 601, 612 (1973).  Here, the DMCA poses a substantial risk that speech regarding the legitimate study and advancement of encryption and computer technology will be prohibited, as set forth in detail in the Declaration of Professor Felton.  Again, this is necessarily a factual question, and one upon which 321 has the right to take discovery.

**C.      The DMCA Exceeds The Scope Of Congressional Powers**

Congress may legislate only pursuant to a power enumerated in the Constitution.  Neither the text nor the legislative history of the DMCA indicates which power Congress relied on, but the DMCA's anti-device provisions are not a valid exercise of any of Congress' enumerated powers.  They prohibit devices without regard for originality, duration of copyright, or infringement of copyright in the underlying, technologically protected work; therefore, they are not a valid exercise of the intellectual property power.  Nor are they a lawful exercise of the necessary and proper power or the commerce power, because they contravene specific limits on Congress' power under the Intellectual Property Clause.

**1.      The DMCA Cannot Be Sustained Under The Intellectual Property Clause**

The Intellectual Property Clause "is both a grant of power and a limitation."  *Graham v. John Deere Co.*, 383 U.S. 1, 5 (1966).  The Intellectual Property Clause authorizes Congress only to grant exclusive rights in "[w]ritings" and "[d]iscoveries," and only for "limited [t]imes." U.S. Const. Art. I, § 8, cl. 8; *Trade-Mark Cases*, 100 U.S. 82, 93-94 (1879).  A law that protects informational goods without regard for these limitation` cannot claim the Intellectual Property Clause as its authority.  *Trade-Mark Cases*, 100 U.S. at 93-94 (holding that Intellectual Property Clause could not authorize law protecting trademarks regardless of "novelty, invention, discovery, or any work of the brain" or of  "fancy or imagination").[30]

---

at 1128.

[30] The Copyright Clause requires that copyright be limited in both scope and effect.  *See Feist*

307369.02

1    The anti-device provisions of the DMCA do not meet this exacting standard.  They

2    operate regardless of whether the device is used to access information that is a constitutionally

3    protectable writing, regardless of whether the work has passed into the public domain, regardless

4    of whether the desired use of the work would infringe copyright, and regardless of whether the

5    accused device has been used at all.  *See* 17 U.S.C. §1201(a)(2), (b)(1).  The Intellectual Property

6    Clause does not permit such a tenuous connection, as the House Commerce Committee

7    recognized.  *See* H.R. Rep. No. 105-551 at 23-25 (1998) (recommending that a ban on devices be

8    implemented "as free-standing provisions of law" external to Title 17, "in large part because

9    these regulatory provisions have little, if anything, to do with copyright law").

10          2.       **The DMCA Cannot Be Sustained Under The Necessary And Proper Clause**

11   Congress may have seen the DMCA's anti-device provisions as an exercise of its power

12   "[t]o make all [l]aws which shall be necessary and proper for carrying into [e]xecution" the

13   intellectual property power.  U.S. Const. Art. I, §8, cl. 18.  The necessary and proper power

14   allows Congress only those means, "which are appropriate, which are plainly adapted to that end,

15   [and] which are not prohibited, but consist with the letter and spirit of the constitution."

16   *McCulloch v. Maryland*, 17 U.S. 316, (4 Wheat) 421 (1819).  Therefore, it is not enough that

17   Congress enacted the anti-device provisions with the legitimate goal of providing effective

18   protection for copyrighted works.  As Chief Justice Marshall emphasized in *McCulloch*, the

19   Necessary and Proper Clause is instrumentalist by design, but does not thereby become an

20   instrument for rendering other constitutional limits toothless.  *See United States v. Lopez*, 514

21   U.S. 549, 566-68 (1995) (holding that intrastate activity may be regulated pursuant to Congress'

22   commerce power only if it "substantially affect[s]" interstate commerce); *City of Boerne v.*

23   *Flores*, 521 U.S. 507, 517 (1997) (holding that the Religious Freedom Restoration Act exceeded

24

25   *Publications v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50 (1991) (holding that Intellectual Property
     Clause compels denial of copyright protection to facts, and also to unoriginal compilations of facts);
26   *Baker v. Selden*, 101 U.S. 99, 103-04 (1879) (denying copyright protection to accounting system that had
     not received patent protection, and suggesting that Intellectual Property Clause requires this result);
27   *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834) (denying copyright protection to transcriptions of Supreme
     Court arguments and opinions); *Clayton v. Stone*, 5 F. Cas. 999 (C.C.S.D.N.Y. 1829) (denying copyright
28   protection to news reports); *see generally*, Litman, Jessica, *The Public Domain*, 39 Emory L.J. 965
     (1990).

1   Congress' constitutional authority to remedy state violations of the Fourteenth Amendment using

2   "appropriate legislation")

3          The principle of limited protection requires that copyright not confer the exclusive right

4   to control all uses of a work.  The Copyright Act scrupulously preserves fair use and other

5   doctrines that limit attempts to control personal use of lawfully acquired copies of works.  *See,*

6   *e.g.*, 17 U.S.C. §§ 102(b) (idea-expression distinction), 107 (fair use), 109(a) (first sale).  The

7   DMCA destroys the Intellectual Property Clause's carefully crafted balance.  First, the

8   provisions effectively nullify the public's ability to make fair use of the underlying copyrighted

9   works.  Second, the DMCA effectively nullifies the public's ability to access, use and copy

10  public domain material, including copyright-expired material, whenever they are shielded by

11  technological protection systems.  The *Corley* court characterized this argument as "premature

12  and speculative" absent evidence that a copyright owner actually had applied a technological

13  measure to prevent copying from the public domain.  *Corley*, 273 F.3d at 445.  But Congress'

14  authority to enact a law cannot depend upon the subsequent conduct of the law's beneficiaries,

15  and, in any event, 321 has adduced just such evidence and must be afforded the opportunity to

16  develop additional evidence through discovery.

17         It is no answer to these problems to say that this result is what Congress intended.

18  *Corley*, 273 F.3d at 443-44 & n. 13.  That option was not open to Congress.  Nor is it an answer

19  to say that copyright infringement is an "epidemic" that warrants drastic intervention, *Reimerdes*,

20  111 F. Supp. 2d at 331-32; Congress is not free to choose a cure that would kill the patient.

21  Because the DMCA abrogates clear, specific limits on Congress' intellectual property power,

22  they may not stand as an exercise of Congress' power under the Necessary and Proper Clause.

23  To so hold would be to conclude that Congress may effectively amend the Constitution to

24  remove restrictions with which it disagrees.  The Constitution dictates otherwise.

25         **3.      The DMCA Cannot Be Sustained Under The Commerce Clause**

26         Congress may have intended the anti-device provisions as an exercise of the commerce

27  power.  But Congress may not rely on the commerce power to enact legislation that overrides

28  other, more specific constitutional constraints.  Thus, in *Railway Labor Executives' Ass'n v.*

-36-

1    *Gibbons*, 455 U.S. 457 (1982), the Supreme Court reasoned that Congress could not invoke the

2    commerce power to enact bankruptcy legislation that violated the Bankruptcy Clause's

3    uniformity requirement.  *Id*. at 468-69 ("If we were to hold that Congress had the power to enact

4    nonuniform bankruptcy laws pursuant to the Commerce Clause, we would eradicate from the

5    Constitution a limitation on the power of Congress to enact bankruptcy laws").  Thus, Congress

6    may not invoke the Commerce Clause to extend exclusive protection to public domain or

7    copyright-expired subject matter, or to eliminate fair use of copyrighted expression, any more

8    than it may invoke the Necessary and Proper Clause to do so.  *See* Julie E. Cohen, *Copyright and

9    the Jurisprudence of Self-Help*, 13 Berkeley Tech. L.J. 1089, 1131-32 (1998); William Patry,

10   *The Enumerated Powers Doctrine and Intellectual Property: An Imminent Constitutional

11   Collision*, 67 Geo. Wash. L. Rev. 359 (1999).[31]

12   **D.    The Studios' Claims Under The DMCA Are Barred By Misuse**

13          The exercise of rights in intellectual property is limited by the equitable doctrine of

14   misuse.  Misuse has typically been found where a defendant can show some attempt by the

15   owner of intellectual property to obtain more than was intended by its grant, or to restrain trade

16   in ways beyond the intended scope of the intellectual property right.  *See, generally, Chisum*

17   §19.04; *Brulotte v. Thys Co.*, 379 U.S. 29 (1964) (patent misuse).

18          Although the misuse doctrine had its origins in patent law, it is a judge-made doctrine,

19   and has been expanded into the realm of intellectual property more generally.  *See Lasercomb

20   America, Inc. v. Reynolds*, 911 F.2d 970, 976 (9th Cir. 1990) (license attempting to prevent

21   licensees from independently developing a competing product was copyright misuse); *Practice

22   Mgmt. Info. Corp. v. AMA*, 121 F.3d 516, 520 (9th Cir. 1997) (AMA engaged in copyright misuse

23   by licensing code to agency in exchange for agreement not to use competing code system);

24   ---

25   [31] In *United States v. Moghadam*, 175 F.3d 1269, 1275-76 (11th Cir. 2000), the Court acknowledged that a
     law enacted pursuant to the commerce power cannot survive review if it is "fundamentally inconsistent"
     with the Intellectual Property Clause, but concluded that the anti-bootlegging legislation challenged by
26   the defendant did not create such a conflict as applied to that defendant.  321 does not challenge the anti-
     bootlegging laws, and does not allege a conflict with the Intellectual Property Clause's fixation
27   requirement.  Instead, more relevant to our purposes, the *Moghadam* court expressly suggested that a
     different challenge to the anti-bootlegging statute, based on its grant of perpetual protection to live
28   musical performances, would likely succeed.  *Id*. at 1281.  That is the essential nature of the challenge

1  *Alcatel USA Inc. v. DGI Tech., Inc.*, 166 F.3d 772 (5th Cir. 1999) (copyright misuse found where

2  license limited use of operating system to hardware produced by copyright owner); *Union*

3  *Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976) (trademark misuse).  The

4  consistent theme of the cases is a refusal to reward private extension of intellectual property

5  rights contrary to public policy.

6        *Alcatel* is particularly instructive.  There, the copyright plaintiff made telephone

7  switching systems which were controlled by its copyrighted software.  The plaintiff licensed its

8  software to be used only in conjunction with its own manufactured hardware, thus effectively

9  leveraging its monopoly from software into hardware.  The appellate court held that this

10  licensing scheme was copyright misuse, because public policy forbids "the use of the copyright

11  to secure an exclusive right or limited monopoly not granted by the Copyright Office. . . ."

12  *Alcatel*, 166 F.3d at 793.

13        The Studios have used their control of CSS to force customers who purchase DVDs to

14  use only particular DVD players.[32]  The Studios' licensing scheme is entirely circular.  The

15  Studios license CSS to encrypt movies on DVDs; then the Studios license the keys to developers

16  only if they sign an onerous license agreement with strict confidentiality and trade secret

17  provisions, imposing regional encoding and other restrictions.  Section 1201, as interpreted by

18  the Studios, then closes the circle by preventing the development of competing players without

19  the CSS license.

20        This system of licenses allows the Studios to dictate the features of DVD players,

21  notwithstanding that the DMCA expressly provides that §1201 not be used to require

22

23  here.

[32] The lawsuits brought to date under the DMCA reflect the misuse of its provisions.  One of the most
notorious has been the attempt by Sony to suppress distribution of software tools for the programmable
"Aibo" robot dog. Sony, which offers a suite of such products for sale, sent a demand letter to a website
offering different software tools, claiming that the tools were a DMCA violation as they could permit
owners of an Aibo robot to circumvent technical protections on the Aibo software.  See Farhad Manjoo,
*Aibo Owners Biting Mad at Sony*, Wired News, Nov 2, 2001, www.wired.cim/news/business/0,1367,48088,00.html;
David Labrador, *Teaching Robot Dogs New Tricks*, Scientific American, Jan. 21, 2002.  Indeed, virtually
none of the enforcement activities under the DMCA have reflected any effort to stem piracy; instead, the
theme of the cases is that the DMCA is a weapon to exclude competition.  *See, e.g., Lexmark Int'l Inc. v.
Static Control Components*, Case No. 02-571-KSF (E.D. Ky 2002) (suing under DMCA to prevent
manufacture of compatible toner cartridges).

-38-

307369.02

1   manufacturers to comply with Studio requirements.  *See* §1201(c)(3).  The Studios have thus

2   leveraged their control over the copying of copyrighted work in order to control unlicensed

3   players, much like the defendant in *Alcatel* used a copyright in order to control hardware.  The

4   Studios have also exploited this scheme to control access to non-copyrighted work and the ability

5   to engage in fair use.  Indeed, the Studios take the position that it is illegal under the DMCA to

6   use DVD Copy Code in order to circumvent CSS protection for *any* purpose, including making

7   clips for scholarship, criticism, parody, and education.[33]  Moreover, they require customers who

8   scratch a disk, or experience degradation, to purchase a replacement copy at full cost.  Farnham

9   Decl., Exh. A. (Dowden, Hutto, Keating, McLaughlin, Rivera, Schoene, Sparkman, Thibodeaux,

10  et al.  The Studios have also used their encryption technologies to place "region coding" on

11  DVDs, prohibiting a DVD sold in Thailand from being played in the United States, and thus

12  allowing the Studios to engage in price discrimination, selling DVDs more cheaply in some

13  countries than in others.

14          If the Studios are found to have engaged in misuse, the remedy is that the intellectual

15  property rights that they have misused are rendered unenforceable.  *Morton Salt Co. v. G. S.*

16  *Suppiger Co.*, 314 U.S. 488, 493 (1942); *Alcatel,* 166 F.3d at 793 (refusing to enforce copyright

17  due to misuse even where defendant guilty of copyright infringement and unclean hands).  321 is

18  entitled to develop the facts to show that the Studios are misusing their right to prevent the

19  unlawful circumvention of CSS under the DMCA by seeking to suppress DVD Copy Code, thus

20  prohibiting the fair use of copyrighted material and the free use of information in the public

21  domain, and are thus precluded from enforcing any rights to prevent the circumvention of CSS

22  under the DMCA.

23  **E.     The Studios Cannot Established A Claim Under The DMCA Because They Have Not
            Demonstrated Any Injury**

24          Section 1203(a) provides that only those persons *injured* by a violation can seek redress

25  under the DMCA.  But the Studios have adduced no evidence, let alone undisputed evidence,

26  that they have suffered, or are likely to suffer, any economic injury as a result of the distribution

27

28  _____

[33] Farnham Decl., ¶6 (citing Marta Grutka of MPAA).

307369.02

1  of 321's product.  Indeed, the Burke Declaration explains that it is equally, if not more, likely

2  that the availability of DVD Copy Code will result in a net economic benefit to the Studios.  The

3  Studios' motion for partial summary judgment or adjudication on its cross-claims under the

4  DMCA must fail for this additional reason.

5  **F.      The Studios Are Not Entitled to Injunctive Relief**

6           In a conclusory paragraph at the end of its brief, the Studios ask the Court for broad

7  injunctive relief preventing all further sale of the 321 Copy Code and the destruction of all copies

8  of the software and the retrieval of products already sold to retail outlets.  Proposed Order ¶ 5.  It

9  is a "fundamental principle that an injunction is an equitable remedy that does not issue as of

10  course." *Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 542 (1987).  The DMCA does not alter the

11  equitable nature of the relief sought, and therefore courts must apply the traditional standard for

12  injunctive relief.  *Id.* at 540-41 (absent clear congressional intent, courts must apply principles of

13  equity in issuing permanent injunctions).  The party seeking relief must prove (1) the lack of an

14  adequate remedy at law, and (2) irreparable harm absent the injunction.  *Easyriders Freedom*

15  *F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1495-96 (9th Cir. 1996).  The court must then evaluate

16  whether there is a *factual basis* justifying the relief.  *See Walters v. Reno*, 145 F.3d 1032, 1046-

17  47 (9th Cir. 1998).[34]  Because the Studios have not made any such factual showing , and have not

18  proven and cannot prove irreparable harm, they are not entitled to equitable relief and their

19  request for a permanent injunction must be denied.

20                          **IV.      CONCLUSION**

21           For the foregoing reasons, 321 requests that the Studios' motion for summary

22  adjudication be denied.

23

24  ---

[34] The Studios are not entitled to an injunction under the standards or presumptions that apply to copyright
infringement actions, because the Studios have not alleged that 321 or its customers have engaged in any
copyright infringement.  First, the Studios have not presented any evidence of infringement by any party.
Second, the evidence shows that the primary use of 321 Copy Code is for fair use purposes.  Moore Decl.,
¶20.  Finally, the Studios have not made a claim for copyright infringement against 321 in this action and
have asked that 321's declaratory relief claim on this issue be dismissed.  *See* Answer and Counterclaim
at 20.  In *Reimerdes*, the court did not consider the injunction under the presumptions that apply in
copyright infringement actions, instead considering an injunction based on the factual showing at trial and
the equities presented by the case.  111 F. Supp. 2d at 343-44.

-40-

1   DATED: February 21, 2003          KEKER & VAN NEST, LLP

2

3                                     By:          /S/
                                      LLOYD A. FARNHAM
4                                     Attorneys For Plaintiff And Counter Defendants 321 Studios,
                                      Robert Moore, Robert Semaan And Victor Mattison
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-41-

307369.02

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**321 Studios' MPAs In Opposition To Defendants' Motion For Summary Judgment**
**Case No. C 02-1955 SI**