1   ROBERT D. MCCALLUM, JR.
    Assistant Attorney General
2   THEODORE C. HIRT
    Assistant Branch Director, Federal Programs Branch
3   JOHN H. ZACHARIA (D.C. Bar # 456867)
    Trial Attorney, Federal Programs Branch
4          United States Department of Justice
           20 Massachusetts Avenue, NW, Seventh Floor
5          Washington, DC  20530
           Telephone: (202) 305-2310, Facsimile: (202) 616-8470
6   KEVIN V. RYAN
7   United States Attorney
    JOCELYN BURTON (CA Bar #135879)
8   Assistant United States Attorney, Chief, Civil Division
           450 Golden Gate Ave., Box 36055
9          San Francisco, CA  94102
           Telephone: (415) 436-7198, Facsimile: (415) 436-6748
10
11  Attorneys for Intervenor United States

12              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
13                SAN FRANCISCO HEADQUARTERS

14  _____
                                        )
15  321 STUDIOS,                        )   **Case No. 02-CV-1955-SI**
                                        )
16              Plaintiff,              )   **BRIEF FOR INTERVENOR**
                                        )   **UNITED STATES OF AMERICA**
17       v.                             )   **IN RESPONSE TO PLAINTIFF'S**
                                        )   **OPPOSITION TO**
18  METRO-GOLDWYN-MAYER STUDIOS         )   **DEFENDANTS' MOTION FOR**
    INC., et al.,                       )   **PARTIAL SUMMARY**
19                                      )   **JUDGMENT**
20              Defendants.             )
    _____)
21                                      )   **Date:        April 25, 2003**
    METRO-GOLDWYN-MAYER STUDIOS         )   **Time:        9:00 a.m.**
22  INC., et al.,                       )   **Courtroom:   10, 19th Floor**
                                        )   **Judge:       The Honorable Susan**
23              Counterclaimants        )   **             Illston**
                                        )
24                                      )
         v.                             )
25                                      )
    321 Studios, et al.                 )
26                                      )
                                        )
27              Counterdefendants.      )
    _____)
28

# TABLE OF CONTENTS

Table of Authorities ..... ii

Introduction ..... 1

Background ..... 2

I.    Statutory and Regulatory Background ..... 2

II.   Factual Background ..... 5

Argument ..... 7

I.    Congress Acted Within Its Constitutional Authority When It Enacted the DMCA ..... 7

    A.  Congress Properly Enacted Sections 1201(a)(1)(a), 1201(a)(2), and 1201(b) of the DMCA Pursuant to the Commerce Clause ..... 8

    B.  Congress May Act Pursuant to the Commerce Clause to Protect Rights Granted Under the Intellectual Property Clause ..... 10

II.   The DMCA Does Not Violate the First Amendment ..... 14

    A.  Plaintiff May Not Make a Facial First Amendment Challenge to the DMCA ..... 14

    B.  The DMCA Does Not Violate the First Amendment As Applied to Plaintiff's Sale of DVD Copy Code ..... 17

        1.   The DMCA Is Content-Neutral ..... 17

        2.   The DMCA Furthers Important Government Interests ..... 19

        3.   The DMCA Is Sufficiently Tailored to Satisfy Constitutional Requirements ..... 21

    C.  The DMCA Does Not Violate the First Amendment As Applied to Third Parties ..... 22

        1.   Plaintiff Does Not Have Standing to Assert a Fair Use Defense on Behalf of Third Parties ..... 22

        2.   No Court Has Held That the Fair Use Doctrine Is a Constitutional Requirement ..... 23

        3.   The Fair Use Defense Is Inapplicable Because the DMCA Does Not Present an Issue of Infringement ..... 26

Conclusion ..... 27

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Nidorf*, 26 F.3d 100 (9th Cir. 1994)........................................ 15, 16, 20

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ........................................... 14, 15, 22

*City of Dallas v. Stanglin*, 490 U.S. 19 (1989) ................................................ 15

*Eldred v. Ashcroft*, 123 S. Ct. 769 (2003).............................................. 23, 24

*FEC v. Nat'l Right to Work Committee*, 459 U.S. 197 (1982) ........................... 22

*First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978) ......................................... 25

*Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824)............................................ 8, 9

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ...................... 24

*Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964) .............................. 11

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ............................. 7, 15

*New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1 (1988) ..................... 15, 16

*Railway Labor Executives Ass'n v. Gibbons*, 455 U.S. 457 (1982)....................... 11

*Roulette v. City of Seattle*, 97 F. 3d 300 (9th Cir. 1996)............................... 14

*South Dakota v. Dole*, 483 U.S. 203 (1987) ................................................ 11

*The Trade-Mark Cases*, 100 U.S. 82 (1879)................................................ 11

*Turner Broadcasting Sys. Inc. v. FCC*, 512 U.S. 622 (1994) .................... 17, 18, 21

*United States v. Elcom*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002)..................... passim

*United States v. Lopez*, 514 U.S. 549 (1995) ........................................... passim

*United States v. Moghadam*, 175 F.3d 1269 (11th Cir. 1999)................... 10, 11, 12

*United States v. National Treasury Employees Union*, 513 U.S. 454 (1995)..................... 7

*United States v. O'Brien*, 391 U.S. 367 (1968) ....................................... 17, 19

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).......................... passim

1

*Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y.
2       2000), *aff'd*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d
        Cir. 2001) ................................................................................................ passim
3
*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................................ 18
4

**STATUTES**

5
17 U.S.C.A. § 106 ................................................................................................... 14
6
17 U.S.C.A. § 107 ................................................................................................... 23
7
17 U.S.C.A. § 1201(a) ............................................................................................ 19
8
17 U.S.C.A. § 1201(a)(1)(A) ............................................................................... 3, 5
9
17 U.S.C.A. § 1201(a)(1)(B) ................................................................................... 5
10
17 U.S.C.A. § 1201(a)(1)(C) ................................................................................... 5
11
17 U.S.C.A. § 1201(a)(1)(E) ................................................................................... 5
12
17 U.S.C.A. § 1201(a)(2) ............................................................................... passim
13
17 U.S.C.A. § 1201(b) ................................................................................... passim
14
17 U.S.C.A. § 1201(c)(1) ....................................................................................... 26
15
17 U.S.C.A. § 1201(d) ............................................................................................. 5
16
17 U.S.C.A. § 1201(e) ........................................................................................ 5, 22
17
17 U.S.C.A. § 1201(f) ........................................................................................ 5, 22
18
17 U.S.C.A. § 1201(g) .................................................................................. 5, 16, 22
19
17 U.S.C.A. § 1201(h) ............................................................................................. 5
20
17 U.S.C.A. § 1201(i) ............................................................................................. 5
21
17 U.S.C.A. § 1201(j) ........................................................................................ 5, 22
22
17 U.S.C.A. § 302 ................................................................................................... 14
23
17 U.S.C.A. § 303 ................................................................................................... 14
24
18 U.S.C.A. § 2319A .............................................................................................. 10
25
Digital Millenium Copyright Act, 17 U.S.C.A. § 1201 *et seq.* ............................... 1
26

27

28

1

## OTHER AUTHORITIES

2   144 Cong. Rec. E2136-02 (1998) ................................................................ 9, 12

3   144 Cong. Rec. S12985-01 (daily ed. Nov. 12, 1998), 1998 WL 785674
4       (Cong. Rec.) .......................................................................................... 3

5   65 Fed. Reg. 64556 (Oct. 27, 2000) ........................................................... 5

6   H.R. Rep. No. 105-551 (II) (1998) ................................................... 8, 9, 20

7   H.R. Rep. No. 94-1476 (1976) .................................................................. 23

8   S. Rep. No. 105-190 (1998) ........................................................... 4, 12, 20

9   WIPO Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11
10      (1997), 1997 WL 447232 ...................................................................... 3

11  WIPO Performances and Phonograms Treaty, Apr. 12, 1997, S. Treaty Doc.
        No. 105-17, Art. 18 (1997), 1997 WL 447232 ..................................... 3

12

## TREATISES

13  Melville Nimmer & David Nimmer, *Nimmer on Copyright* (2001) ...................................... 26

14

## CONSTITUTIONAL PROVISIONS

15  U.S. Const. art. I, § 8, cl. 18 ..................................................................... 7
16
17  U.S. Const. art. I, § 8, cl. 3 ....................................................................... 8

18  U.S. Const. art. I, § 8, cl. 8 ....................................................................... 7

19

20

21

22

23

24

25

26

27

28

1
2

**INTRODUCTION**

3        Intervenor United States of America hereby respectfully submits this brief to defend

4   the constitutionality of the Digital Millennium Copyright Act ("DMCA").  Plaintiff, "a small

5   internet company" (Plaintiff's First Amended Complaint ("FAC") ¶ 1), offers products that

6   permit an owner of a digital versatile disk ("DVD") encoded by a protective technological

7   measure known as the Content Scramble System ("CSS") to "decode" CSS and thus "create

8   backup copies of DVDs."  "321 Studios' Memorandum of Points and Authorities in

9   Opposition to Defendants' Motion for Partial Summary Judgment" ("Pl. Opp." or

10  "Opposition") at 4.  Plaintiff contends that, in offering its product, Plaintiff does not violate

11  the DMCA.  *See* Pl. Opp. at 7-19.  Plaintiff further contends that even if the Court rules that

12  Plaintiff has violated the Act, the DMCA's anti-trafficking provisions are unconstitutional

13  because Plaintiff alleges that (1) Congress did not have the constitutional authority to enact

14  these provisions and (2) such provisions, as construed by Defendants, violate the First

15  Amendment of the Constitution.  *See id* at 19-37; FAC ¶¶ 39, 44, 49.[1]

16
17

18        Contrary to Plaintiff's claims, and as set forth more fully below, Congress properly

19  acted pursuant to its authority under the Commerce Clause of the Constitution when enacting

20  the DMCA, 17 U.S.C.A. § 1201 *et seq*.  In addition, courts that have considered the anti-

21  trafficking provisions at issue here have uniformly held that these provisions do not target

22  speech or expressive conduct and cannot be subjected to a facial First Amendment attack.

23  *United States v. Elcom*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002); *Universal City Studios, Inc.*

24

25

26  [1]   Although Plaintiff appears to challenge only § 1201(a)(2) of the DMCA in its First
    Amended Complaint, FAC ¶ 35, Plaintiff appears to extend its constitutional challenge in its
27  Opposition to DMCA § 1201(b) as well.  Pl. Opp. at 9-10, 19-37.  In any event, as set forth
    below, both of these DMCA provisions pass constitutional muster.
28

1   *v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000), *aff'd*, *Universal City Studios, Inc. v.*

2   *Corley*, 273 F.3d 429 (2d Cir. 2001).  Similarly, Plaintiff cannot succeed in an as-applied

3   First Amendment challenge because, even if the Court concludes incidental protected

4   expression was involved in Plaintiff's trafficking of the products at issue, such courts have

5   rejected as-applied challenges to the anti-trafficking provisions because they are narrowly

6   tailored to address Congress' compelling concerns regarding electronic commerce.  This

7   Court, if it reaches them, should also reject Plaintiff's "as applied" constitutional challenges.

8

9                                    **BACKGROUND**

10  **I.  STATUTORY AND REGULATORY BACKGROUND**

11          Until fairly recently, artists and authors had only to contend with the "bootleg"

12  distribution of their works in hard-copy form.  With the advent of digital media and the

13  Internet as a means to distribute such media, copyright owners now face the reality of

14  uncontrollable, on-line infringement of copyrighted works in digital format.  In response to

15  this threat, the World Intellectual Property Organization ("WIPO") attempted to harmonize

16  and strengthen intellectual property laws worldwide in the form of two treaties, the Copyright

17  Treaty and the Performances and Phonograms Treaty, the first of which provides in Article

18  11 that contracting states

19

20                  shall provide adequate legal protection and effective legal
                    remedies against the circumvention of effective technological
21                  measures that are used by authors in connection with the
                    exercise of their rights under this Treaty or the Berne
22                  Convention and that restricts acts, in respect of their works,
                    which are not authorized by the authors concerned or permitted
23                  by law.

24

25

26

27

28

*See* WIPO Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11 (1997), 1997

WL 447232, at *13.[2]  The United States signed these treaties on April 2, 1997, and the

Senate ratified them on October 21, 1998.  *See* 144 Cong. Rec. S12985-01 (daily ed. Nov.

12, 1998) (Resolution of Ratification of Treaties), 1998 WL 785674 (Cong. Rec.).

Congress enacted the DMCA (1) to address what Congress perceived as new

challenges to copyright law arising from the advent of digital technology and electronic

commerce, and (2) to implement the WIPO treaties.  The DMCA contains three prohibitions.

*First*, the DMCA prohibits "circumvent[ing] a technological measure that effectively

controls access to a work protected under this [copyright] title."  17 U.S.C.A.

§ 1201(a)(1)(A).  *Second*, the DMCA prohibits the manufacture of or trafficking in products

or technology designed to circumvent a technological measure that controls access to a

copyrighted work.  *See id.* at § 1201(a)(2).[3]  *Third*, the DMCA prohibits the manufacture of

---

[2]   Article 18 of the WIPO Performances and Phonograms Treaty provides that contracting states

> shall provide adequate legal protection and effective legal remedies against
> the circumvention of effective technological measures that are used by
> performers or producers of phonograms in connection with the exercise of
> their rights under this Treaty and that restricts acts, in respect of their
> performances or phonograms, which are not authorized by the performers or
> the producers of phonograms concerned or permitted by law.

*See* WIPO Performances and Phonograms Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 18 (1997), 1997 WL 447232, at *25-*26.

[3]   In full, § 1201(a)(2) provides that:

> No person shall manufacture, import, offer to the public, provide, or otherwise
> traffic in any technology, product, service, device, component, or part thereof,
> that –
>
> (A) is primarily designed or produced for the purpose of circumventing a
>      technological measure that effectively controls access to a work protected
>      under this title;

or trafficking in products or technology designed to circumvent measures that protect a copyright owner's rights under the Copyright Act. *See id.* at § 1201(b).[4] Thus, whereas § 1201(a)(2) applies to technology that blocks *access* to the copyrighted work – such as a device that permits access to an article on an Internet website only by those who pay a fee or have a password – § 1201(b) applies to technology that protects the copyright itself – such as a device on the same website that prevents the viewer from copying the article once it is accessed. *See* S. Rep. No. 105-190, 11-12 (1998).

The DMCA provides several exceptions to these prohibitions. The statue permits an individual to circumvent an access control on a copyrighted work, or in limited

---

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

[4]     Section 1201(b)(1) provides that:

No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that –

(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

circumstances, to share circumvention technology: (1) in order for a school or library to determine whether to purchase a copyrighted product; (2) for law enforcement purposes; (3) to achieve interoperability of computer programs; (4) to engage in encryption research; (5) as necessary to limit the Internet access of minors; (6) as necessary to protect personally identifying information; or (7) to engage in security testing of a computer system. *See* 17 U.S.C.A. §§ 1201(d)-(j).

In addition, the DMCA provides that its prohibition on access circumvention itself, § 1201(a)(1)(A), would not apply to users of certain types of works if, upon the recommendation of the Register of Copyrights, the Librarian of Congress concludes that the ability of those users "to make noninfringing uses of particular class of work" is "likely to be . . . adversely affected" by the prohibition.  17 U.S.C.A. § 1201(a)(1)(B).  The statute makes clear, however, that any exceptions to § 1201(a)(1)(A) adopted by the Librarian of Congress are not defenses to violations of the anti-trafficking provisions contained in §§ 1201(a)(2) and 1201(b).  *See* 17 U.S.C.A. § 1201(a)(1)(E).[5]

## II.  FACTUAL BACKGROUND

In 1997, Defendants and other movie studios began distributing films for home viewing on DVDs.  *See Universal City Studios v. Reimerdes*, 111 F. Supp. 2d 294, 310 (S.D.N.Y. 2000).  DVDs "are the latest technology for private home viewing of recorded

---

[5]    To permit the Librarian of Congress to conduct an administrative rule-making proceeding regarding possible exceptions to § 1201(a)(1)(A), the DMCA delayed the effective date of that provision for two years.  *See* 17 U.S.C.A. § 1201(a)(1)(C).  The Register of Copyrights, in consultation with the Department of Commerce, completed this rule-making proceeding on October 27, 2000, and the Librarian of Congress adopted two exceptions to § 1201(a)(1)(A) – neither of which is relevant here.  *See* 65 Fed. Reg. 64556, 64564-66 (Oct. 27, 2000) (adopting exceptions to § 1201(a)(1)(A) for compilations consisting of lists of websites blocked by filtering software applications and for literary works protected by access control mechanisms that fail to permit access because of malfunction, damage, or obsolescence).

1    motion pictures and result in drastically improved audio and visual clarity and quality of

2    motion pictures shown on televisions or computer screens." *Id.* at 307; *cf.* FAC ¶¶ 19 (DVDs

3    are a "technology that permits the storage and playback of video and films in a digital

4    format"), 20 ("Because video images are stored on DVDs in a digital format, rather than the

5    analog format used on videocassettes, DVDs permit the payback of video images with

6    improved clarity and quality."). Use of the DVD format, however, brought an "increased

7    risk of piracy by virtue of the fact that digital files, unlike material on video cassettes, can be

8    copied without degradation from generation to generation." *Reimerdes*, 111 F. Supp. 2d at

9    309.

10

11       To minimize this increased risk, Defendants adopted a technological measure known

12   as the Content Scramble System ("CSS"). *See* FAC ¶ 23; Pl. Opp. at 2; *Reimerdes*, 111 F.

13   Supp. 2d at 308. CSS involves encrypting or scrambling the digital sound and graphics fields

14   on a DVD that together constitute a motion picture. *Reimerdes*, 111 F. Supp. 2d at 309-10;

15   FAC ¶ 23 ("CSS works by scrambling the digital data that makes up each frame of video

16   images."). A CSS-protected DVD is then unscrambled by technological components

17   contained in licensed DVD players or computer drives. *See id.* at 310; *see also* FAC ¶ 23.

18

19       Plaintiff, "a small internet company" (FAC ¶ 1), offers at least one product[6] that

20   permits an owner of a CSS-protected DVD to "decode" "CSS-encoded data" and thus "create

21   backup copies of DVDs." Pl. Opp. at 4. Plaintiff has also advertised that users of one of its

22   products, "DVD-X COPY," "can 'Make Perfect Copies Of Your DVDs,' . . . and that a copy

23   made with DVD-X COPY 'is EXACTLY like the original.'" Plaintiff/Counterclaim

24   Defendants' Answer to Counterclaim ¶ 26.

25

26

27

28

**ARGUMENT**[7]

**I.  CONGRESS ACTED WITHIN ITS CONSTITUTIONAL AUTHORITY WHEN IT ENACTED THE DMCA.**

Congress had the authority to enact §§ 1201(a)(2) and 1201(b) of the DMCA (collectively the "anti-trafficking provisions") pursuant to the Constitution's Commerce Clause.  The federal government is one of enumerated powers, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819); *United States v. Lopez*, 514 U.S. 549, 566 (1995), and the Framers entrusted to Congress the authority "[t]o make all laws which shall be necessary and proper for carrying into Execution" the powers vested by the Constitution in the government of the United States.  U.S. Const. Art. I, § 8, cl. 18.  The Constitution contains several express grants of power to Congress, among them the Intellectual Property Clause[8] and the Commerce Clause.

Plaintiff erroneously contends that "[n]either the text nor the legislative history of the DMCA indicates which power Congress relied on" in enacting the DMCA.  Pl. Opp. at 34.  Although Plaintiff speculates that Congress may have seen the DMCA as an exercise of its power pursuant to the Intellectual Property Clause, the Necessary and Proper Clause, or the Commerce Clause (Pl. Opp. at 34-37), Plaintiff concludes that "the DMCA's anti-device

---

6    Two of Plaintiff's products appear to be at issue in this case – "DVD Copy Plus" and "DVD X Copy."  For ease of reference, Intervenor adopts Plaintiff's convention of referring to these products collectively as "DVD Copy Code."  *See* Pl. Opp. at 4.

7    In submitting this brief, Intervenor does not state a position as to whether Plaintiff or Counterdefendants have violated the DMCA.  Furthermore, if the Court finds that Plaintiff or Counterdefendants do not violate the DMCA, then Intervenor respectfully submits that the Court need not reach the constitutional issues raised by Plaintiff.  *Cf. United States v. National Treasury Employees Union*, 513 U.S. 454, 478 (1995) (courts should avoid unnecessary adjudication of constitutional issues).

8    Article I, Section 8, Clause 8 of the Constitution grants Congress the power to "promote the Progress of Science and useful Arts."  This Clause is referred to herein alternatively as the Intellectual Property Clause or the Copyright Clause.

1  provisions are not a valid exercise of any of Congress' enumerated powers."  Pl. Opp. at 34.

2  In fact, the legislative history of the DMCA reflects that Congress expressly based its

3  exercise of authority over circumvention technology on the Commerce Clause rather than the

4  Intellectual Property Clause or any other enumerated power.  *See* H.R. Rep. No. 105-551 (II),

5  at 35 (1998) ("Constitutional Authority Statement: Pursuant to clause 2(l)(4) of Rule XI of

6  the Rules of the House of Representatives, the Committee finds that the Constitutional

7  authority for this legislation is provided in Article I, section 8, clause 3, which grants

8  Congress the power to regulate commerce with foreign nations, among the several States,

9  and with the Indian tribes."); *see also id.* at 22 (noting that the bill "is about much more than

10  intellectual property.  It defines whether consumers and businesses may engage in certain

11  conduct, or use certain devices, in the course of transacting electronic commerce.  Indeed,

12  many of these rules may determine the extent to which electronic commerce realizes its

13  potential.").

14

15

16  **A.  Congress Properly Enacted Sections 1201(a)(1)(A), 1201(a)(2), and 1201(b) of the DMCA Pursuant to the Commerce Clause.**

17

18  "Congress plainly has the power to enact the DMCA under the Commerce Clause."

19  *Elcom*, 203 F. Supp. 2d at 1138.  Article I, Section 8, Clause 3 of the Constitution delegates

20  to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several

21  States, and with the Indian Tribes."

22  > The commerce power "is the power to regulate; that is, to
23  > prescribe the rule by which commerce is to be governed.  This
24  > power, like all others vested in congress, is complete in itself,
25  > may be exercised to its utmost extent, and acknowledges no
     > limitations, other than are prescribed by the constitution."

26  *United States v. Lopez*, 514 U.S. 549, 553 (1995) (quoting *Gibbons v. Ogden*, 22 U.S. (9

27  Wheat.) 1, 196 (1824)).  As defined by the Supreme Court, the term "commerce" as

28  referenced in the Constitution is "commercial intercourse" which "is regulated by prescribing

rules for carrying on that intercourse." *Gibbons*, 22 U.S. at 189-90.  Specifically, such

regulation may be directed at protecting channels of interstate commerce, instrumentalities of

interstate commerce, things in interstate commerce, or activities having a substantial relation

to, or which substantially affect, interstate commerce.  *Lopez*, 514 U.S. at 558-59 (citations

omitted).  In *United States v. Lopez*, the Supreme Court set forth the applicable test to

determine whether a law exceeds Congress' commerce power: "whether a rational basis

existed for concluding that a regulated activity sufficiently affected interstate commerce." *Id.*

at 557.

Here, the DMCA clearly prohibits conduct that has a substantial effect on commerce

between the states and commerce with foreign nations.  *Elcom*, 203 F. Supp.2d at 1138.  In

creating the DMCA's anti-trafficking provisions, Congress acted to directly regulate specific

things moving in commerce (circumvention technology) and to protect channels of interstate

commerce, including electronic commerce.  Indeed, the legislative history reflects that the

DMCA developed out of a wide-ranging review of the issues affecting the growth of

electronic commerce and a concern about inappropriate distribution of products harmful to

the market for digital content.  H.R. Rep. No. 105-551(II), at 22; 144 Cong. Rec. E2136-02,

2137 (1998).

Most significantly, to the extent that circumvention devices enable wrongdoers to

engage in piracy by unlawfully copying and distributing copyrighted works of authorship, the

sale of such devices has a direct effect on suppressing the market for legitimate copies of the

works.  *Elcom*, 203 F. Supp. 2d at 1138.  Accordingly, there is a rational basis for concluding

that the regulated activity here sufficiently affects interstate commerce to establish that

1   Congress acted within its authority under the Commerce Clause.[9]  *Id.* (citing *Lopez*, 514 U.S.

2   at 557); *see also United States v. Moghadam*, 175 F.3d 1269, 1276-77 (11th Cir. 1999)

3   (holding that the anti-bootlegging statute (18 U.S.C.A. § 2319A) had a sufficient connection

4   to interstate and foreign commerce to satisfy the *Lopez* test).[10]

5

6   **B.  Congress May Act Pursuant to the Commerce Clause to Protect Rights Granted Under the Intellectual Property Clause.**

7       Congress may act pursuant to the Commerce Clause to pass legislation that protects

8   intellectual property rights, even where the Intellectual Property Clause alone does not

9   provide sufficient authority for such legislation.  The Supreme Court has long recognized that

10  while each of the powers of Congress is alternative to all of the others, "what cannot be done

11  under one of them may very well be doable under another."  *Moghadam*, 175 F.3d at 1277.

12

13  _____

14  [9]   Because Congress properly relied upon its Commerce power to enact the DMCA,
    Plaintiff's allegation that "[t]he DMCA cannot be sustained under the Intellectual Property

15  Clause" is inapposite.  Pl. Opp. at 34-35.

16  [10]  In analyzing whether Congress had the power under the Commerce Clause to enact a
    statute similar to the DMCA, the "anti-bootlegging" statute (criminalizing the unauthorized

17  recording of live musical performances), the Eleventh Circuit concluded that

18              The link between compact discs and interstate commerce and
                commerce with foreign nations is self-evident. . . . Bootleggers

19              depress the legitimate markets because demand is satisfied
                through unauthorized channels.  Generally speaking,

20              performing artists who attract bootleggers are those who are
                sufficiently popular that their appeal crosses state or national

21              lines.  The very reason Congress prohibited this conduct is
                because of the deleterious economic effect on the recording

22              industry.  The specific context in which [the anti-bootlegging
                statute] was enacted involved a treaty with foreign nations,

23              called for by the World Trade Organization, whose purpose
                was to ensure uniform recognition and treatment of intellectual

24              property in international commerce. . . . Moreover, the type of
                conduct that Congress intended to regulate by passing the anti-

25              bootlegging statute is by its very nature economic activity.

26

27  *Moghadam*, 175 F.3d at 1276 (citations omitted).

28

In this vein, the Commerce Clause may be used as a basis to legislate within a context contemplated by another section of the Constitution so long as Congress does not override an otherwise existing Constitutional limitation.  *Lopez*, 514 U.S. at 553-59; *compare Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964) (upholding public accommodation provisions of the Civil Rights Act of 1964 as valid under the Commerce Clause despite the fact that the Act may have reached beyond Congress' authority under the Fourteenth Amendment) *and South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (holding that Congress could act pursuant to the Spending Clause to impose restrictions that would be beyond Congress' power to enact directly) *with Railway Labor Executives Ass'n v. Gibbons*, 455 U.S. 457 (1982) (striking down act by Congress under Commerce Clause that violated Bankruptcy Clause's uniformity requirement).

        In *Moghadam*, the Eleventh Circuit addressed the precise constitutional question raised by Plaintiff in its Opposition: "whether Congress can use its Commerce Clause power to avoid the limitations that might prevent it from passing the same legislation under the Copyright Clause."  175 F.3d at 1277; Pl. Opp. at 34 (alleging that the DMCA's anti-trafficking provisions are not "a lawful exercise of the . . . commerce power[] because they contravene specific limits on Congress' power under the Intellectual Property Clause").  After reviewing *The Trade-Mark Cases*, 100 U.S. 82, 99 (1879), *Heart of Atlanta Motel*, and *Railway Labor*, the Eleventh Circuit decided that the grant of power pursuant to the Intellectual Property Clause "itself is stated in positive terms, and does not imply any negative pregnant" that would suggest "a ceiling on Congress' ability to legislate pursuant to other grants" and that "[e]xtending quasi-copyright protection also furthers the purpose of the Copyright Clause to promote the progress of the useful arts."  *Moghadam*, 175 F.3d at 1280.  As a result, the Eleventh Circuit concluded that "the Copyright Clause does not envision that

1   Congress is positively forbidden from extending copyright-like protection under other

2   Constitutional clauses, such as the Commerce Clause." *Id.* (holding that the anti-bootlegging

3   statute's provision of "copyright-like protection in the instant case is not fundamentally

4   inconsistent with" the purpose of, and not "irreconcilably inconsistent with" a limitation

5   contained within, the Intellectual Property Clause).

6          Like the anti-bootlegging statute at issue in *Moghadam*, Congress' enactment of the

7   DMCA pursuant to the Commerce Clause "is not fundamentally inconsistent with" the

8   purpose of the Intellectual Property Clause.  *Elcom*, 203 F. Supp. 2d at 1140-41.  As the

9   legislative history of the DMCA demonstrates, Congress viewed the DMCA as

10  "paracopyright" legislation (much like the "copyright-like" anti-bootlegging statute in

11  *Moghadam*) that could be enacted under the Commerce Clause.  *Elcom*, 203 F.3d at 1140

12  (citing 144 Cong. Rec. E2137 (1998)).  Congress' efforts to protect the market for digital

13  content under the Commerce Clause cannot be said to override constitutional restraints of the

14  Intellectual Property Clause because Congress' fundamental motivation was to protect rights

15  granted under the Intellectual Property Clause in the digital world.  *See id.*  Congress

16  recognized that traditional intellectual property laws regulating the use of information border

17  on unenforceable in the digital world; only regulation of the devices by which information is

18  delivered will successfully save constitutionally guaranteed intellectual property rights.  *See*

19  *id.* ("Protecting the exclusive rights granted to copyright owners against unlawful piracy by

20  preventing trafficking in tools that would enable widespread piracy and unlawful

21  infringement is consistent with the purpose of the Intellectual Property Clause's grant to

22  Congress of the power to 'promote the useful arts and sciences' by granting exclusive rights

23  to authors in their writings."); S. Rep. No. 105-190, at 8 ("Due to the ease with which digital

24  works can be copied and distributed worldwide virtually instantaneously, copyright owners

1  will hesitate to make their works readily available on the Internet without reasonable

2  assurance that they will be protected against massive piracy.").

3      In its Opposition, Plaintiff maintains that "the essential nature of [its] challenge here"

4  is that the DMCA somehow violates the Intellectual Property Clause's "Limited Times"

5  requirement (as opposed to that Clause's "fixation" requirement at issue in *Moghadam*) by

6  effectively granting copyright owners "perpetual protection" of their works.  Pl. Opp. at 37

7  n.31.[11]  However, nothing in the DMCA permits a copyright owner to prevent a work on a

8  DVD from ever entering the public domain, despite the expiration of the copyright.  *See*

9  *Elcom*, 203 F. Supp. 2d at 1141 (reaching same conclusion with respect to DMCA § 1201(b)

10 as applied to "ebooks").  The essence of a copyright is the legally enforceable exclusive

11 rights to reproduce and distribute copies of an original work of authorship, to make

12 derivative works, and to perform the work publicly for a limited time.  *Id.*; 17 U.S.C.A.

13

14

---

15  [11]   Elsewhere in its discussion challenging Congress' authority to enact the DMCA, Plaintiff
16  apparently contends as well that the DMCA is inconsistent with the Intellectual Property
    Clause because the DMCA allegedly (1) "eliminate[s] fair use of copyrighted expression"
17  and (2) "extend[s] exclusive protection to public domain or copyright-expired subject
    matter."  Pl. Opp. at 37.  Plaintiff's reliance on these alleged inconsistencies, however, is
18  misplaced.  Plaintiff's attempt to rely on a conflict between the DMCA and fair use is
    misplaced for at least two reasons.  *First*, and as set forth more fully in the discussion
19  regarding the First Amendment, *infra*, Plaintiff's argument proceeds from the false premise
    that fair use is a constitutional right under the First Amendment when in fact the Supreme
20  Court has never recognized a constitutional right to fair use under any constitutional
    provision.  *Corley*, 273 F.3d at 458.  *Second*, in any event, the anti-trafficking provisions do
21  not ban the *use* of circumvention tools precisely because Congress "expressly sought to
22  *preserve fair use*" when it enacted § 1201(c)(1) of the DMCA.  *Elcom*, 203 F. Supp. 2d at
    1140-1141 (emphasis added); 17 U.S.C.A. § 1201(c)(1) ("Nothing in this section shall affect
23  rights, remedies, limitations, or defenses to copyright infringement, including fair use, under
24  this title.").

25      Plaintiff's claim that the DMCA's anti-trafficking provisions extend copyright-like
    protection to public domain works is also erroneous because "[n]othing within the DMCA
26  grants any rights to anyone in any public domain work.  A public work remains in the public
    domain and any person may make use of the public domain work for any purpose."  *Elcom*,
27  203 F. Supp. 2d at 1141.

28

§§ 106, 302-03.  When a copyright expires, so does any protectable intellectual property right in a work's expression.  *Elcom*, 203 F. Supp. 2d at 1141.  Upon expiration, the user may copy, quote, or republish the expression without any legally enforceable restriction on the use of the expression.  *Id.*  Accordingly, none of those rights is extended beyond the statutory term merely by prohibiting the trafficking in or marketing of devices primarily designed to circumvent use restrictions on works in digital form.  *Id.*  Thus, "the DMCA does not run afoul of any restraint on Congress' power imposed by the Intellectual Property Clause."  *Id.*[12]

## II.   THE DMCA DOES NOT VIOLATE THE FIRST AMENDMENT.

### A.   Plaintiff May Not Make a Facial First Amendment Challenge to the DMCA.

Plaintiff may not make a facial challenge to the DMCA as overbroad pursuant to the First Amendment for at least two independent reasons.  *First*, as a threshold matter, on its face the DMCA does not proscribe "spoken words" or conduct that is "patently 'expressive or communicative'" or integral to or commonly associated with expression.  *Roulette v. City of Seattle*, 97 F. 3d 300, 303 (9th Cir. 1996) (holding that "the Supreme Court has entertained facial freedom-of-expression challenges only against statutes that, 'by their terms,' sought to regulate 'spoken words,' or patently 'expressive or communicative conduct'") (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612-13 (1973)).  "[A] facial freedom of speech attack must fail, unless at a minimum, the challenged statute is directed narrowly and specifically at expression or conduct commonly associated with expression."  *Roulette*, 97 F.3d at 305 (internal quotation marks omitted).

---

[12]   Because the DMCA is consistent with the Commerce Clause and is not prohibited by any provision in the Constitution, Plaintiff's contention that the DMCA exceeds Congress' power under the Necessary and Proper Clause also fails.  Pl. Opp. at 35 ("The necessary and proper power allows Congress only those means, 'which are appropriate, which are plainly adapted

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Here, the DMCA is not directed specifically at expression or conduct associated with expression, and the DMCA has numerous permissible applications. *Elcom*, 203 F. Supp. 2d at 1133 (holding that DMCA § 1201(b), "[b]y its terms," is not directed at expression); *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988) (party may only make a facial freedom of speech challenge if the Court finds that "*every* application of the statute create[s] an impermissible risk of suppression of ideas") (emphasis added, internal citations omitted). The DMCA's anti-trafficking provisions are laws of general application focused on trafficking in technology; they are not focused on speech. *Elcom*, 203 F. Supp. at 1133; *see Anderson v. Nidorf*, 26 F.3d 100, 103-04 (9th Cir. 1994) (holding that California's anti-piracy statute is not subject to facial challenge because, *inter alia*, the statute focused upon infringement for commercial advantage or private financial gain).[13]

By its terms, the DMCA's anti-trafficking provisions target the manufacture of, trafficking in, or marketing of "any technology, product, service, device, component, or part thereof" that circumvents access control or usage control restrictions. 17 U.S.C.A. §§ 1201(a)(2), 1201(b)(1); *Elcom*, 203 F. Supp. 2d at 1133. Any technology or product, such as hardware, that circumvents access control or usage control restrictions as set forth in the anti-trafficking provisions falls within the scope of the Act; devices like hardware clearly do not constitute "spoken words" or "expressive communicative conduct." *Elcom*, 203 F. Supp. 2d at 1133. Accordingly, on this basis alone, "an overbreadth facial challenge is not available" to Plaintiff. *Id.*; *see Broadrick*, 413 U.S. at 612-13.

---

to that end, [and] which are not prohibited, but consistent with the letter and spirit of the constitution.' *McCulloch v. Maryland*, 17 U.S. 316, (4 Wheat) 421 (1819)").

[13] *Cf. City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes – for example, walking down the street or meeting one's friends at a shopping mall – but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.").

*Second*, even if the Court construed the DMCA as a statute directed at spoken words or conduct commonly associated with expression, Plaintiff's reliance on the overbreadth doctrine for its facial freedom of speech attack is misplaced.  To present an overbreadth challenge, Plaintiff must allege that the DMCA "is invalid because it is so broadly written that it infringes unacceptably on the first amendment rights of third parties." *Nidorf*, 26 F.3d at 103; *Elcom*, 203 F. Supp. 2d at 1132 (same).  As a result, "[a] statute will be declared unconstitutional *only if* the court finds a 'realistic danger that the statute itself will significantly compromise *recognized* First Amendment protections of parties not before the Court.'" *Nidorf*, 26 F.3d at 104 (citing *New York State Club*, 427 U.S. at 11) (emphasis added); *Elcom*, 203 F. Supp. 2d at 1133 (same).

Here, Plaintiff bases its overbreadth on a single allegation: that "the DMCA poses a substantial risk that speech regarding legitimate study and advancement of encryption and computer technology will be prohibited."  Pl. Opp. at 34.[14]  Even assuming, *arguendo*, that First Amendment protection for such speech did exist, the DMCA does not "significantly compromise" this protection because the DMCA's anti-trafficking provisions target the "manufacture" of or "trafficking in" circumvention technology, not speech regarding the study of encryption and computer technology.  Indeed, the DMCA expressly provides an exception for "[e]ncryption research," as set forth in 17 U.S.C.A. § 1201(g).  Accordingly, whatever limited impairment of the one category of speech raised by Plaintiff, it "does not significantly compromise or impair the First Amendment rights of third parties so as to render the DMCA overbroad." *See Elcom*, 203 F. Supp. 2d at 1135.

[14]   To the extent Plaintiff contends that such study is part of an alleged First Amendment right to fair use, this contention necessarily fails because it relies on the false premise that there exists a constitutional right to fair use.  As set forth more fully *infra*, fair use is not a

**B.  The DMCA Does Not Violate the First Amendment As Applied to Plaintiff's Sale of DVD Copy Code**

Plaintiff alleges that "DVD Copy Code is itself speech" because it includes a computer program, "DVD X Copy," and computer object code that allegedly is speech.  Pl. Opp. at 20, 27-28.  Although it is unclear whether Plaintiff's trafficking of computer object code (or the code itself) constitutes speech, *see Corley*, 273 F.3d at 454; *Elcom*, 203 F. Supp. 2d at 1126, even assuming, *arguendo*, that the sale of DVD Copy Code does constitute speech, the DMCA's anti-trafficking provisions do not violate Plaintiff's First Amendment rights because the DMCA (1) is content-neutral with respect to speech, (2) furthers important governmental interests in promoting electronic commerce and protecting the rights of copyright owners, and (3) is sufficiently tailored to achieve these objectives without unduly burdening free speech.  *United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("When 'speech' and 'non-speech' elements are combined in a single course of conduct, a sufficiently important government interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms."); *Elcom*, 203 F. Supp. 2d at 1127-28 (applying *O'Brien* test to DMCA).

**1.  The DMCA is Content-Neutral**

The DMCA's anti-trafficking provisions (§§ 1201(a)(2) and 1201(b)) are content-neutral.  *See Corley*, 273 F.3d at 454 (holding that the DMCA § 1201(a)(2) is content-neutral); *Elcom*, 203 F. Supp. 2d at 1128-29 (holding that § 1201(b) is content-neutral).  The principal inquiry in determining whether a statute is content-neutral is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys.  *Turner Broadcasting Sys. Inc. v. FCC*, 512 U.S. 622, 642 (1994);

recognized constitutional right.  *Corley*, 273 F.3d at 458 ("the Supreme Court has never held that fair use is constitutionally required").

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Elcom*, 203 F. Supp. 2d at 1128 (same); *see also Corley*, 273 F.3d at 450-51.  The government's purpose is the controlling consideration.  *Ward*, 491 U.S. at 791; *Elcom*, 203 F. Supp. 2d at 1128 (same).  By this measure, the DMCA's anti-trafficking provisions are clearly content-neutral.

The DMCA's purpose is to target the non-speech, functional components of circumvention software (like Plaintiff's), not to "stifle[] speech on account of its message." *Turner*, 512 U.S. at 641.  Plaintiff alleges that "the DMCA suppresses speech that indicates how to circumvent a technological measure protecting a copyright."  Pl. Opp. at 27. Contrary to Plaintiff's unsupported conclusion, "no portion of the legislative history . . . demonstrates a congressional intent to target speech because of its expressive content." *Elcom*, 203 F. Supp. 2d at 1128.  In fact, every court that has considered the issue in the context of the DMCA has determined that Congress was not concerned with suppressing ideas but instead enacted the anti-trafficking measures because of the circumvention function performed by circumvention software.  *Reimerdes*, 111 F. Supp. 2d at 329 ("The reason that Congress enacted the anti-trafficking provision of the DMCA had nothing to do with suppressing particular ideas of computer programmers and everything to do with functionality."); *Elcom*, 203 F. Supp. 2d at 1128; *Corley*, 273 F.3d at 454.  As the Second Circuit observed in analyzing the "DeCSS" DVD decryption software at issue in that case:

> The Appellants' argument fails to recognize that . . . DeCSS – has both a nonspeech and a speech component, and that the DMCA, as applied to the Appellants, . . . target[s] only the nonspeech component.  Neither the DMCA nor the posting prohibition is concerned with whatever capacity DeCSS might have for conveying information to a human being, and that capacity, as previously explained, is what arguably creates a speech component of the decryption code.  The DMCA and the posting prohibition are applied to the DeCSS solely because of its capacity to instruct a computer to decrypt CSS.  That functional capability is not speech within the meaning of the First Amendment.

*Corley*, 273 F.3d at 454.

The *Corley* analysis of the application of the DMCA to the DVD decryption software in that case is instructive in considering Plaintiff's decryption software, DVD Copy Code, vis-à-vis the DMCA.  The DMCA applies to DVD Copy Code because of its capacity to decode the CSS technology designed to control unauthorized access to copyrighted work or to protect a copyright owner's rights.[15]  The DMCA does not reach DVD Copy Code because of any capacity that it may have to communicate ideas or information to a human being.  *See Corley*, 273 F.3d at 454; *see also Reimerdes*, 111 F. Supp. 2d at 304-05 ("In an era in which . . . computer code also is capable of inflicting other harm, society must be able to regulate the use and dissemination of code in appropriate circumstances.  The Constitution, after all, is a framework for building a just and democratic society.  It is not a suicide pact.").  Accordingly, the DMCA's anti-trafficking provisions as applied to Plaintiff are content-neutral.

### 2.    The DMCA Furthers Important Government Interests

A statute that is content neutral will satisfy the First Amendment "if it furthers an important or substantial government interest; if the government interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest."  *Turner*, 512 U.S. at 662 (quoting *O'Brien*, 391 U.S. at 377).  The Government's interests in preventing unauthorized copying of copyrighted works and promoting electronic commerce are

---

[15]   Although Plaintiff and Defendants disagree as to whether DVD Copy Code implicates the DMCA's access control provision (§ 1201(a)(2)) or the Act's usage control provision (§ 1201(b)), they agree that DVD Copy Code implicates at least one of these provisions.  *See*, *e.g.*, Pl. Opp. at 8 ("any circumvention of CSS raises issues under § 1201(a), which governs unauthorized access, but does not raise issues under § 1201(b)").

1   unquestionably substantial.  *See* H.R. Rep. No. 105-551 (II), at 23 (1998) ("The debate on

2   [the DMCA] highlighted two important priories: promoting the continued growth and

3   development of electronic commerce; and protecting intellectual property rights."); *Elcom*,

4   203 F. Supp. at 1129-30; *Corley*, 273 F.3d at 454; *see also Anderson v. Nidorf*, 26 F.3d at

5   103-04.  Congress has repeatedly found that copyright and, more broadly, intellectual

6   property piracy are endemic.  *E.g.*, *Elcom*, 203 F. Supp. 2d at 1129-30 ("Notwithstanding

7   [penalties for copyright infringement] copyright piracy of intellectual property flourishes,

8   assisted in large part by today's world of advanced technologies. . . . industry groups estimate

9   that counterfeiting and piracy of computer software cost the affected copyright holders more

10  than $11 billion last year") (brackets in original) (quoting H.R. Rep. 106-216 (1999));

11  *Reimerdes*, 111 F. Supp. 2d at 335 n.230 (same).

12          When Congress enacted the DMCA, "Congress recognized that a primary threat to

13  electronic commerce and to the rights of copyright holders was the plague of digital piracy."

14  *Elcom*, 203 F. Supp. 2d at 1129.  Indeed, as the Senate Report notes, Congress specifically

15

16  enacted the DMCA to protect American copyrighted works:

17

18                  Due to the ease with which digital works can be copied and
                    distributed worldwide virtually instantaneously, copyright
19                  owners will hesitate to make their works readily available on
                    the Internet without reasonable assurance that they will be
20                  protected against massive piracy.  Legislation implementing
                    the treaties provides this protection and creates the legal
21                  platform for launching the global digital on-line marketplace
                    for copyrighted works.  It will facilitate making available
22                  quickly and conveniently via the Internet the movies, music,
                    software, and literary works that are the fruit of American
23                  genius.

24

25  S. Rep. No. 105-190, at 8 (1998).  Thus, by prohibiting the trafficking in circumvention

26  technology, the DMCA furthers the government's important interests in promoting electronic

27  commerce, protecting copyrights, and preventing electronic piracy.  *See Elcom*, 203 F. Supp.

28

1    2d at 1130 ("there is little question that the governmental interests would be promoted less

2    effectively in the absence of the [DMCA]").  Accordingly, the magnitude of these

3    government interests furthered by the DMCA are important and substantial, especially since

4    "the Framers intended copyright itself to be the engine of free expression."  *Harper & Row,*

5    *Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 558 (1985).

6

7             **3.    The DMCA Is Sufficiently Tailored to Satisfy Constitutional
                       Requirements**

8             The DMCA's anti-trafficking provisions are sufficiently tailored for First

9    Amendment purposes.  The Supreme Court has emphasized that a content-neutral regulation

10   "need not be the least speech-restrictive means of advancing the Government's interest."

11   *Turner*, 512 U.S. at 662; *Corley*, 273 F.3d at 455.  "Rather, the requirement of narrow

12   tailoring is satisfied so long as the regulation promotes a substantial government interest that

13   would be achieved less effectively absent the regulation."  *Turner*, 512 U.S. at 662 (citations

14

15   and internal quotations omitted).

16           Courts have uniformly found that the DMCA's anti-trafficking provisions reflect the

17   "narrow tailoring" required to achieve the government's important interests.  *Elcom*, 203 F.

18   Supp. 2d at 1130-32 (holding that § 1201(b) is sufficiently tailored); *Corley*, 273 F.3d at 454-

19

20   55 (holding that DMCA § 1201(a)(2) is sufficiently tailored).  "Without the ban on

21   trafficking in circumvention tools, the government's interest in promoting electronic

22   commerce, preserving the rights of copyright holders, and preventing piracy would be

23   undermined."  *Elcom*, 203 F. Supp. 2d at 1130.  Absent the technology to protect works from

24   copyright infringement, the result would likely be "even more rampant piracy, with a

25   corresponding likely decrease in the willingness of authors and owners of copyrighted works

26   to produce them in digital form or make the works available on-line."  *Id.*  Accordingly,

27

28

"there is little question that the governmental interest would be promoted less effectively in the absence of the regulation [the DMCA]." *Id.*

Furthermore, the DMCA does not burden substantially more speech than is necessary to achieve the government's important interests.  The numerous exceptions to the DMCA demonstrate the "narrow tailoring" of the DMCA.  Congress carefully balanced, for instance, the needs of law enforcement and other government agencies, computer programmers, encryption researchers, and computer security specialists against the serious problems created by circumvention technology.  *See* 17 U.S.C.A. §§ 1201(e)-(g), 1201(j); *Elcom*, 203 F. Supp. 2d at 1130-31.  Plaintiff does not allege that its conduct falls within any of the DMCA's exceptions.  *See Elcom*, 203 F. Supp. at 1131 (citing *FEC v. Nat'l Right to Work Committee*, 459 U.S. 197, 208 (1982) ("statutory prohibitions and exceptions" regarding political contributions by corporations and unions held "sufficiently tailored . . . to avoid undue restriction on the associational interests" by political organization).  Thus, the DMCA does not burden substantially more speech than is necessary to achieve the government's asserted goals of promoting electronic commerce, protecting copyrights, and preventing electronic piracy.  *Elcom*, 203 F. Supp. 2d at 1132.

## C.  The DMCA Does Not Violate the First Amendment As Applied to Third Parties

### 1.  Plaintiff Does Not Have Standing to Assert a Fair Use Defense on Behalf of Third Parties

As a threshold matter, Plaintiff does not have standing to assert a fair use defense on behalf of third parties.  "[A] person to whom a statute constitutionally may be applied may not challenge that statute on the ground that it conceivably may be applied unconstitutionally to others in situations not before the Court."  *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).  Plaintiff itself does not claim to be making fair use of any copyrighted materials.

1   Rather, Plaintiff improperly advances a hypothetical fair use argument on behalf of users of

2   its DVD Copy Code products, something Plaintiff does not have standing to do.

### 2.   No Court Has Held That the Fair Use Doctrine Is a Constitutional Requirement

5   Even if Plaintiff had standing to assert third parties' alleged constitutional right to fair

6   use, Plaintiff would have nothing to assert because no court has held that the fair use doctrine

7   is a categorical constitutional requirement.  Fair use is a judicially created doctrine that

8   "limits the exclusive rights of a copyright holder by permitting others to make limited use of

9   portions of the copyrighted work, for appropriate purposes, free of liability for copyright

10   infringement."  *Reimerdes*, 111 F. Supp. 2d at 321.  Fair use existed only at common law

11   until the enactment of the 1976 Copyright Act, which provides a provision defining fair use,

12   17 U.S.C.A. § 107, that Congress had intended to maintain the status quo.  *See* H.R. Rep. No.

13   94-1476, at 66 (1976).

15   Although fair use has continued to have a basis in statutory and common law, "the

16   Supreme Court has never held that fair use is constitutionally required."  *Corley*, 273 F.3d at

17   458; *Elcom*, 203 F. Supp. 2d at 1131.  Plaintiff alleges that "the Supreme Court has since

18   rejected that view in *Eldred v. Ashcroft*, 123 S. Ct. 769 (2003)."  Pl. Opp. at 20.  Based on

19   *Eldred*, Plaintiff concludes that there now exists a categorical First Amendment right to fair

20   use simply because that Court observed that "copyright law contains built-in First

21   Amendment accommodations" and that "the 'fair use' defense allows the public to use not

22   only facts and ideas contained in a copyrighted work, but also expression itself in certain

23   circumstances."  Pl. Opp. at 20-21 (quoting *Eldred*, 123 S. Ct. at 788-89).

25   Far from declaring a new constitutional doctrine, the Court in *Eldred* was merely

26   repeating the same observation the Supreme Court had already made in past opinions – that

27   the fair use doctrine accommodates First Amendment protections.  In fact, throughout the

section of the *Eldred* opinion relied upon by Plaintiff, the opinion cites extensively to the

Supreme Court's 1985 opinion in *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471

U.S. 539 (1985), which had already noted "the First Amendment protections already

embodied in the Copyright Act's distinction between copyrightable expression and

uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally

afforded by fair use." 471 U.S. at 560.  Clearly, the *Eldred* opinion did not replace the

statutory (and common law) source of the fair use doctrine with a new First Amendment

source. Accordingly, Plaintiff's attempt to stretch the *Eldred* opinion's reach to include

declaring a new constitutional right to fair use goes too far.

Most significantly, Plaintiff has provided no support for its premise that fair use of

DVD movies is constitutionally required to be made by copying the original work in its

original format.  By attempting to invalidate the DMCA for violating the First Amendment as

applied to third parties, Plaintiff improperly attempts to extend constitutional protection not

just to the fair use doctrine, but to specific fair uses of DVD movies as well.  Plaintiff's

examples of the fair uses that Plaintiff believes that the DMCA will prevent others from

making all appear to involve copying in a digital format those portions of a DVD movie

amenable to fair use, a copying that would enable the fair user to manipulate the digitally

copied portions.  Pl. Opp. at 4-5.  One example is a student using Plaintiff's DVD Copy Code

to incorporate images from a DVD movie to insert into an artistic work.  Pl. Opp. at 5.  As

much as Plaintiff makes of this point, Plaintiff offers no authority for it.  "We know of no

authority for the proposition that fair use, as protected by the Copyright Act, much less the

Constitution, guarantees copying by the optimum method or in the identical format of the

original." *Corley*, 273 F.3d at 459; *Elcom*, 203 F. Supp. 2d at 1131 ("Defendant has cited no

authority which guarantees a fair user the right to the most technologically convenient way to

engage in fair use. The existing authorities have rejected that argument.").  As the Second

Circuit observed:

> the DMCA does not impose even an arguable limitation on the
> opportunity to make a variety of traditional fair uses of DVD
> movies, such as commenting on their content, quoting excerpts
> from their screenplays, and even recording portions of the
> video images and sounds on film or tape by pointing a camera,
> a camcorder, or a microphone at a monitor as it displays the
> DVD movie.  The fact that the resulting copy will not be as
> perfect or as manipulable as a digital copy obtained by having
> direct access to the DVD movie in its digital form, provides no
> basis for a claim of unconstitutional limitation of fair use. . . .
> Fair use has never been held to be a guarantee of access to
> copyrighted material in order to copy it by the fair user's
> preferred technique or in the format of the original.

*Corley*, 275 F.3d at 459; *Elcom*, 203 F. Supp. 2d at 1131 (holding that "the DMCA does not

'eliminate' fair use. . . . Lawful possessors of copyrighted works may continue to engage in

each and every fair use authorized by law.").[16]

---

[16]   In the same vein, Plaintiff's claim that "the DMCA impairs the First Amendment right
[of third parties] to access non-copyrighted works" must fail.  Pl. Opp. at 22.  Plaintiff's lack
of standing aside, Plaintiff claims that "[t]he purchaser of a DVD has an unqualified right
under the First Amendment to make use of this public domain information.  *See First Nat'l
Bank v. Bellotti*, 435 U.S. 765, 783 (1978)."  Pl. Opp. at 22.  Plaintiff's reliance on *Bellotti*,
however, is misplaced for at least two reasons.  *First*, *Bellotti* recognized that the First
Amendment extends beyond protection of the press and self-expression of individuals and
includes prohibiting the government from limiting the stock of information from which the
public may draw.  435 U.S. at 783.  However, *Bellotti* does not stand for (and Plaintiff offers
no authority for) the proposition from which Plaintiff proceeds; namely, that it would violate
the First Amendment for the government to grant exclusive copyright-like rights in works
that have already entered the public domain.  *See Elcom*, 203 F. Supp. 2d at 1134.

   *Second*, even assuming that such a right existed, that situation is not presented here.
In rejecting the identical argument, the court in *Elcom* found that "the DMCA does not grant
anyone exclusive rights in public domain works or otherwise non-copyrighted expression.  A
public domain work remains in the public domain."  203 F. Supp. 2d at 1134.  The DMCA
does nothing to limit any person's use of any public domain work for any purpose.  *See id.*
Accordingly, Plaintiff's challenge fails because "the DMCA does not 'prevent access to
matters in the public domain' or allow any publisher to remove from the public domain and
acquire rights in any public domain work.  Nothing within the DMCA grants any rights to
anyone in any public domain work."  *Elcom*, 203 F. Supp. 2d at 1131.

### 3.   The Fair Use Defense Is Inapplicable Because the DMCA Does Not Present an Issue of Infringement

Fair use is an affirmative defense to a claim of copyright infringement – something that can only occur *after* a user has already circumvented technology whose purpose is to protect against acts infringing a copyright.  The DMCA "targets the *circumvention* of digital walls guarding copyrighted material (and trafficking in circumvention tools), [it] does not concern itself with the *use* of those materials after circumvention has occurred."  *Corley*, 273 F.3d at 443 (emphasis in original); 17 U.S.C.A. § 1201(c)(1) ("Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, *including fair use*, under this title.") (emphasis added).  Thus, the alleged importance of DVD Copy Code to certain fair uses of encrypted DVDs by third parties is immaterial to Plaintiff's potential statutory liability under the DMCA's anti-trafficking provisions.  *See Corley*, 273 F.3d at 442 (affirming and citing *Reimerdes*, 111 F. Supp. 2d at 322-24).  *See also* Melville Nimmer & David Nimmer, *Nimmer on Copyright* §§ 12A.06[B][3], 12A.18[C] (2001).  Because this case does not concern copyright infringement, Plaintiff's prolix discussion of fair use has nothing to do with the DMCA's anti-trafficking provisions at bar.

Accordingly, even if Plaintiff had standing to assert the constitutional rights of third parties, the DMCA does not violate the First Amendment as applied to third parties.

1

## CONCLUSION

2

      For all the foregoing reasons, Intervenor respectfully submits that if the Court reaches

3

the constitutional issues raised by Plaintiff, the Court find that the DMCA is constitutional.

4

5

Dated: March 14, 2003.            Respectfully submitted,

6

7

                      ROBERT D. McCALLUM, JR.
                      Assistant Attorney General

8

9

                      KEVIN V. RYAN
                      United States Attorney

10

                      JOCELYN BURTON

11

                      Assistant United States Attorney
                      Chief, Civil Division

12

13

                                /s/
                      THEODORE C. HIRT

14

                      JOHN H. ZACHARIA
                      Attorneys, Department of Justice

15

                      20 Massachusetts Ave., N.W., 7th Floor
                      Washington, D.C.  20530

16

                      Tel.:    (202) 305-2310
                      Fax:    (202) 616 8470

17

                      E-mail:john.zacharia@usdoj.gov

18

                      Attorneys for Intervenor United States

19

20

21

22

23

24

25

26

27

28