RUSSELL J. FRACKMAN (State Bar No. 49087)
PATRICIA H. BENSON (State Bar No. 60656)
STEVEN B. FABRIZIO (*pro hac vice*)
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone:  (310) 312-2000
Facsimile:  (310) 312-3100

Attorneys for Defendants and Counterclaimants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| 321 STUDIOS, also known as 321 Studio, LLC,<br><br>               Plaintiff,<br><br>     v.<br><br>METRO-GOLDWYN-MAYER STUDIOS INC.; et al.<br><br>          Defendants. | Case No.: C-02-1955 SI<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS AND COUNTERCLAIMANTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: April 25, 2003<br>Time: 9:00 a.m.<br>Courtroom: 10, 19th Floor |
| METRO-GOLDWYN-MAYER STUDIOS INC. et al.<br><br>      Counterclaimants,<br><br>     v.<br><br>321 STUDIOS et al.,<br><br>      Counterclaim Defendants. | Judge: Hon. Susan Illston |

Mitchell Silberberg &
Knupp LLP

1

## **TABLE OF CONTENTS**

2

Page

3
I. **321'S TRAFFICKING IN THE DVD CIRCUMVENTION SOFTWARE VIOLATES BOTH SECTIONS 1201(a) AND 1201(b) OF THE DMCA** .................. 3

4

A. Access Circumvention .................................................................................. 4

5

1. Primarily Designed, Marketed or Only Commercial Valuable for Circumvention ................................................................................. 5

6

7

2. "Circumvent a Technological Measure" ......................................... 7

8

B. Copy Circumvention ................................................................................... 8

9

C. Prohibiting Technology That is Marketed For the Purpose Of Circumventing Does Not Violate The First Amendment ............................................... 11

10

II. **POTENTIAL CONSUMER USES OF THE DVD CIRCUMVENTION SOFTWARE ARE IRRELEVANT** ................................................................ 12

11

12
III. **321'S FIRST AMENDMENT CHALLENGES TO THE DMCA ARE MERITLESS** ................................................................................... 15

13

A. 321 Does Not Have Standing To Raise A First Amendment Challenge On Behalf Of Its Customers ......................................................................... 16

14

15
B. In Any Event, Section 1201 Does Not Impermissibly Burden The First Amendment Rights Of Users of The DVD Circumvention Software .............. 18

16

1. The DMCA Does Not "Eliminate" Fair Use .............................. 18

17

2. Fair Use Is Not A Constitutional Right ..................................... 19

18

3. "Fair Use" And The First Amendment Are Not Co-Extensive .......... 20

19

4. The DMCA Does Not Place An Impermissible "Financial Burden" On First Amendment Rights Of Third Parties. ............................ 23

20

5. The DMCA Does Not Impair Any Person's Right To Access Non-Copyrighted Works .............................................................. 24

21

22
C. Section 1201 Does Not Violate 321's First Amendment Rights ........... 24

23

1. The DMCA Is Not A Content Based Restriction .......................... 25

24

D. The DMCA Meets "Intermediate Scrutiny" ....................................... 29

25

1. The DMCA Furthers Important Governmental Interests .......... 31

26

2. The DMCA Is Sufficiently Narrowly Tailored ......................... 34

27

E. 321's Remaining Overbreadth Challenge Is Meritless ......................... 38

28

Mitchell Silberberg & Knupp LLP

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IV.    THE DMCA WAS PROPER UNDER THE COMMERCE CLAUSE**......................38

**V.    MISUSE IS NOT A DEFENSE** ..................................................................41

**VI.    THE STUDIOS HAVE STANDING TO ASSERT A
CLAIM UNDER THE DMCA**...................................................................42

**VII.    THE STUDIOS ARE ENTITLED TO A PERMANENT INJUNCTION**................43

Mitchell Silberberg &
Knupp LLP

ii

1

# <u>TABLE OF AUTHORITIES</u>

2

**<u>Page(s)</u>**

3

## **CASES**

4

5

<u>44 Liquormart, Inc. v. Rhode Island,</u>
     517 U.S. 484 (1996)....................................................................................................12

6

<u>American Booksellers Association, Inc. v. Hudnut,</u>
     771 F.2d 323 (7th Cir. 1985) .......................................................................................28

7

8

<u>Anderson v. Liberty Lobby, Inc.,</u>
     477 U.S. 242 (1986)....................................................................................................10

9

<u>Arkansas Writers' Project, Inc. v. Ragland,</u>
     481 U.S. 221 (1987)....................................................................................................24

10

11

<u>Aronson v. Quick Point Pencil Co.,</u>
     440 U.S. 257 (1979)....................................................................................................39

12

<u>Atari, Inc. v. JS&A Group, Inc.,</u>
     597 F. Supp. 5 (N.D. Ill. 1983) ...............................................................................14, 15

13

14

<u>Bantam Books, Inc. v. Sullivan,</u>
     372 U.S. 58 (1963)......................................................................................................18

15

<u>Bartinicki v. Vopper,</u>
     532 U.S. 514 (2001)....................................................................................................28

16

17

<u>Bernstein v. United States Department of State,</u>
     922 F. Supp. 1426 (N.D. Cal. 1996) ...........................................................................26

18

<u>Brandenburg v. Ohio,</u>
     395 U.S. 444 (1969)....................................................................................................28

19

20

<u>Broadrick v. Oklahoma,</u>
     413 U.S. 601 (1973)....................................................................................................16

21

<u>Bursey v. United States,</u>
     466 F.2d 1059 (9th Cir. 1972) .....................................................................................17

22

23

<u>CSC Holdings, Inc. v. Greenleaf Electronics, Inc.,</u>
     Case No. 99-C-7249, 2000 WL 715601 (N.D. Ill., June 2, 2000) ..............................42, 43

24

<u>Cable/Home Communication Corp. v. Network Productions, Inc.,</u>
     902 F.2d 829 (11th Cir. 1990) .....................................................................................43

25

<u>City of Ladue v. Gilleo,</u>
     512 U.S. 43 (1994)......................................................................................................27

26

27

<u>City of Renton v. Playtime Theaters, Inc.,</u>
     475 U.S. 41 (1986)..................................................................................................26, 37

28

Clark v. Community for Creative Non-Violence,
        468 U.S. 288 (1984).........................................................................26, 29, 33, 34

Costar Group, Inc. v. Loopnet, Inc.,
        164 F. Supp. 2d 688 (D.Md. 2001) ..............................................................40

Craig v. Boren,
        429 U.S. 190 (1976)......................................................................................17

Denver Area Educational Telecommunications Consortium, Inc.
 v. Federal Communications Commission,
        518 U.S. 727 (1996)......................................................................................18

Eisenstadt v. Baird,
        405 U.S. 438 (1972)......................................................................................17

Eldred v. Ashcroft,
        123 S. Ct. 769 (2003)...............................................................................19, 20

Federal Election Commission v. Akins,
        524 U.S. 11 (1998)........................................................................................41

Florida Bar v. Went for It, Inc.,
        515  U.S. 618 (1995)......................................................................................11

Forsyth County, Ga. v. Nationalist Movement,
        505 U.S. 123 (1992)................................................................................18, 28

Harold Lloyd Corp. v. Witwer,
        65 F.2d 1 (9th Cir. 1933) ................................................................................9

Harper & Row Publishers, Inc. v. Nation Enterprises,
        471 U.S. 539 (1985)..........................................................................20, 22, 23

Houston v. Hill,
        482 U.S. 451 (1987)......................................................................................28

Hurley v. Irish-American Gay, Lesbian & Bisexual Group,
        515 U.S. 557 (1995)......................................................................................27

Hustler Magazine v. Falwell,
        485 U.S. 46 (1988)........................................................................................27

Hynes v. Mayor and Council of Borough of Oradell,
        425 U.S. 610 (1976)......................................................................................16

Junger v. Daley,
        209 F.3d 481 (6th Cir. 2000) .................................................................25, 29

Karn v. United States Department of State,
        925 F. Supp. 1 (D.D.C. 1996) ...............................................................28, 32, 33

Lexmark International, v. Static Control Components, Inc.,
        Civ. No. 02-571 (KSF) (E.D. Ky 2003)................................................40, 42, 43

iv

<u>Los Angeles News Service v. Tullo,</u>
    973 F.2d 791 (9th Cir. 1992) ..........................................................................................13

<u>MAI Systems Corp. v. Peak Computer, Inc.,</u>
    991 F.2d 511 (9th Cir. 1993) ..........................................................................................14

<u>Madsen v. Women's Health Center, Inc.,</u>
    512 U.S. 753 (1994).........................................................................................................43

<u>Metromedia, Inc. v. City of San Diego,</u>
    453 U.S. 490 (1981).........................................................................................................28

<u>Ohralik v. Ohio State Bar Association,</u>
    436 U.S. 447 (1978).........................................................................................................27

<u>One World One Family Now v. City and County of Honolulu,</u>
    76 F.3d 1009 (9th Cir. 1996) ..........................................................................................35

<u>Pavlovich v. Superior Court,</u>
    29 Cal. 4th 262 (2002).....................................................................................................41

<u>Pennsylvania Accessories Trade Association, Inc. v. Thornburgh,</u>
    565 F. Supp. 1568 (M.D. Pa. 1983).................................................................................12

<u>Pollstar v. Gigmania, Ltd.,</u>
    170 F. Supp. 2d 974 (E.D. Cal. 2000)..............................................................................40

<u>Practice Management Information Corp. v. American Medical Association,</u>
    121 F.3d 516 (9th Cir. 1997) ..........................................................................................40

<u>Princeton University Press v. Michigan Document Services, Inc.,</u>
    99 F.3d 1381 (6th Cir.1996) ...........................................................................................12

<u>ProCD, Inc. v. Zeidenberg,</u>
    86 F.3d 1447 (7th Cir. 1996) .............................................................................22, 24, 39

<u>RCA/Ariola International, Inc. v. Thomas & Grayston Co.,</u>
    845 F.2d 773 (8th Cir. 1988) ..........................................................................................11

<u>RIAA v. Diamond Multimedia System Inc.,</u>
    180 F.3d 1072 (9th Cir. 1999),  ......................................................................................15

<u>Realnetworks, Inc. v. Streambox, Inc.,</u>
    2000 WL 127311, 6 (W.D. Wash. 2000)..........................................................................42

<u>Regan v. Time, Inc.,</u>
    468 U.S. 641 (1984).........................................................................................................28

<u>Riley v. National Federation of the Blind, Inc.,</u>
    487 U.S. 781 (1988).........................................................................................................27

<u>Roulette v. City of Seattle,</u>
    97 F.3d 300 (9th Cir. 1996) .......................................................................................17, 37

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC.2

Mitchell Silberberg &
Knupp LLP

<u>Rubin v. Coors Brewing Company</u>,
  514 U.S. 476 (1995).............................................................................................12

<u>Schaumberg v. Citizens for a Better Environment</u>,
  444 U.S. 620 (1980).............................................................................................27

<u>Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Board</u>,
  502 U.S. 105 (1991).........................................................................................23, 28

<u>Sony Computer Entertainment America, Inc. v. Gamemasters</u>,
  87 F. Supp. 2d 976 (N.D. Cal. 1999) .............................................................35, 40, 42

<u>Sony Corp. of America v. Universal City Studios, Inc.</u>,
  464 U.S. 417 (1984)...............................................................................................6

<u>Texas v. Johnson</u>,
  491 U.S. 397 (1989).............................................................................................27

<u>Trade-mark Cases</u>,
  100 U.S. 82 (1879)...........................................................................................37, 38

<u>Turner Broadcasting System, Inc. v. FCC</u>,
  512 U.S. 622 (1994)......................................................................................29, 30, 32

<u>Turner Broadcasting SYstem, Inc. v. FCC II</u>,
  520 U.S. at 180 (1997)......................................................................................29, 30

<u>United States v. Albertini</u>,
  472 U.S. 675 (1985).........................................................................................33, 35

<u>United States v. Elcom, Ltd.</u>,
  203 F. Supp. 2d 1111 (N.D. Cal. 2002) ...........................................................  *passim*

<u>United States v. Lopez</u>,
  514 U.S. 549 (1995).............................................................................................37

<u>United States v. Mendelsohn</u>,
  896 F.2d 1183 (9th Cir. 1990) ................................................................................28

<u>United States v. Moghadam</u>,
  175 F.3d 1269 (11th Cir. 1999) ........................................................................38, 39, 40

<u>United States v. O'Brien</u>,
  391 U.S. 367 (1968).........................................................................................26, 29

<u>United States v. Poocha</u>,
  259 F.3d 1077 (9th Cir. 2001) ................................................................................28

<u>United States v. Schulman</u>,
  817 F.2d 1355 (9th Cir. 1987) ................................................................................28

<u>Universal City Studios, Inc. v. Corley</u>,
  273 F.3d 429 (2nd Cir. 2001)............................................................................. *passim*

vi

Mitchell Silberberg &
Knupp LLP

Universal City Studios, Inc. v. Reimerdes,
    111 F. Supp. 2d 294 (S.D.N.Y. 2000)..................................................................... *passim*

Universal City Studios, Inc. v. Reimerdes,
    82 F. Supp. 2d 211 (S.D.N.Y. 2000)..........................................................................42, 43

Vault v. Quaid Software Ltd.,
    847 F.2d 255 (5th Cir. 1988) ...........................................................................................15

Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,
    192 F. Supp. 2d 321 (D.N.J. 2002) .................................................................................12

Virginia v. American Booksellers Association, Inc.,
    484 U.S. 383 (1988)....................................................................................................16, 17

Walt Disney Productions. v. Air Pirates,
    581 F.2d 751 (9th Cir. 1978) ...........................................................................................23

Ward v. Rock Against Racism,
    491 U.S. 781 (1989)..........................................................................................29, 34, 35

Zacchini v. Scripps-Howard Broadcasting Company,
    433 U.S. 562 (1977)...................................................................................................21, 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC.2

1

**STATUTES**

2

3     17 U.S.C. § 101 .................................................................................................9, 15

4     17 U.S.C. § 106(4) ...............................................................................................10

5     17 U.S.C. § 202 ...................................................................................................14

6     17 U.S.C. § 504(c) ..............................................................................................36

7     17 U.S.C. § 1001 *et. seq*......................................................................................15

8     17 U.S.C. § 1002 .................................................................................................35

9     17 U.S.C. §§ 1201 ........................................................................................ *passim*

10    17 U.S.C. § 1309(b) ............................................................................................37

11    18 U.S.C. § 1030 .................................................................................................35

12    18 U.S.C. § 2314 .................................................................................................35

13    18 U.S.C. § 2510 .................................................................................................35

14    47 U.S.C. §§ 553 and 605 ...................................................................................35

15    H.R. Rep. No. 105-551(I) ..................................................................................2, 5

16    H.R. Rep. No. 105-796 at 70 .................................................................................9

17    S. Rep. 105-190........................................................................................5, 31, 32, 37

18

19

**AUTHORITIES**

20

21    3 M. & D. Nimmer, <u>Nimmer On Copyright</u>, § 12A.03[D][1], at 12A-33 (2002) ...........................2

22

23

24

25

26

27

28

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC.2

1

### Preliminary Statement

2

3   Although it is difficult to tell from 321's Opposition, this is *not* an action for copyright

4   infringement, and it is *not* about what 321's customers may do with its products.  This *is* an

5   action concerning 321's liability for trafficking in the DVD Circumvention Software.  The

6   DMCA makes it a violation to "offer to the public" or to "traffic" in the DVD Circumvention

7   Software.  Thus, 321's liability arises before anybody buys or uses its products.  321 is a

8   commercial enterprise whose only business is the manufacture, sale, and distribution of unlawful

9   circumvention products, which it began selling after one court expressly held that an equivalent

10  product violated the DMCA, and which it continues to "improve" and sell to the public.

11  321, and its expert, do not dispute any relevant aspect of the Studios' description of how

12  the DVD Circumvention Software works or what it accomplishes.  If anything, the Opposition

13  confirms that with respect to the essential issue in this case – circumvention – there are no

14  material facts in dispute.  321 is liable under both section 1201(a) (access protection) and section

15  1201(b) (copy protection).  For that reason, 321's Opposition is but a (lengthy) attempt to deflect

16  the Court from this core issue.  In the process, 321 seeks a third bite at the apple, recycling

17  arguments made (sometimes verbatim and by the same counsel or amicus) and rejected by the

18  courts in <u>Universal City Studios, Inc. v. Corley</u>, 273 F.3d 429 (2nd Cir. 2001) and <u>United States</u>

19  <u>v. Elcom, Ltd.</u>, 203 F. Supp. 2d 1111 (N.D. Cal. 2002).[1]

20  First, 321 contends it does not violate the DMCA, based on completely irrelevant

21  supposed uses of its circumvention software by its users, and tortured and unsupported "statutory

22  constructions" which contradict the express language of the DMCA and which, if followed,

23  would nullify the statute (and its intended protections).  Next, 321 asserts constitutional

24

---

[1]   321 tries to distinguish <u>Corley</u> and <u>Elcom</u> in one sentence, arguing that the technologies at
issue there, unlike 321's technology, "facilitated the instant redistribution of copyrighted content
over the internet."  Opp. at 7.  This attempt fails because the DMCA's prohibitions are not based
on whether the prohibited circumvention technology facilitates Internet copying and distribution
or DVD copying and distribution.  321's argument also fails both because 321's DVD
Circumvention Software does facilitate Internet distribution (fn. 8, <u>infra</u>), and, in any event, the
conduct of those using the software is irrelevant to 321's liability (section II, <u>infra</u>).

1

1    arguments -- again largely focusing on irrelevant claimed uses of its consumers -- which confuse

2    and conflate First Amendment rights (which it lacks standing to raise) with fair use (a limited

3    affirmative defense not applicable to the trafficking provisions of the DMCA), and which

4    impermissibly attempt to elevate the making of complete copies of copyrighted works to an

5    absolute free speech right.  In doing so, 321 ignores that the DMCA regulates function not

6    speech, is content neutral, is designed to protect the significant governmental interest of

7    "[p]romoting the continued growth and development of electronic commerce," and was properly

8    enacted under the Commerce Clause.  Finally, 321 briefly throws in an inapt misuse defense, and

9    incongruously claims that the Studios (the intended beneficiaries of the DMCA and which 321

10   sued for declaratory relief) lack standing and have not been irreparably harmed by 321's

11   unlawful conduct.

12         In the end, the DVD Circumvention Software is a burglar's tool.  The analogies to its

13   products that 321 decries and labels as the creation of the Studios (Opp. at 7) are in fact the

14   analyses of the United States Court of Appeals for the Second Circuit, the United States

15   Congress, and the pre-eminent treatise on U.S. copyright law:

16                "In its basic function, it is like a skeleton key that can open a
               locked door, a combination that can open a safe, or a device that
17             can neutralize the security device attached to a store's products."
               Corley, 273 F.3d at 453.
18
                 "The act of circumventing a technological protection measure put
19             in place by a copyright owner to control access to a copyrighted
               work is the electronic equivalent of breaking into a locked room in
20             order to obtain a copy of a book."
               H.R. Rep. No. 105-551(I), at 17 (1998).
21
                 "The basic provision . . . is equivalent to breaking into a castle."
22             3 M. & D. Nimmer, Nimmer On Copyright, § 12A.03[D][1], at
               12A-33 (2002).
23
           The Studios' motion should be granted.
24

25

26

27

28

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1
2

## **Argument**

I.    **321'S TRAFFICKING IN THE DVD CIRCUMVENTION SOFTWARE**
3       **VIOLATES BOTH SECTIONS 1201(a) AND 1201(b) OF THE DMCA**

4           CSS is an integrated system that protects against both access and copying.  Declaration of

5   Robert Schumann ("Schumann Decl."), ¶¶ 12-20.  321 is liable, and the Studios are entitled to

6   summary judgment, if 321 violated *either* the access-circumvention provisions of Section

7   1201(a)(2) *or* the copy-control provisions of Section 1201(b).  See Universal City Studios, Inc. v.

8   Reimerdes, 111 F. Supp. 2d 294, 316 n.133 (S.D.N.Y. 2000) (noting that the two sections "are

9   very similar," and finding liability under 1201(a) obviated the need to consider 1201(b)).  The

10  undisputed facts establish that 321 has violated both anti-circumvention provisions.

11          321 *admits* that "CSS is an access control system" (Opp. at 2), and that the DVD

12  Circumvention Software circumvents CSS encryption to gain access to a DVD:

13              "DVD-X-Copy reads the data on the DVD drive, *decodes it* as
                necessary, and then uses the data to create a backup copy of the
14              DVD.  DVD-X-Copy can be used to create backup copies of DVDs
                *encoded with* or without *CSS*. . . . In order to read CSS-encoded
15              data, DVD-X-Copy uses a well-known and publicly available CSS
                key.  DVD-X-Copy then uses the well-known CSS algorithm to
16              *decode the data*, and is this respect, DVD-X-Copy works just like
                any licensed DVD player."  Opp. at 4 (emphasis added).
17

18  Similarly, 321 admits that "§ 1201(a)(2) applies to DVD Copy Code, because CSS controls

19  access to DVDs. . . . CSS prevents unauthorized access to a DVD by requiring a key in order to

20  view the data contained on the DVD. . . . Thus, any circumvention of CSS raises issues under

21  § 1201(a), which governs unauthorized access" (Opp. at 8; Touretzky Decl. ¶¶ 10-14); and that

22  "the ability to unlock CSS is just one feature of DVD Copy Code" (Opp. at 18).  See also First

23  Amended Complaint ¶ 23 ("Most DVDs manufactured, distributed or sold by the defendants are

24  recorded onto the DVD in a scrambled format in which the data is encrypted in order to prevent

25  unauthorized access. . . ."); ¶ 29; Mayer Decl. Ex. E (message board posting from 321

26  programmer admitting that "yes, the software has to descramble the contents of the DVD in

27  order to do anything useful with it").  321's attempt to avoid liability by arguing that its DVD

28  Circumvention Software "works just like any licensed DVD player," necessarily admits this

1   dispositive fact – *321 circumvents the CSS protections employed by the Studios* -- while

2   omitting the crucial qualifying facts that *321 does not have a license, and its product is not a*

3   *licensed DVD player.*  321's admission that it sells software that evades an access control

4   technology establishes its liability under Section 1201(a)(2).

5        The undisputed facts also establish that 321 is liable under Section 1201(b).  CSS

6   undeniably is a copy control system.  Through its multi-layered protections, including an

7   authentication process, an encryption process, and strict license requirements, its very purpose is

8   to prevent the unauthorized reproduction of CSS-protected DVDs.  Again, 321 admits that it

9   circumvents the copy protection afforded by CSS, and permits an unencrypted copy of a DVD to

10  be made.  See Moore Decl. ¶ 6 ("DVD X Copy reads the data on the DVD drive, decodes it as

11  necessary, and then uses the data to create a backup copy of the DVD.  The data is read by the

12  DVD drive, decrypted by the software . . ."); First Amended Complaint ¶ 26 ("DVD Copy Plus

13  [creates] a copy of the contents of the DVD"); ¶ 28 ("DVD X Copy allows a user to make a

14  DVD copy of a DVD video . . ."); Mayer Decl., Ex. D.  (321's chief executive:  "People are

15  already making DVD Copies. . . . What we're doing is bringing it to the mass market").  Even

16  the very names 321 gives to its products ("DVD *Copy* Plus," "DVD-X-*Copy*") reflect their

17  intended purpose and effect: to copy CSS-protected DVDs.

18        **A.     Access Circumvention**

19        Section 1201(a)(2) prohibits:

20        (1) trafficking in
          (2) any component or part of a technology or product that
21        (3) either:

22             • is primarily designed;
               • has no other commercially significant value other than; or
23             • is marketed;

24        (4) to circumvent a technological measure that

25        (5) effectively controls access to a copyrighted work.

26        In its brief argument attempting to avoid Section 1201(a) liability, 321 makes only two

27  points: First, it contends half-heartedly that the DVD Circumvention Software was not

28  "primarily designed" to circumvent and/or has commercially significant value other than to

4

1    circumvent.  Opp. at 18-19.  Second, it asserts that the DVD Circumvention Software does not

2    "circumvent a technological measure" because the section 1201(a)(3)(A) definition of

3    "circumvent a technological measure" includes the phrase "without the authority of the copyright

4    owner," and "*any* purchaser of a DVD has the right to *access* its contents."  Opp. at 8-9

5    (emphasis in original).  Both of these arguments rely on fundamental misreadings of the plain

6    text of section 1201.

7                    1.    <u>Primarily Designed, Marketed or Only Commercial Valuable for</u>
                           <u>Circumvention</u>

8            Section 1201(a)(2) provides three alternative grounds for liability.  A technology is

9    unlawful if it: (A) is "primarily designed" to circumvent; (B) has "only limited commercially

10   significant purpose or use other than to circumvent"; or (C) is clearly marketed for use in

11   circumventing.  17 U.S.C. §§ 1201(a)(2)(A)-(C).  Any one element is sufficient.  <u>See</u> H.R. Rep.

12   105-551 (II), at 39 ("for a technology, product, service, device, component, or part thereof to be

13   prohibited under this subsection, ***one of three*** conditions must be met") (emphasis added); S.

14   Rep. 105-190, at 11, n.19 ("even if a device does not have circumvention as its primary purpose

15   or design, that is, that it does not fall within the prohibition of section 1201(a)(2)(A), the device

16   would still be illegal if it fell within the prohibitions of ***either*** 1201(a)(2)(B) and (C)") (emphasis

17   in original).

18           The DVD Circumvention Software qualifies under all three subdivisions.  By definition,

19   the unlawful "part" of the DVD Circumvention Software -- the part that allows for the

20   circumvention of CSS protection -– not only was "primarily" designed to circumvent, ***that is all***

21   ***it was designed to do***, and that is all that it does.  <u>See</u> <u>Reimerdes</u>, 111 F. Supp. 2d at 319

22   ("DeCSS was created solely for the purpose of decrypting CSS – that is all it does.").[2]  The CSS-

23

---

24   [2]   321's DVD Copy Plus utilizes a program called "SmartRipper."  SmartRipper is built upon,
     and operates in a manner nearly identical to, deCSS.  <u>See</u> Schumann Decl. ¶¶ 26-30.  321's
25   founder and President, Robert Moore, a "software engineer," clearly was aware of the virtual
     equivalence of the two programs.  <u>See</u> Moore Decl. ¶ 1.  DVD X Copy utilizes a "proprietary"
26   program to accomplish the same result.  <u>See</u> Schumann Decl. ¶¶ 32, 33; <u>see also</u> Mayer Decl.,
     Ex. E (321 programmer's admission that "[t]he dispute between whether or not DVD X Copy
27   uses deCSS is more of an issue of semantics than substance").

28

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1    circumvention component of the DVD Circumvention Software also has no commercial value or

2    significance at all other than to circumvent CSS, and 321 has not even attempted to articulate

3    one.  Finally, 321 expressly markets its products as a fast, easy way to copy CSS-protected

4    DVDs.  Mayer Decl., Exs. A-C.  (For example, advertising on 321's web site promises that

5    DVD-X-Copy will make "PERFECT COPIES OF YOUR DVDS! . . . IN ABOUT AN HOUR.")

6          These obvious and indisputable facts force 321 to argue (while at the same time

7    admitting) "[t]he ability to unlock CSS is just one feature of DVD Copy Code," in that the DVD

8    Circumvention Software also can be used to copy DVDs not protected by CSS, such as home

9    videos.  Opp. at 18.  However, 321's admission that *a part* of the DVD Circumvention Software

10   circumvents CSS renders 321 liable.  Both section 1201(a)(2) and section 1201(b)(1) expressly

11   provide liability for a circumvention "technology, product, service, device, ***component or part***

12   ***thereof***."  (Emphasis added).  Thus, when an unlawful circumvention technology device is

13   incorporated into a larger overall "product" or "device," § 1201 expressly creates liability.  For

14   example, a clock-radio that included the DVD Circumvention Software would violate § 1201.  It

15   is the "component" or "part" of the DVD Circumvention Software that circumvents CSS-

16   protection to which the Studios object; the other aspects are irrelevant.  If 321 only made DVD

17   copying software that did not circumvent CSS-protection (like numerous DVD "burning"

18   programs) (see Schumann Decl. ¶ 37) and thus only copied non-CSS protected works (like the

19   wedding videos or home movies referred to by some of its declarants), there would be no section

20   1201 liability.  But it does not: the DVD Circumvention Software is expressly designed to gain

21   access to and copy CSS-encoded DVDs. [3]

22

23

24

25   [3]   The fact that other components of the DVD Circumvention Software may have separate
     functions does not implicate the "substantial non-infringing use" doctrine applicable to the law

26   of contributory infringement articulated by Sony Corp. of America v. Universal City Studios,
     Inc., 464 U.S. 417 (1984).  See Reimerdes, 111 F. Supp. 2d at 323 & n.170 ("Congress explicitly

27   noted that Section 1201 does not incorporate Sony. . . .  The Sony test of 'capab[ility]' of
     substantial non-infringing uses.' . . . is not part of this legislation.") (citation omitted).

28

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

## 2.  "Circumvent a Technological Measure"

To "circumvent a technological measure" is expressly and broadly defined as "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."  17 U.S.C. § 1201(a)(3)(A).  321 does not dispute that its software decrypts CSS.  Rather, 321's entire argument that it does not circumvent a technological measure rests on the indefensible position that people who buy DVDs have "the authority of the copyright holder" to access the content of the DVD, <u>i.e.</u>, to watch it.  Opp. at 8-9.  This argument intentionally confuses the "authority" of consumers to *view* CSS-encrypted DVDs on licensed DVD players and the (lack of) "authority" of "traffickers" to *decrypt or bypass* CSS protection.  The "authority of the copyright holder" that is necessary, and that 321 admits it lacks, is the authority to circumvent CSS protection.  Section 1201(a)(3)(A) "exempts from liability those who would 'decrypt' an encrypted DVD with the authority of a copyright owner, not those who would 'view' a DVD with the authority of a copyright owner."  <u>Corley</u>, 273 F.3d at 444.  <u>See also</u> <u>Reimerdes</u>, 111 F. Supp. 2d at 294 n. 137 ("[t]he DMCA proscribes trafficking in technology that decrypts or avoids an access control measure without the copyright holder consenting to the decryption or avoidance").  Licensed DVD players have "the authority of the copyright holder" *to decrypt CSS*; 321's DVD Circumvention Software does not.[4]  321's argument results in an absurdity.  Obviously those who manufacture and sell CSS-encrypted DVDs want their purchasers to be able to obtain lawful access to them.  If that was enough to grant the "authority of the copyright holder" to traffic in circumvention technology, section 1201(a)(2) would be meaningless.

---

[4]   Thus, 321's claim that the DVD Circumvention Software works the same way that licensed and authorized DVD hardware devices do, omits the crucial distinction that the authorized hardware manufacturers are licensed and have been issued a key "with the authority of the copyright holder" to decrypt CSS.  In exchange, licensed DVD players must adhere to strict prohibitions on copying, or allowing the copying, of the decrypted DVD.

7

Mitchell Silberberg &
Knupp LLP

## B.     Copy Circumvention

The first three elements of section 1201(b)(1) are the same as discussed above with respect to section 1201(a)(2); the last two elements are slightly different.  Section 1201(b)(1) prohibits:

> (1) trafficking in
> (2) any component or part of a technology that
> (3) either:
>
> - is primarily designed;
> - has no other commercially significant value other than; or
> - is marketed;
>
> (4) to circumvent a protection afforded by a technological measure; that
> (5) effectively protects a right of a copyright owner under this title in a work or a portion thereof.

321 argues that the DVD Circumvention Software does not violate section 1201(b)(1) because *its software* does not "violate a right of a copyright holder."  Opp. at 10.  But that is not the test.  Section 1201(b) prohibits trafficking in technology *that circumvents a technological measure* that protects the right of a copyright holder, as the DVD Circumvention Software indisputably does.  Once again, the DVD Circumvention Software satisfies each element of the statute.  There is no dispute that 321 "traffics" in the DVD Circumvention Software, and the "part" of the DVD Circumvention Software that decrypts CSS is designed and marketed solely for that purpose.  As to the last two elements, 321 argues that CSS does not protect a right of a copyright holder because it is not a copy-control measure, and that, in any event, the DVD Circumvention Software does not circumvent the CSS encryption.

CSS indisputably *is* a copy-control measure for two reasons.  First, as discussed above, 321 admits that CSS controls access to encrypted DVDs.  Because, as 321 admits, a CSS-encrypted DVD cannot be copied until it is accessed (Touretzky Decl. ¶¶ 15-17), and cannot be copied except by a licensed DVD player, CSS controls copying.  Of course, the ultimate purpose of CSS is to prevent copying of DVDs.

Mitchell Silberberg & Knupp LLP

1    Second, 321's argument that CSS is not a copy-control measure is based solely on its

2 statement that "CSS does not prevent the copying of the encrypted data contained on the DVD."

3 Opp. at 8. [5]  But 321 admits that the "encrypted data" that can be copied is useless.

4          "[A]lthough it is possible to make a copy of a CSS encrypted
           DVD, such a copy is missing the CSS 'lock.'  Because *the copy* is
5          missing the lock, it cannot be opened by the CSS key, and cannot
           be accessed or viewed.  *So although CSS allows for copying, that*
6          *copying is not particularly useful.*"  Opp. at 3 (emphasis added).

7    This admission destroys 321's argument.  Since virtually no one would want an unusable

8 copy of a DVD, a technology, like CSS, that *prevents* the making of *usable* copies but *allows*

9 only the making of *unusable* copies clearly qualifies as a "technological measure that effectively

10 protects a right of a copyright owner."  That phrase is defined in section 1201(b)(2)(B) as a

11 measure that "prevents, restricts, or otherwise limits the exercise of a right of a copyright owner

12 under this title."  Because, as 321 admits, CSS prevents the making of a usable copy of an

13 encrypted DVD, CSS *at a minimum* "restricts" and "limits" copying to unusable copies.  See 17

14 U.S.C. § 101 (defining copies as "material objects . . . in which a work is fixed . . . *and from*

15 *which the work can be perceived*") (emphasis added).

16    This common sense interpretation – that preventing copying means restricting making

17 usable copies – is supported by a venerable copyright principle:  an infringing copy is one which

18 the "ordinary person" will see (or hear) as having substantially similar expression to the original;

19 it is not a jumbled version bearing no observable similarity to the original.  See, e.g., Harold

20 Lloyd Corp. v. Witwer, 65 F.2d 1, 18 (9th Cir. 1933).

21    This conclusion is reinforced by the DMCA's internal structure.  Section 1201(k)

22 expressly refers to "automatic gain control" and "colorstripe" as "copy control" technologies.

23 These technologies are employed by VHS format analog video cassette recorders "to prevent the

24 making of *a viewable copy* of a . . . prerecorded tape or disc containing one or more motion

25 pictures or audiovisual works. "  H.R. Rep. 105-796 at 70 (emphasis added).  These

26

27 ──────────────
   [5]  As noted above, in order to do even that, the locking mechanism of CSS, which controls access
28 to the DVD, must be circumvented.  Schumann Decl. ¶ 14(a).

9

1    technologies, just as CSS, allow "copying" in the hyper-technical sense argued by 321, but all

2    are, by definition, copy-control technologies because the copies made are useless to (i.e., not

3    "viewable" by)[6] the consumer.  "[D]evices that defeat these technologies . . . should be seen for

4    what they are – circumvention devices prohibited by this legislation."  Id. at 68.[7]

5          321 next argues that the DVD Circumvention Software does not circumvent CSS because

6    it does not "avoid" or "bypass" the protections afforded by CSS in that "it simply uses the

7    authorized key to unlock the encryption."  Opp. at 16.  This argument fails because it is

8    undisputed that 321 does not have the authority to use the "authorized key. "  Indeed that is what

9    this case about.  321's admission that it "unlocks the encryption" without authority is an

10   admission that the DVD Circumvention software "avoids" and "bypasses" CSS.

11         321 similarly argues that the DVD Circumvention Software does not circumvent CSS

12   because it does not "remove, deactivate or otherwise impair" the protection afforded by CSS,

13   because "the original DVD is completely unchanged, and its encryption remains intact."  Opp. at

14   16.  But, because the DVD Circumvention Software "avoids" and "bypasses" CSS, as discussed

15   above, it violates section 1201(b)(1).  The "remove, deactivate or otherwise impair" language

16   provides *additional* grounds for liability.  Regardless, the argument fails.  The DVD

17   _____

18   [6]  In fact, CSS protects multiple rights of copyright holders, including the public performance
     right, 17 U.S.C. § 106(4), since a scrambled copy cannot be "publicly performed."

19   [7]  321 also argues in a footnote that there is a "disputed question of fact" regarding "whether CSS

20   'effectively' controls anything," because certain CSS "keys" have been hacked.  Opp. at 10 n.6.
     Even if *all* CSS keys were public (which 321 does not claim), this argument ignores the statutory

21   definition: "[A] technological measure 'effectively protects a right of a copyright owner under
     this title' if the measure, *in the ordinary course of its operation*, prevents, restricts, or otherwise

22   limits the exercise of a right of a copyright owner under this title."  § 1201(b)(2)(B) (emphasis
     added).  CSS is "effective" because, without circumventing the CSS encryption with 321's

23   software (or something similar), viewable copies of these DVDs cannot be made.  Opp. at 3.
     Whether CSS is the most powerful encryption or can be hacked is irrelevant to 321 Studios'

24   liability – if the only technological protection the statute was concerned with were those that
     were not possible to circumvent, the statute would be meaningless.  See Reimerdes, 111 F. Supp.

25   2d at 318 (such an interpretation would "gut the statute").  Thus, the lengthy portions of 321's
     declarations directed to the "effectiveness" of CSS cannot prevent entry of summary judgment.

26   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might

27   affect the outcome of the suit under the governing law will properly preclude the entry of
     summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.")

28

                                              10

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1  Circumvention Software "removes" CSS encryption when, as 321 admits, it creates new copies

2  of the Studios' works that ***do not contain the CSS protections*** embedded in the original copies.

3  Moore Decl. ¶ 10.  Notwithstanding any supposed "copying protections" inserted by DVD X

4  Copy, these "circumvented" copies can be used to make additional copies.[8]  Ultimately, the

5  indisputable fact that the DVD Circumvention Software "removes" the CSS protections from the

6  copyrighted work to permit copying is a violation of section 1201(b)(1).

7          C.      **<u>Prohibiting Technology That is Marketed For the Purpose Of Circumventing</u>**
   **<u>Does Not Violate The First Amendment</u>**

8         321's only defense to its violation of the "marketing" prohibition in sections

9
   1201(a)(2)(c) and 1201 (b)(1)(c) is a one paragraph claim that the prohibition violates the First

10  Amendment.  321's argument fails for one overriding reason:  the First Amendment does not

11  protect commercial speech that involves illegal activity.  <u>See</u> <u>Florida Bar v. Went for It, Inc.</u>, 515

12

---

13  [8]  321 does not claim that DVD Copy Plus has any "copying protections."  As to DVD-X-Copy,

14  321's premise is incorrect, even accepting 321's plainly erroneous view that the DMCA would
   permit trafficking in a circumvention technology as long as the technological measure ***selected***

15  ***by the copyright owner*** that was circumvented was replaced with another technological measure
   ***selected by the trafficker***.  It is undisputed that DVD-X-Copy enables multiple copying.  The

16  "semaphore" placed by DVD-X-Copy on the copy of the decrypted DVD does not prevent

17  further copies from being made.  Multiple first generation copies can be made from the original
   DVD, ***and*** serial copies can be made from the decrypted DVD.  <u>See</u> Schumann Decl. ¶ 6 ("plain

18  text, unencrypted copies made with DVD Copy Plus and DVD X Copy "can be further copied,
   distributed or otherwise manipulated in the same manner as any other unprotected computer

19  files"); ¶ 37 ("Only DVD-X-Copy (and no other software) will recognize the 'marker' file.
   Thus, once the CSS has been stripped from the DVD contents by operation of DVD-X-Copy,

20  any number of freely available software programs are able to, and will, make unlimited serial
   copies of that content -- whether from the DVD-R or the computer hard drive copy -- without

21  any restrictions.  I personally have confirmed this by making multiple copies of a DVD-R
   originally made using DVD-X-Copy.").  Additionally, the unencrypted copy that the DVD

22  Circumvention Software leaves on the user's computer hard drive can be moved before it is
   erased, and used to burn further copies or transmit over the Internet.  Schumann Decl. ¶ 14.

23  321's expert never once mentions these alleged "anti-piracy" features and the Moore Decl. does
   not dispute Schumann's statements.  Moore Decl. ¶ 17 ("digital semaphore" is read by <u>321's</u>

24  software.)  Similarly, the "indelible visible disclaimer" that 321 includes (and its touted ability to
   trace "infringers" through a "watermark") does not prevent copying, and is a legally irrelevant

25  example of (attempting to) shut the barn door after the horse has left.  <u>See, e.g.</u>, <u>RCA/Ariola</u>

26  <u>International, Inc. v. Thomas & Grayston Co.</u>, 845 F.2d 773, 777 (8th Cir. 1988) (statement to

27  retailers employing defendant's machines, admonishing them "not to permit their employees to
   take any part in the copying process," did not avoid vicarious liability).

28

Mitchell Silberberg &
Knupp LLP

U.S. 618, 623-24 (1995) ("[T]he government may freely regulate commercial speech that concerns unlawful activity."); Pennsylvania Accessories Trade Ass'n, Inc. v. Thornburg, 565 F. Supp. 1568, 1574 (M.D. Pa. 1983) (statute that "forbids 'advertisement[s]' that 'promote the sale of objects designed or intended for use as drug paraphernalia" does not violate the First Amendment because "the forbidden speech is commercial speech proposing an illegal transaction"). Since the DMCA prohibits marketing only unlawful circumvention technology, not (as 321 contends) any purportedly "legal attributes," it does not violate the First Amendment.[9]

## II.   POTENTIAL CONSUMER USES OF THE DVD CIRCUMVENTION SOFTWARE ARE IRRELEVANT

The lengthy argument that some of 321's **customers** allegedly make non-infringing uses of the DVD Circumvention Software is irrelevant to 321's liability. As discussed above, 321 violates sections 1201(a)(2) and 1201(b)(1) by "traffic[king]," "offer[ing] to the public," and "manufactur[ing]" the DVD Circumvention Software. *There is no requirement that anyone ever buy the product or use it in any way*. In enacting sections 1201(a)(2) and 1201(b), Congress was concerned with developing a separate scheme for the particularized harm caused by trafficking in circumvention technologies, as distinct from any harm caused by user conduct. The DMCA follows that construct, clearly demarking the traffickers' liability for circumvention (e.g., §§ 1201(a)(2), 1201(b)) from the users' liability for infringement (e.g., 1201(a)(1); see also § 501). Cf., e.g., Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc., 192 F. Supp. 2d 321, 334 ("Video Pipeline should not be able to hide behind the lawful actions and privileges extended to its retailer customers who have abided by the Copyright Act."); Princeton Univ. Press v. Michigan Document Servs., Inc., 99 F.3d 1381, 1389 (6th Cir.1996) ("courts have . . . properly rejected attempts by for-profit users to stand in the shoes of their customers making

---

[9]   Because the cases cited by 321 involved lawful products, they are easily distinguishable. See Rubin v. Coors Brewing Company, 514 U.S. 476 (1995) (marketing of beer); 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996) (marketing of liquor).

12

1   nonprofit or noncommercial uses"); <u>Los Angeles News Serv. v. Tullo</u>, 973 F.2d 791, 797 (9th

2   Cir. 1992) ("the ultimate use to which the customer puts the tape is irrelevant").

3        321's invocation of section 1201(c), providing that the fair use defense to ***copyright***

4   ***infringement*** is unaffected by the prohibitions of section 1201, is another red herring.  If

5   Congress had intended "fair use" to be a defense to circumvention liability under sections

6   1201(a)(2) or 1201(b)(1) – it would have said so.  Instead, it considered fair use implications of

7   the DMCA and clearly and simply provided only that fair use remained a defense to copyright

8   infringement by users.  <u>See</u> <u>Corley</u>, 273 F.3d at 443 (Section 1201(c)(1) "simply clarifies that the

9   DMCA targets the ***circumvention*** of digital walls guarding copyrighted material [and trafficking

10   in circumvention tools], but does not concern itself with the ***use*** of those materials.") (emphasis

11   in original).  The Court in <u>Corley</u> rejected this very argument when it was made by 321's *amicus,*

12   The Electronic Frontier Foundation ("EFF").  <u>See</u> EFF Brief, at 16-17:

13
14
15
16

> "Subsection 1201(c)(1) ensures that the DMCA is not read to
> prohibit the 'fair use' of information just because that
> information was obtained in a manner made illegal by the
> DMCA.  The Appellants' much more expansive interpretation
> of Section 1201(c)(1) is not only outside the range of plausible
> readings of the provision, but is also clearly refuted by the
> statute's legislative history."  <u>Corley</u>, 273 F.3d at 443-44.

17   The <u>Elcom</u> Court explained the issue further:

18
19
20
21
22

> "Congress' expressed intent to preserve the right of fair use is not
> inconsistent with a ban on trafficking in circumvention
> technologies, even those that could be used for fair use purposes
> rather than infringement.  Fair use of a copyrighted work continues
> to be permitted, as does circumventing use restrictions for the
> purpose of engaging in a fair use, even though engaging in certain
> fair uses of digital works may be made more difficult if tools to
> circumvent use restrictions cannot readily be obtained."  203 F.
> Supp. 2d at 1125.

23        Accordingly, "it is unlawful to traffic in tools that allow fair use circumvention."  <u>Id.</u>

24   (emphasis added).  Simply put, nothing in the language of section 1201(b) "would permit

25   trafficking in devices designed to bypass use restrictions in order to enable a fair use, as opposed

26   to an infringing use. ***The statute does not distinguish between devices based on the uses to***

27   ***which the device will be put***.  Instead, all tools that enable circumvention of use restrictions are

28

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1  banned, not merely those use restrictions that prohibit infringement." Id. at 1124 (emphasis

2  added).

3       For this basic reason, the possible end-uses by 321 customers, to which 321 devotes

4  much of its Opposition, simply are outside the purview of this Motion.  In addition to being

5  irrelevant to 321's liability, its arguments as to consumer uses are wrong or misplaced.

6       *First*, much of the end-user conduct discussed in 321's Opposition has nothing to do with

7  the CSS circumvention component of the DVD Circumvention Software because it is used to

8  copy non-CSS protected works owned by users, e.g., home movies (Stier), instructional videos

9  (Levitt, Gage) wedding videos (Yaciw), medical radiographs (Bevans), or works created by the

10  users themselves (Piell).[10]

11       *Second*, ownership of a physical property (e.g., a DVD) has never conferred the right to

12  copy the intellectual property embodied thereon (e.g., copyrighted motion pictures).  17 U.S.C.

13  § 202 (ownership of copyright distinct from ownership of material object).  And the making of a

14  single copy is an infringement.  MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 518

15  (9th Cir. 1993).  321 quotes from Elcom on this issue, but neglects the language that immediately

16  follows its quote:

17            "[T]he right to make a back-up copy of 'computer programs' is a
          statutory right, expressly enacted by Congress in Section 117(a),

18            and there is as yet no generally recognized right to make a copy of
          a protected work, regardless of its format, for personal

19            noncommercial use." Elcom, 203 F. Supp.2d at 1135.

20  See also Atari, Inc. v. JS&A Group, Inc., 597 F. Supp. 5, 9-10 (N.D. Ill. 1983) ("Congress did

21  not enact a general rule that making back-up copies of copyrighted works would not infringe.")

22

23

24  [10]  321 has retreated from its initial claim that the sole purpose of its DVD Circumvention
Software is "to permit legitimate owners to create archival copies of the DVDs they already
own."  First Amended Complaint ¶ 26.  321 now admits that is not the case, (Opp. at 4-5, 12),

25  and that its customers use its software for purposes such as making *additional* (not "archival")
copies for use in multiple locations (e.g., Hudson) or when traveling (e.g., Althaus, Good) or

26  making "derivative" works (e.g., Goscha).  Indeed, 321's president recently proclaimed that
"there's absolutely nothing wrong with" making a copy of a DVD so a "friend" can have the

27  DVD.  http://news.com.com/2008-1082-992985.html.

28

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

*Third*, the **limited** exception of § 117 for making archival copies of computer programs that 321 cites does not apply to the Studios' works.  The works contained on the DVDs are not computer programs.  (Even 321's expert hedges in making this comparison.  Touretzky Decl. ¶ 41 (claiming "compelling similarities" between motion pictures and commercial software, and that both "can be considered" software.)).  They are "audiovisual works."  17 U.S.C. § 101.  ("Audiovisual works are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.")  See, e.g., Atari, 597 F. Supp. at 9-10 (Section 117 does not apply to computer programs contained within physical media, in that case, video game cartridges).  In fact, the limited, express exception codified in § 117 reconfirms that the making of other exact copies – "back up" or not – is **not** exempt and is infringing.[11]

### III.   321'S FIRST AMENDMENT CHALLENGES TO THE DMCA ARE MERITLESS

321 makes two First Amendment challenges to the DMCA.  The first posits that prohibiting trafficking in the DVD Circumvention Software "eliminates" the ability of **end-users** to exercise supposed First Amendment rights with respect to the Studios' copyrighted works.  The second asserts that the anti-trafficking prohibitions impermissibly restrain 321's **own** alleged First Amendment right to express itself.  Neither challenge is a novel one; both were considered and thoughtfully rejected, for good reason, by the Corley and Elcom courts.  None of 321's arguments justifies a departure from those decisions.

---

[11]   Vault v. Quaid Software Ltd., 847 F. 2d 255 (5th Cir. 1988) and RIAA v. Diamond Multimedia Sys. Inc., 180 F. 3d 1072, 1079 (9th Cir. 1999), cited by 321, are not to the contrary.  The former was limited to the express exemption of § 117, and the latter to the exemption from non-serial coping contained in the Audio Home Recording Act, 17 U.S.C. § 1001 *et. seq.*

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1

### A.   321 Does Not Have Standing To Raise A First Amendment Challenge On Behalf Of Its Customers

2

3          321 attempts to hide the issue of its standing to raise purported First Amendment rights of

4   third parties, relegating the subject to a one-sentence footnote.  Opp. at 20, n.13.  321's

5   reluctance to address this threshold standing issue is understandable: it is a bedrock principle of

6   constitutional jurisprudence that "a person to whom a statute may constitutionally be applied will

7   not be heard to challenge that statute on the ground that it may conceivably be applied

8   unconstitutionally to others, in other situations not before the Court."  Broadrick v. Oklahoma,

9   413 U.S. 601, 610 (1973).  "A closely related principle is that constitutional rights are personal

10  and may not be asserted vicariously."  Id.  "These principles rest on more than the fussiness of

11  judges.  They reflect the conviction that under our constitutional system courts are not roving

12  commissions assigned to pass judgment on the validity of the Nation's laws."  Id. at 610-611.[12]

13         The single limited exception to this basic standing rule exists in the doctrine of

14  "overbreadth."  See Hynes v. Mayor and Council of Borough of Oradell, 425 U.S. 610, 633

15  (1976) ("Broadrick recognized that it is *only* the application of the doctrine of 'overbreadth'

16  which sometimes permits limited exceptions to traditional rules of standing in the First

17  Amendment area.") (emphasis added).  That doctrine permits litigants "to challenge a statute not

18  because their own rights of free expression are violated, but because of a judicial prediction or

19  assumption that the statute's very existence may cause others not before the court to refrain from

20  constitutionally protected speech or expression."  Virginia v. American Booksellers Ass'n, Inc.,

21  484 U.S. 383, 392-93 (1988); Broadrick, 413 U.S. at 612.

22

23  _____

[12]   321 clearly recognized the infirmity of its position. Under a now-deleted February 26, 2003,
24  website posting titled "*Do you want to be a Star?*," 321's president wrote: "321 Studios' law
    firm (Keker & Van Nest) is looking for an actual user of the software to file a motion on behalf
25  of that user to intervene in our landmark fair use lawsuit.  This will ensure that we are able to
    assert the rights (First Amendment, fair use, etc.) of DVD owners and 321 customers in this
26  case."  http://dvdxcopy.afterdawn.com/thread view cfm./24804.  As this reply memorandum was
    being drafted, one individual responded to the advertisement, moving to intervene.  Regardless
27  of the outcome of his motion to intervene (which the Studios oppose), his involvement does not
    confer standing on 321, nor alter the Studios' entitlement to summary judgment against 321.

28

16

Mitchell Silberberg &
Knupp LLP

1    However, 321 deliberately has avoided characterizing its First Amendment challenge as

2    an "overbreadth" attack.  For good reason:  "A facial freedom of speech attack must fail unless,

3    at a minimum, the challenged statute 'is directed narrowly and specifically at expression or

4    conduct commonly associated with expression.'"  Roulette v. City of Seattle, 97 F.3d 300, 305

5    (9th Cir. 1996), quoting City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 760

6    (1988).  See also Elcom, 203 F. Supp. 2d at 1133 ("facial attacks on overbreadth grounds are

7    limited to situations in which the statute or regulation by its terms regulates spoken words or

8    expressive conduct.").  As the Elcom Court concluded, the DMCA is not "by its terms" (or at all)

9    directed "'narrowly and specifically at expression or conduct commonly associated with

10   expression.'… Accordingly, an overbreadth facial challenge is not available."  203 F. Supp. 2d at

11   1133.

12   In an effort to disguise what can only be an impermissible overbreadth challenge, 321

13   attempts to shoehorn itself into standing reserved for those whose very compliance with a

14   *facially discriminatory* statute would violate the *equal protection* rights of a third party.

15   Eisenstadt v. Baird, 405 U.S. 438, 443 (1972), and Craig v. Boren, 429 U.S. 190, 195 (1976), the

16   cases on which 321 relies, illustrate why the shoe doesn't fit.  Both involved statutes prohibiting

17   the plaintiff from distributing a product to certain categories of individuals, based on a

18   constitutionally impermissible criterion.  See Craig, 429 U.S. at 195 (vendor entitled to challenge

19   statute prohibiting the sale of 3.2% beer to men but not women); Eisenstadt, 405 U.S. at 443

20   (vendor entitled to challenge statute that prohibited the sale of contraceptives to unmarried

21   individuals).  Nothing in the application or the enforcement of the DMCA discriminates at all

22   among end-users; selling circumvention software to any and *all* end-users is illegal.[13]

23

24

25

---

26   [13]  The only *First Amendment* standing case 321 cites is Virginia v. American Booksellers
     Ass'n, 484 U.S. 383 (1988), which was decided on *overbreadth* grounds (which, as set forth

27   above, 321 cannot use to challenge the DMCA).  The other First Amendment case cited by 321,
     Bursey v. United States, 466 F.2d 1059 (9th Cir. 1972), did not address standing at all.

28

17

**B.    In Any Event, Section 1201 Does Not Impermissibly Burden The First Amendment Rights Of Users of The DVD Circumvention Software**

Even if 321 had standing to assert the putative First Amendment rights of its users (which it does not), its arguments fail.  Those arguments rest on a series of flimsy propositions, all of which already have been rejected by other courts, and none of which survives even the most rudimentary scrutiny: namely, that (1) prohibiting the sale of the DVD Circumvention Software "eliminates" fair use; (2) the "fair use" doctrine is a First Amendment right; and (3) the First Amendment right and the fair use affirmative defense are co-extensive, such that any purported burden on the ability to make (purported) "fair uses" of copyrighted works violates a user's First Amendment rights.

**1.    The DMCA Does Not "Eliminate" Fair Use**

321 does not (and cannot) contend that the DMCA places any statutory limitation on the *type* of conduct encompassed by the "fair use" defense (see 17 U.S.C. § 1201(c)(1) ("[n]othing in this section shall affect . . . defenses to copyright infringement, including fair use.").  Rather, 321's First Amendment challenge theorizes that "to the extent that the DMCA bans the *tools* necessary to engage in fair use, it has eliminated fair use itself."  Opp. at 21 (emphasis added).[14]

321's hyperbolic claim that prohibiting the DVD Circumvention Software "does away with fair use in the digital realm"  (Opp. at 19) is unmitigated hogwash.  "The DMCA does not impose even an arguable limitation on the opportunity to make a variety of traditional fair uses of DVD movies, such as commenting on their content, quoting excerpts from their screenplays, and

---

[14]  321 cites three cases – Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123 (1992), Denver Area Educational Telecommunications Consortium, Inc. v. Federal Communications Comm'n, 518 U.S. 727 (1996), and Bantam Books, Inc. v. Sullivan, 372 U.S. 58 (1963) –for the proposition that prohibiting the dissemination of the DVD Circumvention Software is a "back door" regulation of speech.  None of these cases has anything to do with prohibiting products that can be used in furtherance of purported speech rights.  Each involved statutes that either *directly* regulated speech or First Amendment activity (Denver Area, 518 U.S. at 754-60 (regulation required cable broadcasters to "segregate and block" certain types of programming,)) or permitted a government entity to censor or discriminate against certain speech (Forsyth County, 505 U.S. at 133-34 (ordinance required county to assess parade fees based on content of parade); Bantam, 372 U.S. at 64 (law permitted a commission to list certain types of publications as "objectionable" and to require that distributors treat such publications differently)).

18

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1   even recording portions of the video images and sounds on film or tape by pointing a camera, a

2   camcorder, or a microphone at a monitor as it displays the DVD movie." Corley, 273 F.3d at

3   459. See also Elcom, 203 F. Supp. 2d at 1111 ("Congress has not banned or eliminated fair use

4   and nothing in the DMCA prevents anyone from quoting from a work or comparing texts for the

5   purpose of study or criticism.").

6      The DMCA also allows ample additional breathing room for fair uses. It contains

7   express exemptions for nonprofit libraries, archives, and educational institutions; law

8   enforcement, intelligence and government activities; reverse engineering; encryption research;

9   and security testing. 17 U.S.C. §§ 1201(d)-(j). Cf. Eldred v. Ashcroft, 123 S. Ct. 769, 789

10  (2003) (noting that Copyright Term Extension Act contains explicit statutory "safeguards" for

11  "libraries, archives and similar institutions."). As yet a further safeguard, section 1201(a)(1)(C)

12  provides for triennial rulemaking by the Library of Congress to determine "whether persons who

13  are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely

14  affected by the prohibition…in their ability to make noninfringing uses under this title of a

15  particular class of copyrighted works." In fact, advocates of the position that CSS-encrypted

16  DVDs should be exempted from the DMCA's prohibition on access-control circumvention

17  applied for such an exemption during the first triennial rulemaking. The Library of Congress,

18  after soliciting public comment and obtaining testimony from 50 groups, as well as nearly 400

19  written submissions, determined that "no such exemption was warranted." DMCA Rulemaking

20  at 64557, 64569.

21      **2.    Fair Use Is Not A Constitutional Right**

22      The doctrine of "fair use" is a ***statutory defense*** to an action for copyright infringement –

23  not a First Amendment "right" (or, indeed, any "right"). No case has ever held, as 321 asserts

24  without citation of authority, that the "fair use doctrine is the savings clause that renders the

25  copyright laws consistent with the First Amendment." Opp at 21. See Corley, 273 F.3d at 458

26  ("Appellants contend that the DMCA, as applied by the District Court, unconstitutionally

27  eliminates 'fair use' of copyrighted materials.    We reject this extravagant claim….[T]he

28

19

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1   Supreme Court has never held that fair use is constitutionally required."). (Citations to the

2   record omitted).

3       Nothing in Eldred changes the analysis. See Opp. at 20. Eldred stands for nothing more

4   than the unremarkable proposition that the "fair use" defense – like the idea/expression

5   dichotomy and various other statutory provisions – accommodates First Amendment concerns.

6   See Eldred, 123 S.Ct. at 789 ("In addition to spurring the creation and publication of new

7   expression, copyright law contains built-in First Amendment accommodations…."). This

8   uncontroversial (and longstanding) proposition is not equivalent to a holding that fair use is a

9   constitutional "right."[15]

10       **3.      "Fair Use" And The First Amendment Are Not Co-Extensive**

11       321's First Amendment argument is even narrower than the (untrue) claim that fair use is

12   a constitutional right. Its First Amendment argument rests entirely upon a single *form* of alleged

13   "fair use" – making an exact digital copy, in whole or in part, of a DVD. See Opp. at 21

14   (identifying "fair uses" as "excerpting clips for scholarship or critical reviews, creating

15   instructional videos, incorporating movie clips into new video works, making backup copies of

16   DVDs, and repairing scratched DVDs"). Tellingly, 321 never once argues that these particular

17   forms of "fair use" are *First Amendment* uses. Rather, 321 engages in a sleight-of-hand,

18   literally *replacing* its "First Amendment" discussion with a "fair use" discussion, so as to imply

19   that *any* use that might be considered a "fair use" must be the equivalent of a First Amendment

20   use. See, e.g., Opp., at 21-22. But there is no *First Amendment* right to make an exact copy.

21   "There can be no First Amendment justification for the copying of expression along with idea

22

23   _____

    [15]   The only other case cited by 321 in support of its claim, Harper & Row Publishers, Inc. v.
24   Nation Enterprises, 471 U.S. 539, 559 (1985), actually supports the *Studios'* position. The
    Supreme Court expressly rejected the suggestion that there existed a "First Amendment"
25   exception to the Copyright Act. It instead found that copyright's idea/expression dichotomy
    "[strikes] a definitional balance between the First Amendment and the Copyright Act by
26   permitting free communication of facts while still protecting an author's expression." 471 U.S.
    at 556 (internal cite and quotation omitted). The Court never once indicated that the doctrine of
27   "fair use" might be a First Amendment right or even that the doctrine had its roots in the First
    Amendment.
28

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1   simply because the copier lacks either the will or the time or energy to create his own

2   independently evolved expression.  The first amendment guarantees the right to speak; it does

3   not offer a governmental subsidy for the speaker, and particularly a subsidy at the expense of

4   authors whose well-being is also a matter of public interest."  1 Nimmer, § 1.10[D], at 1- 96-97.

5   Accord Zacchini v. Scripps-Howard Broadcasting Company, 433 U.S. 562, 573 (1977) (rejecting

6   First Amendment challenge to right of publicity statute: "we are quite sure that the First and

7   Fourteenth Amendments do not immunize the media when they broadcast a performer's entire

8   act without his consent.").

9         As the Second Circuit explained:

10          "We know of no authority for the proposition that fair use, as
    protected by the Copyright Act, much less the Constitution,
11          guarantees copying by the optimum method or in the identical
    format of the original. . . .  The fact that the resulting copy will not
12          be as perfect or as manipulable as a digital copy obtained by having
    direct access to the DVD movie in its digital form, provides no
13          basis for a claim of unconstitutional limitation of fair use.  A film
    critic making fair use of a movie by quoting selected lines of
14          dialogue has no constitutionally valid claim that the review (in
    print or on television) would be technologically superior if the
15          reviewer had not been prevented from using a movie camera in the
    theater, nor has an art student a valid constitutional claim to fair
16          use of a painting by photographing it in a museum."

17  Corley, 273 F.3d at 459.  See also Elcom, 203 F. Supp. 2d at 1133, n.4 ("There is no direct

18  authority for the proposition that the doctrine of fair use is coextensive with the First

19  Amendment, such that 'fair use' is a First Amendment right."); DMCA Rulemaking at 64569

20  ("there is no unqualified right to access works on any particular machine or device of the user's

21  choosing").

22        Likewise, an author's choice to disseminate his or her work in a particular format, or with

23  technological or other restrictions on the use of that work, does not raise First Amendment

24  problems.  Inherent in the copyright monopoly is the copyright holder's right to control his or her

25  creation:  "It has always been a fundamental principle of copyright law that the copyright owner

26  has no obligation to make his work available to the public….  He may choose to keep it locked in

27  his office, or to provide access only upon certain terms.  Regardless of this choice, the law can

28  make it illegal to break into his office, even if the ultimate object is to make a fair use of the

21

1   work."  Testimony of Marybeth Peters, Register of Copyrights, <u>NII Copyright Protection Act of</u>

2   <u>1995</u>, Joint Hearing Before Subcommittee on Courts and Intellectual Property of the House

3   Committee on the Judiciary and the Senate Committee on the Judiciary, 104th Cong., 1st Sess.,

4   November 15, 1995 (U.S. Gov't. Printing Office, 1996) [Ex. 2 to Request for Judicial Notice

5   ("RJN")], at 51.  <u>See also</u> <u>Harper & Row</u>, 471 U.S. at 559 ("[F]reedom of thought and expression

6   'includes both the right to speak freely and the right to refrain from speaking at all."), *citing*

7   <u>Wooley v. Maynard</u>, 430 U.S. 705, 714 (1977); <u>ProCD, Inc. v. Zeidenberg</u>, 86 F.3d 1447, 1455

8   (7th Cir. 1996) (copyright owner may place restrictions on the use of the copyrighted work).[16]

9        In light of the foregoing, 321 cannot seriously contend (and does not) that there is a ***First***

10  ***Amendment*** right to make exact and complete copies of a DVD – including "backup" copies of a

11  DVD to protect against the risk of damage from misuse or mishandling; or extra copies of DVDs

12  for oneself or one's family or friends; or "repairing" broken DVDs.  But with the exception of a

13  few users who claim to use the DVD Circumvention Software to copy ***unencrypted*** content for

14  which they do not ***need*** or use the decryption technology,[17] ***every single one*** of the 210 users

15  who completed 321's form "declaration" claim to use the DVD Circumvention Software for

16  these or similar purposes.  This is precisely the type of "bodily appropriation" of the Studios'

17  copyrighted works that courts repeatedly have found do ***not*** implicate any First Amendment

18  rights.  <u>Elcom</u>, 203 F. Supp. 2d at 1135 ("There certainly has been no generally recognized First

19  Amendment right to make back-up copies of electronic works.  Thus, to the extent the DMCA

20  impacts a lawful purchaser's 'right' to make a back-up copy, or to space-shift that copy to

21

22  [16]   *Amici* Law Professors argue that the ability to make perfect digital copies of a DVD is
    essential to the exercise of "fair use" because "motion pictures incorporate images and sounds
23  [and] direct copying of excerpts is the analogue to direct quotation."  Law Professors' Brief, at 9.
    But none of the cases they cite stands for this sweeping proposition; each merely found that the
24  particular uses claimed to be infringing were "fair uses" and did not give rise to liability.  None
    of these cases had anything to do with the ***format*** of the allegedly taken work – much less
25  whether making a particular ***type*** of copy was "essential" to the exercise of "fair use."  Nor did
    any of these cases have anything to do with any purported First Amendment "right" to make
26  copies.

27  [17]   Bevins, Durbin, Moffat, Monroe, Nakaoka, Rowthorn, Sink, and Yaciw.

28

22

1   another computer, the limited impairment of that one right does not significantly compromise or

2   impair the First Amendment rights of users so as to render the DMCA unconstitutionally

3   overbroad."); Harper & Row, 471 U.S. at 557-58 ("[Respondent] possessed an unfettered right to

4   use any factual information revealed in [the memoirs] for the purpose of enlightening its

5   audience, but it can claim no need to 'bodily appropriate' [Mr. Ford's] 'expression' of that

6   information by utilizing portions of the actual [manuscript]."); Walt Disney Productions. v. Air

7   Pirates, 581 F.2d 751, 759 (9th Cir. 1978) (rejecting First Amendment defense to copying of

8   Plaintiffs' copyrighted cartoon characters: "Because the defendants here could have expressed

9   their theme without copying Disney's protected expression…their First Amendment challenge be

10  dismissed."). Cf. Zacchini, 433 U.S. at 573 (no First Amendment privilege to broadcast a

11  performer's entire act).

### 4. The DMCA Does Not Place An Impermissible "Financial Burden" On First Amendment Rights Of Third Parties.

12  

13          Positing that the Studios "may argue" that users can copy a DVD using a video camera

14  (an example that actually comes from Corley, 273 F.3d at 459, not the Studios), 321 contends

15  that this would place a "financial burden" on such users' First Amendment rights. Opp. at 22.

16  This argument is a red herring.  As discussed above, there is no "First Amendment right" (and

17  not even any fair use "right") to make a particular form of copy or to copy from a particular

18  medium.  Nor do 321's users need a video camera to make "fair uses" of the Studios'

19  copyrighted works:  they are free to quote from the dialogue, criticize the work, or show the

20  copyrighted work in a classroom for instructional purposes (to list just a few examples).  That

21  aside, 321's argument grossly mischaracterizes the law.  The only "financial burdens" on First

22  Amendment rights that render a statute unconstitutional are those that "imposes a financial

23  burden on speakers because of the *content* of their speech."  See Simon & Schuster, Inc. v.

24  Members of N.Y. State Crime Victims Board, 502 U.S. 105, 115 (1991) (emphasis added)

25  (invalidating statute that forfeited the proceeds of publications pertaining to "the reenactment of

26  a crime" or "the expression of [an] accused or convicted person's thoughts, feelings, opinions or

27  emotions regarding the crime"); Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 221

28  

23

1   (1987) (invalidating tax that applied only to certain types of magazines, but exempted "religious,

2   professional, trade, and sports journals").  Even assuming the DMCA placed a financial burden

3   on a (non-existent) "First Amendment" right to make a copy, the alleged burden exists for ***all***

4   encrypted works, ***irrespective*** of the content.  Hence the alleged "burden" cannot invalidate the

5   statute.

6           **5.**        **The DMCA Does Not Impair Any Person's Right To Access Non-Copyrighted Works**

7         A prohibition on trafficking in DVD Circumvention Software neither impairs the ability

8   of consumers to access non-copyrighted works, nor "place[s] unlimited power in the hands of

9   copyright holders to control information."  Opp. at 22.  Even if, as 321 argues, the purchaser of a

10  DVD has a right to use public domain material, that does not mean that the Studios (or anyone

11  else) must provide it in any particular format or manner.  The <u>Elcom</u> defendants made the

12  identical argument, using the identical hyperbole, and citing the identical authority.  The Court

13  expressly rejected it:

14

15          "Assuming for the sake of argument that it would violate the First Amendment for the government to grant exclusive copyright-like rights in works that have already entered the public domain, that situation is not presented here.  ***The hole in defendant's argument is that the DMCA does not grant anyone exclusive rights in public domain works or otherwise non-copyrighted expression.***  A public domain work remains in the public domain.  Any person may use the public domain work for any purpose – quoting, republishing, critiquing, comparing, or even making and selling copies.  ***Publishing the public domain work in an electronic format with technologically imposed restrictions on how that particular copy of the work may be used does not give the publisher any legally enforceable right to the expressive work, even if it allows the publisher to control that particular copy.***

16

17

18

19

20

21

22  203 F. Supp. 2d at 1134 (emphasis added).  <u>See also</u> <u>ProCD</u>, 86 F.3d at 1455 (shrinkwrap license

23  restricting use of software did not create any rights "equivalent" to copyright).  There is no basis

24  to depart from <u>Elcom</u>'s well-reasoned conclusion, and 321 offers none.

25          **C.**     **Section 1201 Does Not Violate 321's First Amendment Rights**

26        321's second challenge to the DMCA is based on its own alleged First Amendment

27  rights.  This challenge is predicated on the erroneous premise that the DMCA is a content-based

28

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1    restriction on speech and thus subject to the heightened (or "strict") scrutiny applied to statutes

2    that discriminate against particular types of speech based on the speakers' message.  Opp. at 26.

3    That is not the case here.

4              1.      **The DMCA Is Not A Content Based Restriction**

5                      a.      **The DMCA Regulates Circumvention Technology Because Of**
                                **Its Function, Not Its Expression.**

6

7              The level of First Amendment scrutiny accorded a statute depends on whether it is

8    content-based or content-neutral.  321 claims the DMCA is a content-based restriction because it

9    prohibits trafficking in ***circumvention*** technology and thus "cannot be articulated without

10   reference to the content of the speech that is banned."  Opp. at 27.  <u>Corley</u> and <u>Elcom</u> expressly

11   rejected the same argument.  See <u>Corley</u>, 273 F.3d at 454 ("[Defendants] argue that the [anti-

12   trafficking provisions of the DMCA] 'specifically target…scientific expression based on the

13   particular topic addressed by that expression – namely, techniques for circumventing CSS.'  We

14   disagree.") (Citations to the record omitted.); <u>Elcom</u>, 203 F. Supp. 2d at 1128 (rejecting

15   argument that "it is precisely the content of the code that causes the government to regulate it").

16            Every court that has considered the issue has held that decryption technology contains

17   both functional and expressive elements.[18]  <u>See</u>, <u>e.g.</u>, <u>Junger v. Daley</u>, 209 F.3d 481, 484 (6th

18   Cir. 2000) ("[S]ource code has both an expressive feature and a functional feature."); <u>Corley</u>,

19   273 F.3d at 451 (the "realities of what code is and what its normal functions are require a First

20   Amendment analysis that treats code as combining nonspeech and speech elements, *i.e.*,

21   functional and expressive elements.").[19]  <u>Bernstein v. United States Dept. of State</u>, 922 F. Supp.

22

23   [18]  321 makes the bogus claim that the extent to which computer code is functional (as opposed
     to expressive) is a "factual" issue.  Opp. at 29, n.24.  But the issue is not the extent to which code
24   is functional; it is whether the statute regulates the function or the message.  <u>Elcom</u>, 203 F. Supp.
     2d at 1128.  This is a legal, not a factual inquiry.  <u>See</u> <u>Junger</u>, 209 F.3d at 485.  In any event,
25   ***both*** sides have submitted evidence about what functions are performed by 321's DVD
     Circumvention Software, and that evidence is not in dispute.  <u>Compare</u> Schumann Decl. ¶¶ 25,
26   26, 29, 31-35 <u>with</u> Touretzky Decl. ¶ 30 and Moore Decl. ¶¶ 3, 6.

27
28   [19]  Contrary to the urging of *amicus* EFF, the function/expression distinction, and the application
     of "intermediate scrutiny" to statutes regulating the functional elements of computer software, is

                                                      25

1    1426 (N.D. Cal. 1996), which 321 cites, is not to the contrary.  Bernstein said only that the fact

2    that computer code has a functional element does not mean code is not speech – a proposition the

3    Studios do not challenge.  Contrary to 321's assertion, Bernstein did not hold that "export

4    regulations prohibiting the dissemination of encryption software violated the First Amendment."

5    Opp. at 28.  The Court held only that the plaintiff had raised "a colorable" First Amendment

6    claim sufficient to survive a motion to dismiss for lack of justiciability.  922 F.Supp. at 1439

7    ("the Court at this stage of the proceedings need only determine whether the claim is colorable.")

8         The distinction between function and expression is dispositive in determining whether a

9    statute is content-neutral.  That is because in making that determination, courts look to whether

10   Congress enacted the statute "because of agreement or disagreement with the *message* it

11   conveys."  Elcom, 203 F. Supp. 2d at 1138 (emphasis added).  See also City of Renton v.

12   Playtime Theaters, Inc., 475 U.S. 41, 48-49 (1986) (concern underlying content-based

13   restrictions is based on the principle that "government may not grant the use of a forum to people

14   whose views it finds acceptable, but deny use to those wishing to express less favored or more

15   controversial views.").

16        The DMCA is not concerned with prohibiting any "message" (subversive or otherwise)

17   that might be conveyed by 321.  The DMCA is directed solely to the function of circumvention

18   technologies.  "The reason that Congress enacted the anti-trafficking provision of the DMCA had

19   nothing to do with suppressing particular ideas of computer programmers and everything to do

20   with *functionality*."  Reimerdes, 111 F. Supp. 2d at 329 (emphasis added).  See also Elcom, 203

21   F. Supp. 2d at 1128 ("Here, the parties have pointed to no portion of the legislative history that

22   demonstrates a congressional intent to target speech because of its expressive content.  Rather,

23   Congress sought ways to further electronic commerce and protect intellectual property rights,

24

25   entirely consistent with First Amendment jurisprudence, and does not relegate certain types of
     speech to "second class First Amendment citizenship."  In determining whether certain

26   regulations on speech are "content-based" or "content-neutral," the Supreme Court long has
     sanctioned the segregation of "expressive" elements of speech from "non-expressive" elements.

27   See e.g. United States v. O'Brien, 391 U.S. 367 (1968); Clark v. Community for Creative Non-
     Violence, 468 U.S. 288 (1984).

28

26

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1   while at the same time protecting fair use."). In other words, "Congress sought to ban the code

2   not because of what the code *says*, but rather because of what the code *does*." Elcom, 203 F.

3   Supp. 2d at 1128.[20]

4           **b.      Prohibiting "Trafficking" In The DVD Circumvention**
                       **Software Is No More Content-Based Than Prohibiting Its Use**

5

6           321 struggles in vain to distinguish dissemination of computer code from its use, arguing

7   that its dissemination of the software is "expressive" in nature. See Opp. at 29. This distinction

8   is untenable. 321 never has contended (nor could it) that by transmitting or shipping its products

9   to customers, it intends to impart a particular message or viewpoint – its goal is the sale, for

10  profit, of its unlawful software products. That the sale may be carried out by words or that the

11  product sold is computer code does not entitle it to First Amendment protection. See Ohralik v.

12  Ohio State Bar Ass'n, 436 U.S. 447, 456 (1978) ("It has never been deemed an abridgment of

13  freedom of speech or press to make a course of conduct illegal merely because the conduct was

14  in part initiated, evidenced, or carried out by means of language, either spoken, written, or

15  printed."); United States v. Mendelsohn, 896 F.2d 1183, 1185 (9th Cir. 1990); Corley, 273 F.3d

16  at 454 (upholding DMCA as applied to "posting" DeCSS code on the internet: "Neither the

17  ─────────────────────

18  [20] 321 claims the DMCA should be compared to the flag-desecration statute at issue in Texas v.
     Johnson, 491 U.S. 397, 404-05 (1989); the defamatory speech in Hustler Magazine v. Falwell,
19  485 U.S. 46, 52 (1988); or the parade regulations in Hurley v. Irish-American Gay, Lesbian &
     Bisexual Group, 515 U.S. 557, 577-78 (1995). If anything, these cases are instructive because of
20  their *contrast* to the function regulated by the DMCA. Each involved a content-based restriction
     on pure speech or, in the case of Johnson, purely symbolic conduct. Each of the regulations at
21  issue sought to regulate the *specific message* communicated by the speaker. In Johnson, the
     statute prohibited the desecration of the flag -- the "very purpose" of which "is to serve as a
22  symbol of our country" – "in a way that the actor knows will offend." In Hurley and Hustler, the
     *only* "act" regulated was *the very expression itself* (Hustler's parody "advertisement" mocking
23  Jerry Falwell and the involvement of a gay and lesbian group in a parade). Johnson, 491 U.S. at
     405. 321 also argues the DMCA should be compared to the sign ban in City of Ladue v. Gilleo,
24  512 U.S. 43 (1994) and the ban on solicitations in Riley v. Nat'l. Fed.'n of the Blind, Inc., 487
     U.S. 781 (1988) and Schaumburg v. Citizens for a Better Environment, 444 U.S. 620 (1980).
25  City of Ladue had nothing to do with the separation of "function" and "expression." That case
     belongs to the line of authority, not relevant here, that a prohibition that forecloses an entire
26  method of communicating messages sweeps too broadly and is unconstitutional. 312 U.S. at 45-
     55. The DMCA does not foreclose any, let alone an entire, means of communicating a message.
27  Riley and Schaumburg were direct prohibitions on pure speech and are equally inapposite.

28

1   DMCA nor the posting provision is concerned with whatever capacity DeCSS might have for

2   conveying information to a human being."); Karn v. United States Dept. of State, 925 F. Supp. 1,

3   10 (D.D.C. 1996) ("The defendants are not regulating the export of the diskette because of the

4   expressive content of the comments and/or source code, but instead are regulating because of the

5   belief that the combination of encryption source code on machine readable media will make it

6   easier for foreign intelligence sources to encode their communications.") See also United States

7   v. Schulman, 817 F.2d 1355 (9th Cir. 1987) (no First Amendment defense for showing alien how

8   to cross the border illegally).

9            c.       **The DMCA Is Not A Content-Based Restriction On Expressive
                      Conduct Justified By Its "Potential Consequences"**

10           Both 321 and *amicus* EFF argue that the DVD Circumvention Software cannot be

11   regulated "on the basis of its potential consequences," because the software "does not lead

12   inexorably to copyright infringement."  Opp. at 29-30 & n.21; EFF Brief, at 14, 16.  This

13   argument is fundamentally flawed.  Brandenburg v. Ohio, 395 U.S. 444 (1969) (cited by EFF),

14   as well as every case cited by 321 for this proposition, involved restrictions on speech based

15   entirely upon the ***message*** being communicated.  These cases stand only for the proposition (not

16   at issue here) that an otherwise ***impermissible content-based*** regulation does not become

17   ***permissibly content-neutral*** merely because the regulation is justified by the potential

18   consequences of the particular speech (e.g., "fighting words").[21]  For that reason, 321's

19

20

21   [21]  See Forsyth County, 505 U.S. at 134 (parade ordinance permitted discrimination based on
     content of parade, even though county justified such discrimination on ground that certain types

22   of parades carried greater risks of harm); Houston v. Hill, 482 U.S. 451, 462 (1987) (statute
     criminalized speech that "in any manner…interrupt[s] an officer"). American Booksellers Ass'n,

23   Inc. v. Hudnut, 771 F.2d 323, 333 (7th Cir. 1985) (statute prohibited sale of speech that
     "subordinates" women but permitted speech that portrays women in positions of equality, "no

24   matter how graphic the sexual content"); United States v. Poocha, 259 F.3d 1077, 1082 (9th Cir.
     2001) (defendant could not be penalized for using profanity); Simon & Schuster, 502 U.S. at 117

25   (only speech relating to criminal acts was subject to statute); Regan v. Time, Inc., 468 U.S. 641,
     648-59 (1984) (statute prohibited publishing photographs of currency, unless photographs were

26   used "for philatelic, numismatic, educational, historical, or newsworthy purposes"); Metromedia,
     Inc. v. City of San Diego, 453 U.S. 490, 493-96 (1981) (statute prohibited posting of some signs,

27   but not others, based on their message).  Bartinicki v. Vopper, 532 U.S. 514 (2001), which 321
     also cites for this point, is equally distinguishable.  Bartinicki involved a regulation on "pure

28

                                                    28

1    hyperbolic claim that "there is a disputed issue of fact as to whether the availability of a program

2    such as DVD-X-Copy will overbear the will of the citizenry and turn them into a lawless mob"

3    (Opp. at 31), inadvertently misses or intentionally misstates the point.  The DMCA does not

4    regulate decryption technology because of the danger imposed by any *message* communicated

5    by the prohibited technology, but because of its *functional capacity* for harm.  Corley, 273 F.3d

6    at 454; Elcom, 203 F. Supp. 2d at 1128.  Thus, 321 is free to communicate whatever messages it

7    wants concerning the undesirability of CSS or other encryption technology; it just may not traffic

8    in technology that defeats it.

9        **D.    The DMCA Meets "Intermediate Scrutiny"**

10           Because the DMCA is content-neutral, it is subject to *"*intermediate*"* scrutiny.  Elcom,

11   203 F. Supp. 2d at 1129 ("the court concludes that intermediate scrutiny, rather than strict

12   scrutiny, is the appropriate standard to apply."); Corley, 273 F.3d at 454 ("[Section 1201] is . . .

13   content-neutral, just as would be a restriction on trafficking in skeleton keys identified because

14   of their capacity to unlock jail cells"); Junger, 209 F.3d at 485 (applying "intermediate" scrutiny

15   to regulation on encryption source code).  Under "intermediate scrutiny," the test is whether (1)

16   the regulation furthers "an important or substantial governmental interest" and (2) the means

17   chosen do not "burden substantially more speech than is necessary to further the government's

18   legitimate interests."  Ward v. Rock Against Racism, 491 U.S. 781, 791, 799 (1989); see also

19   Clark, 468 U.S. at 293; O'Brien, 391 U.S. at 377.

20           321 (and *amicus* EFF), citing but mischaracterizing the Supreme Court's two decisions in

21   Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622 (1994) (Turner I) and 520 U.S. 180 (1997)

22   (Turner II), assert that the Studios must present (and the Court must consider) "substantial

23   evidence" that these two elements are satisfied.  Opp. at 23.  In fact, whether the DMCA passes

24   muster under "intermediate" scrutiny is not an evidentiary issue that requires the Studios to

25   litigate, and the Court to act as a super-legislature to decide, the policy issues considered (and

26   _____

27   speech" (532 U.S. at 526), and the "narrow holding" of the case was "limited to the special

28   circumstances presented [t]here."  Id. at 535 (Breyer, J. concurring).

29

Mitchell Silberberg &
Knupp LLP

1   determined) by Congress.  To the contrary, in reviewing the constitutionality of a statute, the

2   Court's "sole obligation is 'to assure that, in formulating its judgments, ***Congress*** has drawn

3   reasonable inferences based on substantial evidence.'" (emphasis added).  <u>Turner II</u>, 520 U.S. at

4   195; <u>Turner I</u>, 512 U.S. at 664.  In doing so, the Court "must accord ***substantial deference*** to the

5   predictive judgments of Congress," and need not reweigh the evidence *de novo*, or…replace

6   Congress' factual predictions with [its] own." <u>Id.</u> (emphasis added).  The rationale for this rule

7   is clear:

8               "Sound policymaking often requires legislators to forecast future
                events and to anticipate the likely impact of these events based on
9               deductions and inferences for which complete empirical support
                may be unavailable.  As an institution, moreover, Congress is far
10              better equipped than the judiciary to 'amass and evaluate the vast
                amounts of data' bearing upon an issue as complex and dynamic as
11              that presented here….And Congress is not obligated, when
                enacting its statutes, to make a record of the type that an
12              administrative agency or court does to accommodate judicial
                review."
13

14  <u>Turner I</u>, at 665-66 (*quoting* <u>Walters v. Nat'l Ass'n of Radiation Survivors</u>, 473 U.S. 305, 331

15  n.12 (1985)).[22]  "This principle has special significance in cases, like this one, involving

16  congressional judgments concerning regulatory schemes of inherent complexity and assessments

17  about the likely interaction of industries undergoing rapid economic and technological change."

18  <u>Turner II</u>, 520 U.S. at 196.  Thus, "even in the realm of First Amendment questions where

19  Congress must base its conclusions upon substantial evidence, deference must be accorded to

20  Congress' findings as to harm to be avoided and to remedial measures adopted for that end, lest

21  court infringe on traditional legislative authority to make predictive judgments when enacting

22  nationwide regulatory policy." <u>Id.</u> at 196.

23

24

25  _____
    [22]  The portion of <u>Turner I</u> on which 321 relies for the proposition that "factual findings
26  concerning the actual effects of the regulations of protected speech were 'critical'" (Opp. at 23)
    is ***not*** the opinion of the Court.  To the contrary, a majority of the Court did ***not*** join in that part
27  of the opinion.  More important, the "factual findings" about "the actual effects of the
    regulation" that 321 claims <u>Turner I</u> requires, were the findings of ***Congress.***
28

                                                        30

1    Congress enacted the DMCA only after the development of a vast record over more than

2    five years (1993 - 1998).  See S. Rep. 105-190, at 2-8.  This record included:

3    •    More than 1,500 pages of written comments from more than 150 individuals and

4    organizations.  Id. at 3.

5    •    Extensive hearings before the House and Senate Judiciary Committees and

6    intellectual property subcommittees, in which testimony was received from dozens of

7    individuals, including law professors; representatives of industries such as computer and

8    communications, consumer electronics, software, electrical and electronics engineers, and the

9    motion picture and recording industries; high-ranking government officials (including the

10   Register of Copyrights; the Assistant Secretary and Commissioner of Patents and Trademarks,

11   Department of Commerce; and the Assistant Director General of the World Intellectual Property

12   Organization); and non-profit organizations.  Id. at 6. [23]

13   •    The creation and development of a special task force "to investigate the effects of

14   emerging digital technology on intellectual property rights and make recommendations on any

15   appropriate changes to U.S. intellectual property law and policy."  Id. at 2.  That task force

16   convened a special Conference on Fair Use "to explore the particularly complex issue of fair use

17   in a digital environment."  Id. at 3.

18   As set forth below, based on this enormous record and the evidence contained therein,

19   Congress justifiably concluded that the DMCA both furthers important governmental interests

20   and does not burden more speech than necessary to achieve that interest.

21        1.    **The DMCA Furthers Important Governmental Interests**

22   As set forth in the Studios' moving papers, Congress enacted the DMCA to address

23   significant public policy concerns, including "[p]romoting the continued growth and

24   development of electronic commerce,"  H. Rep. No. 105-551 (II), at 23 (1998); "protecting

25

26   [23]   Among the evidence considered by Congress was testimony and statements from some of the
very same law professors who filed an *amicus* brief in support of 321.  See, e.g., Hearings Before

27   Subcommittee on Courts and Intellectual Property, House Judiciary Committee, Sept. 16 & 17,
1997 (attaching statement from Pamela Samuelson) (RJN, ex. 4).

28

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1    intellectual property rights," id.; and encouraging the dissemination of intellectual property,

2    because "[d]ue to the ease with which digital works can be copied and distributed worldwide

3    virtually instantaneously, copyright owners will hesitate to make their works readily available on

4    the Internet without reasonable assurance that they will be protected against massive piracy."

5    S. Rep. No. 105-190, at 8 (1998).[24]

6    　　　Congress clearly determined, based on the substantial evidence before it, that "the recited

7    harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in

8    a direct and material way."  Turner I, 512 U.S. at 664.  See, e.g., Reimerdes, 111 F. Supp. 2d at

9    335 n.230 (citing portions of Congressional record containing evidence that the cost of piracy to

10   affected copyright holders is between $11 and $20 billion each year; that in some countries

11   software piracy rates are as high as 97% of sales; and that "the effect of this volume of theft is

12   substantial: lost U.S. jobs, lost wages, lower tax revenue, and higher prices for honest purchasers

13   of copyrighted software."); S. Rep. 105-190, at 10 (discussing importance of intellectual property

14   industries); H. Rep. 105-551(I), at 9 ("In order to protect the owner, copyrighted works will most

15   likely be encrypted and made available to consumers once payment is made for access to a copy

16   of the work.  There will be those who will try to profit from the works of others by decoding the

17   encrypted codes protecting copyrighted works, or engaging in the business of providing devices

18   or services to enable others to do so."); H. Rep. 105-551(II), at 25 ("the Committee…recognizes

19   that the digital environment poses a unique threat to the rights of copyright owners, and as such,

20   necessitates protection against devices that undermine copyright interests.").[25]

21   

22   [24]  321 does not dispute that circumvention technology can be used to facilitate piracy of
     copyrighted works, that without technological restrictions to prevent such piracy, copyright

23   holders would be reluctant to disseminate their works, and that absent the restrictions of the
     DMCA, the availability to the public of circumvention technology will be increased.  See Karn,

24   925 F. Supp. at 12.

25   [25]  Examination of even a tiny portion of the Congressional record, in addition to that cited in the

26   text, reveals the substantiality of the evidence considered by Congress.  See, e.g., Statement of
     Sen. Hatch, National Information Infrastructure Copyright Protection Act, Hearing Before

27   Committee on the Judiciary, United States Senate, 104th Cong., 2d Sess., May 7, 1996 (U.S.
     Gov't. Printing Office, 1997) ("May 7, 1996 Senate Hearings") [RJN, Ex. 3], at 2 (noting that

28   content providers are holding back from making works available on digital format); Statement of

32

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

321's argument that applying the DMCA against *its* product will not advance a governmental interest (even if assumed *arguendo* to be accurate) is entirely beside the point. See Opp. at 23. "The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception *in the particular case* will not threaten important governmental interests." United States v. Albertini, 472 U.S. 675, 688 (1985) (emphasis added). See also Clark, 468 U.S. at 296-97 ("[I]t is evident from our cases that the validity of this regulation need not be judged solely by reference to the demonstration at hand.").[26]

Kenneth Kay, Executive Director, Creative Incentive Coalition, May 7, 1996, Senate Hearings, at 8-10, 11-13 (noting the importance of the copyright industries, the cost of piracy, the ready availability of pirated works, and the need for copyright owners to "place their copyrighted works in protective envelopes."); Statement of Bruce Lehman, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, WIPO Copyright Treaties Implementation Act, Hearing Before the Subcomm. on Courts and Intellectual Property of the Comm. of the Judiciary, House of Representatives, 105th Cong., 1st Sess., Sept. 16 & 17, 1997 (U.S. Gov't. Printing Office, 1997) ("Sept. 16 & 17, 1997, House Hearings") [RJN, Ex. 4], at 34-40 (discussing importance of DMCA); Statement of Marybeth Peters, Register of Copyrights, Sept. 16 & 17, 1997, House Hearings, at 45-49 ("Peters Testimony")(discussing need for anticircumvention provisions); Statement of Robert Holleyman, Business Software Alliance, Sept. 16 & 17, 1997, House Hearings, at 69-77 (piracy costs software industries $11.2 billion in sales every year; software in digital form is susceptible to piracy; and "without a specific provision prohibiting circumvention of technological means used to prevent unauthorized acts, authors will be increasingly weary of making their works available through electronic networks."); Testimony of Rep. Ros-Lehtinen, Intellectual Property Rights: The Music and Film Industry, Hearing Before the Subcommittee on International Economic Policy and Trade of the Committee on International Relations of the House of Representatives, 105th Cong., 2d Sess., May 21, 1998 (U.S. Govt. Printing Office 1998) ("May 21, 1998, Hearings") [RJN, Ex. 5], at 1-4 (copyright sector is largest exporter and accounts for over 3.6% of gross domestic product; piracy cost copyright owners $425 million in 1998); Testimony of Bruce Lehman, May 21, 1998 Hearings, at 14-15 (discussing need for technological protection to protect against international piracy); Statement of Bonnie Richardson, May 21, 1998, Hearings, at 47-52 (discussing international piracy and need for anti-circumvention laws); Executive Summary, Economists, Inc., May 21, 1998 Hearings, at 70-72 (outlining importance of intellectual property industries to U.S. economy). See also Request for Judicial Notice ("RJN"), Exs. 2 - 5.

[26] 321's argument that the DMCA does not serve important governmental interests because "DeCSS, which lacks the serial copy protections of DVD X Copy, is still widely available on the Internet" (Opp. at 24) has been expressly rejected by at least one court. See Karn, 925 F. Supp. at 11 (rejecting claim that O'Brien test is not satisfied because the cryptographic algorithms contained on plaintiff's diskette are "already widely available in other countries [through the

33

1

## 2. **The DMCA Is Sufficiently Narrowly Tailored**

2      As a threshold matter, 321's claim that the DMCA is overly "restrictive" fails because it

3  is constructed entirely on the erroneous premises that the DMCA "eliminates" or otherwise

4  burdens fair use, and that fair use is a First Amendment right. As discussed above, neither fair

5  use in general – nor making an exact digital copy in particular – is a First Amendment right (nor

6  any "right" at all), and thus any "burden" on such uses is not a burden on the First Amendment.[27]

7      That aside, the Studios are not required to prove that the DMCA is the "least restrictive

8  means of accomplishing the governmental objective." Corley, 273 F.3d at 455. See also Ward,

9  491 U.S. at 798 (the regulation "need not be the least restrictive or least intrusive means of

10  [serving a legitimate, content-neutral purpose]."); Elcom, 203 F. Supp. 2d at 1132 ("Under

11  intermediate scrutiny, it is not necessary that the government select the least restrictive means of

12  achieving its legitimate governmental interest."). Nor is the Court required to evaluate the

13  DMCA against the various hypothetical alternatives proposed by 321 or amicus. Opp. at 24; EFF

14  Brief, at 11-13. See Clark, 468 U.S. at 299 (upholding, against First Amendment challenge, a

15  "no-camping" law with respect to national parklands: "We are unmoved by the Court of

16  Appeals' view that the challenged regulation is unnecessary, and hence invalid, because there are

17  less speech-restrictive alternatives that could have satisfied the Government interest in

18  preserving park lands.... We do not believe, however, that either [O'Brien] or the time, place, or

19  manner decisions assign to the judiciary the authority to replace the Park Service as the manager

20

_____

21

22  Internet and other sources] or are so 'weak' that they can be broken by the [National Security
    Agency].")  The argument is unsupportable in any event, since it would mean that as soon as one
23  "cracks" and disseminates an encryption code, the previous Government interest in stopping
    circumvention of access and copying protection ceases.

24  [27]  Although EFF suggests that the prohibition on circumvention tools "would burden scientific
25  speech, especially in the area of computer security" (EFF Brief at 10), it does not (and cannot)
    explain why. The DMCA not only exempts legitimate encryption research from the anti-
26  circumvention proscriptions, but it also allows researchers to develop and use technological
    measures (i.e., circumvention tools) to perform good faith encryption research, and to provide
27  those tools to others who are collaborating in or verifying that good faith research. 17 U.S.C.
    §§ 1201(g)(2), (4).
28

34

1  of the Nation's parks or endow the judiciary with the competence to judge how much protection

2  of park lands is wise and how that level of conservation is to be attained."); Albertini, 472 U.S. at

3  689 ("Nor are such regulations invalid simply because there is some imaginable alternative that

4  might be less burdensome on speech.").

5          "[T]he requirement of narrow tailoring is satisfied 'so long as the…regulation promotes a

6  substantial governmental interest that would be achieved less effectively absent the regulation."

7  Ward, 491 U.S. at 798-99.  See also One World One Family Now v. City and County of

8  Honolulu, 76 F.3d 1009, 1013-14 (9th Cir. 1996).  "Without the ban on trafficking in

9  circumvention tools, the government's interest in promoting electronic commerce, preserving the

10  rights of copyright holders, and preventing piracy would be undermined.  The absence of

11  effective technological restrictions to prevent copyright infringement would inevitably result in

12  even more rampant piracy, with a corresponding likely decrease in the willingness of authors and

13  owners of copyrighted works to produce them in digital form or make the works available on-

14  line." Elcom, 203 F. Supp. 2d at 1130.  See also Id. at 1132 ("[T]he DMCA does not burden

15  substantially more speech than is necessary to achieve the government's asserted goals of

16  promoting electronic commerce, protecting copyrights, and preventing electronic piracy.")

17          Both 321 and EFF err in asserting that Congress failed to consider "the efficacy and

18  availability of constitutionally acceptable less restrictive means"  Opp. at 25; EFF Brief at 10.

19  Congress *did* consider – and rejected – the very alternatives proposed by 321 and EFF.  As the

20  Register of Copyrights explained to Congress:

21          "After an extensive analysis, the Copyright Office has concluded
            that existing protections under U.S. law are insufficient to satisfy
22          the treaty obligation.  In making this determination, the Copyright
            Office examined a number of existing bodies of law.  These
23          included the doctrine of contributory infringement under copyright
            law, and a variety of federal statutes including the Audio Home
24          Recording Act, 17 U.S.C. § 1002, the Communications Act, 47
            U.S.C. §§ 553 and 605, the National Stolen Property Act, 18
25          U.S.C. § 2314, the Electronic Communications Privacy Act, 18
            U.S.C. § 2510 and the Computer Fraud and Abuse, 18 U.S.C.
26          § 1030 . . . We do not believe that the doctrine of contributory
            infringement provides sufficient protection to fulfill the treaty
27          obligation to provide 'adequate legal protection and effective legal

28

35

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1   remedies' against circumvention.... Most devices for circumventing

2   technological measures, even those designed or entirely used for
    infringing purposes, will be capable of substantial noninfringing

3   uses since they could potentially be employed in the course of a
    fair use, or in the use of a public domain work.  It is therefore not

4   surprising that the Sony standard, in practice, has been ineffective
    in addressing the circumvention problem....Copyright, moreover,

5   may not afford any recourse against those who engage in acts of
    circumvention alone. . . .   Some of the other laws we considered

6   address particular aspects of circumvention of particular types of
    technological protection measures such as the scrambling of

7   broadcast signals.  In the aggregate, however, they fail to provide
    the general coverage required by the treaties."

8

9   Peters Testimony, September 16 & 17, 1997, House Hearings, at 46-47 (Ex. 4 to RJN).

10  Congress' rationale for rejecting those alternatives was sound: "Because of the difficulty

11  involved in discovering and obtaining meaningful relief from individuals who engage in acts of

12  circumvention, a broader prohibition extending to those in the business of providing the means

13  for circumvention appears to be necessary to make the protection adequate and effective."  Id., at

14  48.  See also Elcom, 203 F. Supp. 2d at 1132:

15      "In addition, the alternatives proposed by defendant – enacting
        more severe penalties for copyright infringement – may not be as

16      effective at preventing widespread copyright infringement and
        electronic piracy as is banning the trafficking in or the marketing of

17      the tools that allow piracy to thrive.  Congress certainly could have
        approached the problem by targeting the infringers, rather than

18      those who traffic in the tools that enable the infringement to occur.
        However, it is already unlawful to infringe, yet piracy of

19      intellectual property has reached epidemic proportions.  Pirates are
        world-wide, and locating and prosecuting each could be both

20      impossible and ineffective, as new pirates arrive on the scene.  But,
        pirates and other infringers require tools in order to bypass the

21      technological measures that protect against unlawful copying.
        Thus, targeting the tool sellers is a reasoned, and reasonably

22      tailored, approach to 'remedying the evil' targeted by Congress.  In
        addition, because tools that circumvent copyright protection

23      measures for the purpose of allowing fair use can also be used to
        enable infringement, it is reasonably necessary to ban the sale of all

24      circumvention tools in order to achieve the objectives of preventing
        widespread copyright infringement and electronic piracy in digital

25      media.  Banning the sale of all circumvention tools thus does not
        substantially burden more speech than is necessary.[28]

26

27  _____

28  [28]  In 1999, the penalties for infringement were increased by Congress to a maximum of
    $150,000 per (willful) infringement.  17 U.S.C. § 504(c).  Yet, in the digital age, massive

    36

1    321 and EFF further err in suggesting that Congress did not consider the impact of the

2    DMCA on the fair uses 321 claims are implicated by that statute.  Although that analysis was

3    constitutionally unnecessary since "fair use" is not a First Amendment right, Congress did so

4    exhaustively.  See, e.g., H. Rep. 105-551(II), at 25-26 (discussing balance in DMCA between

5    protection and fair use); Peters Testimony, September 16 & 17, 1997, House Hearings, at 48-50

6    (discussing provisions in DMCA designed to balance protection with fair use and other

7    traditional copyright limitations); Hollyman Testimony, at 74 (discussing need for a balanced

8    approach to promote interests of authors, users, and customers); Letter, Sept. 16, 1997,

9    September 16 & 17, 1997, House Hearings, at 154-56 (expressing concern by law professors

10   about chilling effect of DMCA); Statement of Rep. Rick Boucher, Sept. 16 & 17, 1997, House

11   Hearings, at 193 (expressing concern about fair use).  It was precisely because of those concerns

12   that Congress not only enacted the specific exemptions of §§ 1201 (c)-(g), but also delayed for

13   two years the effective date of section 1201(a)(1) to allow the Library of Congress to "examine"

14   what adverse effects the circumvention prohibition might have.  DMCA Rulemaking, at 64558.

15   The Library of Congress found, after a two-year review of extensive testimony and written

16   submissions, that "the existence of technological measures that control access to motion pictures

17   on DVDs has not had a significant adverse impact on the availability of those works to the

18   public." Id. at 64569.  Further, under its triennial rulemaking authority, the Library of Congress

19   continues to review the "adverse impact" issues, including some of the very arguments made by

20   *amicus* here.  17 U.S.C. § 1201 (a)(1)(C).

21   Finally, 321 suggests that "Congress' different, and significantly less restrictive,

22   treatment of a highly similar problem" -- namely, unidentified "burglar tool statutes" and the

23   Audio Home Recording Act, and 17 USC § 1309(b) -- means that the DMCA is not narrowly-

24   tailored.  Opp. at 24-25.  But the DMCA ***was*** modeled after existing legislation, including "black

25   box" decryption legislation enacted both as part of the Telecommunications Act and NAFTA.

26

27   infringement by countless, anonymous individuals continues to exist precisely because such
     penalties do not provide a solution.  See Reimerdes, 111 F. Supp. 2d at 315 (describing viral

28   distribution of digital copies).

Mitchell Silberberg &
Knupp LLP

1   See S. Rep. 105-190, at 11.  However, even if this were not the case, failing to adopt the same

2   approach as another statute would not render the DMCA unconstitutional because the

3   government "must be allowed a reasonable opportunity to experiment with solutions to

4   admittedly serious problems."  Renton, 475 U.S. at 52 ("Nor is our holding [that a zoning

5   ordinance meets intermediate scrutiny] affected by the fact that Seattle ultimately chose a

6   different method of adult theater zoning that that chosen by Renton.").

7        **E.**     **321's Remaining Overbreadth Challenge Is Meritless**

8        321 makes a perfunctory argument that the DMCA is "substantially overbroad" on its

9   face.  As set forth above, the DMCA cannot be challenged for overbreadth.  See Roulette, 97

10  F.3d at 305; Elcom, 203 F. Supp. 2d at 1133.  In any event, 321's overbreadth argument is

11  meritless for the reasons set forth at page 16 of the Brief of Intervenor United States.

12

13  **IV.**     **THE DMCA WAS PROPER UNDER THE COMMERCE CLAUSE**

14       321 wrongly asserts that "[n]either the text nor the legislative history of the DMCA

15  indicates which power Congress relied on."  Opp. at 34.  Congress made clear that the DMCA

16  was enacted pursuant to its Commerce Clause authority.  See H. Rep. No. 105-551(II), at 35

17  ("Constitutional Authority Statement: …[T]he Committee finds that the Constitutional authority

18  for this legislation is provided in Article I, section 8, clause 3, which grants Congress the power

19  to regulate commerce with foreign nations, among the several States, and with the Indian

20  tribes.").  Therefore, 321's extensive discussions of the Intellectual Property Clause and the

21  Necessary and Proper Clause are irrelevant.  See Elcom, 203 F. Supp. 2d at 1138-1142

22  (Congress did not exceed its Commerce Clause authority in enacting the DMCA).

23       321 does not dispute that the activity regulated by § 1201 -- trafficking in circumvention

24  technology -- "substantially affects" interstate commerce and thus properly is the subject of the

25  Commerce Clause.  See United States v. Lopez, 514 U.S. 549, 560 (1995); see also Trade-mark

26  Cases, 100 U.S. 82, 86 (1879) ("Commerce is a term of the largest import.  It comprehends

27  intercourse for the purposes of trade in any and all its forms, including transportation, purchase,

28  sale, and exchange of commodities…").  Instead, 321 (and *amici* professors) argues that such an

38

1   exercise of Commerce Clause authority was improper because the DMCA is "inconsistent" with

2   the Copyright Clause in two ways: (1) it "extend[s] exclusive protection to public domain or

3   copyright-expired subject matter" (Opp. at 37; Brief of Law Professors at 12); and (2) it

4   "eliminate[s] fair use of copyrighted expression."  (Id.)  These arguments are meritless.[29]

5       Preliminarily, whether or not "legislation reaches beyond the limits of one grant of

6   legislative power has no bearing on whether it can be sustained under another."  United States v.

7   Moghadam, 175 F.3d 1269, 1276 (11th Cir. 1999).  "The various grants of legislative authority

8   contained in the Constitution stand alone and must be independently analyzed.  In other words,

9   each of the powers of Congress is alternative to all of the other powers, and what cannot be done

10  under one of them may very well be doable under another."  Id.  Only laws that are

11  *"fundamentally inconsistent"* with another grant of Congressional power – in other words, laws

12  which Congress is "positively forbidden" to pass – run afoul of the Constitution.  Id. at 1280.

13      Nothing in the DMCA is inconsistent with limitations on Congressional power under the

14  Intellectual Property clause – much less "fundamentally inconsistent."  As discussed above, the

15  DMCA neither "eliminates" nor otherwise affects rights afforded by (or limited by) the

16  Copyright Act, including the "fair use" of copyrighted works.  See 17 U.S.C. § 1201(c).  The

17  DMCA also does not grant the Studios any rights in public domain or otherwise uncopyrightable

18  works.  See Elcom, 203 F. Supp. 2d at 1141 (rejecting claim that DMCA eliminates fair use or

19  grants rights in public domain works); supra at III. B. 5.

20      Nor does the DMCA conflict with the "limited times" provision of the Copyright Clause.

21  The DMCA prohibits circumvention of controls placed on *particular copies* of a copyrighted

22  work purchased by consumers.  It does not affect rights in the underlying copyrighted material –

23  much less extend any such rights in perpetuity.  See Aronson v. Quick Point Pencil Co., 440 U.S.

24

---

25  [29]  As a variant on these arguments, *amici* Law Professors contend that the DMCA prohibits
    reverse engineering to achieve interoperability, and thus impermissibly grants "private
26  monopolization of the unpatented technical standards."  Brief of Law Professors at 10.  This
    argument fails for two reasons.  First, 321 does not contend that it reverse engineered CSS, let
27  alone that it did so to achieve interoperability, and thus the argument is irrelevant.  Second, the
    DMCA expressly authorizes reverse engineering to achieve interoperability.  17 U.S.C § 1201(f).

28

257, 264 (1979) (enforcement of royalty agreement after patent entered public domain was not

inconsistent with "limited times" clause because "enforcement of the agreement does not

withdraw any idea from the public domain."); ProCD, 86 F.3d at 1455 ("shrinkwrap" license

restricting the use of computer database containing telephone directory information did not

"withdraw any information from the public domain…Everyone remains free to copy and

disseminate all 3,000 telephone books that have been incorporated into ProCD's database.");

Elcom, 203 F. Supp. 2d at 1141:

> "[T]he DMCA does not allow a copyright owner to effectively
> prevent an ebook from ever entering the public domain, despite the
> expiration of the copyright…The publisher/copyright owner has no
> right to prevent any user from using the work any way the user
> prefers… The essence of a copyright is the legally enforceable
> exclusive rights to reproduce and distribute copies of an original
> work of authorship, to make derivative works, and to perform the
> work publicly, for a limited period of time.  (Citations omitted.)
> None of those rights is extended beyond the statutory term merely
> by prohibiting the trafficking in or marketing of devices primarily
> designed to circumvent use restrictions on works in electronic
> form."

The anti-circumvention provisions of the DMCA not only are entirely *consistent* with the

purposes and goals of the Copyright Clause, they *further* those goals:  "Protecting the exclusive

rights granted to copyright owners against unlawful piracy by preventing trafficking in tools that

would enable widespread piracy and unlawful infringement is consistent with the purpose of the

Intellectual Property Clause's grant to Congress of the power to 'promote the useful arts and

sciences' by granting exclusive rights to authors in their writings."  Elcom, 203 F. Supp. 2d at

1140-41.  See also Moghadam, 175 F.3d at 1280 (anti-bootlegging statute "furthers the purpose

of the Copyright Clause to promote the progress of the useful arts."); DMCA Rulemaking at

64568, n.13 (finding that "the availability of access control measures has resulted in *greater*

availability of these materials" [referring to ancillary material on DVDs such as "outtakes,

interviews with actors and directors, language features, etc."]) (emphasis added).[30]

---

[30] 321 and *amici* law professors make much of *dicta* in Moghadam that raised the issue (but
declined to decide) whether the anti-bootlegging statute is consistent with the "limited times"
clause.  175 F. 3d at 1281.  To the extent that anything in the opinion could be read to suggest an
inconsistency, it is not an inconsistency that exists in the DMCA.  The anti-bootlegging statute in

40

1

2   **V.      MISUSE IS NOT A DEFENSE**

3          Misuse is a potential defense only to copyright infringement claims, which the Studios do

4   not allege.  Opp. at 40, n.34 ("the Studios have not alleged that 321 or its customers have

5   engaged in any copyright infringement").  See Practice Management Information Corp. v.

6   American Medical Assn., 121 F.3d 516, 520 (9th Cir. 1997) ("misuse is a defense to copyright

7   infringement"); Pollstar v. Gigmania, Ltd., 170 F. Supp. 2d 974, 982 (E.D. Cal. 2000) ("the court

8   need not decide whether there was copyright misuse because Plaintiff does not allege copyright

9   infringement"); Costar Group, Inc. v. Loopnet, Inc., 164 F. Supp. 2d 688, 708 (D.Md. 2001)

10  ("Misuse of copyright is an affirmative defense to a claim of copyright infringement"); see also

11  Lexmark Int'l, v. Static Control Components, Inc., Civ. No. 02-571 (KSF), Order at 38 (E.D. Ky.

12  February 27, 2003) ("[t]he misuse defense, while often asserted, has rarely been upheld as a

13  defense to a claim of copyright infringement"), Ex. 1 to RJN.  321 does not cite any authority

14  supporting a theory of "Section 1201 misuse," because no such authority exists.  This is true

15  because ***Section 1201 does not grant an intellectual property monopoly***.  See, e.g., Sony

16  Computer Entertainment America, Inc. v. Gamemasters, 87 F. Supp. 2d 976, 988-89 (N.D. Cal.

17  1999) (rejecting misuse defense where plaintiff's claims were directed toward defendant's device

18  that allowed "users to play non-authorized, non-territory video games by circumventing the

19  PlayStation's built in controls," because plaintiff's claims were "based upon a sound

20  construction of the Digital Millennium Copyright Act"); Lexmark, at 38-39 (rejecting misuse

21  defense, because "Lexmark is not seeking to improperly extend its copyright monopoly.

22  Lexmark is simply attempting to . . . protect access to, its copyrighted computer programs. . . .

23

24

25

26  _____

27  Moghadam granted exclusive rights in the underlying intellectual property (performances); the

28  DMCA does not create ***any*** rights in ***any*** intellectual property.

41

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

1 Lexmark's efforts to enforce the rights conferred to it under the DMCA cannot be considered an

2 unlawful act undertaken to stifle competition").[31]

3          Additionally, a "section 1201 misuse" defense (if it did exist at all), necessarily would

4 fail as a matter of law because CSS is licensed and controlled by DVD CCA, a nonprofit

5 organization, not by the Studios.  See Moore Decl., ¶ 10 ("the CSS system is administered and

6 controlled by the Copyright Control Authority"); First Amended Complaint ¶ 23; Pavlovich v.

7 Superior Court, 29 Cal. 4th 262 (2002); Reimerdes, 111 F. Supp. 2d at 310.  ("As the motion

8 picture companies did not themselves develop CSS and, in any case, are not in the business of

9 making DVD players and drives, the technology for making compliant devices, i.e., devices with

10 CSS keys, had to be licensed to consumer electronics manufacturers.")[32]

11

12 **VI.      THE STUDIOS HAVE STANDING TO ASSERT A CLAIM UNDER THE DMCA**

13          After rushing to this Court alleging that "an actual, present  and justifiable controversy

14 has arisen" because the Studios threatened to sue it (Complaint ¶¶ 41, 42), 321 now claims that

15 the Studios lack standing even to ***assert*** a claim.  This Motion seeks summary judgment on 321's

16 amended complaint ***and*** on the Studios' counterclaim.  Putting aside 321's illogic, the Studios

17 have alleged the injury required by section 1203(a).  See Counterclaim ¶¶ 53, 86.  The Studios,

18 which rely on CSS to protect their copyrighted works, plainly have standing to assert a claim for

19 trafficking in products that circumvent that protection; the Studios are precisely the category of

20 parties that the DMCA was designed to protect.  See Federal Election Comm'n v. Akins, 524

21 U.S. 11, 18-19 (1998) (standing is conferred on those within the "zone of interests" protected by

22 the statute).  The Studios are enjoined by the mere fact of 321's trafficking in the DVD

23 Circumvention Software; to establish standing under Section 1201, need not show that an end-

24

25 [31]   Although irrelevant and without foundation, each of the examples of alleged "misuse" cited
by 321 were DVDs not made or sold by the Studios or (in one case) a copyrighted motion

26 picture, where allegedly a few seconds of stock footage was used.  (Moore Decl. ¶ 33).

27 [32]   321 and *amicus* EFF apparently claim that "region coding" and "other restrictions" are
"onerous."  That is not misuse.  It also is not accurate.  This claim was considered and rejected

28 by the copyright office.  See Rulemaking, at 64569.

Mitchell Silberberg &
Knupp LLP

REPLY MEMORANDUM IN SUPPORT OF MTN FOR PARTIAL SUMMARY JUDGMENT; C-02-1955 SI
0513599.DOC

user actually ever used the device.  See CSC Holdings, Inc. v. Greenleaf Electronics, Inc., Case
No. 99-C-7249, 2000 WL 715601, *6 (N.D. Ill., June 2, 2000) (plaintiff had standing to assert
DMCA claim without a showing that any end-user ever actually used the circumvention device
to gain illegal access to plaintiff's encrypted cable pay-per-view programming).[33]  In any event,
the record is replete with examples of the use of 321's product to circumvent the CSS encryption
that protects the Studios' motion pictures.  See, e.g., Opp. at 4-5 (citing declarations of users who
copy DVDs for such things as inserting clips from popular films into "training tapes" and
"artistic works").

## VII.    THE STUDIOS ARE ENTITLED TO A PERMANENT INJUNCTION

321 contends that to obtain a permanent injunction, the Studios must show 321's liability
and a likelihood of irreparable harm in the absence of an injunction.  Here, once liability is
established, irreparable harm is ***presumed***.  Universal City Studios, Inc. v. Reimerdes, 82 F.
Supp. 2d 211, 214 (S.D.N.Y. 2000) (applying presumption of irreparable harm to violation of
DMCA); Gamemasters, 87 F. Supp. 2d at 988 (applying presumption of irreparable harm to
DMCA claims: "where the movant has demonstrated a likelihood of success upon the merits of
its intellectual property claims, irreparable injury is to be presumed."); Lexmark, at 48 ("a
plaintiff that demonstrates a likelihood of success on the merits of its claim for violation of the
anti-trafficking provisions of the [DMCA] is entitled to a presumption of irreparable injury.").

321's assertion that the Studios are not entitled to the presumption of irreparable harm
because they "have not presented any evidence of [copyright] ***infringement***" (Opp. at 40) misses
the point.  The Studios' injury arises from the very act of trafficking in circumvention

---

[33]  321's reliance on the (astounding) speculation that "it is entirely possible that [the DVD
Circumvention Software] in fact cause[s] a net benefit to Defendants" is misplaced.  Opp. at 40.
The injury that gives the Studios standing arises from the act of 321's ***trafficking*** in
circumvention technology – not "downstream" uses.  Further, 321 Studios cannot defeat standing
merely by ***contesting*** the existence of injury.  Realnetworks, Inc. v. Streambox, Inc., 2000 WL
127311, *6 (W.D. Wash. 2000) ("The court finds that RealNetworks has standing to pursue
DMCA claims under 17 U.S.C. § 1203, which affords standing to 'any person' ***allegedly*** injured
by a violation of sections 1201 and 1202 of the DMCA.") (emphasis added).

43

Mitchell Silberberg &
Knupp LLP

1   technology, without reference to any uses made of the DVD Circumvention Software.  321 is

2   continuing to, and unless enjoined will continue to "upgrade" its DVD Circumvention Software

3   and sell it to large numbers of users.  That act of trafficking in and of itself threatens irreparable

4   harm by rendering the Studios' access and use control technology obsolete and allowing the

5   Studios' copyrighted works to become available in unprotected format.  See Reimerdes, 82 F.

6   Supp.2d at 225-26.  ("[t]here is little room for doubting that broad dissemination of DeCSS

7   would seriously injure or destroy plaintiffs' ability to distribute their copyrighted products on

8   DVDs and, for that matter, undermine their ability to sell their products to the 'home video'

9   market in other forms").  Accordingly, the rationale for the presumption of irreparable harm to

10  copyright infringement is as compelling – if not ***more*** compelling – in the DMCA context:

> "Copyright infringement is presumed to give rise to [irreparable harm].  In this case, plaintiffs do not allege that defendants have infringed their copyrights, but rather that defendants offer technology that circumvents their copyright protection system and thus facilitates infringement.  For purposes of the irreparable injury inquiry, this is a distinction without a difference.  If plaintiffs are correct on the merits, they face substantially the same immediate and irreparable injury from defendants' posting of DeCSS as they would if defendants were infringing directly.  Moreover, just as in the case of direct copyright infringement, the extent of the harm plaintiffs will suffer as a result of defendants' alleged activities cannot readily be measured, suggesting that the injury truly would be irreparable."  Reimerdes, 82 F. Supp. 2d at 215.

18  See also Lexmark, at 48 ("The damages incurred by violations of Section 1201(a)(2) of the

19  [DMCA] . . ."cannot readily be measured, suggesting that the injury truly is irreparable.").  For

20  these reasons, 321 also cannot and does not dispute that legal remedies are inadequate.  See CSC

21  Holdings, at *7 (enjoining sale of "pirate" cable decoders because "[a]ny adequate remedy for

22  Plaintiff would necessarily have to include equitable relief that would prevent Defendants from

23  selling additional 'pirate' decoder boxes in the future.").[34]

---

[34]  *Amicus* EFF argues, citing Madsen v. Women's Health Center, Inc., 512 U.S. 753 (1994) (***upholding*** reasonable restraints on antiabortion protesting) that an injunction preventing the dissemination of the DVD Circumvention Software is an impermissible "prior restraint" because it is insufficiently "narrowly tailored."  321 Studios does not advance this argument, for good reason.  "The classic prior restraint cases were dramatically different from this one…The fact that there may be some expressive content in the code should not obscure the fact that its predominant character is no more expressive than an automobile ignition key. . . . Hence, those

44

1

2                                    **Conclusion**

3           For all of the reasons set forth herein and in the Studios' and Intervenor's other filings,

4    the Studios' motion should be granted.

5
                                              Respectfully submitted,
6

7    DATED:  March 28, 2003              RUSSELL J. FRACKMAN
                                         PATRICIA H. BENSON
8                                        STEVEN B. FABRIZIO
                                         MITCHELL SILBERBERG & KNUPP LLP
9

10                                       By:_____/s/_____
                                                 Russell J. Frackman
11                                               Attorneys for Defendants
                                                 Counterclaimants
12

13

14

15

16

17

18

19

20

21

22

23

24

25   _____

26   of the traditional rationales for the prior restraint doctrine that relate to inhibiting the
     transmission and receipt of ideas are of attenuated relevance here…."  Reimerdes, 82 F. Supp.2d
27   at 225-26.  See also Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d
     829, 849 (11th Cir. 1990) (rejecting First Amendment defense to injunctive relief).
28
                                             45