1
2
3
4
5
6
7                        UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNIA

9

10   321 STUDIOS,                                    No. C 02-1955 SI

11              Plaintiff,                            **ORDER GRANTING DEFENDANTS'
         v.                                          MOTION FOR PARTIAL SUMMARY
12                                                   JUDGMENT AND RESOLVING
     METRO GOLDWYN MAYER STUDIOS,                    RELATED MOTIONS**
13   INC., et al.,
              Defendants.
14   _____/

15   AND RELATED COUNTERCLAIMS.
16   _____/

17

18       Presently before the Court are defendant/counterclaimants' motion for partial summary judgment, and

19   various accompanying motions.  Having carefully considered the arguments of counsel and the papers

20   submitted, the Court hereby GRANTS  defendant/counterclaimants motion for partial summary judgment;

21   GRANTS plaintiff Victor Mattison's motion to dismiss defendants' counterclaims; DENIES plaintiff's motion

22   for denial or continuance of motion for summary judgment pursuant to Rule 56(f); GRANTS Electronic Frontier

23   Foundation's and Copyright Law Professors' motion for leave to file *amici* briefs in opposition to defendants'

24   motion for summary judgment; DENIES  plaintiff's motion for leave to amend answer to counterclaim;

25   GRANTS Larry Davis' motion to intervene as plaintiff; and GRANTS defendants' motion for judicial notice,

26   for the reasons set forth below.

27

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

**BACKGROUND**

A digital versatile disc ("DVD") is a five inch wide plastic disk that stores digital information.  Moore Decl., ¶ 2 n.1; Schumann Decl., ¶ 7.  DVDs currently make up 39% of the sales of video and film works. Schwerin Decl. ¶ 3.  Many films are sold only in the DVD format.  Moore Decl. ¶ 25; Schwerin Decl., ¶ 4. This format allows bonus features, such as alternate endings, deleted scenes, video games,  alternate viewing configurations, commentary from directors and actors, and  other menu-driven options, that are not available on VHS tapes or any other format.  Moore Decl. ¶¶ 26-30; Schwerin Decl., ¶7; Touretsky Decl., ¶ 9; Schumann Decl., ¶18.

Many DVDs store the digital data in a format called the "Contents Scramble System" or "CSS."  The Copyright Control Authority administers the CSS encoding scheme and the licensing of the electronic "keys" used by DVD players to playback DVDs.  Moore Decl. ¶¶ 10-11; Schumann Decl., ¶¶12-14.  The 31 CSS keys and the algorithm that can be used to decode a DVD are broadly available  on the Internet.  Touretsky Decl., ¶¶ 7, 11, 14, 22, 24; Schumann Decl., ¶ 22.

Plaintiff 321 Studios, LLC  is a company that markets and sells software and instructions for copying DVDs.  First Amended Complaint ¶¶ 1, 23, 26, 28, 29; Moore Decl., ¶¶ 2-4. 321 sells two products: DVD Copy Plus, which began selling in August 2001, and DVD-X COPY, which began selling in November 2002. Moore Decl. ¶¶ 2, 5.  DVD Copy Plus consists of an electronic guide explaining how to create backup copies of DVDs, two pieces of free, publicly available software, and one CD burning application, PowerCDR, licensed from a German company.  Moore Decl. ¶2.  DVD Copy Plus copies video content from original DVDs regardless of whether they are encoded with CSS.  Moore Decl. ¶ 3.  The software does not create an identical copy of the DVD; rather it allows the user to copy a portion of the video contents on the DVD onto a recordable CD.  Moore Decl. ¶ 3.   DVD-X COPY requires the user to have a DVD drive that is capable of reading and writing data to  blank DVD media.  Moore Decl. ¶ 5.  DVD-X COPY reads the data on the original DVD, decodes it, and then uses the data to create a backup copy of the DVD.  Moore Decl. ¶ 6.  This data is read by the DVD drive, decrypted by the DVD-X COPY software, and then stored on the computer (either in RAM or on the hard drive) until the backup copy of the DVD is created.  Id.   Once the backup copy is created, the  stored data from the original DVD is automatically deleted.  Id.  If the DVD is encoded with

2

CSS, DVD-X COPY uses a CSS "player key" to access the data; DVD-X COPY also contains publicly known computer code that performs the algorithms to decode the DVD data. Moore Decl. ¶ 8. DVD-X COPY does not affect the encryption on the original DVD. Moore Decl. ¶ 9.

Plaintiff 321 Studios filed a complaint for declaratory relief on April 22, 2002, seeking, in Claim One, a declaratory judgment from this Court that "its activities in distributing DVD Copy Plus and DVD-X COPY do not violate the provisions of the [Digital Millenium Copyright Act, "DMCA"] or, in the alternative, that these provisions are invalid in light of other copyright law provisions, these provisions are invalid because Congress exceeded its enumerated powers under Article 1, Section 8, of the United States Constitution, these provisions are unconstitutionally vague, and/or these provisions violate the First Amendment of the Constitution." FAC ¶ 44. Claim Two seeks a declaratory judgment from this Court that its distribution of DVD Copy Plus and DVD-X COPY do not violate the Copyright Act "on the grounds that DVD Copy Plus and DVD-X COPY have substantial non-infringing uses, that the use of DVD Copy Plus and DVD-X COPY constitute fair use, and/or that the provisions of the Copyright Act, if interpreted to bar the distribution of DVD Copy Plus and DVD-X COPY, violate the First Amendment of the Constitution." FAC ¶ 49.

Most defendants ("the Studios") are members of the Motion Picture Association of America ("MPAA"). They are owners of copyrights in motion pictures, and produce and/or distribute DVDs that contain the copyrighted material. The United States was granted intervenor-defendant status on August 12, 2002 and limits its involvement to plaintiff's claims regarding the validity of the DMCA.

Now before the Court are defendant/counterclaimants' motion for partial summary judgment, plaintiff Victor Mattison's motion to dismiss defendants' counterclaims, plaintiff's motion for denial or continuance of motion for summary judgment pursuant to Rule 56(f), Electronic Frontier Foundation's and Copyright Law Professors' motion for leave to file amici briefs in opposition to defendants' motion for summary judgment, plaintiff's motion for leave to amend answer to counterclaim, Larry Davis' motion to intervene as plaintiff, and defendants' request for judicial notice.

///

**LEGAL STANDARD**

**A.     Summary judgment**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that "the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" See T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. See T.W. Electric, 809 F.2d at 630-31 (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986)); Ting v. United States, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See Falls Riverway Realty, Inc. v. City of Niagara Falls, 754 F.2d 49 (2d Cir. 1985); Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). Hearsay statements found in affidavits are inadmissible. See, e.g., Fong v. American Airlines, Inc., 626 F.2d 759, 762-63 (9th Cir. 1980).


**B.     Motion to dismiss**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S.

*United States District Court*

For the Northern District of California

United States District Court

For the Northern District of California

183, 104 S. Ct. 3012 (1984).

In answering this question, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor.  See Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings.  See United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).

If the court dismisses the complaint, it must then decide whether to grant leave to amend.  The Ninth Circuit has "repeatedly held  that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

**C.**      **Rule 56(f)**

Rule 56(f) of the Federal Rules of Civil Procedure provides that, upon a showing by the party opposing a motion for summary judgment that it "cannot for reasons stated present by affidavit facts essential to justify the party's opposition," the court may deny or continue the motion for summary judgment in order to permit that party an opportunity to obtain necessary discovery.  "Ordinarily, summary judgment should not be granted when there are relevant facts remaining to be discovered, but the party seeking a continuance bears the burden to show what specific facts it hopes to discover that will raise an issue of material fact." Continental Maritime v. Pacific Coast Metal Trades, 817 F.2d 1391, 1395 (9th Cir. 1987).

A Rule 56(f) motion should be granted where the party opposing summary judgment makes a timely application that specifically identifies relevant information to be discovered, and there is some basis for believing that such information actually exists.  Visa Int'l Serv. Ass'n v. Bankcard Holders, 784 F.2d 1472, 1475 (9th Cir. 1986).  Granting of such a motion is particularly appropriate where the identified information is the subject of outstanding discovery requests.  Id.

///

**D.**      **Amendment**

United States District Court
For the Northern District of California

Rule 15(a) of the Federal Rules of Civil Procedure provides for the amendment of pleadings by leave of court and requires that such leave "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, the grant or denial of a motion to amend is committed to the discretion of the district court, and denial is proper where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962); see also Lockman Found. v. Evangelical Alliance Mission, 930 F.2d 764, 772 (9th Cir. 1991). An amendment is considered futile where the added claim could be defeated by a motion to dismiss or for summary judgment. See Wilson v. American Trans Air, Inc., 874 F.2d 386, 392 (7th Cir. 1989).

**E.     Intervention**

Rule 24 of the Federal Rules of Civil Procedure is to be broadly interpreted in favor of allowing intervention. See Forest Conservation Council v. United States Forest Service, 66 F.3d 1489, 1493 (9th Cir. 1995). Rule 24 entitles a party to intervene as of right "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Fed. R. Civ. P. 24(a). A motion to intervene under Rule 24(a) is subject to the following four-part test:

> (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

Forest Conservation Council, 66 F.3d at 1493 (quoting Sierra Club v. U.S. Environmental Protection Agency, 995 F.2d 1478, 1481 (9th Cir. 1993)).

Even if a party does not qualify for intervention of right, a court may permit that party's intervention under the following circumstances:

> when an applicant's claim or defense and the main action have a question of fact or law in common. . . . [or] [w]hen a party to an action relies for

6

1

> ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order.

Fed. R. Civ. P. 24(b). In deciding whether a party should be permitted to intervene, "the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Id. Permissive intervention "is committed to the broad discretion of the district court." Orange County v. Air Cal., 799 F.2d 535, 539 (9th Cir. 1986).

**DISCUSSION**

**I.    Defendants' motion for partial summary judgment**

In adjudicating this dispute, this Court finds a number of recent cases dealing with the DMCA instructive and persuasive. In the Second Circuit, many of these issues were considered at both the trial court level in Universal City Studios, Inc. v. Reimerdes, 111 F. Supp. 2d 346 (S.D.N.Y. 2000), and at the appellate level in  Universal City Studios, Inc. v. Corley, 273 F.3d 429 (2nd Cir. 2001). In addition, Judge Ronald Whyte of this district wrote a lengthy and well reasoned opinion in United States v. Elcom LTD., 203 F. Supp. 2d 1111 (N.D. Cal. 2002). This Court finds these cases dispositive on many of the same issues raised by plaintiffs and defendants in the instant case.

Corley (and the district court case of Reimerdes) dealt, as this case does, with the decryption of DVDs. Eric Corley and his company, 2600 Enterprises, Inc., appealed the district court's judgment, following a full non-jury trial, which enjoined them from posting the DeCSS decryption program on the 2600 website, or linking to any website on which DeCSS was posted. Corley, 273 F.3d at 434-35. Defendants argued that the DMCA overstepped limits in the Copyright Clause on the duration of copyright protection, that the DMCA as applied to their dissemination of DeCSS violated the First Amendment, and that the DMCA violated the First Amendment and Copyright Clause by unduly obstructing "fair use" of copyrighted materials. Id. at 436. The Second Circuit held: 1) that the constitutional challenge based on the Copyright Clause was premature and speculative; 2) that intermediate scrutiny was the appropriate standard of review under which to analyze the injunction against posting or linking to DeCSS, and that under intermediate scrutiny the injunction did not unduly burden defendants' First Amendment rights; and 3) that the DMCA, as applied by the District Court, does not

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   unconstitutionally limit fair use.  Id. at 445, 450-458, 458-59.

2   In Elcom, the defendant was criminally prosecuted by the United States for violations of the DMCA.

3   A product sold by Adobe Systems, called Adobe Acrobat eBook Reader, provides technology to read on

4   personal computers books produced in digital form.  Elcom, 203 F. Supp. 2d at 1117.  The Adobe Acrobat

5   eBook Reader contained restrictions that allowed the purchaser of an electronic book to read the book only

6   on the computer onto which the book had been downloaded, but barred the purchaser from emailing or

7   copying the book onto another computer.  Id. at 1118.  Defendant Elcomsoft developed and sold a product

8   called the Advanced eBook Processor ("AEBPR"), which allowed a user to remove the use restrictions from

9   electronic books and allowed the book to be easily reproduced and electronically distributed.  Id.  Defendant

10  was indicted for violations of the DMCA for trafficking in and marketing of the AEBPR.  Defendant filed a

11  motion to dismiss the indictment, based on the unconstitutionality of the DMCA.  Defendant argued first that

12  the DMCA was unconstitutionally vague as applied to it and therefore violated the Due Process Clause.

13  Defendant also argued  that the DMCA violated the First Amendment, contending that it was a content-based

14  restriction that was not narrowly tailored to serve a compelling government interest, that it infringed the fair use

15  rights of third parties, and that it was too vague, and therefore impermissibly chilled free expression.   Judge

16  Whyte held: 1) that the DMCA had no ambiguity in what tools are allowed or prohibited, and therefore the law

17  was not unconstitutionally vague; 2) that while computer code is speech, and is therefore protected by the First

18  Amendment, the DMCA is sufficiently tailored to protect legitimate and substantial governmental interests, and

19  so did not burden defendant's First Amendment rights; 3) that the DMCA does not impermissibly violate fair

20  use rights of users; 4) that the DMCA is not unconstitutionally vague under the First Amendment; and 5) that

21  Congress did not exceed its authority in enacting the DMCA.[1]

22  This Court will discuss both the Corley and the Elcom decisions in more detail throughout this opinion.

24  **A.      321's liability under the anti-circumvention provisions of the DMCA**

25  **1.      The Digital Millennium Copyright Act**

26  Congress enacted the DMCA in 1998 following the adoption of the World Intellectual Property

---

[1] After the Elcom motion to dismiss was denied, defendant was tried and acquitted by a jury.

United States District Court

For the Northern District of California

Organization Copyright Treaty.  Two sections of the DMCA are at issue in this case.  The first, 17 U.S.C.§ 1201(a)(2), provides:

> No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that –
> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

The second, 17 U.S.C. §1201 (b)(1), provides:

> No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that –
> (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;
> (B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion therefore; or
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

However, both sections are subject to 17 U.S.C. § 1201 (c)(3), which provides:

> Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

In both §§ 1201 (a)(2) and (b)(1), only one of the three enumerated conditions must be met in order to find a violation of the statute.  Defendant Studios contend that plaintiff 321 Studios is engaged in all three types of conduct prohibited by both §§ 1201(a)(2) and (b)(1).


　　　　2.　　　**The challenged conduct of 321 Studios**

　　　　The Studios state first that 321's DVD copying software is plainly technology within the meaning of § 1201.  Defendants then assert that CSS is a technological measure that both effectively controls access to a

9

work protected under the DMCA, triggering § 1201(a)(2), and effectively protects a right of a copyright owner under the DMCA, triggering § 1201(b)(1).  As defined by the statute, a technological measure effectively controls access to a work "if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work," while a technological measure "'effectively protects a right of a copyright owner under this title' if the measure, in the ordinary course of operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title." 17 U.S.C. § 1201 (a)(3)(B); (b)(2)(B).  Defendants assert that CSS prevents access to DVDs in the absence of the proper CSS keys, and that only licensed DVD players can legally access the CSS keys in order to play DVDs.  See Universal Studios v. Reimerdes, 111 F. Supp. 2d at 317-318 ("One cannot gain access to a CSS-protected work on a DVD without application of the three keys that are required by the software.  One cannot lawfully gain access to the keys except by entering into a license with the DVD CCA under authority granted by the copyright owners or by purchasing a DVD player or drive containing the keys pursuant to such a license.")  321, in a footnote, questions whether CSS is an effective control or protection of DVDs, since the CSS access keys are widely available on the internet.  However, this is equivalent to a claim that, since it is easy to find skeleton keys on the black market, a deadbolt is not an effective lock to a door.  Moreover, the statute itself defines "effectively protects a right of a copyright owner under this title" to mean "if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title."  17 U.S.C. § 1201(b)(2)(B).  It is evident to this Court, as it has been to previous courts, that CSS is a technological measure that both effectively controls access to DVDs and effectively protects the right of a copyright holder.[2]  See Reimerdes, 111 F. Supp. 2d at 317-18 ("One cannot lawfully gain access to the keys except by entering into a license with the DVD CCA under authority granted by the copyright owners or by purchasing a DVD player or drive containing the keys pursuant to such a license. In consequence, under the express terms of the statute, CSS 'effectively controls access' to copyrighted DVD movies. It does so, within the meaning of the statute, whether or not it is a strong means of protection.")

---

[2]Plaintiff 321 Studios also disputes that CSS protects the right of a copyright holder (as is necessary for a violation of §1201(b)(1)), stating that it only controls access to DVDs, but is not a copy control device. That argument is discussed *infra*.

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

Defendants next state that 321's DVD copying software is "primarily designed or produced for the purpose of circumventing" CSS, "has only limited commercially significant purpose or use other than to circumvent" CSS, and is marketed by 321 for use in circumventing CSS.  The statute defines to "circumvent a technological measure" as "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner" and defines "to circumvent protection afforded by a technological measure" as "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure." 17 U.S.C. §§ 1201(a)(3)(A) and (b)(2)(A).  Defendants maintain that the only purpose of 321's software is to bypass CSS protection and thereby to permit access to and copying of CSS protected DVDs; and the 321 software would have no commercially significant purpose without the circumvention components.  Further, defendants assert that none of the § 1201 exemptions apply and that legal uses of the software by 321 customers are irrelevant to liability under § 1201.

Plaintiff 321 Studios disputes all of these claims.  321 accuses defendants of ignoring "the central fact that makes 321's DVD Copy Code legal. . . DVD Copy Code works on *original* DVDs the user has already purchased, and thus unquestionably has the right to access." Pltf's Opposition 7:14-16 (emphasis in original). Plaintiff argues that any circumvention of CSS raises issues under only § 1201 (a),  not § 1201(b), because CSS controls only access to DVDs,  not copying. Plaintiff further states that even if §1201(b) does apply, DVD Copy Code would not violate it because its primary and intended use does not violate any right of a copyright holder.  Plaintiff maintains that, if providing the means to decrypt CSS to the owner of the disk constituted "circumvention" under §1201(a)(2), then all DVD player manufacturers must violate that section, because every DVD player provides the means to decrypt CSS.  Plaintiff notes that making personal backup copies of DVDs is expressly authorized under the copyright laws as fair use, and that, since the primary and intended use of 321's software is legal fair use, 321 does not violate § 1201 (b).

### a.      The provisions specific to § 1201 (a)(2)

Defendants assert that 321's DVD copying software is clearly violative of §1201 (a)(2), because it is designed for the purpose of circumventing CSS, which is a technological measure that effectively controls

access to the DVDs; it has only limited commercially significant purpose or use other than to circumvent CSS; and it is marketed for use in circumventing CSS. 321 responds that it cannot be in violation of § 1201 (a)(2) because "circumvent" by definition is done without the authority of the copyright holder. The DMCA provides at § 1201 (a)(3)(a) that "to 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright holder." 321 states that it does have the authority of the copyright holder because its product only works on original DVDs, and the purchaser of the DVD has authority of the copyright holder to bypass CSS. This argument was offered and rejected in <u>Corley</u>, the Second Circuit case which also addressed issues of DVD copying and the DMCA. In <u>Corley</u>, the defendants argued "that an individual who buys a DVD has the 'authority of the copyright owner' to view the DVD, and therefore is exempted from the DMCA pursuant to subsection 1201(a)(3)(A) when the buyer circumvents an encryption technology in order to view the DVD on a competing platform." <u>Corley</u>, 272 F.3d at 444. The court responded: "the basic flaw in this argument is that it misreads subsection §1201(a)(3)(A). That provision exempts from liability those who would 'decrypt' an encrypted DVD with the authority of a copyright owner, not those who would 'view' a DVD with the authority of a copyright owner." <u>Id.</u> This Court agrees with the <u>Corley</u> court that the purchase of a DVD does not give to the purchaser the authority of the copyright holder to decrypt CSS.

Plaintiff also claims that if its software is in violation of §1201(a)(2), then all DVD players must also be in violation, since they also decrypt CSS. This argument lacks merit. Licensed DVD players have been issued a key to decrypt CSS, and in exchange must adhere to strict prohibitions on copying of the decrypted DVD; 321's software does not have such a license, and therefore does not have the authority of the copyright owner. Accordingly, this Court rejects plaintiff's argument that the "without the authority of the copyright holder" language exempts its product from liability under § 1201 (a)(2).

### b.      The provisions specific to §1201(b)(1)

Plaintiff first asserts that CSS is not a copy control measure, since it controls only <u>access</u> to DVDs, but does not control or prevent <u>copying</u> DVDs. Plaintiff goes on that § 1201 (b)(1), which prohibits devices that

12

United States District Court

For the Northern District of California

circumvent technological measures which protect "a right of a copyright owner," is concerned only with illegal copying. Thus, since 321's product circumvents only CSS, and CSS is not a copy control measure, § 1201 (b)(1) does not apply at all to 321. However, 321 both misreads the statute and misstates the purposes of CSS. The statute prohibits manufacturing, importing, offering to the public, providing, or otherwise trafficking in any technology that circumvents protection afforded by a technological measure that effectively protects a right of a copyright owner. While 321 is technically correct that CSS controls access to encrypted DVDs, the purpose of this access control is to control copying of those DVDs, since encrypted DVDs cannot be copied unless they are accessed. 321 claims that CSS does not prevent copying, since it does not prevent copying the encrypted data on the DVD. However, as 321 admits "that copying is not particularly useful," as any copy made without circumventing CSS could not be accessed or viewed. Opp. at 3:9-10. It is clear to this Court CSS is a copy control system, and therefore § 1201 (b)(1) does apply.

321 then states that, if § 1201 (b)(1) applies, 321's software does not violate the section because the primary and intended use of the software does not violate any right of a copyright holder. It asserts that many uses of the software do not implicate the DMCA at all, as they do not involve accessing CSS; do not implicate copyright infringement, as they involve making copies of DVDs that are in the public domain; are fair use of copyrighted materials; or involve making a single, archival backup copy of a movie that the user has already purchased, which is authorized under copyright law. However, the downstream uses of the software by the customers of 321, whether legal or illegal, are not relevant to determining whether 321 itself is violating the statute. As Judge Whyte of this District stated in Elcom: "Congress did not ban the act of circumventing the use restrictions. Instead, Congress banned only the trafficking in and marketing of devices primarily designed to circumvent the use restriction protective technologies. Congress did not prohibit the act of circumvention because it sought to preserve the fair use rights of persons who had lawfully acquired a work." Elcom, 203 F. Supp. 2d at 1120.

Corley also addressed and rejected a similar argument:

> [Defendants] contend that subsection 1201(c)(1), which provides that "nothing in this section shall affect rights, remedies, limitations or defenses to copyright infringement, including fair use, under this title" can be read to allow the circumvention of encryption technology protecting copyrighted material when the material will be put to "fair uses" exempt from copyright liability. We disagree that subsection 1201(c)(1) permits

13

United States District Court

For the Northern District of California

1

2

3

4

> such a reading.  Instead, it simply clarifies that the DMCA targets the circumvention of digital walls guarding copyrighted material (and trafficking in circumvention tools), but does not concern itself with the use of those materials after circumvention has occurred.  Subsection 1201 (c)(1) ensures that the DMCA is not read to prohibit the "fair use" of information just because that information was obtained in a manner made illegal by the DMCA.

5   <u>Corley</u>, 273 F.3d at 443.  Indeed, a simple reading of the statute makes it clear that its prohibition applies to

6   the manufacturing, trafficking in and making of devices that would circumvent encryption technology, not to the

7   users of such technology.  It is the technology itself at issue, not the uses to which the copyrighted material may

8   be put.  This Court finds, as did both the <u>Corley</u> and <u>Elcom</u> courts, that legal downstream use of the

9   copyrighted material by customers is not a defense to the software manufacturer's violation of the provisions

10  of § 1201 (b)(1).

11      321 also asserts that its software does not violate §1201(b)(2) because the software does not

12  "circumvent" encryption.  Section1201(b)(1) defines such circumvention, as "avoiding, bypassing, removing,

13  deactivating, or otherwise impairing a technological measure," and 321 states that its software does not avoid,

14  bypass, remove, deactivate, or otherwise impair a technological measure, but that it simply uses the authorized

15  key to unlock the encryption.  However, while 321's software does use the authorized key to access the DVD,

16  it does not have authority to use this key, as licensed DVD players do, and it therefore avoids and bypasses

17  CSS.

18      For these reasons, §1201(b)(1) does apply to 321's DVD copying software.

19

20          **c.      The common provisions of § 1201 (a)(2) and § 1201 (b)(1)**

21      While defendants claim that plaintiffs' product violates all three statutory prongs of §§ 1201(a)(2) and

22  (b)(1), plaintiff asserts that 321 violates none of them.  321 asserts that its product was not primarily designed

23  and produced to circumvent a technological measure, that it does not have "only limited commercially significant

24  purpose" other than to circumvent CSS, and that the prohibition against marketing a product for use in

25  circumventing such protection is violative of the First Amendment.  This Court will take each prong in turn.

26      Plaintiff states that its DVD copying software was not primarily designed and produced to circumvent

27  a technological measure, but that it was designed and produced to allow users to make copies of all or part of

28

**United States District Court**
For the Northern District of California

1   a DVD.  Plaintiff maintains that the ability to unlock CSS is just one of the features of its software.  However,

2   as defendants point out, only that specific feature is challenged here; and all that it does and was designed to

3   do is to circumvent CSS.  Defendants contend in their reply brief that 321's admission that a part of its software

4   circumvents CSS is enough to render 321 liable, since the statute bars "any technology, product, service,

5   device, component, or *part* thereof that is primarily designed or produced for the purpose of circumventing."

6   §§ 1201 (a)(2) and (b)(1) (emphasis added).  Defendants' reading of the statute is correct.  It is undisputed

7   that a part of 321's software is solely for the purpose of circumventing CSS; this portion of the software,

8   therefore, violates 17 U.S.C. §1201(a)(2)(A).

9           With regard to the second prong of both § 1201(a)(2) and § 1201 (b)(1), it is impossible for this Court

10   to determine on summary judgment whether 321's product has only limited commercially significant purposes

11   other than circumvention, as this is a question of fact for a jury to decide, and neither party has produced

12   significant evidence on this issue.  With regard to the third prong of both §1201(a)(2) and §1201(b)(1),

13   321 does not dispute that it markets its DVD copying software for use in circumventing CSS, but states that

14   the marketing prong of the statute violates the First Amendment.  321 claims that this prohibition against

15   marketing forbids dissemination of information about the product's legal attributes, and that such a prohibition

16   cannot be reconciled with the First Amendment.  See Rubin v. Coors Brewing Co., 514 U.S. 476 (1995); see

17   also 44 Liquormart v. Rhode Island, 517 U.S. 484 (1996).  However, these cases are inapposite, as the First

18   Amendment does not protect commercial speech that involves illegal activity, and  this Court has found that the

19   CSS circumvention portion of the 321 software is illegal.  See Florida Bar v. Went for It, Inc., 515 U.S. 618,

20   623-24 (1995) ("The government may freely regulate commercial speech that concerns unlawful activity.");

21   see also Corley, 272 F.3d at 447.  Therefore, as 321 markets its software for use in circumventing CSS, this

22   Court finds that  321's DVD copying software is in violation of the marketing provisions of §§ 1201(a)(2) and

23   (b)(1).

24           Accordingly,  this  Court  finds  that  321's  software  is  in  violation  of  both  §  1201 (a)(2)  and

25   § 1201 (b)(1), because it is both primarily designed and produced to circumvent CSS, and marketed to the

26   public for use in circumventing CSS.

27

28

**United States District Court**
For the Northern District of California

### B.        Constitutionality of the DMCA

Plaintiff 321 asserts that the DMCA, as construed by the defendants, violates the First Amendment and is therefore unconstitutional.  321 argues that a ban on its DVD copying software impermissibly burdens the First Amendment rights of its users; that the DMCA unconstitutionally restricts 321's speech; that the DMCA is substantially overbroad, so as to give 321 standing to pursue a constitutional challenge on behalf of its customers; and that the DMCA exceeds the scope of congressional powers.

The Studios respond  that the intermediate level of scrutiny used by both the <u>Elcom</u> and <u>Corley</u> courts is the appropriate standard, and that under this standard the statutes pass muster: the government had legitimate and substantial interests in imposing the restriction; the interests are unrelated to the suppression of free expression; and the restrictions on the First Amendment freedoms of plaintiffs are no greater than is essential to the furtherance of the governmental interests. <u>See</u> <u>Turner Broadcasting System, Inc. v. FCC</u>, 512 U.S. 622, 662 (1994).

### 1.        Standing

As a threshold issue, defendants first assert that plaintiff does not have standing to raise a First Amendment challenge on behalf of its customers.  However, because this Court will grant Larry Davis' motion to intervene as plaintiff (*infra*), this standing issue is moot.

### 2.        The DMCA does not unconstitutionally restrict 321's speech

Plaintiff contends that the DMCA unconstitutionally restricts 321's First Amendment right to tell others how to make fair use of copyrighted works.   Courts have held that computer code is speech, and therefore merits First Amendment protection.   <u>See</u> <u>Corley</u>, 273 F.3d at 445-449 ("Communication does not lose constitutional protection as 'speech' simply because it is expressed in the language of computer code."); <u>see also</u> <u>Bernstein v. United States Dep't of State</u>, 922 F. Supp. 1426, 1434-36 (N.D. Cal, 1996); <u>Junger v. Daley</u>, 209 F.3d 481, 484 (6th Cir. 2000)). Courts have found that both the executable object code and the

16

United States District Court

For the Northern District of California

1  more readable source code merit First Amendment protection.[3]  See Elcom, 203 F. Supp. 2d at 1126.  As

2  with other kinds of speech, the scope of the protection for computer code depends upon whether the restriction

3  on the code is because of its content.  See Corley, 273 F.3d at 450.

4      Plaintiffs argue that the DMCA, as interpreted by the Studios, regulates the computer code on the basis

5  of its content, since it bans only the kind of speech (code) that indicates how to circumvent a technological

6  measure that protects a copyright.  As such, plaintiff argues, the strict scrutiny analysis applies.  However, like

7  both the Corley and Elcom courts, this Court finds that intermediate scrutiny is the appropriate level of scrutiny

8  with which to analyze this case.

9      While the DMCA does refer to the function of the technological measures that it bars, it is only that

10  functional element of the computer code that is barred; the DMCA does not suppress the speech contained

11  within the computer code because of its content, but only because of the way in which that code, when

12  executed, operates.  In Corley, defendants challenged the district court's injunction against posting DeCSS or

13  any other technology for circumventing CSS on any Internet web site.  The Corley court stated:

14     [Defendants'] argument fails to recognize that the target of the posting
    provisions of the injunction – DeCSS – has both a nonspeech and a

15     speech component, and that the DMCA, as applied to the [defendants],
    and the posting prohibition of the inunction target only the nonspeech

16     component.  Neither the DMCA nor the posting prohibition is concerned
    with whatever capacity DeCSS might have for conveying information to

17     a human being, and that capacity, as previously explained, is what
    arguably creates a speech component of the decryption code.  The

18     DMCA and the posting prohibition are applied to DeCSS solely because
    of its capacity to instruct a computer to decrypt CSS.  That functional

19     capability is not speech within the meaning of the First Amendment. The
    Government seeks to "justify" both the application of the DMCA and the

20     posting prohibition to the [defendants] solely on the basis of the functional
    capability of DeCSS

21     to instruct a computer to decrypt CSS, i.e., "without reference to the
    content of the regulated speech."  This type of regulation is therefore

22     content-neutral, just as would be a restriction on trafficking in skeleton

23

24      [3] Corley provides a helpful explanation of the difference between object code and source code:  "A
computer responds to electrical charges, the presence or absence of which is represented by strings of 1's and

25  0's.  Strictly speaking, 'object code' consists of those 1's and 0's.  While some people can read and program
in object code, 'it would be inconvenient, inefficient and, for most people, probably impossible to do so.'

26  Computer languages have been written to facilitate program writing and reading.  A program in such a computer
language – BASIC, C, and Java are examples – is said to be written in 'source code.'  Source code has the

27  benefit of being much easier to read (by people) than object code, but as a general matter, it must be translated
back to object code before it can be read by a computer."  Corley, 273 F.3d at 438-39 (internal citations

28  omitted).

1       keys identified because of their capacity to unlock jail cells, even though
2       some of the keys happened to bear a slogan or other legend that qualified
    as a speech component.

3   Corley, 273 F.3d at 454 (citing Hill v. Colorado, 530 U.S. 703, 720 (2000)).

4       The defendants in Elcom made a similar argument, claiming that "it is impossible to regulate the

5   'functional' aspects of computer code without necessarily regulating the content of the expressive aspects of

6   the code." Elcom, 203 F. Supp. 2d at 1128.  Judge Whyte rejected this argument: "Divorcing the function

7   from the message, however, is precisely what the courts have done in other contexts, for example, in

8   determining what portions of code are protectable by copyright and what uses of that same code are permitted

9   as fair uses." Id. at 1128-29.  He concluded that "intermediate scrutiny, rather than strict scrutiny, is the

10  appropriate standard to apply.  Under this test, the regulation will be upheld if it furthers an important or

11  substantial government interest unrelated to the suppression of free expression, and if the incidental restrictions

12  on First Amendment freedoms are no greater than essential to the furtherance of that interest."  Id. at 1129.

13

14      In this case, plaintiffs only offer legal arguments that the previous courts considered and rejected.  This

15  Court comes to the same conclusion as the courts who previously considered this question, and determines that

16  intermediate scrutiny is the appropriate standard under which the DMCA should be analyzed.

17      Under intermediate scrutiny, the Government must "demonstrate that the recited harms are real, not

18  merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  Turner

19  Broadcasting System, Inc. v. FCC, 512 U.S. 622, 624 (1994).  This Court must "accord substantial deference

20  to the predictive judgments of Congress," since "[a]s an institution . . . Congress is far better equipped than the

21  judiciary to 'amass and evaluate the vast amounts of data' bearing upon an issue as complex and dynamic as

22  that presented here."  Id.  Congress enacted the DMCA after evaluating a great deal of information, including

23  testimony from a number of the law professors who filed an amicus brief before this Court.  Congress

24  determined that the DMCA was needed to protect copyrights and intellectual property rights; this Court finds

25  that the challenged provisions further important and substantial government interests unrelated to the

26  suppression of free expression, and that the incidental restrictions on First Amendment freedoms are no greater

27  than essential to the furtherance of those interests.

28

**United States District Court**
For the Northern District of California

**3.** **The statute does not impermissibly burden the fair use rights of users**

This Court concludes that the challenged portions of the DCMA do not unconstitutionally burden the fair use rights of users of the copyrighted material. In reaching this result, the Court rejects as too sweeping plaintiff's claim that such users have a First Amendment right to make fair use of copyrighted works based on Eldred v. Ashcroft, 123 S. Ct. 769 (2003). The Eldred case stated that "in addition to spurring the creation and publication of new expression, copyright law contains built-in First Amendment accommodations . . . the 'fair use' defense allows the public to use not only facts and ideas contained in a copyrighted work, but also the expression itself in certain circumstances." Eldred, 123 S. Ct. at 788-89. However, the Court went on to state: "[t]he First Amendment securely protects the freedom to make – or decline to make – one's own speech; it bears less heavily when speakers assert the right to make other people's speeches. To the extent such assertions raise First Amendment concerns, copyright's built-in free speech safeguards are generally adequate to address them." Id. at 789. While the Court further declared that copyrights are not immune from challenges under the First Amendment, it is a stretch to claim that Eldred mandated absolute First Amendment protection for fair use of copyrighted works.

As the First Amendment bears "less heavily" in situations such as this, this Court determines that the burdens concededly imposed by the DMCA do not unconstitutionally impinge fair use rights. Although not all content on DVDs may be available in other forms, plaintiffs have conceded that it is possible to copy the content in other ways than in an exact DVD copy. This Court agrees with this analysis in Corley:

> We know of no authority for the proposition that fair use, as protected by the Copyright Act, much less the Constitution, guarantees copying by the optimum method or in the identical format of the original. . . The fact that the resulting copy will not be as perfect or as manipulable as a digital copy obtained by having direct access to the DVD movie in its digital form, provides no basis for a claim of unconstitutional limitation of fair use.

Corley, 272 F.3d at 459. Fair use is still possible under the DMCA, although such copying will not be as easy, as exact, or as digitally manipulable as plaintiff desires. Furthermore, as both Corley and 321 itself stated, users can copy DVDs, including any of the material on them that is unavailable elsewhere, by non-digital means. 321's assertion that this would impermissibly place a financial burden on users' First Amendment rights is both an overstatement of the extent of the fair use doctrine and a misstatement of First Amendment law. A financial burden would only render a statute unconstitutional if it was placed on the speaker because of the content of

United States District Court

For the Northern District of California

1  the speech, not because of the speaker's desire to make such speech.  See Simon & Schuster, Inc. v.

2  Members of N.Y. State Crime Victims Board, 502 U.S. 105, 115 (1991); Arkansas Writers' Project, Inc.

3  v. Ragland, 481 U.S. 221, 232-233 (1987); Minneapolis Star & Tribune v. Minnesota Commissioner of

4  Revenue, 460 U.S. 575, 588 (1983).  As Elcom stated, "Congress has not banned or eliminated fair use and

5  nothing in the DMCA prevents anyone from quoting from a work or comparing texts for the purpose of study

6  or criticism. The fair user may find it more difficult to engage in certain fair uses with regard to electronic books,

7  but nevertheless, fair use is still available."  Elcom, 203 F. Supp. 2d at 1134-35.

8         Plaintiff also claims that the DMCA impairs the First Amendment right to access non-copyrighted

9  works: "[U]nder the Studios' reading of the DMCA, because the technological measure *can* be used to

10  protect a copyrighted work, it is illegal to market a product that could circumvent it *even if the product is*

11  *applied to non-copyrighted works*."  Pltfs. Opposition at 22:21-23 (emphasis in original).  Again, however,

12  while purchasers of DVDs with material in the public domain unquestionably have the right to make use of this

13  public domain material, they can simply access it from a non-CSS encrypted DVD or can choose to access

14  and copy this public domain material in a non-digital form.  The DMCA does not prohibit copying of non-CSS

15  encrypted material, so if 321 removed the part of its software that bypasses CSS and marketed only the DVD

16  copying portion, it could freely market its product to customers who use the software to copy non-CSS

17  encrypted DVDs and other public domain material.  As Elcom stated:

18         A public domain work remains in the public domain.  Any person may use
           the public domain work for any purpose – quoting, republishing, critiquing,
19         comparing, or even making and selling copies.  Publishing the public
           domain work in an electronic format with technologically imposed
20         restrictions on how that particular copy of the work may be used does not
           give the publisher any legally enforceable right to the expressive work,
21         even if it allows the publisher to control that particular copy.

22  Elcom, 203 F. Supp. 2d at 1134.

23         Plaintiffs then contend that a prohibition on its DVD copying software is not necessary to advance any

24  significant government interest.  Necessity, however, is not the test.  As the Elcom case stated:

25         Under intermediate scrutiny, it is not necessary that the government select
           the least restrictive means of achieving its legitimate governmental interest.
26         By its very nature, the intermediate scrutiny test allows some impingement
           on protected speech in order to achieve the legitimate governmental
27         objective.  A sufficiently important governmental interest in regulating the
           targeted conduct can justify incidental limitations on First Amendment

28

1  freedoms.  Having considered the arguments asserted by the parties, the
2  court finds that the DMCA does not burden substantially more speech
   than is necessary to achieve the government's asserted goals of promoting
   electronic commerce, protecting copyrights, and preventing electronic
3  piracy.

4  Elcom, 203 F. Supp. 2d at 1132.

5        There are significant governmental interests involved in this prohibition on DVD copying software, and

6  it is not required that proof of its use for copyright infringement be presented at this stage. This Court finds that

7  a ban on manufacturing, importing, offering to the public, providing, or otherwise trafficking in technology that

8  circumvents CSS does not impermissibly burden the First Amendment rights of it DVD users.

9

10  **4.  The DMCA does not exceed the scope of Congressional powers**

11        321 claims that the DMCA cannot be sustained under the Commerce Clause, the Intellectual Property

12  Clause, or the Necessary and Proper Clause.  In Elcom, Judge Whyte considered and rejected the first two

13  of these claims.  With regard to the Commerce Clause claim, he stated:

14      Congress plainly has the power to enact the DMCA under the Commerce
    Clause.  "The commerce power 'is the power to regulate; that is, to
15  prescribe the rule by which commerce is to be governed.  This power, like
    all others vested in Congress, is complete in itself, may be exercised to its
16  utmost extent, and acknowledges no limitations, other than are prescribed
    by the Constitution.'" The DMCA prohibits conduct that has a substantial
17  effect on commerce between the states and commerce with foreign
    nations.  Trafficking in or the marketing of circumvention devices "for
18  gain," as proscribed by Sections 1201(b) and 1204, has a direct effect on
    interstate commerce.  To the extent that circumvention devices enable
19  wrongdoers to engage in on-line piracy by unlawfully copying and
    distributing copyrighted works of authorship, the sale of such devices has
20  a direct effect on suppressing the market for legitimate copies of the
    works.  Accordingly, there is a rational basis for concluding that the
21  regulated activity sufficiently affects interstate commerce to establish that
    Congress had authority under the Commerce Clause to enact the
22  legislation.

23  Elcom, 203 F. Supp. 2d at 1138 (internal citations omitted).  Judge Whyte then acknowledged that  the

24  analysis of whether Congress was precluded by the Intellectual Property Clause from enacting the DMCA was

25  a more difficult question, but stated:

26      Protecting the exclusive rights granted to copyright owners against
    unlawful piracy by preventing trafficking in tools that would enable
27  widespread piracy and unlawful infringement is consistent with the purpose
    of the Intellectual Property Clause's grant to Congress of the power to

28

21

United States District Court

For the Northern District of California

"promote the useful arts and sciences" by granting exclusive rights to authors in their writings. In addition, Congress did not ban the use of circumvention tools out of a concern that enacting such a ban would unduly restrict the fair use doctrine and expressly sought to preserve fair use. See 17 U.S.C. §1201(c). Therefore, on the whole, the DMCA's anti-device provisions are not fundamentally inconsistent with the Intellectual Property Clause.

Id. at 1140-41. He then went on to analyze whether the DMCA was "irreconcilably inconsistent" with a limitation contained within the Intellectual Property Clause:

While the DMCA may make certain fair uses more difficult for digital works of authorship published with use restrictions, fair use has not been eliminated. Similarly, the argument that Congress' ban on the sale of circumvention tools has the effect of allowing publishers to claim copyright-like protection in public domain works is tenuous and unpersuasive. Nothing within the DMCA grants any rights to anyone in any public domain work. A public domain work remains in the public domain and any person may make use of the public domain work for any purpose.

Id. at 1141.

The plaintiff here makes a similar claim, that since the DMCA outlaws the trafficking in and marketing of such de-encryption technology, that it has also eliminated the possibility of fair use. But as was stated in Corley

[Defendants] have provided no support for their premise that fair use of DVD movies is constitutionally required to be made by copying the original work in its original format . . . A film critic making fair use of a movie by quoting selected lines of dialogue has no constitutionally valid claim that the review (in print or on television) would be technologically superior if the reviewer had not been prevented from using a movie camera in the theater, nor has an art student a valid constitutional claim to fair use of a painting by photographing it in a museum. Fair use has never been held to be a guarantee of access to the copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original.

Corley, 272 F.3d at 459. Ultimately, the Elcom court concluded:

Accordingly, the DMCA does not run afoul of any restraint on Congress' power imposed by the Intellectual Property Clause. Section 1201(b) of the DMCA was within Congress' Commerce Power to enact, and because it is not irreconcilably inconsistent with any provision of the Intellectual Property Clause, Congress did not exceed its constitutional authority in enacting the law.

Id. at 1141-42.

However, 321 contends that while both Corley and Elcom state that fair use is not constitutionally

22

United States District Court

For the Northern District of California

1   based, the Supreme Court has, since those decisions, rejected that view in <u>Eldred v. Ashcroft</u>, 123 S.Ct. 769

2   (2003).  In <u>Eldred</u>, the Court stated: "[C]opyright law contains built-in First Amendment accommodations.

3   First, it distinguishes between ideas and expression and makes only the latter eligible for copyright protection

4   . . .  Second, the 'fair use' defense allows the public to use not only facts and ideas contained in a copyrighted

5   work, but also expression itself in certain circumstances." <u>Id.</u> at 788-89.  However, § 1201 does not eliminate

6   fair use, and the doctrine of fair use does not guarantee copying by the optimum method or in the identical

7   format of the original.  This Court determines that the DMCA does not exceed the scope of either the

8   Commerce or the Intellectual Property Clauses.[4]

9          Accordingly, defendants are entitled to summary judgment that 321 has  violated 17 U.S.C.

10   §§ 1201(a)(2) and (b)(1), and that 321 is not entitled to a declaratory judgment that its DVD Copy Plus and

11   DVD-X Copy are permissible under 17 U.S.C. § 1201.  Furthermore, this Court dismisses 321's Second

12   Claim for Relief as moot, since by granting summary judgment to defendants, there is no current and justiciable

13   controversy as to whether 321 is also liable for copyright infringement, the claim raised in the Second Claim

14   for Relief.

15

16          **B.        Request for injunction**

17          This Court also determines that an injunction, as provided for in 17 U.S.C. § 1203(b), is appropriate.

18   That statute provides: "In an action brought under [sections 1201 or 1202], the court may grant temporary and

19   permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation."  The Court in

20   <u>Reimerdes</u> stated "injunctive relief is appropriate if there is a reasonable  likelihood of future violations absent

21   such relief and, in cases brought by private plaintiffs, if the plaintiff lacks an adequate remedy at law."

22   <u>Reimerdes</u>, 111 F. Supp. 2d at 343.  These two elements are present in the instant case.  While the <u>Reimerdes</u>

23   court did not issue the injunction until after a full trial, that court stated "in the Court's view, the trial fully

24   vindicated its pretrial assessment that there were, in actuality, very few genuinely disputed questions of material

25

26   _____

27          [4]The Necessary and Proper Clause analysis is irrelevant, as Congress clearly stated that the DMCA
     was enacted pursuant to its authority under the Commerce Clause: "the Constitutional authority for this
     legislation is provided in Article I, section 8, clause 3, which grants Congress the power to regulate commerce

28   with foreign nations, among the several States, and with the Indian tribes." H. Rep. No. 105-551(II), at 35.

**United States District Court**
For the Northern District of California

fact.  Examination of the trial record will reveal that virtually the entire case could have been stipulated." Reimerdes, 111 F. Supp. 2d at 345.  Furthermore, there is a distinct likelihood of appeal in this case and judicial economy leads this Court to attempt to ensure that the appellate record is complete. Accordingly, this Court enjoins 321, as of seven days from the issuance of this order, from manufacturing, distributing, or otherwise trafficking in any type of DVD circumvention software.

**II.    Plaintiff Victor Mattison's motion to dismiss defendants' counterclaims**

Counterclaimant Victor Mattison moves this Court to dismiss defendants' counterclaims against him. Mr. Mattison is a part owner of a company which owns stock in 321 Studios, and therefore he "passively" owns twenty five percent of 321 Studios' stock.  Mr. Mattison asserts that § 1201(a)(2)(C) does not create personal liability for passive investors, and that liability is limited to those who sell the prohibited devices, and those who act in concert with the sellers.  He argues that the defendants/ counterclaimants have not alleged any facts which would give rise to the inference that he acted in concert with 321 Studios, and therefore the claims against him must be dismissed.

The Studios contend that they have included "numerous detailed factual averments  concerning Mattison's active participation in and involvement with" the technology at issue in this action.  Mr. Mattison's response, with which this Court concurs, is that the Studios have not alleged facts that would support the inference that he "acted in concert" with 321; rather, all of their allegations regarding him consist of purely legal conclusions.  He brings to this Court's attention both Counterclaims ¶ 66 and 68, which state respectively:

> 66. Counterclaimants are informed and believe, and on that basis aver, that Counterclaim Defendant Victor Mattison ("Mattison") is and at all times relevant hereto was a 25% owner of 321 Studios.

> 68. Each of the Counterclaim Defendants is, and at all times mentioned herein was, a party to the unlawful activities complained of herein, and has conspired with and/or acted in concert or combination with each of the other Counterclaim Defendants and/or has aided and abetted such other Counterclaim Defendant and/or has acted as an agent for each of the other Counterclaim defendants with respect to the actions and matters described in this Counterclaim, and/or has controlled each of the other Counterclaim Defendants and the infringing conduct herein alleged.

The Studios cite two other paragraphs of the counterclaim.  Paragraph 67  states:

> 67. Counterclaimants are informed and believe, and on that basis aver,

1    that Moore, Semaan, and Mattison (hereinafter sometimes referred to
     collectively as the "Individual Counterclaim Defendants") direct, control,
2    ratify, participate in, and/or are the moving forces behind the violation of
     Counterclaimants' rights complained of herein.
3
Paragraph 79 alleges that the counterclaim defendants
4
5    developed and now operate a business that is designed for and built upon
     the unlawful marketing, distribution and sale to the public of software...that
6    is specifically designed for the purpose of decrypting CSS-protected
     DVDs, including those containing copyrighted motion pictures owned by
7    Counterclaimants.  The decrypted DVDs then are used to make
     unauthorized copies of Counterclaimants copyrighted motion pictures.
8    Counterclaimants exhort purchasers, including through their advertising
     and promotional efforts to do precisely that.

9    This Court agrees that these are legal conclusions pled as if they were facts.  Defendants do not allege any facts

10   that would support the inference that Mr. Mattison is any more than a passive investor in 321 Studios.

11   Therefore, as the Court determines that  as defendants' counterclaims against Mr. Mattison fail to state a claim

12   upon which relief can be granted, this Court GRANTS plaintiff Victor Mattison's motion to dismiss.

13

14   **III.    Plaintiff's motion for denial or continuance of motion for summary judgment pursuant to Rule 56(f)**

15        Plaintiff 321 moves under Rule 56(f) to delay summary judgment until it has had the opportunity to do

16   discovery on a number of subjects that it claims are relevant to the summary judgment motion: 1) whether CSS

17   is "effective" under § 1201; 2) whether DVD Copy Code is primarily used for fair use purposes; 3) whether

18   DVD Copy Code is primarily designed or produced to circumvent, and has commercially significant purposes

19   other than to circumvent; 4) whether a ban on DVD Copy Code impermissibly burdens the First Amendment;

20   5) whether a ban on DVD Copy Code is the least restrictive means; 6) whether the DMCA is facially

21   overbroad; 7) whether the Studios' claims under the DMCA are barred by misuse; and 8) whether the Studios

22   can demonstrate any injury.  In opposition to this motion, the Studios assert both that 321 has not been diligent

23   in pursuing the discovery it seeks, as required under 56(f), and that 321 has not met its burden of showing that

24   the evidence that it seeks would defeat summary judgment.

25        This Court agrees with defendants that none of the discovery sought by plaintiffs is necessary for

26   determination of the summary judgment motion.  It deals either with concepts defined in the statute itself, or with

27   issues not relevant the summary judgment decision.  Accordingly, the Court DENIES plaintiff's motion for

28

**United States District Court**
For the Northern District of California

1   denial or continuance of this motion for summary judgment pursuant to Rule 56(f).

2

3   **IV.     Motions for leave to file *amicus* briefs in opposition to defendants' motion for partial summary judgment**

4

5   The Court GRANTS the motions by Electronic Frontier Foundation and Copyright Law Professors to file *amicus* briefs in opposition to defendants' motion for partial summary judgment.

6

7

8   **V.      Plaintiff's motion for leave to amend answer to counterclaim**

9   Plaintiff 321 Studios, and counterclaim defendants Robert Moore and Robert Semaan, seek leave to

10  file an amended answer to the counterclaim, to plead the defenses of fair use, protected speech under the First

11  Amendment, and misuse. Defendants contend that the amended defenses are not legally viable, and therefore

12  this Court should deny the plaintiff's motion.

13  The Court agrees. Fair use and misuse are defenses only to copyright infringement claims, which are

14  not at issue in this motion. Additionally, as this Court has already related in some detail in the summary

15  judgment portion of this opinion, the First Amendment is not an affirmative defense to a claim under the

16  DMCA. Therefore, as 321's proposed amended defenses are futile, this Court DENIES the motion to amend

17  counterclaims.

18

19  **VI.     Larry Davis' motion to intervene as plaintiff**

20  Larry Davis is an individual who uses 321's DVD copying software to make backup copies of his

21  DVDs for his personal use, and moves this Court to intervene as a plaintiff in this action, in accordance with

22  Rule 24(a).     The motion is GRANTED.

23

24  **VII.    Defendants' request for judicial notice**

25  Pursuant to Fed. R. Evid. 201, defendants request that this Court take Judicial Notice of: 1) Order

26  Granting Preliminary Injunction, <u>Lexmark Int'l v. Static Control Components, Inc.</u>, Civ. No. 02-571 (KSF)

27  (E.D. Ky. February 27, 2003); 2) <u>NII [National Information Infrastructure] Copyright Protection Act of 1995,</u>

28  Joint Hearing Before the Subcommittee on Courts and Intellectual Property of the House Committee on the

**United States District Court**
For the Northern District of California

Judiciary and the Senate Committee on the Judiciary, 104th Cong. 1st Sess. on H.R. 2441 and S.1284, NII Copyright Protection Act of 1995, November 15, 1995, Serial No. 38 (Part 1) and Serial No. J-104-57 (U.S. Govt. Printing Office, 1996); 3) National Information Infrastructure Copyright Protection Act of 1995, Hearing Before the Committee on the Judiciary, United States Senate, 104th Cong., 2d Sess. on S. 1284, May 7 1996, Serial No. J-104-78 (U.S. Govt. Printing Office, 1997); 4) WIPO Copyright Treaties Implementation Act; And Online Copyright Liability Limitation Act, Hearing Before the Subcommittee on Courts and Intellectual Property of the Committee on the Judiciary, House of Representatives, 105th Cong., 1st Sess. on H.R. 2281 and H.R. 2280, September 16 and 17, 1997, Serial No. 33 (U.S. Govt. Printing Office, 1997); and 5) Intellectual Property Rights: The Music and Film Industry, Hearing Before the Subcommittee on International Economic Policy and Trade of the Committee on International Relations, House of Representatives, 105th Cong., 2d Sess., May 21, 1998 (U.S. Govt. Printing Office 1998). This Court takes judicial notice of these documents, because they are the types of documents for which the accuracy cannot reasonably be questioned.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendant/counterclaimants' motion for partial summary judgment (Docket #70), GRANTS plaintiff Victor Mattison's motion to dismiss defendants' counterclaims (Docket #68), DENIES plaintiff's motion for denial or continuance of motion for summary judgment pursuant to Rule 56(f) (Docket #87), GRANTS Electronic Frontier Foundation's and Copyright Law Professors' motion for leave to file amici briefs in opposition to defendants' motion for summary judgment (Docket ## 91, 92), DENIES plaintiff's motion for leave to amend answer to counterclaim (Docket #93), GRANTS Larry Davis' motion to intervene as plaintiff (Docket #95), and GRANTS defendants' requests for judicial notice (Docket ## 100, 104). Further, this Court enjoins plaintiff 321 Studios from manufacturing, distributing, or otherwise trafficking in any type of DVD circumvention software. This injunction shall take effect seven days from the issuance of this order.


**IT IS SO ORDERED.**


Dated: February 19, 2004                    __s/Susan Illston_____
                                            SUSAN ILLSTON

1

United States District Judge

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California